## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERICAN AXLE             )
MANUFACTURING, INC.,      )
                       )
       Plaintiff,         )
                       )
    v.                  )     Civil Action No. 15-1168-LPS-CJB
                       )
NEAPCO HOLDINGS LLC and NEAPCO  )
DRIVELINES LLC,         )
                       )
       Defendants.       )

## <u>MEMORANDUM ORDER</u>

Pending before the Court in this patent infringement action is Defendants Neapco

Holdings LLC and Neapco Drivelines LLC's (collectively, "Defendants" or "Neapco") motion to

transfer venue (the "Motion") to the United States District Court for the Eastern District of

Michigan ("Eastern District of Michigan").  (D.I. 13)  For the reasons that follow, the Court

orders that Neapco's Motion be DENIED.

## I.      BACKGROUND

### A.      Procedural Background

Plaintiff American Axle & Manufacturing, Inc. ("Plaintiff" or "AAM") filed the instant

case on December 18, 2015, alleging that Neapco infringes three patents (collectively, the

"patents-in-suit" or "asserted patents"):  United States Patent Nos. 7,774,911, 8,176,613 and

8,528,180.  (D.I. 1)  On January 4, 2016, Chief Judge Leonard P. Stark referred the instant case

to this Court to resolve any and all matters with regard to scheduling, as well as any motions to

dismiss, stay and/or transfer venue.  (D.I. 6)  On February 12, 2016, Neapco answered the

Complaint, (D.I. 11), and on February 17, 2016, they filed the instant Motion, (D.I. 13).  The

Court heard oral argument on the Motion on May 25, 2016.  (D.I. 38 (hereinafter, "Tr."))

Meanwhile, following a Case Management Conference, the Court entered a Scheduling

Order in the case on April 8, 2016.  (D.I. 28)  Trial is scheduled to begin on January 16, 2018.

(*Id.* at ¶ 22)

### B.      The Parties and the Allegations

Plaintiff AAM is a Delaware corporation with its principal place of business in Detroit,

Michigan.  (D.I. 1 at ¶ 2)  It has at least 30 locations in four continents.  (D.I. 19 at 3; *see also*

Declaration of Michael Voight in Support of Plaintiff's Opposition to Defendants' Motion to

Transfer Venue (hereinafter, "Voight Decl."), *id.*, ex. 2, at ¶¶ 5-6)  AAM asserts that it is a global

leader in automotive technology development, including in the "noise, vibration and harshness"

("NVH") area, and that it manufactures, engineers, designs and validates, *inter alia*, driveline and

drivetrain systems.  (D.I. 19 at 3; Voight Decl. at ¶¶ 3, 8-9)  These systems include propshafts

and related components for light trucks, sport utility vehicles, passenger cars, crossover vehicles

and commercial vehicles.  (D.I. 19 at 3; Voight Decl. at ¶ 3)

AAM is the owner by assignment of the asserted patents, (D.I. 1 at ¶ 2), which relate to

the reduction and improvement of NVH, (D.I. 19 at 3).  The patents are related, and they are each

entitled "Method for Attenuating Driveline Vibrations."  (D.I. 1, exs. A-C; Tr. at 34)  They are

directed to methods for manufacturing a shaft assembly of a driveline system whereby propshafts

and liners are "tuned" together to reduce noise and vibration in the propshaft.  (D.I. 1, exs. A-C;

*see also* D.I. 19 at 3 n.1; Tr. at 34)

Defendants Neapco Holdings LLC and Neapco Drivelines LLC are Delaware limited

liability corporations with principal places of business in Belleville, Michigan.  (D.I. 1 at ¶¶ 3-4;

2

D.I. 11 at 2 at ¶¶ 3-4)  Neapco is a global company with locations in three continents, including North American locations in Michigan, Nebraska and Mexico.  (D.I. 19, exs. 6-7)  Neapco offers a range of products in various automotive specialities, including propshafts with tuned liners. (D.I. 1 at ¶ 12; D.I. 11 at 4 at ¶ 12)

In this action, AAM alleges that Neapco directly and indirectly infringes the asserted patents by the manufacture, use, sale and offers to sell its propshafts, including the 4 ½ and 5 inch propshafts for use in Chevy Colorado and GMC Canyon pickup trucks, which are identified by product numbers 94769073 and 94769076.  (D.I. 1 at ¶¶ 12, 14-16, 19-21, 24-26)

## II.    DISCUSSION

### A.    Legal Standard

Section 1404(a) of Title 28 provides the statutory basis for a transfer inquiry.  It provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).

The party seeking a transfer has the burden "to establish that a balancing of proper interests weigh[s] in favor of the transfer[.]" *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970) (citation omitted); *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995).[1]  That burden is a heavy one:  "unless the balance of convenience of the parties is *strongly in favor* of [the] defendant, the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25

---

[1]    In analyzing a motion to transfer venue in a patent case, it is the law of the regional circuit that applies. *Intellectual Ventures I LLC v. Checkpoint Software Techs. Ltd.*, 797 F. Supp. 2d 472, 487 n.7 (D. Del. 2011) (citing *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1331 (Fed. Cir. 2011)).

(emphasis added) (internal quotation marks and citation omitted); *see also CNH Am. LLC v. Kinzenbaw*, C.A. No. 08-945(GMS), 2009 WL 3737653, at *2 (D. Del. Nov. 9, 2009).

The United States Court of Appeals for the Third Circuit has observed that courts must analyze "all relevant factors" to determine whether "on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." *Jumara*, 55 F.3d at 879 (internal quotation marks and citation omitted). Nevertheless, it has identified a set of private interest and public interest factors that are appropriate to account for in this analysis (the "*Jumara* factors"). The private interest factors to consider include:

> [1] [The] plaintiff's forum preference as manifested in the original choice, [2] the defendant's preference, [3] whether the claim arose elsewhere, [4] the convenience of the parties as indicated by their relative physical and financial condition, [5] the convenience of the witnesses—but only to the extent that the witnesses may actually be unavailable for trial in one of the fora, and [6] the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)[.]

*Id.* (citations omitted). The public interest factors to consider include:

> [1] [T]he enforceability of the judgment, [2] practical considerations that could make the trial easy, expeditious, or inexpensive, [3] the relative administrative difficulty in the two fora resulting from court congestion, [4] the local interest in deciding local controversies at home, [5] the public policies of the fora, and [6] the familiarity of the trial judge with the applicable state law in diversity cases[.]

*Id.* at 879-80 (citations omitted).

## B.    Appropriateness of Transferee Venue

The first step in the transfer analysis is to determine whether this action could have been brought in the proposed transferee venue. *Mallinckrodt Inc. v. E-Z-Em Inc.*, 670 F. Supp. 2d 349, 356 (D. Del. 2009). In the parties' briefing, there was no dispute that AAM could have

4

properly brought this infringement action in the Eastern District of Michigan, where Defendants (indeed, all parties) have their principal places of business. *See* 28 U.S.C. § 1400(b); *see also* (D.I. 14 at 6-7; D.I. 19; Tr. at 5).

### C.   Application of the *Jumara* factors

The Court will proceed to analyze the *Jumara* factors and their impact on whether transfer should be granted.

#### 1.   Private Interest Factors

##### a.   Plaintiff's choice of forum

When analyzing the first *Jumara* private interest factor—the "plaintiff's forum preference as manifested in the original choice"—the court should not consider simply the fact of that choice, but the reasons behind the choice. *Pragmatus AV, LLC v. Yahoo! Inc.*, Civil Action No. 11-902-LPS-CJB, 2012 WL 4889438, at *4 & n.5 (D. Del. Oct. 15, 2012) ("*Pragmatus I*") (citing cases), *adopted by* 2013 WL 174499 (D. Del. Jan. 16, 2013); *see also Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 200 (D. Del. 1998). "If those reasons are rational and legitimate, then they will weigh against transfer, as they are likely to support a determination that the instant case is properly venued in this jurisdiction." *Pragmatus I*, 2012 WL 4889438, at *4 (internal quotation marks, brackets and citations omitted) (citing cases); *see also Intellectual Ventures I LLC v. Altera Corp.*, 842 F. Supp. 2d 744, 754 (D. Del. 2012) ("*Altera*").

AAM asserts that it chose to sue Neapco in this District because, *inter alia*, Delaware is the state of incorporation of all three parties to this action, including both Defendants. (D.I. 19 at 6)  It is well-settled that a party's state of incorporation is a traditional and legitimate venue in which to bring suit. *See Smith Int'l, Inc. v. Baker Hughes Inc.*, Civil Action No. 16-56-SLR-

SRF, 2016 WL 4251575, at *3 (D. Del. Aug. 10, 2016) ("Delaware is a legitimate forum, as both [plaintiff and defendant] are incorporated in Delaware."); *see also* (Tr. at 24).

Indeed, by incorporating in Delaware, AAM has previously associated itself with the forum and availed itself of the benefits and consequences of the State's laws.[2] *See, e.g.*, *Wireless Media Innovations, LLC v. LeapFrog Enters., Inc.*, C.A. No. 13-1545-SLR-SRF, 2014 WL 1203035, at *2 (D. Del. Mar. 20, 2014); *McRo, Inc. v. Activision Blizzard, Inc.*, Civil Action No. 12-1508-LPS-CJB, 2013 WL 6571618, at *4 (D. Del. Dec. 13, 2013) (citing cases), *adopted by* 2013 WL 6869866 (D. Del. Dec. 30, 2013); *Altera*, 842 F. Supp. 2d at 754. It makes sense, then, that it would wish to utilize courts located within that State (including a Court such as this one, well familiar with patent cases) when pursuing a litigation matter like this. Additionally, a plaintiff who chooses to sue a party in its state of incorporation (as AAM did as to both Defendants here) is provided with some certainty that there will be personal jurisdiction over the defendant.[3] *See, e.g.*, *Helicos Biosciences Corp. v. Illumina, Inc.*, 858 F. Supp. 2d 367, 371-73

---

[2]    The record indicates that AAM has been incorporated in Delaware for nearly 20 years, dating back to 1998. (Voight Decl. at ¶ 4)

[3]    AAM raised this justification in its briefing, (D.I. 19 at 6-7), to which Neapco responded that this "purported justification rings hollow here" where "there was no possible uncertainty . . . that the . . . Eastern District of Michigan would have personal jurisdiction over Neapco to decide this dispute[,]" (D.I. 22 at 3-4; *see also* Tr. at 72-73). But in the Court's view, Neapco's point is a non-sequitur, as the fact that there would undisputedly be personal jurisdiction over the Defendants *in the proposed transferee district* is not particularly relevant to the analysis here. There is no requirement that a plaintiff must sue a defendant solely in the forum in which the defendant has its principal place of business, or in the forum that is geographically closest to a defendant's (or even a plaintiff's own) place of business. In a case like this, the entire point is that the plaintiff has selected some other venue in which to sue, and this *Jumara* factor seeks to get at whether there are legitimate reasons to support *that choice*. And when a plaintiff identifies a forum that it believes to be attractive, it will surely want to make certain that *its preferred forum* is one in which there will be a strong case for personal jurisdiction over the defendant. That is what AAM has done here in choosing to file suit in

(D. Del. 2012) (noting that "a defendant's state of incorporation had always been a predictable,

legitimate venue for bringing suit" in that it is a venue where a defendant can be sued); *Altera*,

842 F. Supp. 2d at 754.

Although AAM is not physically located in this District,[4] in view of its clear, legitimate

reasons for choosing this forum, this factor weighs against transfer.[5]

### b. Defendants' forum preference

As for the second private interest factor—Defendants' forum preference—Neapco

prefers to litigate in the Eastern District of Michigan. In analyzing this factor, our Court has

similarly "tended to examine whether the defendant can articulate rational, legitimate reasons to

support that preference." *Pragmatus I*, 2012 WL 4889438, at *6 (citation omitted).

---

Delaware—it prefers this forum for various reasons, but one legitimate factor that helped it settle
on this forum (as opposed to other possibilities) was that this case would not likely be later
dismissed for lack of personal jurisdiction.

[4]     To the extent Defendants assert that AAM's choice of venue should automatically
be accorded "less deference" when it chooses to sue in a place that is not its "home forum" (or
"home turf"), (D.I. 14 at 7), for reasons the Court has previously explained, it does not find this
argument well taken. After reviewing this Court's prior case law discussing the "home turf"
issue, the Court has concluded that whether Delaware is a plaintiff's "home turf," *in and of itself,*
was never meant to have independent significance in the overall *Jumara* balance of convenience
analysis, nor in the analysis of this first *Jumara* private interest factor. *See Papst Licensing
GmbH & Co. KG v. Lattice Semiconductor Corp.*, 126 F. Supp. 3d 430, 438 n.3 (D. Del. 2015);
*McRo*, 2013 WL 6571618, at *3 n.8. The Third Circuit has never utilized this "home turf" rule
in analyzing the application of the *Jumara* factors, and for the reasons set out in the cases cited in
this footnote, the Court will not do so here.

[5]     At oral argument, AAM's counsel noted that another key factor that prompted it
to file suit in this District (as compared to the proposed transferee district) was that "the time to
trial here in Delaware is much quicker than it is in the Eastern District of Michigan." (Tr. at 46)
Though the Court does not mean to cast doubt on the sincerity of this proffered reason, it will not
further address it here. That is in part because the reason was not mentioned in AAM's brief as a
factor prompting the choice of venue, (D.I. 19 at 6-8), and in part because AAM has already
identified a number of legitimate reasons that result in this factor being squarely in its favor.

7

Defendants explain that they seek to transfer this action to the Eastern District of Michigan because that is where they (as well as AAM) are located, as are many likely witnesses and relevant documents. (D.I. 14 at 1, 7-9; D.I. 22 at 5) This Court has often held that the physical proximity of Defendants' place of business (and relatedly, to witnesses and evidence potentially at issue in the case) to the proposed transferee district is a clear and legitimate basis for seeking transfer. *See, e.g., Elm 3DS Innovations LLC v. SK Hynix Inc.*, Civil Action No. 14-1432-LPS-CJB, 2015 WL 4967139, at *6 (D. Del. Aug. 20, 2015) (citing cases).

Thus, the second private interest *Jumara* factor weighs in favor of transfer.[6]

### c.   Whether the claim arose elsewhere

The third private interest *Jumara* factor asks "whether the claim arose elsewhere." As a matter of law, a claim regarding patent infringement arises "wherever someone has committed acts of infringement, to wit, 'makes, uses, offers to sell, or sells any patented invention' without authority." *McRo*, 2013 WL 6571618, at *5 (internal quotation marks and citations omitted). Nevertheless, as to this factor, this Court often focuses on the location of the production, design and manufacture of the allegedly infringing products. *Id.* (citing cases); *Altera*, 842 F. Supp. 2d at 755.

In this case, it is not disputed that—with the exception of some manufacturing relating to

---

[6]     AAM argues that "[u]nder Third Circuit law, Defendants' preference for an alternative forum is not given the same weight as Plaintiff's preference." (D.I. 19 at 8 (internal quotation marks and citations omitted)) The Court, however, has previously explained why, in its view, Third Circuit law does not stand for the proposition that the weight afforded to *this particular second private interest Jumara factor* should automatically be less than the weight afforded to the first private interest *Jumara* factor. *See, e.g., Elm 3DS*, 2015 WL 4967139, at *6 n.13 (citing cases); *Pragmatus I*, 2012 WL 4889438, at *6-7 (citing cases). And so the Court rejects the premise proffered here by AAM.

a component part (the liner)—the design, manufacture and assembly of the accused products (the propshafts) took place at Defendants' facilities in the Eastern District of Michigan. (D.I. 14 at 8 (citing Declaration of Robert Wehner in Support of Defendants' Motion to Transfer Venue (hereinafter, "Wehner Decl."), *id.*, ex. B at ¶¶ 8, 10); Tr. at 18-19, 48) All of the design and development work with respect to the accused products carried out by Neapco occurred at Neapco's facilities in Michigan, and the propshafts are assembled by Neapco there as well. (Wehner Decl. at ¶¶ 8, 10) As for the component liner, it was jointly designed by Neapco and third-party manufacturer Caraustar Industries ("Caraustar"). (*Id.* at ¶ 10; D.I. 14 at 4) Caraustar is a Georgia corporation with headquarters in Georgia; it has other facilities across the United States, including in Saginaw, Michigan. (Declaration of Mark Moreno in Support of Plaintiff's Opposition to Defendants' Motion to Transfer Venue (hereinafter, "Moreno Decl."), D.I. 19, ex. 1 at ¶ 8; Wehner Decl. at ¶ 10; Tr. at 12) Caraustar manufactures the liners in Saginaw. (Wehner Decl. at ¶ 10) Some of the liners are assembled by Neapco at its facilities in Michigan, and some are assembled in Lafayette, Indiana by Alcoa, Inc. (*Id.*; D.I. 19 at 9; Tr. at 18)

In addition to pointing out that some assembly of component parts of the accused products occurs outside of Michigan, AAM also notes that "sales" of the accused products are made nationwide. (Tr. at 51; *see also* D.I. 19 at 9) AAM then argued that because the "alleged infringement" occurs nationwide, this factor should weigh, at most, only "slight[ly]" in favor of transfer. (D.I. 19 at 9 & n.8)

However, as previously noted, the three patents-in-suit exclusively include method claims. (D.I. 1, exs. A-C) Those method claims all relate to methods of manufacturing a shaft assembly for a driveline system. (*Id.*) Despite AAM's argument above, it is not clear to the

9

Court how nationwide *sales* of an accused propshaft would amount to infringement of these claims. Instead, it appears that the key infringement allegations in the Complaint are that in *making and/or assembling* the accused propshafts (including the component liner), Defendants are performing the patented methods. (*See, e.g., id.* at ¶¶ 14-16, 19-21 (noting that infringement is alleged to occur when "Defendants . . . perform, and/or direct or control others to perform on their behalf, a method for manufacturing a shaft assembly of a driveline system"); *cf.* Moreno Decl. at ¶¶ 4-5) And here, where the record indicates that nearly all of the acts relating to the making and/or assembling of these products occurs in the Eastern District of Michigan (and that those that do not occur in neighboring Indiana), this factor must favor transfer.

> **d.** **Convenience of the parties as indicated by their relative physical and financial condition**

In assessing the next private interest factor—the convenience of the parties as indicated by their relative physical and financial condition—this Court has traditionally examined a number of issues. These have frequently included: "(1) the parties' physical location; (2) the associated logistical and operational costs to the parties' employees in traveling to Delaware (as opposed to the proposed transferee district) for litigation purposes; and (3) the relative ability of each party to bear these costs in light of its size and financial wherewithal." *Audatex N. Am., Inc. v. Mitchell Int'l, Inc.*, C.A. No. 12-cv-139 (GMS), 2013 WL 3293611, at *4 (D. Del. June 28, 2013) (internal quotation marks and citations omitted); *see also McKee v. PetSmart, Inc.*, C.A. No. 12-1117-SLR-MPT, 2013 WL 1163770, at *4 (D. Del. Mar. 20, 2013) (citations omitted).

Neapco argues that because all three parties' businesses are headquartered in Michigan, the convenience of litigating the case in that forum "greatly outweighs" the convenience of

litigating in Delaware (where no parties, evidence, or relevant witnesses are located). (D.I. 14 at

8-9; D.I. 22 at 5-6)[7] For its part, AAM acknowledges that it "can't be denied" that "there is

certainly some convenience associated with litigating in Michigan." (Tr. at 48) And that is

certainly correct—solely viewed from a geographical and cost perspective, it would be somewhat

more convenient for Defendants (and, presumably, for AAM too) to travel to an Eastern District

of Michigan courthouse than it would be to travel to Delaware.[8]

However, there are a number of factors suggesting that litigating in Delaware is not

decidedly inconvenient for Defendants either (and that the *difference* in convenience in litigating

---

[7]        In further support of its argument that transfer to the Eastern District of Michigan
would be most convenient for all parties, Neapco pointed to AAM's papers filed in another case
in conjunction with a motion to transfer that action from the Eastern District of Texas to the
Eastern District of Michigan. (D.I. 14 at 1-2, 10, 13 (citing AAM's Motion to Transfer Venue to
the Eastern District of Michigan, *Welding Innovation Solutions, LLC v. Am. Axle & Mfg., Inc.*,
No. 2:13-cv-051-JRG-RSP, D.I. 12 (E.D. Tex. May 8, 2013)); *see also id.*, ex. A)  In that case,
filed against AAM by a holding company headquartered in Texas, AAM had argued that the
Eastern District of Michigan would be a more convenient venue for the dispute because AAM
was headquartered in Michigan and all of the witnesses and documents would be located there.
(D.I. 14, ex. A)  The Court agrees with AAM that the arguments that it made in the Texas
litigation do not meaningfully impact the transfer calculus here, as those arguments were based
on a much different record and in view of different applicable regional circuit law. (D.I. 19 at
12-13 (citing *Tessera, Inc. v. Sony Elecs. Inc.*, C.A. No. 10-838 (RMB) (KW), 2012 WL
1107706, at *4 n.6 (D. Del. Mar. 30, 2012) (finding that a prior submission filed by the plaintiff
in a different case in favor of transfer to the proposed transferee district "establishe[d] little"
where it was "submitted to support the notion that, in *that* particular case, litigation in the
[proposed transferee district] was more convenient than in the plaintiff's choice of forum")
(emphasis in original)).

[8]        AAM itself pushes back on the notion that the Eastern District of Michigan is
more convenient for it than is Delaware. (D.I. 19 at 12)  Despite the geographical proximity of
the Eastern District of Michigan's courthouses to its principal place of business, AAM notes that
"'the best indicator of a plaintiff's own convenience is the plaintiff's own choice of forum.'" (*Id.*
(quoting *Tessera, Inc.*, 2012 WL 1107706, at *4)).  Be that as it may, AAM does not argue that
litigation in the proposed transferee forum would be decidedly *inconvenient* for it, either.  Nor
could it, credibly.

in one forum verses the other would not be great). The Court addresses each below.

First, Neapco's decision to incorporate in Delaware suggests that Delaware is not, in fact, an inconvenient litigation forum for it to defend a lawsuit. Indeed, it is an "uphill climb" for Delaware entities like Defendants to argue otherwise. *Altera*, 842 F. Supp. 2d at 756.

Second, Neapco is global corporation, one that (1) employs over 2,200 people worldwide, (2) operates various facilities in the United States and around the world, and (3) generated an estimated sales volume of over $230 million dollars in 2015. (D.I. 19, exs. 6, 8) Therefore, as AAM asserts, Neapco cannot credibly argue that it could not easily bear any increased logistical or financial costs associated with litigating in Delaware (as opposed to the Eastern District of Michigan). (*Id.* at 10-11 (citing *id.*, exs. 6, 8)) And indeed, at oral argument, Neapco did not attempt to do so. (Tr. at 20-21)

Third, any additional inconvenience to Neapco's employee witnesses in traveling to Delaware for pre-trial or trial proceedings is diminished by the fact that the amount of such travel is not likely to be large—particularly if the case (as most do) resolves prior to trial. *Papst Licensing GmbH & Co. KG v. Lattice Semiconductor Corp.*, 126 F. Supp. 3d 430, 440 (D. Del. 2015) (citing *Human Genome Scis., Inc. v. Genentech, Inc.*, C.A. 11-082-LPS, 2011 WL 2911797, at *7 (D. Del. July 18, 2011)).

In the end, with all parties having their principal places of businesses in the Eastern District of Michigan, the Court recognizes that this factor should tip in Neapco's favor to at least some degree. But in light of the above mitigating factors, which indicate that the magnitude of any increased inconvenience to Defendants in litigating in Delaware is not large, the Court finds that this factor only slightly favors transfer. *See, e.g., Audatex*, 2013 WL 3293611, at *4-5

12

(concluding the same, where both parties operated out of the proposed transferee district, both had sufficient resources to litigate in either forum and both were incorporated in Delaware); *Altera*, 842 F. Supp. 2d at 755 (concluding the same, where all parties were located in or near the proposed transferee district, but the record did not indicate that litigating in Delaware would impose an "undue financial burden" on defendants, who had extensive operations and significant annual sales); *see also Elm 3DS*, 2015 WL 4967139, at \*7-8.

### e.   Convenience of the witnesses to the extent that they may actually be unavailable for trial in one of the fora

The "convenience of the witnesses" is the next factor, "but only to the extent that the witnesses may actually be unavailable for trial in one of the fora[.]" *Jumara*, 55 F.3d at 879. Of particular concern here are fact witnesses who may not appear of their own volition in the venue-at-issue and who could not be compelled to appear by subpoena pursuant to Federal Rule of Civil Procedure 45. *Altera*, 842 F. Supp. 2d at 757; *Affymetrix*, 28 F. Supp. 2d at 203-05.

In *Jumara*, the Third Circuit made clear that in order for this factor to meaningfully favor it, a party must come forward with some amount of specificity. This is evident from the wording of the factor itself, which notes that a witnesses' convenience should be considered "only to the extent that the witnesses may *actually be* unavailable for trial" in one of the fora. *Jumara*, 55 F.3d at 879 (emphasis added). It is also evident from the legal authority that the *Jumara* Court cited to in setting out this factor, which explains:

> The rule is that these applications [for transfer] are not determined solely upon the outcome of a contest between the parties as to which of them can present a longer list of possible witnesses located in the respective districts in which each party would like to try the case. The party seeking the transfer must clearly specify the key witnesses to be called and must make a general statement of

13

> what their testimony will cover. The emphasis must be on this
> showing rather than numbers. One key witness may outweigh a
> great number of less important witnesses. If a party has merely
> made a general allegation that witnesses will be necessary, without
> identifying them and indicating what their testimony will be the
> application for transfer will be denied.

15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure:*

*Jurisdiction and Related Matters* § 3851, at 425-28 (2d ed. 1986) (cited in *Jumara*, 55 F.3d at

879). In light of this, in order for a party to convincingly argue that this factor squarely favors

transfer, the party must provide specificity as to: (1) the particular witness to whom the party is

referring; (2) what that person's testimony might have to do with a trial in this case; and (3) what

reason there is to think that the person will "actually" be unavailable for trial (as opposed to the

proffer of a guess or speculation on that front).[9]

Neapco argues that this factor weighs "heavily" in favor of transfer because there are a

number of third-party witnesses with relevant testimony who are based in the Eastern District of

Michigan. (D.I. 14 at 11-12; D.I. 22 at 7)[10] More specifically, Neapco states that likely

---

[9]    Even to the extent that a party makes such a showing, it is worth keeping in mind
that the practical impact of this factor is limited, in light of the fact that so few civil cases today
proceed to trial (and at trial, so few fact witnesses testify live). *Cellectis S.A. v. Precision
Biosciences, Inc.*, 858 F. Supp. 2d 376, 382 n.6 (D. Del. 2012); *Altera*, 842 F. Supp. 2d at 757-
58.

[10]    In arguing that this factor supports transfer, Neapco also points to "at least five
likely witnesses who work in Defendants' headquarters in Michigan" and to AAM's "current
and/or former employees who will likely testify about the accused products" who are located in
Michigan. (D.I. 14 at 11-12) But as even the preceding paragraph of Neapco's own brief points
out, "'[p]arty witnesses or witnesses who are [currently] employed by a party carry no weight in
the 'balance of convenience' analysis [as to this factor] since each party is able, indeed, obligated
to procure the attendance of its own employees for trial.'" (*Id.* at 11 (quoting *Affymetrix*, 28 F.
Supp. 2d at 203)); *see also McRo*, 2013 WL 6571618, at *8 n.11; (D.I. 19 at 13).

Michigan-based third-party witnesses include three named inventors of the patents-in-suit,[11] two employees of Caraustar (Neapco's third-party manufacturer of liners) and two employees of General Motors ("GM"), Neapco's third-party customer (one of whom, David Schankin, is also a named inventor). (D.I. 14 at 4 & n.1, 11 (citing Wehner Decl. at ¶¶ 9, 12, 13); *see also* D.I. 22 at 7) Neapco also sketches out the likely relevant categories of testimony for these witnesses. (*See* Tr. at 15 (explaining that the inventors could provide relevant testimony with respect to conception and reduction to practice and priority dates of the inventions); D.I. 14 at 11 n.3 (explaining that the Caraustar third-party witnesses would have relevant information regarding the history and production of tuned liners and regarding prior art, including Caraustar's early patents, and the GM witnesses would have relevant knowledge regarding product performance testing and development of the vehicles that incorporate the accused driveline products); *see also* Wehner Decl. at ¶¶ 12, 13)

Neapco has not, however, provided any evidence demonstrating (or even suggesting) that any of these six potential third-party witnesses would "actually be" unavailable for trial in Delaware. All that Neapco offers in that regard is the bare statement that "Neapco has no reason to believe that any of [these] witnesses . . . would voluntarily travel more than 500 miles to Delaware for trial." (D.I. 22 at 7 n.8)[12]

---

[11]     The fourth inventor, Zhaohui Sun, who is the first-named inventor on the asserted patents, remains employed by AAM. (D.I. 14 at 4 n.1; Wehner Decl. at ¶ 9)

[12]     The Court notes that many defendants have been able to make a sufficient showing that a third-party witness will "actually be" unavailable for trial, when that was in fact the case, by providing "affidavits, declarations, or some other type of reliable record evidence indicating that third party witnesses would actually be unwilling or unlikely to testify at trial in Delaware[.]" *Papst Licensing GmbH*, 126 F. Supp. 3d at 442 n.8 (citing cases).

A closer look at the relationships between at least some of these third parties and Defendants suggests that there is in fact reason to believe that they *would* cooperate by providing live testimony at trial (if that were necessary). With regard to the employee witnesses from Caraustar, for example, that entity worked together with Defendants to co-design the liners at issue, and it manufactures them for Defendants. (Wehner Decl. at ¶¶ 10-11) It seems a fair inference at this stage that if Caraustar's partner Neapco asked for its help at a trial, Caraustar would comply. (Tr. at 14) As for GM, it too is a customer of Neapco (though it is also apparently a customer of AAM). (*Id.* at 8-9, 42-43)[13]

For its part, AAM argues that the Eastern District of Michigan is not the sole location of relevant third-party witnesses, and that many likely third-party trial witnesses are in fact located far closer to Delaware than Michigan. (D.I. 19 at 15) To that end, AAM explains that it manufactures propshafts using the technology claimed by the asserted patents, and claims that employees of third-party companies that manufacture its propshafts may be important trial witnesses. (Moreno Decl. at ¶¶ 4-8) For instance, AAM notes that it purchases the vast majority of the liners used in its products from Kaiser Aluminum ("Kaiser"), which also manufactures propshaft tubes for AAM, assembles the liners and then installs the liners into the propshaft tubes, all at Kaiser's Virginia facility. (*Id.* at ¶ 6) AAM asserts that various Kaiser employees located in Virginia (and one in Ohio) will likely have relevant knowledge regarding the patented products. (*Id.* at ¶ 7; D.I. 19 at 15) It also points to certain Caraustar employees who work in

---

[13]     The other two named inventors, Austin Gerding and Dumitru Patrascu, work for GKN Drivelines and Meritor, respectively, (Wehner Decl. at ¶ 9)—companies that Neapco's counsel described at oral argument as "more in the nature of competitors to Neapco[,]" (Tr. at 10). These inventors (like Mr. Schankin) are former AAM employees. (D.I. 19 at 14)

North Carolina and Georgia as having similar evidence, as it explains that it "has worked with Caraustar Converted Products Group relating to the supply of liners" for AAM's patented products. (Moreno Decl. at ¶ 8; *see also* D.I. 19 at 15)

While the relevance of AAM's own products to the instant lawsuit was not made clear in its briefing, Neapco's counsel explained during oral argument that "this is probably a case about prior use. . . . [and that] the testimony from [] third parties who have knowledge of prior use is likely to be crucial to [Neapco's] invalidity defense." (Tr. at 11-13) And according to AAM, third-party employees from entities like Kaiser will have "historical knowledge as to how these types of products are made now under the patented technology as to how they developed over time." (*Id.* at 39)

Nevertheless, as to these asserted third-party trial witnesses, AAM too has not put forward any evidence suggesting that they would be unavailable to testify at a trial in the Eastern District of Michigan (or that they would be willing to come to Delaware for a trial were it held here). (D.I. 22 at 7 n.8)

In the end, Defendants have established, to the Court's satisfaction, that a greater number of third parties with possibly relevant trial testimony are located in the Eastern District of Michigan (as compared to witnesses located closer to Delaware than Michigan). But Defendants have done little to establish that these persons "may actually be unavailable" for trial here. In light of this, the Court finds that this factor favors transfer, but only slightly so. *See, e.g.*, *Papst Licensing GmbH*, 126 F. Supp. 3d at 443 ("Absent some concrete evidentiary showing that third party witnesses [] will be unlikely to testify, the Court cannot give [d]efendants' argument as to their potential unavailability great weight.") (citing cases); *Schubert v. OSRAM AG*, Civil Action

17

No. 12-923-GMS, 2013 WL 587890, at \*6 (D. Del. Feb. 14, 2013) (finding this factor to weigh "slightly in favor of transfer" and granting it "only minimal weight" where the defendant failed to, *inter alia*, "present evidence of unavailability that might allow the court to do more than draw a reasonable inference that prospective witnesses may refuse to testify in this district"); *cf. Smith Int'l, Inc.*, 2016 WL 4251575, at \*5 (finding this factor to be "neutral" where the defendant argued that certain former employees of plaintiff and non-employee inventors may be unavailable in Delaware because they could not be compelled to appear at trial there but did not "identif[y] any witnesses who *cannot* appear in Delaware for trial") (emphasis added).

### f.  Location of books and records

Next the Court considers "the location of books and records (similarly limited to the extent that the files could not be produced in the alternative forum)." *Jumara*, 55 F.3d at 879. "In patent infringement cases, the bulk of the relevant evidence usually comes from the accused infringer. Consequently, the place where the defendant's documents are kept weighs in favor of transfer to that location." *In re Genentech, Inc.*, 566 F.3d 1338, 1345 (Fed. Cir. 2009) (internal quotation marks and citation omitted). Yet this factor is commonly given little weight, as technological advances have "shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is recorded . . . and have lowered the cost of moving that information from one place to another." *Cypress Semiconductor Corp. v. Integrated Circuit Sys., Inc.*, No. 01-199-SLR, 2001 WL 1617186, at \*3 (D. Del. Nov. 28, 2001) (internal quotation marks and citation omitted); *see also Cellectis S.A. v. Precision Biosciences, Inc.*, 858 F. Supp. 2d 376, 382 (D. Del. 2012).

Here, there is no real dispute that the majority of the relevant books and records will be

18

located in or near the Eastern District of Michigan, and that none will be found in Delaware. (D.I. 14 at 12; Wehner Decl. at ¶ 7; D.I. 19 at 16) Nor is it seriously disputed that such materials can be just as easily produced for trial in Delaware as they can in the Eastern District of Michigan.

In its reply brief, Neapco did assert that it intended to "use several real drivetrains as exhibits to educate the jury about the accused products and prior art[,]" and that shipping these large and heavy car parts to Delaware would be much more inconvenient and expensive than transporting them a few miles from its headquarters to an Eastern District of Michigan courthouse. (D.I. 22 at 8) AAM has alleviated any concern with respect to this issue, however, by agreeing to "bear any costs [of Defendants] associate[d] with transporting the driveshafts to Delaware for trial." (Tr. at 80)

With the majority of the books and records located in the transferee district, but with no real difficulty evident in having them produced in this District for trial, this factor weighs only slightly in favor of transfer and should be given little weight. *See, e.g.*, *Joao Control & Monitoring Sys., LLC v. Ford Motor Co.*, C.A. No. 12-cv-1479 (GMS), 2013 WL 4496644, at *6 (D. Del. Aug. 21, 2013); *Altera*, 842 F. Supp. 2d at 759.

### 2.    **Public Interest Factors**

The Court below addresses the four public interest factors that were referenced by at least one of the parties in their briefing.

### a.    **Practical considerations that could make the trial easy, expeditious, or inexpensive**

The Court next considers the "practical considerations that could make the trial easy,

expeditious, or inexpensive." *Jumara*, 55 F.3d at 879. Neapco's only argument as to why this factor has resonance was to repeat its earlier assertions that "as discussed above [in its briefing], most, if not all, of the records, witnesses, and non-party witnesses are located in Michigan—and there appear to be no records, witnesses, or third-party witnesses in Delaware." (D.I. 14 at 13) Because these issues were raised by Neapco, in just the same way, with regard to prior *Jumara* factors, the Court will not "double-count" their impact here. *Elm 3DS*, 2015 WL 4967139, at *11. Therefore, this factor is neutral.

**b.    Administrative difficulties in getting the case to trial**

The next factor is the "relative administrative difficulty in the two fora resulting from court congestion[.]" *Jumara*, 55 F.3d at 879. In its opening brief, Neapco asserted that this factor favors transfer because "the Federal Court Management Statistics from June 2015 reveal that the median time from the filing of a civil complaint to trial in Delaware is 34.1 months, compared to 28.0 months in Michigan." (D.I. 14 at 14 (citing *id.*, ex. E)) By the time of the filing of its reply brief, however, Neapco asserted that this factor was "neutral" or "only slightly favors Delaware." (D.I. 22 at 9; *see also* Tr. at 26-27, 74)

Indeed, the evidence does suggest that this factor should weigh against transfer. It is notable, for instance, that every iteration of the Federal Court Management Statistics that has been published after the version cited in Neapco's brief demonstrates that the median time from the filing of a civil complaint to trial was many months *faster* in Delaware than it was in the Eastern District of Michigan. *See* United States Courts, Federal Court Management Statistics, U.S. District Courts Profiles for Delaware and Eastern District of Michigan (Sept. 2015, Dec. 2015, and June 2016), *available at* http://www.uscourts.gov/statistics-reports/analysis-

reports/federal-court-management-statistics (last visited Sept. 21, 2016).

Moreover, AAM's cited patent case-specific statistics indicate the same thing. (D.I. 19 at

18 (citing *Ithaca Ventures k.s. v. Nintendo of Am. Inc.*, C.A. No. 13-824-GMS, 2014 WL

4829027 at \*6 (D. Del. Sept. 25, 2014) (noting generally that patent-specific statistics are "more

convincing" than general statistics))). AAM points here to patent-specific statistics from Lex

Machina (albeit statistics covering a fairly lengthy range of time—regarding patent cases filed

between January 1, 2000 and February 15, 2016). (*Id.* (citing *id.*, ex. 9)) These statistics show

that the median time to trial for patent cases in Delaware is 568 days faster (that is, over a year

and a half faster) than in the Eastern District of Michigan. (*Id.*, ex. 9 (noting that median time to

trial in Delaware is 746 days, compared to 1,314 days in the Eastern District of Michigan))[14]

It is clear to the Court that these statistics from the above-cited sources do *not* show that

this District is significantly congested as compared to the proposed transferee district. If

anything, they suggest the opposite conclusion. For this reason, the Court concludes that this

factor weighs slightly against transfer, as even Neapco appeared to concede in its reply brief,

(D.I. 22 at 9).

### c. Local interests in deciding local controversies at home

In patent litigation, the local interest factor is typically neutral, as patent issues tend to

---

[14] With that said, Neapco's counsel noted some good reasons why these Lex Machina figures may need to be taken with a grain of salt: (1) that Delaware has significantly more Hatch-Waxman cases (a type of patent case different from the instant matter, which typically proceeds to trial faster than do other types of patent cases) than does the Eastern District of Michigan, (Tr. at 26); and (2) that Defendants' co-counsel had been personally involved in three patent infringement cases in the Eastern District of Michigan during the relevant time frame captured by AAM's statistics, that were nevertheless not listed in the Lex Machina report, (*id.* at 75).

raise controversies that are more properly viewed as national, not local, in scope. *Graphics Props. Holdings Inc. v. Asus Comput. Int'l, Inc.*, 964 F. Supp. 2d 320, 330 (D. Del. 2013). Nevertheless, "[w]hile the sale of an accused product offered nationwide does not give rise to a substantial interest in any single venue . . . if there are significant connections between a particular venue and the events that gave rise to a suit, this factor should be weighed in that venue's favor." *In re Hoffmann–La Roche Inc.*, 587 F.3d 1333, 1338 (Fed. Cir. 2009) (citations omitted); *see also Graphics Props.*, 964 F. Supp. 2d at 330-31.

It is true, as Neapco argues, that the Eastern District of Michigan has a "real interest in deciding local controversies between three Michigan-based companies." (D.I. 22 at 10) Yet without any indication in the record as to how the *specific facts of this case* indicate that these patent infringement allegations raise particularly acute concerns about the reputations or economic future of individuals in the Eastern District of Michigan, the Court is not prepared to find that this factor should weigh more strongly in favor of Neapco. *See Papst Licensing GmbH*, 126 F. Supp. 3d at 445-46 & n.12 (citing *Jumara* and cases from this Court demonstrating that this factor favors transfer most strongly when the movant makes a specific showing as to how the case will actually impact the lives of the citizens of the transferee district). Indeed, as AAM points out, (D.I. 19 at 19), the Court must also consider that "Delaware has a strong interest in adjudicating disputes among its corporate citizens[,]" particularly in a case involving litigation "solely among Delaware corporations[,]" *Altera*, 842 F. Supp. 2d at 760; *see also Elm 3DS*, 2015 WL 4967139, at *12.

With both sides able to claim some (relatively non-specific) local interest, the Court finds this factor to be neutral. *See, e.g., Elm 3DS*, 2015 WL 4967139, at *12; *Altera*, 842 F. Supp. 2d

22

at 760.

### d.    Public policy of the fora

The final factor at play relates to the public policy of the respective fora. This Court has previously held in the transfer context that the "public policy of Delaware encourages the use by Delaware corporations of Delaware as a forum for resolution of business disputes." *Graphics Props.*, 964 F. Supp. 2d at 331 (internal quotation marks and citation omitted). Delaware promotes itself as a place that entities should choose as their corporate home, and in doing so, touts itself as a forum well-positioned to help resolve such disputes. *See, e.g.*, *Wacoh Co. v. Kionix Inc.*, 845 F. Supp. 2d 597, 604 & n.9 (D. Del. 2012).

AAM asserts that because all of the parties are Delaware corporations, this factor weighs against transfer. (D.I. 19 at 19-20) In its reply brief, Neapco did not respond to AAM's argument, or otherwise address this factor in any way. (D.I. 22) Under these circumstances, the Court finds this factor to weigh against transfer. *See, e.g.*, *Kraft Foods Grp. Brands LLC v. TC Heartland, LLC*, Civil Action No. 14-28-LPS, 2015 WL 4778828, at *15 (D. Del. Aug. 13, 2015), *adopted by* 2015 WL 5613160 (D. Del. Sept. 24, 2015).

### 3.    Conclusion Regarding Impact of *Jumara* Factors

In sum, AAM's choice of forum and the "public policy of the fora" factors weigh squarely against transfer, while the "administrative difficulties" factor weighs slightly against transfer. Neapco's forum preference and whether the claim arose elsewhere weigh squarely in favor of transfer, while the convenience of the parties, the convenience of the witnesses and the location of books and records all weigh slightly in favor of transfer. The remainder of the *Jumara* factors are neutral.

23

In the end, Neapco's Motion presents a close case. There are a number of connections between the Eastern District of Michigan and the facts, witnesses and documents that are likely to be important to this matter. And this has resulted in a greater number of *Jumara* factors tipping Neapco's way. As a result, the Court is prepared to say that the balance of convenience tilts in favor of Neapco.

But after a careful review, the Court is not prepared to conclude that this balance "is *strongly* in favor of" Neapco. *Shutte*, 431 F.2d at 25 (emphasis added). This is so for a few reasons.

First, even a quick read of the Complaint renders it understandable why this case was brought in Delaware. If AAM did not wish to file the suit in the district where its adversaries have their principal places of business, it would almost certainly choose the district where all of the parties otherwise have a "home"—the district in which all parties are incorporated. Second, this is clearly a case between large global corporations that can shoulder any added cost of litigating this action in Delaware with ease. Third, although a greater amount of *Jumara* factors have favored Defendants, a close look at a number of those factors suggests that they may not actually have a meaningful impact in this case at all. Fourth, this is not a case where the transferee Court has experience with the specific patents and products at issue here—a factor that, if it is in play, often helps tip the balance in favor of transfer. And finally, this is not a case where everything and everyone that will be relevant to the action is located in Michigan. Many witnesses will be located in Michigan, to be sure, but some third-party witnesses will likely hail from other parts of the United States, including areas closer to Delaware than the proposed transferee district. The force of these considerations are enough, in light of the entire record, to

24

warrant the denial of Neapco's Motion. *See, e.g., Smith Int'l*, 2016 WL 4251575, at *1, *6 (denying transfer where both parties were Delaware corporations with headquarters located in the proposed transferee forum, because even though "it may be more expensive and inconvenient for [defendant] to litigate in Delaware instead of" in the proposed transferee forum, the court saw no reason to "elevate the convenience of one party over the other, [where] discovery is a local event[,] trial is a limited event[,]" and Delaware would serve as a neutral forum) (internal quotation marks and citation omitted); *cf. In re Altera Corp.*, 494 F. App'x 52, 53 (Fed. Cir. 2012) ("[T]he relevant inquiry is broad enough to include the Delaware court's interest in resolving disputes involving its corporate citizens, as opposed to selection of venue for less legitimate reasons."); (Tr. at 23-24).

## III.   CONCLUSION

The Court therefore DENIES Neapco's Motion to Transfer.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **September 30, 2016** for review by the Court, along with a motion for redaction that includes a clear, factually-detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

25

Dated: September 23, 2016

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

26