IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | C. A. No.:  15-1168-LPS-CJB |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

## NEAPCO'S OPENING CLAIM CONSTRUCTION BRIEF

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Melanie K. Sharp (No. 2501)
Robert M. Vrana (No. 5666)
1000 North King Street
Wilmington, DE 19801
(302) 571-6681
msharp@ycst.com

HONIGMAN MILLER SCHWARTZ
AND COHN LLP
J. Michael Huget
Brian J. Arnold
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated:  November 22, 2016

## TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

I.      OVERVIEW OF THE PATENTS-IN-SUIT .......................................................1

        A.      Background of the Alleged Invention and the Prior Art .............................1

        B.      The Alleged Invention of the Patents-In-Suit. ..............................................6

        C.      The Asserted Claims of the Patents-In-Suit. ..................................................9

II.     LEGAL STANDARDS .................................................................................10

III.    LEVEL OF SKILL IN THE ART ...................................................................11

IV.     TERMS FOR CONSTRUCTION....................................................................11

        A.      Tuning Terms.................................................................................................11

        B.      Vibration Modes ............................................................................................15

        C.      Indefinite Terms............................................................................................16

V.      CONCLUSION.............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*,
381 F.3d 1111 (Fed. Cir. 2004)...........................................................................10

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014).....................................................15, 17, 18, 20

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
134 S. Ct. 2120 (2014)...................................................................17, 18, 20

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...........................................................................10

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004)...........................................................................10

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015).....................................................17, 18, 20

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996)...........................................................................11

*Wang Labs., Inc. v. Am. Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999)...........................................................................15

### OTHER AUTHORITIES

Webster's New Universal Unabridged Dictionary, 2nd Ed. (2003) .......................................13, 14

Defendants Neapco Holdings LLC and Neapco Drivelines LLC (collectively, "Neapco") submit this Opening Claim Construction Brief to address the appropriate construction of disputed claim terms in U.S. Patent Nos. 7,774,911 (Ex. A, "'911 patent"); 8,176,613 (Ex. B, "'613 patent"); and 8,528,180 (Ex. C, "'180 patent") (collectively, "patents-in-suit").

## I.   OVERVIEW OF THE PATENTS-IN-SUIT

The '911 patent was filed February 27, 2006, issued August 17, 2010, and is entitled "Method for Attenuating Driveline Vibrations." The '613 and '180 patents are continuations of the '911 patent and, as such, they share a common specification.[1]   The patents-in-suit are generally directed towards methods for attenuating at least two different types of vibration in a vehicle driveline having a propshaft (aka driveshaft) that transmits torque between a first and second driveline component. (*See* '911 patent, at Abstract.)

### A.   Background of the Alleged Invention and the Prior Art

Driveline components affect the noise level heard by consumers in their vehicle. As described in the specification, "vehicle manufacturers and their suppliers are under constant pressure to reduce noise to meet the increasingly stringent expectations of consumers." (Ex. A; '911 patent, at col. 1:14-16.)  "Driveline components and their integration into a vehicle typically play a significant role in sound quality of a vehicle as they can provide the forcing function that excites specific driveline, suspension and body resonances to produce noise." (*Id*. at col. 1:17-20.)  "Common driveline excitation sources can include driveline imbalance and/or run-out, fluctuations in engine torque, engine idle shake, and motion variation in the meshing gear teeth of the hypoid gear set (i.e., the pinion gear and the ring gear of a differential assembly)." (*Id*. at col. 1:23-27.)

---

[1] All citations herein to the specification for the patents-in-suit will be to the '911 patent.

"Propeller (prop) shafts are typically employed to transmit rotary power in a driveline." (*Id*. at col. 1:38-39.)  "Modern automotive propshafts are commonly formed of relatively thin-walled steel or aluminum tubing and as such, can be receptive to various driveline excitation sources."  (*Id*. at col. 1:39-41.)  "Motion variation is the slight variation in angular displacement between the input and output gears of a gear set."  (*Id*. at col. 1:28-29.)  "This variation is typically very small and can be on the order of tens of millionths of an inch (measured tangentially at the pitch line of the gear) for a modern automotive differential assembly."  (*Id*. at col. 1:29-33.)  Moreover, as the specification explains, motion variation changes with the environment:  "Motion variation is typically not constant (e.g., it will typically vary as a function of load, temperature, gearset build position, and break-in wear) and moreover, it cannot be reduced beyond certain levels without severe economic penalties."  (*Id*. at 1:33-37.)

As described by the specification, the "various excitation sources can typically cause the propshaft to vibrate in a bending (lateral) mode, a torsion mode and a shell mode."  (*Id*. at 1:42-44.)  The specification defines each of these three types of vibration modes.  "Bending mode vibration is a phenomenon wherein energy is transmitted longitudinally along the shaft and causes the shaft to bend at one or more locations."  (*Id*. at 1:44-47.)  Fig. 5 describes a propshaft 20' vibrating in a second bending mode:



2

(*See also id.* col. 6:13-29.)  The bending mode natural frequency "is a function of not only the propshaft assembly 20', but also of the 'boundary conditions' (i.e., the manner in which the propshaft assembly 20' is coupled to the driveline 16')."  (*Id.* at col. 6:20-25.)

"Torsion mode vibration is a phenomenon wherein energy is transmitted tangentially through the shaft and causes the shaft to twist."  (*Id.* at 1:47-49.)  Fig. 7 describes a propshaft 20' vibrating in a torsion mode:



(*See also id.* col. 6:33-40.)  The natural torsion frequency "is a function of not only the propshaft assembly 20', but also of the first and second driveline components (e.g., the transmission 18 and the rear axle 22) to which the propshaft assembly is coupled."  (*Id.* at col. 6:35-40.)

"Shell mode vibration is a phenomenon wherein a standing wave is transmitted circumferentially about the shaft and causes the cross-section of the shaft to deflect or bend along one or more axes."  (*Id.* at 1:49-52.)  Fig. 6 depicts a propshaft 20' vibrating in a shell mode:



(*See also id.* col. 6:30-32.)

As acknowledged by the inventors, several techniques have been employed in the prior art to attenuate these vibrations in propshafts.  (*Id.* at 1:53-54.)  However, according to the inventors, the prior art only provided for attenuating one type of vibration at a time.

For example, the patents-in-suit describe U.S. Patent No. 2,001,166 to Swennes, filed in 1933, as using plugs or weights to attenuate vibrations in a propshaft that act as a "resistive means to attenuate bending mode vibrations."  (*Id.* at 1:55-59.)  As defined in the specification, "resistive attenuation of vibration refers to a vibration attenuation means that deforms as vibration energy is transmitted through it (i.e., the vibration attenuation means) so that the vibration attenuation means absorbs (and thereby attenuates) the vibration energy."  (*Id.* at col. 1:60-65.)  The '166 patent describes frictionally attaching the plugs or weights at "experimentally-derived locations" to attenuate the bending mode vibrations.  (*Id.*)  But, because "the plugs tend to be relatively short, they typically would not effectively attenuate shell mode vibration or torsion mode vibration."  (*Id.* at 2:2-4.)  The specification, however, does not describe what it means "effectively attenuate" the vibrations.  (*Id.*)

Similarly, the specification describes another prior art solution to dampen bending mode vibration using a "damper that is inserted into a hollow shaft" as disclosed in U.S. Patent No. 3,075,406 to Butler Jr., filed in 1961. (*Id*. at 2:5-6.) The '406 patent "damper includes a pair of resilient members, which frictionally engage the interior surface of the hollow shaft, and a metal bar that is suspended within the interior of the hollow shaft by the resilient members." (*Id*. at 2:6-10.) The '406 patent explains how at the "resonant frequency of the propeller shaft, 'the motion of the mass is out of phase with the radial motion of the tubular propeller shaft.'" (*Id*. at 2:10-13.) As such, the specification describes the '406 patent as a "reactive damper for attenuating bending mode vibration." (*Id*. at 2:13-15.) As defined in the specification, "reactive attenuation of vibration refers to a mechanism that can oscillate in opposition to the vibration energy to thereby 'cancel out' a portion of the vibration energy." (*Id*. at col. 2:15-18.) But, the specification describes the damper of the '406 patent as "ineffective at attenuating torsion ode vibration and shell mode vibration due to its relatively short length and its contact with a relatively small portion of the interior surface of the propshaft." (*Id*. at col. 2:18-22.) Again, the specification does not describe what it means to be "ineffective." (*Id*.)

Finally, the specification describes existing prior art liners for a propshaft that attenuate shell mode vibrations:

> U.S. Pat. No. 2,751,765 to Rowland et al., U.S. Pat. No. 4,014,184 to Stark and U.S. Pat. Nos. 4,909,361 and 5,976,021 to Stark et al. disclose hollow liners for a propshaft. The '765 and '184 patents appear to disclose hollow multi-ply cardboard liners that are press-fit to the propshaft; the cardboard liners are relatively long and appear to extend substantially coextensively with the hollow shaft. The '361 and '021 patents appear to disclose liners having a hollow cardboard core and a helical retaining strip that extends a relatively short distance (e.g., 0.03 inch) from the outside diameter of the core. The retaining strip has high frictional properties to frictionally engage the propshaft. **Accordingly, the liners of the '765, '184, '361 and '021 patents appear to disclose a resistive means for attenuating shell mode vibration**. These liners, however, do not appear to be suitable for attenuating bending mode vibration or torsion mode vibration. (*Id*. at col. 2:23-38.)

Without explanation, the inventors state that the prior art liners "do not appear to be suitable for attenuating bending mode vibration or torsion mode vibration." (*Id.* at col. 2:36-38.)

Because the prior art dampers and liners allegedly do not attenuate both shell mode vibrations and bending or torsion mode vibrations, according the inventors, "there remains a need in the art for an improved method for damping various types of vibrations in a hollow shaft." ('911 patent, at col. 2:39-41.)

### B.      The Alleged Invention of the Patents-In-Suit.

According to the specification, the alleged invention "facilitates the damping of shell mode vibration as well as the damping of bending mode vibration and/or torsion mode vibration." ('911 patent, at col. 2:41-43.)

Figure 4 depicts a top, partially cut away view of a typical propshaft assembly:



As the propshaft is explained, "[t]he shaft structure **200** can be generally cylindrical, having a hollow central cavity **220** and a longitudinal axis **222**. The shaft structure **200** can be formed of any suitable material." (*Id.* at col. 6:1-2.)  The "propshaft assembly **20** of the particular example provided includes two liners **204** that are identically configured." (*Id.* at col. 6:41-43.)  However, "other quantities of liners **204** may be utilized and that the liners **204** need not be identically configured (i.e., each insert **204** can have different damping characteristics and

a first one of the liners **204** can be different from a second one of the liners **204**).” (*Id.* at col. 6:44-48.)

As for the design of the liners, the specification incorporates by reference the design of the liners disclosed in the prior art '361 patent issued to the Arrow Paper Company in 1990. (*Id.* at col. 6:49-53):



(Ex. D, '361 patent, Fig. 1.)  As the patents-in-suit incorporate the design of the prior art '361 patent, the liner design of one embodiment in the patents-in-suit is similar to the '361 patent:



('911 patent, Fig. 8.)

According to the specification, “the liner **204** can include a structural portion **300** and one or more resilient members **302** that are coupled to the structural portion **300**. The liners **204** are sized such that the structural portion **300** is smaller than the inner diameter of the shaft member **200** but the resilient member(s) **302** is/are sized to frictionally engage the inner diameter of the shaft member **200**.” (*Id.* at col. 6:53-59.)

The liners are then tuned to the driveline: "the mass and the stiffness of the liner(s) **204** are tuned to the driveline **16** such that the liner(s) **204** acts or act as (a) a tuned resistive absorber for attenuating shell mode vibrations; and (b) as one or more of (i) a tuned reactive absorber for attenuating bending mode vibrations, and (ii) a tuned reactive absorber for attenuating torsion mode vibrations." (*Id.* at col. 7:32-39.) As to shell mode vibrations, "[p]referably, the liner(s) **204** is/are tuned to a natural frequency corresponding to at least one of a first shell mode, a second shell mode and a third shell mode." (*Id.* at col. 7:44-46.) As to bending mode vibrations, "[w]here the liner(s) **204** is/are employed to attenuate bending mode vibrations, they are preferably tuned to a natural frequency corresponding to at least one of a first bending mode, a second bending mode and a third bending mode of the propshaft assembly **20** as installed to the driveline **16**." (*Id.* at col. 7:46-50.) As to torsion mode vibrations, "[w]here the liner(s) **204** is/are employed to attenuate torsion mode vibrations, they are preferably tuned to a natural frequency of the driveline **16** in a torsion mode, such as to a frequency that is less than or equal to about 600 Hz." (*Id.* at col. 7:50-55.)

As the specification explains, it may not be possible to exactly tune the liner to the two relevant frequencies (*i.e.*, one for each of the vibration modes being targeted), therefore the liner is tuned within a tolerance of a target frequency:

> It will be appreciated that in certain situations it **may not be possible to exactly tune the liner 204 to the two or more relevant frequencies** associated with a given propshaft assembly **20**, as when a particular liner **204** is used across a family of propshaft assemblies. As such, it will be understood that **a liner 204 will be considered to be tuned to a relevant frequency if it is effective in attenuating vibration at the relevant frequency**. For example, the liner **204** can be considered to be tuned to a relevant frequency if a frequency at which it achieves maximum attenuation is within ±20% of that relevant frequency. Preferably, the liner **204** is considered to be tuned to the relevant frequency if the frequency at which it achieves maximum attenuation is within ±15% of the relevant frequency. More preferably, the liner **204** is considered to be tuned to the relevant frequency if the frequency at which it achieves maximum attenuation is within ±10% of the relevant frequency. Still more preferably, the liner **204** is considered to be

tuned to the relevant frequency if the frequency at which it achieves maximum attenuation is within ±5% of the relevant frequency.

As another example, the liner **204** can be considered to be tuned to a relevant shell mode frequency if it damps shell mode vibrations by an amount that is greater than or equal to about 2%.

(*Id*. at col. 8:24-47 (emphasis added).)

The specification describes several example methods to tune the liner:

It will also be appreciated from this disclosure that various characteristics of the liner **204** can be controlled to tune its damping properties in the shell mode and in one or both of the bending mode and the torsion mode. In the particular example provided, the following variables were controlled: mass, length and outer diameter of the liner **204**, diameter and wall thickness of the structural portion **300**, material of which the structural portion **300** was fabricated, the quantity of the resilient members **302**, the material of which the resilient members **302** was fabricated, the helix angle **330** and pitch **332** with which the resilient members **302** are fixed to the structural portion **300**, the configuration of the lip member(s) **322** of the resilient member **302**, and the location of the liners **204** within the shaft member **200.**

(*Id*. at col. 7:55-8:2.)

### C.    The Asserted Claims of the Patents-In-Suit.

The asserted claims of the patents-in-suit relate to a method for manufacturing a shaft assembly of a driveline system.  (*See* '911 patent, claim 1.)  Plaintiff asserts five independent claims and 28 total claims between the patents-in-suit.[2]  Claim 1 of the '911 patent is illustrative:

A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component, the method comprising:

providing a hollow shaft member;

tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member; and

positioning the at least one liner within the shaft member such that the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%, and

---

[2] The Asserted Claims are claims 1-6, 12, 13, 19-24, 26, 27, 31, and 34-36 of the '911 patent; claims 17-21, 23, 24, and 28 of the '613 patent, and claims 13 and 14 of the '180 patent.

the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.

## II.    LEGAL STANDARDS

The basic tenets of claim construction are well established.  "The words of a claim 'are generally given their ordinary and customary meaning.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . ."  *Id.* at 1313.  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.*; *see Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (holding that claim construction should take into account "the meaning of the claims as a whole . . . .").  "'Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim.'"  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).  "'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'"  *Id.*

When considering the plain and ordinary meaning of a claim term, the Federal Circuit explained the importance of the intrinsic evidence: "We cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."  *Phillips*, 415 F.3d at 1313 (citation and quotation omitted).  The specification "is always highly relevant to the claim construction

analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

## III.   LEVEL OF SKILL IN THE ART

A person of skill in the art for the patents-in-suit would hold at least a bachelor's level degree in mechanical engineering, or a related scientific field, with two or more years of related post-graduate experience (academic or industrial) in the area of design and development of driveshafts, or similar automotive components, and in attenuation of vibration in such components, and in instrumentation and material characteristics. (*See* Declaration of Nejat Olgac In Support Defendants' Opening Claim Construction Brief, Dr. Eng. Sci. ("Olgac Decl.") ¶ 13.)[3]

## IV.   TERMS FOR CONSTRUCTION

The parties have identified twenty terms that fall into three buckets for construction by the Court.  The disputes between the parties are narrow.  Defendants have grouped related claim terms together for the Court's ease of review.

### A.   Tuning Terms

| Claim Term | Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| (1) tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member<br><br>('911 patent at claim 1) | adjusting at least one liner to target frequencies to dampen at least two types of vibration transmitted through the shaft member | Plain and ordinary meaning: Controlling characteristics of at least one liner, such that the at least one liner is effective in reducing vibration of a shaft member at a relevant frequency, to reduce at least two types of vibration transmitted through the shaft member |
| (2) providing a liner | providing a liner that is | Plain and ordinary meaning: |

_____

[3] Defendants filed the Declaration of Nejat Olgac, Dr. Eng. Sci. in Support of Defendents' Opening Claim Construction Brief contemporaneously herewith.

| tuned to attenuate a plurality of types of vibration transmitted through the shaft member<br><br>('613 patent at claim 17) | adjusted to target frequencies to dampen a plurality of types of vibration transmitted through the shaft member | Providing a liner having characteristics controlled, such that the liner is effective in reducing vibration of a shaft member at a relevant frequency, to reduce a plurality of types of vibration transmitted through the shaft member |
|---|---|---|
| (3) tuning a mass and stiffness of at least one liner<br><br>('911 patent at claims 22, 36) | adjusting a mass and stiffness of at least one liner to target a frequency | Plain and ordinary meaning: Controlling a mass and stiffness of at least one liner such that the at least one liner is effective in reducing vibration of a shaft member at a relevant frequency |
| (4) liner having a mass and a stiffness that are tuned to the driveline system<br><br>('180 patent at claim 13) | liner having a mass and a stiffness that are adjusted to target a frequency of the driveline system | Plain and ordinary meaning: liner having a mass and stiffness controlled such that the liner is effective in reducing vibration of a shaft member at a relevant frequency of the driveline system |
| (5) tuned resistive absorber for attenuating shell mode vibrations<br><br>('911 patent at claims 22, 36)<br>('180 patent at claim 13) | absorber that is adjusted to target a frequency and that deforms as vibration energy is transmitted through it to absorb the vibration energy to dampen shell mode vibrations | Plain and ordinary meaning: a liner whose characteristics are controlled such that the liner is effective in reducing shell mode vibration of a shaft member at a relevant frequency by deforming as vibration energy from the shaft member is transmitted through the liner so that the liner absorbs the vibration energy |
| (6) tuned reactive absorber for attenuating bending mode vibrations<br><br>('911 patent at claims 22) | absorber that is adjusted to target a frequency and that oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations | Plain and ordinary meaning: a liner whose characteristics are controlled such that the liner is effective in reducing bending mode vibration of a shaft member at a relevant frequency by oscillating in opposition to vibration energy of the shaft member to cancel out a portion of the vibration energy |
| (7) tuned reactive absorber for attenuating | absorber that is adjusted to target a frequency and | Plain and ordinary meaning: a liner whose characteristics are |

| at least one of bending mode vibrations and torsion mode vibrations  ('911 patent at claims 36) ('180 patent at claim 13) | that oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations | controlled such that the liner is effective in reducing at least one of a bending mode vibration and torsion mode vibration of a shaft member at a relevant frequency by oscillating in opposition to vibration energy of the shaft member to cancel out a portion of the vibration energy |
|---|---|---|

The disputes between the parties regarding the above seven terms are primarily the same. In essence, the disputes are whether "tuning" and "tuned" in the context of the asserted claims refers to "adjusting . . . to target a frequency" (Defendants) or "controlling characteristics . . . such that the liner is effective in reducing vibration of a shaft member at a relevant frequency" (Plaintiff).  Defendants' proposed construction for each disputed term is supported by the plain meaning of the terms and the intrinsic evidence and should therefore be adopted.

Defendants' proposed constructions are consistent with the plain meaning of the terms "tuning" and "tuned."  The patents-in-suit do not define or ascribe any special meaning to the terms "tuning" and "tuned" that deviates from the ordinary usage of those words.  The relevant definitions in Webster's Dictionary defines the word as "—v.t. 13. to adjust (a musical instrument) to a correct or given standard of pitch (often fol. by up). 14. to adapt (the voice, song, etc.) to a particular tone . . . 15. to bring (someone or something) into harmony.  16. to adjust (a motor, mechanism, or the like) for proper functioning. 17. *Radio and Television*. a. to adjust (a circuit, frequency, or the like) so as to bring it into resonance with another circuit, a given frequency, or the like."  (Ex. E, Webster's New Universal Unabridged Dictionary, 2nd Ed. (2003), at 2035.)  Thus, the plain meaning of the terms "tuning" and "tuned" requires adjusting, adapting, or bringing into harmony to a tone, a proper functioning, or resonance with a given

frequency.  (*Id*.)[4]  Defendants' proposed constructions incorporate those concepts, which are consistent with the use of the terms in the specification.

The specification describes how the liners are "tuned to a natural frequency":

> Preferably, the liner(s) **204** is/are **tuned to a natural frequency** corresponding to at least one of a first shell mode, a second shell mode and a third shell mode.  Where the liner(s) **204** is/are employed to attenuate bending mode vibrations, they are **preferably tuned to a natural frequency** corresponding to at least one of a first bending mode, a second bending mode and a third bending mode of the propshaft assembly **20** as installed to the driveline **16**.   Where the liner(s) **204** is/are employed to attenuate torsion mode vibrations, they are **preferably tuned to a natural frequency of the driveline 16 in a torsion mode, such as to a frequency that is less than or equal to about 600 Hz**.

('911 patent, at col. 7:44-55 (emphasis added).)   As the specification explains, it may not be possible to "exactly tune" the liner to the target frequency:  "It will be appreciated that in certain situations it **may not be possible to exactly tune the liner 204 to the two or more relevant frequencies** associated with a given propshaft assembly **20**, as when a particular liner **204** is used across a family of propshaft assemblies."  (*Id*. at col. 8:24-29 (emphasis added).)  "As such, it will be understood that **a liner 204 will be considered to be tuned to a relevant frequency if it is effective in attenuating vibration at the relevant frequency**."   (*Id*. at col. 8:29-31 (emphasis added).)  The specification explains that to be "effective" the liner is tuned to a target frequency within a specific tolerance:

> For example, **the liner 204 can be considered to be tuned to a relevant frequency if a frequency at which it achieves maximum attenuation is within ±20% of that relevant frequency**. Preferably, the liner 204 is considered to be tuned to the relevant frequency if the frequency at which it achieves maximum attenuation is **within ±15% of the relevant frequency**. More preferably, the liner 204 is considered to be tuned to the relevant frequency if the frequency at which it achieves maximum attenuation is **within ±10% of the relevant frequency**. Still more preferably, the liner 204 is considered to be tuned to the relevant frequency if the frequency at which it achieves maximum attenuation is **within ±5% of the relevant frequency**.  As another example, the liner 204 can be considered to be tuned to a relevant shell mode frequency if it damps shell mode vibrations **by an amount that is greater than or equal to about 2%.**

---

[4] While stating that its proposal is "plain and ordinary meaning"—Plaintiff's proposed construction is not consistent with the ordinary usage of the terms "tuning" and "tuned."

(*Id*. at col. 8:24-47 (emphasis added).)  What it means to be "effective," therefore, varies based on preference—from ±5% of the relevant frequency in one example, to ±20% of the relevant frequency in another.  (*Id*. at col. 8:31-47.)  But, in each case, there is a target frequency, *e.g.*, the relevant frequency.  (*Id*.)  Defendants' proposed constructions are therefore consistent with the plain meaning of the terms and the intrinsic record and should be adopted.

Plaintiff's proposed constructions, on the other hand, that the liner is "effective" in reducing vibrations only introduces vagaries into the scope of the claims and would be indefinite. (*See* Olgac Decl., at ¶ 25.)  "A term of degree fails to provide sufficient notice of its scope if it depends 'on the unpredictable vagaries of any one person's opinion.'"  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (internal citations omitted.)  Claims should not be "construed to have a meaning or scope that would lead to their invalidity for failure to satisfy the requirements of patentability."  *Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999).  Plaintiff's proposed constructions should be rejected.

### B.    Vibration Modes

| Claim Term | Defendants' Proposed Construction | Plaintiff's Proposed Construction |
|---|---|---|
| shell mode vibration<br><br>(All patent claims) | phenomenon wherein a standing wave is transmitted circumferentially about the shaft and causes the cross-section of the shaft to deflect or bend along one or more axes | Plain and ordinary meaning: vibration that causes the cross-section of a shaft to distort |
| "bending mode vibration"<br><br>(All patent claims) | phenomenon wherein energy is transmitted longitudinally along the shaft and causes the shaft to bend at one or more locations | Plain and ordinary meaning: vibration that causes the shaft to bend |
| "torsion mode vibration" | phenomenon wherein energy is transmitted tangentially through the shaft and causes the shaft to twist | Plain and ordinary meaning: vibration that causes a shaft to twist |

| (All patent claims) | | |
|---|---|---|

Defendants' proposed constructions come straight from the patent specification. The specification defines each of these three types of vibration modes. "Bending mode vibration is a phenomenon wherein energy is transmitted longitudinally along the shaft and causes the shaft to bend at one or more locations." ('911 patent, at 1:44-47.) "Torsion mode vibration is a phenomenon wherein energy is transmitted tangentially through the shaft and causes the shaft to twist." (*Id*. at 1:47-49.) "Shell mode vibration is a phenomenon wherein a standing wave is transmitted circumferentially about the shaft and causes the cross-section of the shaft to deflect or bend along one or more axes." (*Id*. at 1:49-52.) Because Defendants' proposed constructions are consistent with the definitions in the specification, they should be adopted.

    **C.**    **Indefinite Terms**

| **Claim Term** |
|---|
| *Shell Mode Terms:* positioning the at least one liner within the shaft member such that the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%<br><br>('911 patent at claim 1)<br><br>positioning the liner within the shaft member to damp shell mode vibrations by an amount that is greater than or equal to about 2%<br><br>('613 patent at claim 17) |
| *Bending / Torsion Mode Claims:* configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% [15%, 10%, 5%] of a bending mode natural frequency of the shaft assembly as installed in the driveline system<br><br>('911 patent at claims 1, 2 (15%), 3 (10%), and 4 (5%))<br><br>tuned to within about ±20% [15%, 10%, 5%] of a natural frequency of the driveline system in at least one of a bending mode and a torsion mode<br><br>('613 patent at claim 17, 18 (15%), 19 (10%), and 20 (5%)) |

Each of the above claim phrases suffer from the same problem—they "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2123 (2014). It is not enough to simply identify "some standard for measuring the scope of the phrase." *Interval Licensing*, 766 F.3d at 1370–71 (Fed. Cir. 2014) (emphasis in original). Rather, the claims must identify objective boundaries to a skilled artisan. *Id*. at 1371.[5] As explained by the Federal Circuit, "a patent must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them." *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015) (citing *Nautilus*, 766 F.3d at 2129.)

Here, the above limitations provide for a step in the method of manufacturing whereby calculations are made as to whether the liner dampens, or attenuates, vibrations by a certain amount. In the claims, the shell mode terms require positioning the liner within the shaft member to damp shell mode vibrations by an amount that is greater than or equal to about 2%. Similarly, the bending / torsion mode terms require positioning the liner within the shaft member to damp bending or torsion mode vibrations by an amount that is greater than or equal to about 20%, or 15%, or 10%, or 5% of a natural frequency of the driveline system in a bending or torsion mode. But, as explained in the Declaration of Dr. Nejat Olgac, one skilled in the art could not determine with reasonable certainty whether any system practiced the steps in these claims because one would obtain a different damping result depending on the testing and calculation methods used. (Olgac Decl., at ¶¶ 16-26.)

The issue presented here is similar to that in *Teva*. In that case, the Federal Circuit held that the claims were indefinite where the "molecular weight or average molecular weight can be

---

[5] While indefiniteness is an issue of law, the inquiry often involves underlying factual questions, which "may turn on evaluations of expert testimony." *Nautilus*, 134 S. Ct. at 2130.

ascertained by any of three possible measures" that would "yield a different result for a given polymer sample."  789 F.3d at 1341-44.  Because neither the claims nor specification provided any guidance which measure to use, they "failed to inform with reasonable certainty those skilled in the art about the scope of the invention."  *Id. See also Nautilus*, 134 S. Ct. at 2123, *Interval Licensing*, 766 F.3d at 1371.  The same is true here.  One engineer could prepare a set of test conditions and measurement protocols and determine that a system meets the claimed damping amounts.  (Olgac Decl., at ¶ 18.)   Another engineer could prepare a different set of test conditions and measurement protocols and determine that the same driveshaft / liner sample does not meet the claimed damping amounts.  (*Id.*)  Neither the claims nor specification provides any guidance to determine whether a system practices these claim elements.  (*Id.*)  Whether a system meets these claim elements is left to the subjective choice of the engineer in preparing test conditions and methodologies.  (*Id.*)

For example, as explained by Dr. Olgac, it is unclear from which baseline vibration state the damping amount (2%, 20%, etc.) is measured.  (*Id.* at ¶ 19.)  For example, the baseline vibration could be generated using the drive shaft without any liner.  (*Id.*)  Alternately, the baseline could be generated using a drive shaft with a different liner, such as a non-"tuned" liner described in the prior art.  (*Id.*)  Furthermore, there is no indication for the 2% shell mode damping claim elements whether the measurement is taken in the shaft member installed on a vehicle or it is assembled on a test stand.  (*Id.* at ¶ 22.)  Depending on the baseline state, testing results as to damping amounts would vary.  (*Id.* at ¶¶ 19, 22.)

Another uncertainty relates to whether the damping amount is measured using static or dynamic testing of the response of the liner.  (*Id.* at ¶ 20.)  For example, a static test could include using an impact hammer on the liner as mounted in a shaft and measuring the decay times and frequencies of the corresponding oscillations and their amplitudes.  (*Id.*)  Alternatively,

one could continually excite the liner and/or the shaft with a "dynamic" energy source, such as a dynamic shaker or exciter, and vary the frequency of input energy to determine which input frequency produces the maximum radial vibration response from the liner.  (*Id.*)   With that approach, as Dr. Olgac explains, an engineer would need to know how many shakers to use, where to place the shakers, the amount of energy used, and the type of signal to use (*e.g.*, pink noise, white noise, periodic random, swept sine, chirp, wideband, bandlimited, etc.). These options would result in different damping amounts.  (*Id.*)   The specification provides no guidance.[6]

Moreover, there are many conditions under which you could perform the testing for each of the above limitations that could change the test results as to whether something is within 2%, 20%, 15%, etc., as claimed.  (*Id.* at ¶ 24.)   Because the liner is attached to the driveshaft by friction ('911 patent, at column 6, lines 55-59), the liner (and its damping qualities) would act very differently for different bonding conditions. (*Id.*)   For example, the test results would vary dramatically depending on the ambient temperature (which can change between -40 and 150 °C.) (*Id.*)   The claimed liners would be subject to variations in fit and performance due to many conditions besides temperature, such as rotational accelerations, speed, applied and varying torque and loading conditions (*e.g.*, 2WD, 4WD, engine size), and humidity.  (*Id.*)   Also, the boundary conditions, which have to do with the way in which the system components are bonded to each other, also affect the damping calculations.  (*Id.* at ¶ 22.)   Boundary conditions vary for testing or targeting frequencies and measuring modes (shell, bending, torsional) and/or damping. (*Id.*)   Each such measurement scheme would result in different findings due to the varying boundary conditions and governing dynamics, which determine the "natural frequencies" and the

---

[6] Moreover, it is unclear under which excitation frequency range the test is performed.  (*Id.* at ¶ 21.)

various vibration "modes." (*Id.*) Depending on the test conditions, one would expect very different test results. (*Id.*) The specification does not provide details on which particular conditions to use for the testing. (*Id.* ¶¶ 22, 24.)

Finally, nothing in the claims or the specification provides any guidance on how to calculate the damping amount for any of these claim terms. (*Id.* at ¶ 23.) According to Dr. Olgac, the damping calculations will vary depending on which protocol is adopted. (*Id.*) As he explains, there are many valid ways to calculate damping, such as using "damping ratio," "loss factor," "damping factor," "quality factor," or "percent critical damping." (*Id.*) Moreover, there is no indication as to whether the calculation is a one-time measurement, a mean measurement, a minimum or maximum measurement, or an average of a certain number of calculations. (*Id.*) Each are valid ways to perform the calculation. (*Id.*) But neither the claims nor the specification provides any guidance as to how to perform this calculation. (*Id.*)

As such, one skilled in the art would be unable to ascertain with reasonable certainty the scope of the invention as to these claim limitations. (*Id.* at ¶ 26.) The claims are therefore invalid as indefinite. *See Nautilus*, 134 S. Ct. at 2123; *Teva*, 789 F.3d at 1344; *Interval Licensing*, 766 F.3d at 1371.

## V. CONCLUSION

For the foregoing reasons, Defendants' proposed constructions for the disputed terms should be adopted by the Court. The remainder of the terms are indefinite; therefore any asserted claim including those terms is also invalid as indefinite.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
Robert M. Vrana (No. 5666)
1000 North King Street
Wilmington, DE  19801
(302) 571-6681
msharp@ycst.com

HONIGMAN MILLER SCHWARTZ AND COHN LLP
J. Michael Huget
Brian J. Arnold
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dated:  November 22, 2016

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

01:21254861.1