IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| | ) | C. A. No.:  15-1168-GBW |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |

**JOINT PROPOSED FINAL PRETRIAL ORDER**

**EXHIBIT 11: NEAPCO'S MOTIONS *IN LIMINE* NOS. 1-3**

# NEAPCO'S
# MOTION *IN LIMINE* NO. 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | C. A. No.:  15-1168-GBW |
| Plaintiff, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | **HIGHLY CONFIDENTIAL** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANTS' MOTION *IN LIMINE* NO. 1
TO PRECLUDE ARGUMENT OR EVIDENCE REGARDING
<u>UNDISCLOSED DOCTRINE OF EQUIVALENTS THEORIES</u>**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

*Attorneys for Defendants Neapco Holdings LLC and Neapco Drivelines LLC*

Dated:  November 20, 2023

The Court should exclude any argument, evidence, or testimony regarding doctrine of equivalents ("DOE") issues that Plaintiff American Axle & Manufacturing, Inc. ("Plaintiff") and its expert did not timely disclose.

**First**, Plaintiff should be limited to DOE evidence and argument timely identified in its Supplemental Final Infringement Contentions ("Final Disclosures").  There, Plaintiff disclosed a DOE theory only for claim limitation 1[c] ("tuning at least one liner to attenuate at least two types of vibration. . . ."):

> . . . Neapco contends that the Accused Products do not satisfy the following limitations of the '911 patent:  [Limitation 1[c]:] "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member," [Limitation 22[c]:] "tuning a mass and stiffness of at least one liner," [Limitation 22[d]:] "tuned resistive absorber for attenuating bending mode vibrations," and [Limitation 22[f]:] "tuned reactive absorber for attenuating bending mode vibrations."   AAM maintains that the Accused Products literally satisfy each of these limitations.   Nonetheless, to the extent the Court finds the liners of the Accused Products do not meet any of these limitations literally, the Accused Products satisfy these limitations under the doctrine of equivalents at least because they are configured to substantially match a relevant frequency or frequencies and/or attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

(Ex. A at 5-6 (internal citations omitted) (note: claim 22 is invalid).)  The claim charts attached to Plaintiff's Final Disclosures do not elaborate on DOE with respect to claim limitation 1[c] and merely "reserve the right" to assert DOE against certain other limitations, without actually doing so.  (*See id.*)  Plaintiff's Final Disclosures **did not** articulate a DOE theory (or even reserve the right to do so) for limitation 1[f].  (*See id.* at Claim Chart p. 5-6.)

Despite this, Plaintiff served a supplemental expert report on infringement ("Dr. Rahn's Supplemental Report") which, for the first time, attempted to articulate a DOE theory for claim limitation 1[f].  *See, e.g.*, Ex. B ¶¶ 52, 87, 123, 149, 178, 207.  As this Court has recognized, permitting Plaintiff to introduce new argument or evidence not disclosed in its Final Disclosures

would be unfairly prejudicial to Defendants and would have a serious risk of disrupting trial. *See, e.g.*, Ex. C, *TwinStrand BioSciences, Inc. v. Guardant Health, Inc.*, C.A. No. 21-1126-GBW, D.I. 467 (D. Del. Oct. 31, 2023) (Oral Order) (finding that "Plaintiffs' passing reference to the [DOE] in its Final Infringement Contentions did not meet its burden to affirmatively disclose its theory" and striking DOE from Plaintiff's expert report); Ex. D, *Arendi S.A.R.L. v. LG Elecs. Inc.*, C.A. No. 12-1595-GBW, D.I. 248 (D. Del. Jan. 25, 2021) (Oral Order) (same).

Because Plaintiff did not disclose a theory of infringement under DOE for limitation 1[f] (or any limitation other than 1[c]) in its Final Disclosures, its attempt to add this new theory by way of its expert's report is improper and should be precluded. *See, e.g.*, *id.*; *Sonos, Inc. v. D&M Holdings Inc.*, C.A. No. 14-1330-WCB, 2017 WL 5633204, at *1 (D. Del. Nov. 21, 2017) ("Sonos will not be permitted to present a [DOE] theory of infringement at trial, as it did not include such allegations in its final infringement contentions, except in the form of a boilerplate reservation of right"); Ex. E, *Xpertuniverse, Inc. v. Cisco Sys., Inc.*, C.A. No. 9-157-RGA, D.I. 608 at 4-5 (D. Del. Feb. 28, 2013) (excluding DOE theory asserted only in "cursory recitation of the law" and "passing references to alleged equivalencies"); *see also ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 553 n.4 (Fed. Cir. 2018) (affirming waiver due to "silen[ce] on the matter in [] infringement contentions, save for a catch-all statement"); *Teashot.LLC v. Green Mountain Coffee Roasters, Inc.*, 595 F. App'x 983, 987-88 (Fed. Cir. 2015) (affirming waiver due to party's failure to disclose DOE theory in infringement contentions).

**Second**, Plaintiff's expert's testimony on DOE for limitation 1[c] should be limited to what Dr. Rahn actually disclosed in his report, which is very little. Dr. Rahn's Supplemental Report includes only a single paragraph addressing DOE for each group of Accused Products, and of that, only a **single sentence** actually purports to articulate a DOE opinion:

> To the extent that Neapco does not literally satisfy this limitation [1[c]] for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

(Ex. B, Rahn Supp. Rep. ¶ 42; *see also, e.g.*, *id.* ¶¶ 77, 114, 140, 169, 198 (same).)  Although Dr. Rahn purports to incorporate four additional paragraphs from his Opening Report (¶¶ 310-313) in each of paragraphs 42, 77, 114, 140, 169, and 198 of his Supplemental Infringement Report, paragraphs 310-313 of the Opening Report addressed limitation 22[f] for products no longer accused of infringement.  (*Compare* Ex. F, Rahn Op. Rep. ¶¶ 268, 310-313 *with* Ex. B, Rahn Supp. Rep. ¶ 11 (listing accused parts)).  Because these paragraphs relate to products no longer accused of infringement, they have no relevance and should be excluded.  *See* Fed. R. Evid. 402, 403.

Dr. Rahn should not be permitted to bring DOE into the case with a wholly conclusory single-sentence statement reciting the DOE legal standard.  *See, e.g.*, *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 347 F. Supp. 2d 129, 134 (D. Del. 2004) (granting motion in limine to exclude testimony regarding DOE because the expert's "conclusory statements concerning [Defendant's] accused product are not sufficient evidence"); Ex. E, *Xpertuniverse, Inc.*, C.A. No. 9-157-RGA, D.I. 608, at 4-5 ("Dr. Nourbacksh's cursory recitation of the law of the [DOE] and passing references to alleged equivalences are an insufficient basis to make the [DOE] a triable issue in the case.").

If Dr. Rahn is permitted to testify on DOE at trial, his testimony must be limited to this single conclusory statement, and he should not be allowed to inject new arguments by improperly "elaborating."  *See, e.g.*, Fed. R. Civ. P. 37(c)(1); *Inline Connection Corp. v. AOL Time Warner Inc.*, 472 F. Supp. 2d 604, 613-15 (D. Del. 2007) (granting motion to exclude expert testimony on DOE beyond what was disclosed in report).

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated: November 20, 2023

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

30990655.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-GBW |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

**AMERICAN AXLE'S OPPOSITION TO NEAPCO'S MOTION *IN LIMINE* NO. 1**

The DOE opinions that that Neapco seeks to exclude were properly and thoroughly disclosed both in contentions and in Dr. Rahn's expert reports.  In addition to Dr. Rahn's literal infringement opinions, AAM intends present Dr. Rahn's previously disclosed DOE opinions at trial, and the instant motion should be entirely rejected.

Neapco admits that AAM disclosed its DOE theory and quotes that theory in its brief:  that the Accused Products "are configured to substantially match a relevant frequency or frequencies and/or attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial."  (Ex. A at 6.) Neapco is wrong to argue that theory was disclosed only as to claim 22 and limitation 1[c], but not limitation 1[f].  AAM's DOE theory applies across the tuning limitations.  The supplemental contentions referenced by Neapco in its motion were served on September 17, 2022, after the case had already proceeded to expert reports on claim 22 months before.  When claim 1 was later found not indefinite, AAM supplemented its contentions to address claim 1, including stating that for limitations 1[c] and 1[f], that AAM incorporated by reference the already provided expert opinion as to "corresponding or similar limitations of claims 22 and 36."  (Ex. A to Ex. A at 6-7.) In its claim chart as to limitation 1[f], which recites a liner "tuned to within about ±20% of a bending mode," AAM specifically referenced "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibration" of limitation 22[f], which Neapco admits is explicitly identified as a DOE theory. (*Id*.; Neapco Br. at 1.)   Ultimately, AAM disclosed that the tuning limitations were infringed under DOE at least 3 times before Dr. Rahn's supplemental report specifically addressing limitation 1[f].[1]  (*See* Ex. G ¶¶ 212, 323, 430 (May 31, 2017); Ex. H (July 21, 2017) ¶¶ 77, 113, 142, 310-313; Ex. A at 6 & Ex. A thereto at 6 (September

---

[1] The cases cited by Neapco at pages 1-2 of its brief all relate to a party's failure to disclose any DOE theory in its contentions and are therefore inapplicable to the facts in this case.

22, 2017).)  Dr. Rahn then specifically addressed limitation 1[f], opining, *inter alia*, that Neapco's accused "liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial." (Ex. B ¶¶ 52, 87, 123, 149, 178, 207.)  At ¶¶ 42, 77, 114, 140, 169, and 198, Dr. Rahn references his prior opinions as relevant to claim 1.  Those prior DOE opinions include that "FRF data" demonstrating vibration attenuation at relevant modes indicates that "any difference between the liners of the Accused Products and liners having" a "1-for-1" frequency match is "insubstantial." (Ex. H ¶312.)  Those opinions (and all of the foregoing DOE disclosures) were entirely consistent with AAM's contentions dated September 22, 2017, and AAM's previously-disclosed theory that the tuning limitations are met under DOE.

Mr. Becker had a full opportunity and did respond to all of Dr. Rahn's DOE opinions.  (*See* Ex. I ¶¶112-114; Ex. J¶¶ 78-80.)  Tellingly, Mr. Becker's responses as to claim 22 and claim 1 are amazingly similar, both opining (verbatim) that "[o]ne skilled in the art would not understand that a damper that . . . has the differences in frequencies discussed above, to perform substantially the same function, in the substantially same way, with the substantially same result."  (*See* Ex. I ¶ 113; Ex. J ¶¶ 79.)

Neapco's second argument that Dr. Rahn's opinions narrowly relate to a single sentence as to limitation 1[c] or to products not at issue also fails because it is entirely false.  Dr. Rahn provides DOE opinions for elements 1[c] and 1[f] as to all accused products set for trial: Ex. B ¶¶ 42, 77, 114, 140, 169, and 198 (each addressing 1[c] and referencing Ex. H ¶¶ 310-313,[2] which includes FRF data opinion quoted above); and Ex. B ¶¶ 52, 87, 123, 149, 178, 207 (each addressing 1[f]).

---

[2] Neapco's argument that these paragraphs relate to products no longer at issue appears to be based on a mistaken assumption that Dr. Rahn was incorporating by reference paragraphs of his opening report (Ex. G), when they were in fact references to Dr. Rahn's reply report (Ex. H).

Those extensive opinions are consistent with the crucial substance of AAM's DOE theories, which was repeatedly disclosed throughout contentions and Dr. Rahn's three reports. Neapco improperly puts form over substance and would have paragraphs from Dr. Rahn's reports erased simply because they initially addressed claim limitations or products no longer at issue, even though Dr. Rahn specifically referenced and incorporated those paragraphs by reference into limitations 1[c] and 1[f], as Neapco readily admits. (Neapco Br. at 3.)

Contrary to Neapco's arguments, AAM's DOE disclosures are not merely catch-all statements or passing references. The contentions specifically disclose equivalence theories, namely the means by which the Accused Products meet the tuning limitations to the extent not met literally. This court and others routinely permit experts to testify at trial consistent with the Rule 26(a) disclosures in their expert reports. *E.g.*, *Express Mobile, Inc. v. GoDaddy.com, LLC*, No. 19-cv-1937, D.I. 305 at 9-10 (Transcript of pre-trial conference denying motion *in limine* seeking to exclude DOE theories); *Kirsch v. AOE Ricoh, Inc.*, 2005 WL 8154465, at *13 (E.D. Mich. Sept. 21, 2005) (distinguishing *Honeywell* decision cited by Neapco and finding that an expert's conclusion that differences cited by defendant are "insubstantial" is sufficient to proceed to trial).[3]

Neapco's brief fails to identify prejudice and does not address the *Pennypack* factors, which support denial of Neapco's motion. Neapco failed to raise this issue at the summary judgment or *Daubert* stage, and it is improper to do so now. AAM intends to present trial testimony consistent with its Rule 26(a) expert disclosures, to which Neapco responded, and any objections to such testimony should be addressed during trial. There is no failure to disclose here, and AAM would be severely prejudiced if unable to present its DOE theories on the eve of trial.

---

[3] Neapco's cases are inapposite. Those cases involve mere boilerplate statements or mere reservations as to DOE, not the substantive disclosure at issue here in contentions and paragraphs of expert reports relating to how the tuning limitations are met under DOE.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | C. A. No.: 15-1168-GBW |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

### DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 1

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated:  December 11, 2023

Plaintiff cannot dispute that its Final Infringement Contentions do not disclose a theory of DOE for any limitation other than 1[c].  (Ex. A at 6-7; MIL at 1.)  That is reason enough to grant the motion limiting Plaintiff's DOE proof from going outside its narrow disclosure.

But Plaintiff admits it intends to ignore this boundary.  Plaintiff argues that it can extend its DOE argument "across the *tuning limitations*," whatever those may be (Plaintiff does not say).  (Resp. at 1-2 (emphasis added).)  But "proof of equivalents must be **limitation specific**, not focused only on the claim as a whole."  Ex. K, *VLSI Tech. LLC v. Intel Corp.*, No. 2022-1906, slip op. at 15 (Fed. Cir. Dec. 4, 2023) (emphasis added).  A DOE theory on one limitation thus cannot simply apply "across" other unnamed limitations.  Notably, when including a DOE theory for 1[c], Plaintiff recognized that DOE is on a limitation-by-limitation basis when it expressly reserved the right to add DOE for other limitations.  (*See* Ex. A at Claim Chart, p. 1-6.)

Plaintiff also relies on disclosure of DOE theories about limitations in Claim 22, which has already been held invalid and is not being tried.  That is no justification.  First, Plaintiff's disclosure of a DOE theory for limitations 22[c], 22[d], and 22[f] proves that Plaintiff's disclosure of a DOE theory on only 1[c] was deliberate.  If Plaintiff wanted a DOE theory on 1[d] and 1[f], it knew how to do it.  The omission is telling.  Second, Plaintiff went to great lengths to distinguish Claim 1 from Claim 22 at summary judgment in order to save Claim 1 from the same fate as invalid Claim 22.  Having succeeded in saving Claim 1 from invalidity on that basis, Plaintiff should now be estopped from taking the opposite position and relying on supposed evidence regarding Claim 22 as applying to Claim 1.

Plaintiff is also wrong that there is no prejudice if it expands its DOE theory to other limitations.  This Court routinely excludes DOE theories not disclosed in Final Contentions, even if an expert could respond.  *E.g.*, Exs. C-D.  No deviation from the Court's practice is warranted.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated:  December 11, 2023

*Attorneys for Neapco Holdings LLC and Neapco
Drivelines LLC*

31045062.1

# EXHIBIT A EXCERPTED HIGHLY CONFIDENTIAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 15-1168-LPS-CJB |
| | ) | |
| v. | ) | **CONTAINS INFORMATION** |
| | ) | **DESIGNATED AS HIGHLY** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | **CONFIDENTIAL** |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S SUPPLEMENTAL FINAL PARAGRAPH 7(c) DISCLOSURES

Plaintiff American Axle & Manufacturing, Inc. ("Plaintiff") hereby serves its Supplemental Final Paragraph 7(c) Disclosures on Defendants Neapco Holdings LLC and Neapco Drivelines LLC (collectively, "Defendants") pursuant to paragraph 7(c) of the Scheduling Order entered April 8, 2016 (D.I. 28) and amendments thereto (D.I. 188), the parties' Joint Status Report (D.I. 181), and the Court's order dated September 13, 2017.  These disclosures include a claim chart for the asserted patent, which is attached as Exhibit A, pursuant to paragraph 7(c).

AAM bases these disclosures on its current knowledge, understanding, and belief as to the facts and information available as of the date of this disclosure, without the benefit of supplemental expert discovery.  Plaintiff reserves the right to modify, supplement, amend, or otherwise alter these disclosures as discovery progresses, as permitted by the Federal Rules of Civil Procedure, the Default Standard, or by order of the Court.  In particular, Plaintiff reserves the right to modify, supplement, amend, or otherwise alter these disclosures following an opportunity for supplemental expert discovery.  In addition to the documents cited in Exhibit A, supplemental expert discovery is likely to show that the Accused Products (identified below)

practice the limitations of the asserted claims. AAM will provide its supplemental expert disclosures as required and pursuant to the deadlines set forth in Scheduling Order entered April 8, 2016 (D.I. 28) and amendments thereto (D.I. 188), the parties' Joint Status Report (D.I. 181), and the Court's order dated September 13, 2017.

These disclosures contend that propshafts for Chevy Colorado and GMC Canyon pickup trucks ("Colorado/Canyon propshafts"), including those identified by product nos. 23214716, 23225169, 23253781, 23282324, 23377650, 23464082, 84059642, 84059643, 84059644, 84059645, 84059646, 84059647, 84148488, 84148489, 94769073, and 94769076, respectively ("Accused Products"), infringe U.S. Patent No. 7,774,911 ("the '911 patent"). Specifically, these disclosures contend that the Colorado/Canyon propshafts infringe at least one of claims 1-6, 12, 13, 19-24, 26, 27, 31, and 34-36 of the '911 patent.

Neapco has made several admissions concerning the structure, configuration, and composition of the Accused Products, including the part numbers for the constituent liners of each Accused Product. (*See, e.g.*, Neapco's April 24, 2017, Responses to AAM's Requests for Admission ("Response to RFA") Nos. 28-44.) AAM therefore provides a summary of the Accused Products and their constituent liner part numbers and quantities in Table 1 below based on Neapco's admissions.

| Table 1: Accused Products | |
|---|---|
| **General Motors Part No.** | **Liner Part No(s).[1]** |
| 23282324 | (3) NPFT2G-4978-ABA |

---

[1] Neapco admits ███████████████████████████████████████ ████████████████████████ (*See, e.g.*, Response to RFA Nos. 41 and 44.) As described in Exhibit A, AAM contends that those part numbers also each comprise one liner having Part No. NPFT2G-4978-DBA, despite Neapco's denial to the contrary. (*Id.*) Neapco's Rule 30(b)(6) witness designated on these topics testified that these part nos. ██████████████ ███████████ (*See* Wehner Tr. at 120:12-20.)

| Table 1: Accused Products | |
|---|---|
| **General Motors Part No.** | **Liner Part No(s).[1]** |
| 94769076 | (2) NPFT2G-4978-BA |
| 84059647 | (2) NPFT2G-4978-BA |
| 23214716 | (2) NPFT2G-4978-BA |
| 84059642 | (2) NPFT2G-4978-BA |
| 84148488 | (2) NPFT2G-4978-BA |
| 23464082 | (2) NPFT2G-4978-BA |
| 84059645 | (2) NPFT2G-4978-BA |
| 94769073 | (2) NPFT2G-4978-CA |
| 84059646 | (2) NPFT2G-4978-CA |
| 23225169 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059643 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23253781 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059644 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84148489 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23377650 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |

Neapco further admits the following for all Accused Products:



- ███████████████████████████████████████████████

█████████████████████████████████████████████████

AAM further identifies the following exemplary drawing/schematic documents as relevant to the Accused Products and each claim element of each asserted claim in Exhibit A, regardless of whether these documents are specifically cited with respect to a particular claim element:  NEAPCO0000105 (4.0 inch diameter product); NEAPCO0000106, 107, 880, 992, 1596, 1597, and 913 (4.5 inch diameter products); NEAPCO0000108, 109, 923, and 940 (5.0 inch diameter products); NEAPCO0000110, 111, 941, 991, 1599, 1600, and 982 (5.775 inch diameter products); NEAPCO000080 (liner ending in -ABA); NEAPCO000078 (liners ending in -BA and –CA); NEAPCO000081 (liner ending in –DBA); NEAPCO000082 (liner ending in –DCA).  AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Dr. Christopher D. Rahn, wherein Dr. Rahn provided a background and summary of the Accused Products including a background and summary of the structure, configuration, and composition of the Accused Products.

Nothing in these disclosures, including Exhibit A, is, or should be construed as, an admission regarding Plaintiff's understanding of the proper scope of the asserted claims.  With regard to the claim charts attached as Exhibit A, the citation of a particular document or documents with respect to a particular claim or claim element is not an admission and should not be construed as an admission that only the cited portion of the document or only the cited document(s) are relevant to that particular claim or claim element.  The citations included in Exhibit A are only exemplary in nature, and the cited documents may contain additional support for a particular claim element (including references to additional documents) and/or additional

documents may contain additional support for a particular claim element. Plaintiff reserves the right to rely on uncited portions of documents and other uncited documents with regard to its allegations of infringement. In addition, each dependent claim in Exhibit A should be read to include the citations provided for each independent claim from which it depends.

AAM provides these supplemental contentions for the purpose of notifying Neapco of its infringement positions as to the asserted claims and, as such, the evidence cited in Exhibit A is exemplary in nature. Because the parties have completed substantial expert discovery and summary judgment briefing prior to the submission of these supplemental contentions and such evidence and argument is applicable to the new claims, AAM reserves its right to rely on any evidence previously presented (by either party) in connection with all asserted claims.

The Accused Products literally infringe the asserted claims of the '911 patent. AAM incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Dr. Christopher D. Rahn, wherein Dr. Rahn explained how the Accused Products literally infringe certain of the asserted claims of the '911 patent. AAM further incorporates herein by reference the relevant sections of AAM's opening and reply briefs in support of its motion for summary judgment of infringement, wherein AAM further explained how the Accused Products literally infringe certain of the asserted claims of the '911 patent. (D.I. 156, 186.) AAM further incorporates herein by reference the relevant sections of AAM's opposition brief to Neapco's motion for summary judgment of non-infringement, wherein AAM further explained how the Accused Products literally infringe certain of the asserted claims of the '911 patent. (*See, e.g.*, D.I. 174 at Section VI.C.1-2.)

AAM asserts that, to the extent not infringed literally, the asserted claims are infringed under the doctrine of equivalents. Without providing any basis, Neapco contends that the

Accused Products do not satisfy the following limitations of the '911 patent: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member," "tuning a mass and stiffness of at least one liner," "tuned resistive absorber for attenuating shell mode vibrations," and "tuned reactive absorber for attenuating bending mode vibrations." (Response to Interrogatory No. 7.) AAM maintains that the Accused Products literally satisfy each of these limitations. Nonetheless, to the extent the Court finds the liners of the Accused Products do not meet any of these limitations literally, the Accused Products satisfy these limitations under the doctrine of equivalents at least because they are configured to substantially match a relevant frequency or frequencies and/or attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the liners of the Accused Products perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and/or attenuate vibration at the relevant frequency or frequencies, in substantially the same way, e.g., having liner characteristics, including mass and stiffness, configured to yield substantially the same result, e.g., matching a relevant frequency or frequencies and/or attenuate vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations. Any difference between the features of the Accused Products and these claim limitations are insubstantial. AAM incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Dr. Christopher D. Rahn, wherein Dr. Rahn explained how the Accused Products satisfy certain of these limitations under the doctrine of equivalents. AAM further incorporates herein by reference the relevant sections of AAM's Opposition to Neapco's Motion for Summary Judgment, wherein AAM further explained how the Accused Products satisfy certain of these limitations under the doctrine of equivalents. (*See, e.g.*, D.I. 174 at Section VI.C.3.) AAM reserves the right to assert additional

allegations of infringement under the doctrine of equivalents after an opportunity for supplemental expert discovery, and to the extent Neapco makes additional allegations of non-infringement beyond those provided in its Supplemental Response to Interrogatory No. 7 and/or provides bases for those contentions.

Dated:  September 22, 2017                    Respectfully submitted,

/s/ *Katherine H. Johnson*
James R. Nuttall
John L. Abramic
Katherine H. Johnson
Robert F. Kappers
Randal S. Alexander
STEPTOE & JOHNSON LLP
115 South LaSalle Street, Suite 3100
Chicago, IL 60603
(312) 577-1300


John W. Shaw (No. 3362)
Jeffrey T. Castellano (No. 4837)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120
Wilmington, DE 19801
(302) 298-0701
jshaw@shawkeller.com
jcastellano@shawkeller.com

*Attorneys for Plaintiff American Axle & Manufacturing, Inc.*

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| Claim 1 of U.S. Patent No. 7,774,911 | Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 94769073, 84059646, 23225169, 84059643, 23253781, 84148489, 23377650) |
|---|---|
| A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component, the method comprising: | The Accused products include a shaft assembly that is adapted to transmit torque between a first driveline component and a second driveline component.<br><br>Neapco does not contend that the Accused Products ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents ▮▮▮▮▮▮▮▮▮▮▮▮<br><br>*See, e.g.*, Response to RFA No. 19.<br><br>*See, e.g.,* Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO001600 (84059644 propshaft assembly drawing); NEAPCO001697 (84059644 propshaft assembly drawing); NEAPCO000110 (23377650 propshaft assembly drawing); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000941 (23377650 propshaft assembly drawing); NEAPCO000974 (23377650 propshaft assembly drawing); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA).<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product. |

1

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| providing a hollow shaft member; | The Accused Products include a hollow shaft member.<br><br>Neapco ███████████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents ████████████████████<br><br>*See, e.g.*, Response to RFA No. 1.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO001600 (84059644 propshaft assembly drawing); NEAPCO001697 (84059644 propshaft assembly drawing); NEAPCO000110 (23377650 propshaft assembly drawing); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000941 (23377650 propshaft assembly drawing); NEAPCO000974 (23377650 propshaft assembly drawing); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA).<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product. |
| tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member; and | The Accused Products each include at least one liner and at least one liner is tuned to attenuate at least two types of vibration transmitted through the shaft member.<br><br>*See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| | requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties ▮▮▮▮▮▮ including properties of liners identified by part no. NPFT2G-4978-DBA and NPFT2G-4978-DCA); NEAPCO000080 (drawing of liner identified by part no. NPFT2G-4978-ABA); NEAPCO000078 (drawing of liners identified by part no. NPFT2G-4978-BA and NPFT2G-4978-CA).<br><br>*See, e.g.*, NEAPCO172211 (▮▮▮▮▮▮▮▮▮▮▮▮); NEAPCO000089; NEAPCO160006; Wehner Tr. at 89:16-19, 90:7-23, 91:20-92:7, 121:14-20, 125:4-126:12; Roman Tr. at 79:9-24, 90:18-91:18, 92:1-19, 94:10-18, 95:21-23.<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "tuning a mass and a stiffness of at least one liner." |
| positioning the at least one liner within the shaft member such that | The Accused Products each include at least one liner positioned within the shaft.<br><br>Neapco ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) ==AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents== ▮▮▮▮▮▮▮▮ |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| | *See, e.g.*, Response to RFA Nos. 1, 2, 9, 11, 13, and 53.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA).<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "inserting at least one liner into the shaft member." |
| the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%, and | The Accused Products include at least one liner each and shell mode vibrations are damped by an amount greater than or equal to about 2%.<br><br>*See, e.g.*, Response to RFA Nos. 2, 11-12, 20.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4683-DCA); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4683-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4683-DCA); NEAPCO004343 (GM31xxN – Liner Properties ███████████ including properties of liners identified by part no. NPFT2G-4683-DBA and NPFT2G-4683-DCA); |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| | NEAPCO000080 (drawing of liner identified by part no. NPFT2G-4978-ABA); NEAPCO000078 (drawing of liners identified by part no. NPFT2G-4978-BA and NPFT2G-4978-CA).<br><br>*See, e.g.*, NEAPCO080565 (identifying "███████████ ; NEAPCO180590 ██████████████████████████████; NEAPCO109061 ███████████; ; NEAPCO152803 ████████ (Referencing both ██████████; NEAPCO31286 ████████ NEAPCO002593 ████████ NEAPCO000217 ████████; Parker Tr. at 55:24-56:17; 17:4-118:9, 119:20-121:3; Wehner Tr. at 146:2-3, 182:20-25, 84:10-85:3; Das Rough Tr. at 16:6-17.<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations." |
| the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as | The Accused Products include at least one liner each, bending mode vibrations are damped, and at least one liner is tuned to within about ±20% of a bending mode natural frequency.<br><br>*See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27. |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| installed in the driveline system. | *See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties ███████████, including properties of liners identified by part no. NPFT2G-4978-DBA and NPFT2G-4978-DCA); NEAPCO000080 (drawing of liner identified by part no. NPFT2G-4978-ABA); NEAPCO000078 (drawing of liners identified by part no. NPFT2G-4978-BA and NPFT2G-4978-CA). |
| | *See, e.g.*, NEAPCO195905 (Part no. 23282834 containing ████████████ ███████████████████████████████████; NEAPCO080565 (identifying ████████████; NEAPCO001175 ████████████; NEAPCO001573 ████████████ for GM31xxN"); NEAPCO000212; NEAPCO172211 ("Approach to ████████████ ██████████████████████."); NEAPCO152803 (Referencing both ████████████; NEAPCO000089; NEAPCO160006; Wehner Tr. at 114:22-115:10 (████████████; 120:121:4 ████████████. |
| | AAM further incorporates herein by reference the relevant sections of the Opening |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| | Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." |
| **Claim 2 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 94769073, 84059646, 23225169, 84059643, 23253781, 84059644, 84148489, 23377650)** |
| The method of claim 1, wherein the at least one liner is tuned within ± 15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. | The Accused Products include at least one liner tuned to within about ±15% of a bending mode natural frequency.<br><br>*See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000111 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000991 (23377650 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties ▮▮▮▮▮▮ including properties of liners identified by part no. NPFT2G-4978-DBA and NPFT2G-4978-DCA); NEAPCO000080 (drawing of liner identified by part no. NPFT2G-4978-ABA); NEAPCO000078 (drawing of liners identified by part no. NPFT2G-4978-BA and NPFT2G-4978-CA).<br><br>*See, e.g.*, NEAPCO195905 (Part no. 23282834 containing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Part nos. 23225169, 84059643, 23253781, 84059644, 84148489, 94769071, and 23377650 containing "▮▮▮▮▮▮▮▮▮▮ |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*



| | NEAPCO080565 (identifying |
| | NEAPCO001175 |
| NEAPCO001573 | |
| NEAPCO000212; NEAPCO172211 | |
| | NEAPCO000089; NEAPCO160006; Wehner Tr. at |
| 114:22-115:10 | 120:121:4 |

| | AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." |

| **Claim 3 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
|---|---|
| The method of claim 2, wherein the at least one liner is tuned to within ± 10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. | The Accused Products include at least one liner tuned to within about ±10% of a bending mode natural frequency.<br><br>*See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*



| | including properties of liners identified by part no. NPFT2G-4978-DBA and NPFT2G-4978-DCA); NEAPCO000080 (drawing of liner identified by part no. NPFT2G-4978-ABA); NEAPCO000078 (drawing of liners identified by part no. NPFT2G-4978-BA and NPFT2G-4978-CA).<br><br>*See, e.g.,* NEAPCO195905 (Part no. 23282834 [redacted]" Part nos. 23225169, 84059643, 23253781, 84059644, 84148489, 94769071, and 23377650 [redacted]; NEAPCO080565 (identifying [redacted]; NEAPCO001175 ([redacted] NEAPCO001573 [redacted]; NEAPCO000212; NEAPCO172211 [redacted] NEAPCO109061 [redacted]; NEAPCO152803 (Referencing both [redacted]; NEAPCO000089; NEAPCO160006; Wehner Tr. at [redacted]<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." |
|---|---|
| **Claim 4 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645)** |
| The method of claim 3, wherein the at least one liner is tuned to within ±5% of | The Accused Products include at least one liner tuned to within about ±10% of a bending mode natural frequency. |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| the bending mode natural frequency of the shaft assembly as installed in the driveline system. | *See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27.<br><br>*See, e.g.*, Table 1; NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties ████████ including properties of liners identified by part no. NPFT2G-4978-DBA and NPFT2G-4978-DCA); NEAPCO000080 (drawing of liner identified by part no. NPFT2G-4978-ABA); NEAPCO000078 (drawing of liners identified by part no. NPFT2G-4978-BA and NPFT2G-4978-CA).<br><br>*See, e.g.*, NEAPCO195905 (Part no. 23282834 containing ████████ Part nos. 23225169, 84059643, 23253781, 84059644, 84148489, 94769071, and 23377650 containing ████████; NEAPCO080565 (identifying ████████; NEAPCO001175 ████ NEAPCO001573 ████████ NEAPCO000212; NEAPCO172211 ████████; NEAPCO109061 ████████; NEAPCO152803 (Referencing both ████████; NEAPCO000089; NEAPCO160006; Wehner Tr. at 114:22-115:10 ████████ 120:121:4 ████.<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied corresponding or similar limitations of claims 22 and 36 as to each Accused Product including, for example, "wherein the at least one liner is a tuned reactive absorber for attenuating bending |

10

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | mode vibrations." |
|---|---|
| **Claim 5 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 3, wherein the shell mode is at least one of a first shell mode, a second shell mode and a third shell mode. | The shell mode of the Accused Products is one of a first shell mode, a second shell mode, and a third shell mode.<br><br>Neapco ███████████████████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents ███████████<br><br>*See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27.<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 23 as to each Accused Product. |
| **Claim 6 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 5, wherein the bending mode is at least one of a first bending mode, a second bending mode and a third bending mode. | The bending mode of the Accused Products is one of a first bending mode, a second bending mode, and a third bending mode.<br><br>Neapco ███████████████████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents ███████████<br><br>*See, e.g.*, Response to RFA Nos. 2-8, 11-12, 20, 22-27.<br><br>AAM further incorporates herein by reference the relevant sections of the Opening |

11

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| | Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 24 as to each Accused Product. |
| **Claim 12 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 3, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member. | The liners of the Accused Products include a structural portion and at least one resilient member, which contacts the wall of the shaft member.

Neapco ███████████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents ██████████████████████

*See, e.g.*, Response to RFA Nos. 1-2, 9, 11-13, 20, 53.

*See also* Table 1; NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties ██████████ including properties of liners identified by part nos. NPFT2G-4978-DBA and NPFT2G-4978-DCA).

AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 26 as to each Accused Product. |
| **Claim 13 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 12, wherein the at least one resilient member extends helically about and along the structural | The resilient members of the liners of the Accused Products extend helically along the structural portion.

Neapco ██████████████████████████████████ (*See,* |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| portion. | *e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents if ▮▮▮▮▮▮▮▮<br><br>*See, e.g.*, Response to RFA Nos. 2, 11, and 20.<br><br>*See also* Table 1; NEAPCO000081 (drawing of liner identified by part no. NPFT2G-4978-DBA); NEAPCO000082 (drawing of liner identified by part no. NPFT2G-4978-DCA); NEAPCO004343 (GM31xxN – Liner Properties ▮▮▮▮▮▮ including properties of liners identified by part nos. NPFT2G-4978-DBA and NPFT2G-4978-DCA).<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 27 as to each Accused Product. |
| **Claim 19 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 12, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof. | The structural portion of the liners of the Accused Products are formed of paperboard.<br><br>Neapco ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents if ▮▮▮▮▮<br><br>*See, e.g.*, Response to RFA No. 12.<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 31 as to each Accused Product. |

13

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| **Claim 20 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 3, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node. | The Accused Products include a first liner positioned symmetrically about a bending anti-node.<br><br>Neapco ███████████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents if ████████████<br><br>*See, e.g.*, Response to RFA Nos. 1-2, 9, 11-13, and 53.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA).<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 34 as to each Accused Product. |
| **Claim 21 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23214716, 84059642, 84148488, 23464082, 84059645, 23225169, 84059643, 23253781, 84059644, 84148489)** |
| The method of claim 20, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node. | The Accused Products include a second liner positioned symmetrically about another bending anti-node.<br><br>Neapco ████████████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the |

*American Axle & Manufacturing, Inc. v. Neapco Holdings LLC et al.*, No. 15-cv-1168
Exhibit A - Plaintiff's Final Claim Chart for U.S. Patent No. 7,774,911
*Contains Information Designated as Highly Confidential – Attorneys' Eyes Only*

| | |
|---|---|
| | Doctrine of Equivalents if ███████████████████ █ ████████████<br><br>*See, e.g.*, Response to RFA Nos. 1-2, 9, 11-13, and 53.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA).<br><br>AAM further incorporates herein by reference the relevant sections of the Opening Expert Report (May 31, 2017) and Reply Expert Report (July 21, 2017) of Christopher D. Rahn, wherein Dr. Rahn explained how Neapco satisfied the corresponding limitation of claim 35 as to each Accused Product. |
| **Claim 22 of U.S. Patent No. 7,774,911** | **Neapco Propshafts with liners (GM part nos. 23282324, 94769076, 84059647, 23214716, 84059642, 84148488, 23464082, 84059645, 94769073, 84059646, 23225169, 84059643, 23253781, 84059644, 84148489, 23377650)** |
| A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component, the method comprising: | The Accused products include a shaft assembly that is adapted to transmit torque between a first driveline component and a second driveline component.<br><br>Neapco ██████████████████████████████████ ████████████████████████ (*See, e.g.*, Neapco's April 24, 2017, Response to AAM's Interrogatory No. 7.) AAM reserves the right to assert that the Accused Products satisfy this limitation under the Doctrine of Equivalents if ████████████ █████████████████████<br><br>*See, e.g.*, Response to RFA No. 19.<br><br>*See, e.g.*, Table 1; NEAPCO000991 (84059644 tube and liner assembly drawing requiring one liner identified by part no. NPFT2G-4978-DBA and two liners identified by part no. NPFT2G-4978-DCA); NEAPCO001600 (84059644 propshaft assembly drawing); NEAPCO001697 (84059644 propshaft assembly drawing); NEAPCO000110 (23377650 propshaft assembly drawing); NEAPCO000111 |

15

# EXHIBIT B
# EXCERPTED
# HIGHLY
# CONFIDENTIAL

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**FIRST SUPPLEMENTAL EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.**

By: _____

October 17, 2017

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 3

II.     CREDENTIALS AND QUALIFICATIONS ........................................................... 4

III.    MATERIALS CONSIDERED ................................................................................. 5

IV.     PATENT LAW STANDARDS ................................................................................ 5

V.      SUMMARY OF MY INFRINGEMENT OPINIONS ............................................ 5

VI.     TECHNOLOGY BACKGROUND AND STATE OF THE ART ........................... 6

VII.    THE '911 PATENT ................................................................................................. 6

        A.      The New Asserted Claims ........................................................................... 7

        B.      Claim Construction of the New Asserted Claims ....................................... 9

                1.      The Agreed Claim Constructions ................................................... 10

                2.      The Court's Claim Constructions ................................................... 10

VIII.   BACKGROUND AND SUMMARY OF THE ACCUSED PRODUCTS ............... 11

IX.     THE ACCUSED PRODUCTS INFRINGE THE '911 PATENT ........................... 11

        A.      The Neapco 4.5 inch Accused Products Infringe the '911 patent ............. 11

                1.      GM part nos. 84148488, 23214716, and 84059642 (4.5" x 0.085" x
                        1891 mm) ........................................................................................ 11

                        a.      Claim 1 .............................................................................. 13

                        b.      Claim 2 .............................................................................. 19

                        c.      Claim 3 .............................................................................. 19

                        d.      Claim 4 .............................................................................. 20

                2.      GM part nos. 84059645 and 23464082 (4.5" x 0.085" x 1799 mm) ........ 21

                        a.      Claim 1 .............................................................................. 22

                        b.      Claim 2 .............................................................................. 28

                        c.      Claim 3 .............................................................................. 29

                        d.      Claim 4 .............................................................................. 30

B.    The Neapco 5.0 inch Accused Products Infringe the '911 patent.........................31

1.    GM part nos. 84059646 and 94769073 (5.0" x 0.080" x 1956 mm) ........31

a.    Claim 1 ........................................................................................32

b.    Claim 2 ........................................................................................38

C.    The Neapco 5.775 inch Accused Products Infringe the '911 patent....................39

1.    GM part nos. 84059643 and 23225169 (5.775" x 0.079" x 2222 mm) ................................................................................................40

a.    Claim 1 ........................................................................................41

b.    Claim 2 ........................................................................................47

c.    Claim 3 ........................................................................................48

2.    GM part nos. 84148489, 84059644, and 23253781 (5.775" x 0.079" x 2200 mm) ....................................................................49

a.    Claim 1 ........................................................................................50

b.    Claim 2 ........................................................................................56

c.    Claim 3 ........................................................................................57

3.    GM part no. 23377650 (5.775" x 0.079" x 2172 mm) ............................59

a.    Claim 1 ........................................................................................59

b.    Claim 2 ........................................................................................65

X.    CONCLUSION ................................................................................................66

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

### III.   MATERIALS CONSIDERED

7.      In connection with this First Supplemental Report, I have reviewed the materials identified in my prior reports and declarations.  A complete list of materials that I have relied upon in forming my opinions set forth in this First Supplemental Report is attached as Exhibit B.

8.      I understand that discovery in this case has not been completed.  I reserve my right to supplement this First Supplemental Report to address any documents, declarations, and/or testimony produced by Neapco after serving this First Supplemental Report (or to the extent Neapco produced this information late).

### IV.   PATENT LAW STANDARDS

9.      I am not an attorney.  I have been asked to provide opinions on the infringement of the New Asserted Claims of the '911 patent from the perspective of a person of ordinary skill in the art at the time of invention.  I understand that, for purposes of this First Supplemental Report, the time of invention is assumed to be the earliest priority date of each patent.  For purposes of this First Supplemental Report, I have assumed that the earliest priority date is February 27, 2006, for the '911 patent.

10.      I incorporate herein by reference the relevant sections of my prior reports and declarations concerning my understanding of patent law standards, including Section IV of my May 31 Report.

### V.   SUMMARY OF MY INFRINGEMENT OPINIONS

11.      As explained in greater detail in the remainder of this First Supplemental Report, Neapco infringes one or more New Asserted Claims of the '911 patent at least by its manufacture, offer for sale, and sale of each of the following 4.5, 5.5, and 5.775 inch propshafts ("Accused Products"):

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

**Table 1: Summary of Supplemental Infringement Opinions**

| Accused Products | | | Supplemental Opinion: Infringed Claims |
|---|---|---|---|
| (GM part no.) | Propshaft Diameter | Liner(s) (Quantity; part no.) | |
| 84148488 | 4.5 inch | (2) NPFT2G-4978-BA | '911 patent: 1-6, 12, 13, 19-21 |
| 23214716 | 4.5 inch | (2) NPFT2G-4978-BA | '911 patent: 1-6, 12, 13, 19-21 |
| 84059642 | 4.5 inch | (2) NPFT2G-4978-BA | '911 patent: 1-6, 12, 13, 19-21 |
| 84059645 | 4.5 inch | (2) NPFT2G-4978-BA | '911 patent: 1-6, 12, 13, 19-21 |
| 23464082 | 4.5 inch | (2) NPFT2G-4978-BA | '911 patent: 1-6, 12, 13, 19-21 |
| 84059646 | 5.0 inch | (2) NPFT2G-4978-CA | '911 patent: 1-2 |
| 94769073 | 5.0 inch | (2) NPFT2G-4978-CA | '911 patent: 1-2 |
| 84059643 | 5.775 inch | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA | '911 patent: 1-3, 5, 6, 12, 13, 19-21 |
| 23225169 | 5.775 inch | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA | '911 patent: 1-3, 5, 6, 12, 13, 19-21 |
| 84148489 | 5.775 inch | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA | '911 patent: 1-3, 5, 6, 12, 13, 19-21 |
| 84059644 | 5.775 inch | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA | '911 patent: 1-3, 5, 6, 12, 13, 19-21 |
| 23253781 | 5.775 inch | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA | '911 patent: 1-3, 5, 6, 12, 13, 19-21 |
| 23377650 | 5.775 inch | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA | '911 patent: 1-2 |

## VI.    TECHNOLOGY BACKGROUND AND STATE OF THE ART

12.    I have already provided a technology background and summary of the state of the art in my prior reports and declarations, which I incorporate by reference and summarize below when pertinent.  (*See, e.g.*, May 31 Report, Section VI; July 21 Report, Section VI.)

## VII.    THE '911 PATENT

13.    I have already provided a background and description of the '911 patent and the Original Asserted Claims of the '911 patent, including a summary of the Agreed Claim Constructions and the Court's Claim Constructions of the claim elements of the Original

6

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

         a.     **Claim 1**

         (1)     **1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"**

38.     Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 488, 716, and 642 Accused Products. (*See* '911 patent at claim 1[c].)

39.     I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

40.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 386-93, 478-79; July 21 Report ¶¶ 125-29.)

41.     In those reports, I described how Neapco engineering drawings confirm that the 488, 716, and 642 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-BA and Neapco controls the characteristics of the NPFT2G-4978-BA liners by controlling its material properties and dimensions. As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft

13

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

42.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-BA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member. To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report. (*See, e.g.*, July 21 Report ¶¶ 310-13.)

43.    Neapco therefore satisfies the 1[c] limitation for the 488, 716, and 642 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

(2)    **1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

44.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 488, 716, and 642 Accused Products. (*See* '911 patent at claim 1[e].)

45.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

Hz) (Ex. C)—a difference of 14.3%.  (*See* Ex. D.)  The propshaft of the 488 Accused Product with its NPFT2G-4978-BA liners has a ███████████████████████████████ ██████████████████████████████████████████████████████████████ (Exs. C & D.)

48.     Neapco therefore satisfies the 1[e] limitation for the 488, 716, and 642 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%."  ('911 patent, claim 1[e].)

> **(3)     1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

49.     Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 1[f].)

50.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 414-31, 478-79; July 21 Report ¶¶ 138-43.)

51.     In those reports, I described how the NPFT2G-4978-BA liners match a relevant bending mode frequency of the propshafts of the 488, 716, and 642 Accused Products.  In particular, the ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ (Ex.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

C)███████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex.

C) shows that the ███████████████████████████████████

███████████████████████████  In those reports, I also described how the NPFT2G-

4978-BA liners are configured to damp bending mode vibrations of the propshaft ██████

███████████  For example, the FRF data for the 488 Accused Product (reproduced below)

illustrates ████████████████████████████████████

███████████████████████  In those reports, I also described how the propshaft of the 488

Accused Product with its NPFT2G-4978-BA liners has ███████████████████████

████████████████████████████████████████

███████████████ (Exs. C & D.)



52.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this

limitation for the 488, 716, and 642 Accused Products because the NPFT2G-4978-BA liners are

configured to damp bending mode vibrations in the shaft member, and are tuned to within about

±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline

system.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

53.     Neapco therefore satisfies the 1[f] limitation for the 488, 716, and 642 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent, claim 1[f].)

54.     Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of the 645 Accused Product and 082 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 486-89, 586-87 | ¶ 153 |
| 1[b] | 22[b], 36[b] | ¶¶ 490-93, 586-87 | ¶ 153 |
| 1[d] | 22[d], 36[d] | ¶¶ 502-05, 586-87 | ¶ 153 |
| 5 | 23 | ¶¶ 540-44 | ¶¶ 173-77 |
| 6 | 24 | ¶¶ 545-49 | ¶¶ 173-77 |
| 12 | 26 | ¶¶ 550-56 | ¶¶ 178-79 |
| 13 | 27 | ¶¶ 557-62 | ¶¶ 178-79 |
| 19 | 31 | ¶¶ 563-68 | ¶¶ 178-79 |
| 20 | 34 | ¶¶ 569-76 | ¶¶ 178-79 |
| 21 | 35 | ¶¶ 577-584 | ¶¶ 178-79 |

72.     As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-4 for each of the 645 Accused Product and 082 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

        **a.**      **Claim 1**

                **(1)**      **1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"**

73.     Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 1[c].)

74.     I understand I should apply the following claim constructions for my analysis of this claim limitation:

22

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

75.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and  082 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 494-501, 585-87; July 21 Report ¶¶ 154-58.)

76.     In those reports, I described how Neapco engineering drawings confirm that the 645 and 082 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-BA and Neapco controls the characteristics of the NPFT2G-4978-BA liners by controlling its material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-BA liners of the 645 and 082 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

77.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-BA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration

23

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

at a relevant frequency or frequencies such that any difference is insubstantial. I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report. (*See, e.g.*, July 21 Report ¶¶ 310-13.)

78.     Neapco therefore satisfies the 1[c] limitation for the 645 and 082 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

> **(2)     1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

79.     Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 645 and 082 Accused Products. (*See* '911 patent at claim 1[e].)

80.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 506-21, 585-87; July 21 Report ¶¶ 159-66.)

81.     In those reports, I described how the NPFT2G-4978-BA liners match a relevant shell mode frequency of the propshafts of the 645 and 082 Accused Products. In particular, the

███████████████████████████████████████████████████████████████

██████████████████████████████████ (Ex. C). In those reports, I also described how the NPFT2G-4978-BA liners are configured to damp shell mode vibrations of the propshaft at the second shell mode. For example, the FRF data for the 645 Accused Product (reproduced below) illustrates ████████████████████████████████████████████████████████████

████████████████████████ In those reports, I also described how the propshaft of the 645

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

> **(3)** **1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

84.      Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products. (*See* '911 patent at claim 1[f].)

85.      I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 522-39, 585-87; July 21 Report ¶¶ 167-72.)

86.      In those reports, I described how the NPFT2G-4978-BA liners match a relevant bending mode frequency of the propshafts of the 645 and 082 Accused Products. In particular,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ (*See* Ex. D.) The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████████████

████████████████████████████ In those reports, I also described how the NPFT2G-4978-BA liners are configured to damp bending mode vibrations of the propshaft at the second bending mode. For example, the FRF data for the 645 Accused Product (reproduced below) illustrates an ████████████████████████████████████████

████████████████████████ In those reports, I also described how the propshaft of the 645 Accused Product with its NPFT2G-4978-BA liners has a ████████████████████

26

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████████████

██████████████████████ (Exs. C & D.)



87.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because the NPFT2G-4978-BA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode

27

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

88.     Neapco therefore satisfies the 1[f] limitation for the 645 and 082 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent, claim 1[f].)

89.     Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

           **b.     Claim 2**

                **(1)     "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

90.     As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

91.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of the 646 Accused Product and 073 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 595-98, 694-96 | ¶ 184 |
| 1[b] | 22[b], 36[b] | ¶¶ 599-602, 694-96 | ¶ 184 |
| 1[d] | 22[d], 36[d] | ¶¶ 611-614, 694-96 | ¶ 184 |

109.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2 for each of the 646 Accused Product and 073 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1 and 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### a.    Claim 1

#### (1)    1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

110.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 646 and 073 Accused Products.  (*See* '911 patent at claim 1[c].)

111.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

112.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 603-10, 694-96; July 21 Report ¶¶ 185-89.)

113.    In those reports, I described how Neapco engineering drawings confirm that the 646 and 073 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-CA and Neapco controls the characteristics of the NPFT2G-4978-CA liners by controlling its material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-CA liners of the 646 and 073 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

114.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-CA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

33

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



119.     Neapco therefore satisfies the 1[e] limitation for the 646 and 073 Accused Products by positioning at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

> **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

120.     Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 646 and 073 Accused Products. (*See* '911 patent at claim 1[f].)

121.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 631-48, 694-96; July 21 Report ¶¶ 199-210.)

122.    In those reports, I described how the NPFT2G-4978-CA liners match a relevant bending mode frequency of the propshafts of the 646 and 073 Accused Products.  In particular, the ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████████████████████████

████████████████████████████ In those reports, I also described how the NPFT2G-4978-CA liners are configured to damp bending mode vibrations of the propshaft at the second bending mode.  For example, the FRF data for the 646 Accused Product (reproduced below) illustrates ██████████████████████████████████████████████████████

██████████████████████████ In those reports, I also described how the propshaft of the 646 Accused Product with its NPFT2G-4978-CA liners has a ██████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ (Exs. C & D.)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



123.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because the NPFT2G-4978-CA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-CA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-CA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-CA liners achieve

37

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

124. Neapco therefore satisfies the 1[f] limitation for the 646 and 073 Accused Products by positioning at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

125. Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

        **b.**     **Claim 2**

                **(1)**    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

126. As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

127. Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 646 and 073 Accused Products. (*See* '911 patent at claim 2.)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

135.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-3 for each of the 643 Accused Product and the 169 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-3, 5, 6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

> a.    **Claim 1**

>> (1)    1[c]: **"tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"**

136.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 1[c].)

137.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

138.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 712-20, 810-812; July 21 Report ¶¶ 223-27.)

139.    In those reports, I described how Neapco engineering drawings confirm that the 643 and 169 Accused Products comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA, and Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

by controlling their material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 643 and 169 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

140.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

141.   Neapco therefore satisfies the 1[c] limitation for the 643 and 169 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

(2)   **1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



145.    Neapco therefore satisfies the 1[e] limitation for the 643 and 169 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

> **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

146.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 643 and 169 Accused Products. (*See* '911 patent at claim 1[f].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

147.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 744-64, 810-12; July 21 Report ¶¶ 237-48.)

148.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products.  For example, the ████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████ (Ex. C)████████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████████ ████████████████████████████████ In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations of the propshaft at the ████████████████  For example, the FRF data for the 643 Accused Product (reproduced below) illustrates an ████████████████████████████████ ████████████████████████████████████████ In those reports, I also described how the propshaft of the 643 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ████████████████████████████████████ ████████████████████████████ (Ex. C; Ex. D.)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



149.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.   For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

150.    Neapco therefore satisfies the 1[f] limitation for the 643 and 169 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

151.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

**b.    Claim 2**

**(1)    "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

152.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

153.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of 489, 644, and 781 Accused Products.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 818-21, 922-24 | ¶ 258 |
| 1[b] | 22[b], 36[b] | ¶¶ 822-25, 922-24 | ¶ 258 |
| 1[d] | 22[d], 36[d] | ¶¶ 835-38, 922-24 | ¶ 258 |
| 5 | 23 | ¶¶ 877-81 | ¶¶ 275-79 |
| 6 | 24 | ¶¶ 882-86 | ¶¶ 275-79 |
| 12 | 26 | ¶¶ 887-93 | ¶¶ 280-81 |
| 13 | 27 | ¶¶ 894-99 | ¶¶ 280-81 |
| 19 | 31 | ¶¶ 900-905 | ¶¶ 280-81 |
| 20 | 34 | ¶¶ 906-13 | ¶¶ 280-81 |
| 21 | 35 | ¶¶ 914-21 | ¶¶ 280-81 |

164.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-3 for each of the 489, 644, and 781 Accused Products.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-3, 5, 6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

### a.    Claim 1

#### (1)    1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

165.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[c].)

166.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two |

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

| | types of vibration transmitted through the shaft member |
|---|---|

167.   I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 826-34, 922-24; July 21 Report ¶¶ 259-63.)

168.   In those reports, I described how Neapco engineering drawings confirm that the 489, 644, and 781 Accused Products comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA, and Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 489, 644, and 781 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

169.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to

51

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

==substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)==

170.    Neapco therefore satisfies the 1[c] limitation for the 489, 644, and 781 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

171.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[e].)

172.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 839-57, 922-24; July 21 Report ¶¶ 269-74.)

173.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 489, 644, and 781 Accused Products.  For example, the ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████ (Ex. C).  (*See* Ex. D.)  In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp shell mode vibrations of the propshaft at the ███████████████  For example, the FRF data for the 489 Accused Product (reproduced

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

below) illustrates an ████████████████████████████████████████████

████████████████████████ In those reports, I also described how the propshaft of the 489

Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ████████

████████████████████████████████████████████████████████

(Exs. C & D.)



174.     Neapco therefore satisfies the 1[e] limitation for the 489, 644, and 781 Accused

Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two

NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured

to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to

about 2%." ('911 patent, claim 1[e].)

> **(3)     1[f]: "the at least one liner is also configured to damp
> bending mode vibrations in the shaft member, the at
> least one liner being tuned to within about ±20% of a
> bending mode natural frequency of the shaft assembly
> as installed in the driveline system."**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

175.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[f].)

176.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 858-76, 922-24; July 21 Report ¶¶ 269-74.)

177.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 489, 644, and 781 Accused Products.  For example, the ███████████████████████████████ (Ex. C) ██████████████████████████████████████████████████████ ███ (Ex. C)—███████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ███████████████████████████████ ██████████████████████████████████  As another example, the ████████ ████████████████████████████████ (Ex. C) ██████████████████████████ ███████████████████████████ (Ex. C)████████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers shows that the ██████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████  In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations of the propshaft at the █████████████████  For example, the FRF data for the 489 Accused Product

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

(reproduced below) illustrates an ████████████████████████████

██████████████████████████████   In those reports, I also described how the

propshaft of the 489 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA

liners has a ███████████████████████████████████████████████

██████████   (Exs. C & D.)



178. *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

179.    Neapco therefore satisfies the 1[f] limitation for the 489, 644, and 781 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

180.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

        **b.**    **Claim 2**

        **(1)**    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

181.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

### 3.      GM part no. 23377650 (5.775" x 0.079" x 2172 mm)

191.      As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 650 Accused Product.

192.      As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for the 650 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 930-33 | ¶ 284 |
| 1[b] | 22[b], 36[b] | ¶¶ 934-37 | ¶ 284 |
| 1[d] | 22[d], 36[d] | ¶¶ 946-49 | ¶ 284 |

193.      As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2 for the 650 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1 and 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

#### a.      Claim 1

##### (1)      1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

194.      Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for the 650 Accused Product.  (*See* '911 patent at claim 1[c].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

195.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

196.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 938-45, 1034-36; July 21 Report ¶¶ 285-89.)

197.    In those reports, I described how Neapco engineering drawings confirm that the 650 Accused Product comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA, and Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 650 Accused Product configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

198.    *Doctrine of Equivalents*:  My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant

60

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

199.    Neapco therefore satisfies the 1[c] limitation for the 650 Accused Product by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

200.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for the 650 Accused Product.  (*See* '911 patent at claim 1[e].)

201.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 950-68, 1034-36; July 21 Report ¶¶ 290-94.)

202.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 650 Accused Product. For example, the ███████████████████████████████ (Ex. C) ████████████ ██████████████████████████████████████████ (Ex. C)████████████ ██████████ (*See* Ex. D.)  In those reports, I also described how the NPFT2G-4978-DBA and

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

> **(3)   1[f]: "the at least one liner is also configured to damp
> bending mode vibrations in the shaft member, the at
> least one liner being tuned to within about ±20% of a
> bending mode natural frequency of the shaft assembly
> as installed in the driveline system."**

204.   Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for the 650 Accused Product.  (*See* '911 patent at claim 1[f].)

205.   I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 969-88, 1034-36; July 21 Report ¶¶ 295-300.)

206.   In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 650 Accused Product.  For example, the ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████  (*See* Ex. D.)  The FRF of the sum of all four accelerometers shows that the ████████████████████████████████████████████████

██████████████████████████████████████  In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations of the propshaft at the ███████████████  For example, the FRF data for the 650 Accused Product (reproduced below) illustrates an █████████████████

████████████████████████████████████████████████  In those reports, I also described how the propshaft of the 650 Accused Product with its NPFT2G-

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

4978-DBA and NPFT2G-4978-DCA liners has a ███████████████████████

███████████████████████████████████ (Ex. C; Ex. D.)



207.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled

64

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

208.    Neapco therefore satisfies the 1[f] limitation for the 650 Accused Product by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

209.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

> **b.    Claim 2**
>
> **(1)    "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

210.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

211.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

# EXHIBIT C

CASREF,Multi−Media Docs,PATENT

**U.S. District Court**
**District of Delaware (Wilmington)**
**CIVIL DOCKET FOR CASE #: 1:21−cv−01126−GBW−SRF**

TwinStrand Biosciences, Inc. et al v. Guardant Health, Inc.
Assigned to: Judge Gregory B. Williams
Referred to: Judge Sherry R. Fallon
Related Cases:  1:17−cv−01616−LPS−CJB
                1:20−cv−01580−LPS
                1:23−mc−00216−GBW
                1:22−cv−00334−GBW−CJB
Cause: 35:271 Patent Infringement

Date Filed: 08/03/2021
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Entered | # | Docket Text |
|---|---|---|
| 10/31/2023 | 467 | ORAL ORDER: Having reviewed the parties' letters (D.I. 331, D.I. 357, and D.I. 367) regarding Guardant's Motion to Strike Dr. Pachter's Reports and Opinions Regarding the Doctrine of Equivalents ("DOE") (D.I. 330), and for the reasons stated herein, IT IS HEREBY ORDERED that Guardant's Motion to Strike (D.I. 330) is GRANTED. Dr. Pachter will not be allowed to present a theory of infringement of the 631 or 127 patents based on the DOE. Plaintiffs possess the "obligation to articulate, in a timely manner, contentions and then expert opinion and linking evidence specifically directed to the claim elements it contends are met... by a theory of equivalents, under the function/way/result and/or insubstantial differences tests." Arendi SARL v. LG Electronics Inc., C.A. No. 12−1595−GBW, D.I. 248 (Oral Order) (D. Del. Jan. 25, 2021). The Court finds that Plaintiffs' passing reference to the doctrine of equivalents in its Final Infringement Contentions did not meet its burden to affirmatively disclose its theory. See id. (striking DOE opinions when a party made "passing reference to DOE in its complaints" and first presented evidence of its theory in a reply expert report); see also, e.g., D.I. 331 at Ex. 4 (Plaintiffs' Final Infringement Contentions And Claim Charts) ("In the event that any claim limitation is deemed to be missing under a literal infringement analysis Plaintiffs reserve the right to demonstrate the presence of a substantial equivalent of such a limitation and pursue infringement under the doctrine of equivalents."). Moreover, the Court finds that Plaintiffs did not disclose its DOE theory until service of Dr. Pachter's expert report. Such disclosure was untimely because Plaintiffs "cannot avoid the boundaries of its timely infringement contentions by not disclosing the substance of its doctrine of equivalents... contentions until its... Opening Expert Report." Fairchild Semiconductor Corp. v. Power Integrations Inc., No. 12−540−LPS, D.I. 162 (Oral Order) (D. Del. Oct. 22, 2014) (granting a motion to strike). Because Plaintiffs' disclosure of its DOE theory was untimely, the Court next turns to the Pennypack factors. The Court finds that the Pennypack factors support exclusion under the circumstances. Guardant would be prejudiced by allowing Plaintiffs to proceed on its untimely contentions because Guardant would be forced to present new defenses for the asserted DOE theories without the benefit of fact discovery. Guardant could not cure this prejudice without undue expense and/or delay, including disruption of the currently−scheduled trial. See D.I. 331 at 3, Fairchild, No. 12−540−LPS at D.I. 162; TQ Delta, LLC v. Adtran, Inc., 2020 WL 4529865 (D. Del. July 31, 2020) ("a belated attempt to introduce a DOE theory of infringement is not a mere correction of information, but instead, creates a new ballgame.") (internal citations omitted). Guardant has represented that, with knowledge of Plaintiffs' DOE theories, Guardant would have explored additional prior art (including from third parties), explored a potential ensnarement defense, and developed additional technical non−infringement contentions based on its product information and source code. D.I. 367 at 2. While the Court does not find that Plaintiffs acted in bad faith, Plaintiffs did fail to comply with the Court's scheduling order for identifying its infringement contentions. Plaintiffs allege that their DOE contentions rely on the same underlying facts as their direct infringement claims. D.I. 357 at 1,3. Thus, Plaintiffs could have, but chose not to, disclose their DOE theories. See TQ Delta, LLC v. Coxcom LLC, C.A. No. 15−612−GWB, D.I. 455, at *12 (D. Del. May 24, 2022) (striking DOE because, inter alia, plaintiff had possession of evidence underlying DOE theory for |



| | | three (3) months). While exclusion of Plaintiffs' untimely DOE theories may limit their contentions, Plaintiffs may still proceed on the underlying evidence and their timely–filed contentions. Accordingly, the Court finds that exclusion of Dr. Pachter's Reports and Opinions Regarding the DOE is appropriate under the circumstances. ORDERED by Judge Gregory B. Williams on 10/31/23. (ntl) (Entered: 10/31/2023) |

# EXHIBIT D

STAYED,DISCOVERY–JLH,Multi–Media Docs,PATENT

## U.S. District Court
## District of Delaware (Wilmington)
## CIVIL DOCKET FOR CASE #: 1:12–cv–01595–GBW

Arendi S.A.R.L. v. LG Electronics Inc., et al.
Assigned to: Judge Gregory B. Williams
Related Cases:   1:09–cv–00119–LPS
                 1:11–cv–00260–LPS
                 1:20–cv–01483–LPS
                 1:13–cv–00919–JLH
                 1:13–cv–00920–GBW
                 1:12–cv–01596–LPS
                 1:12–cv–01597–GBW
                 1:12–cv–01598–LPS
                 1:12–cv–01599–LPS
                 1:12–cv–01600–GBW
                 1:12–cv–01601–JLH
                 1:12–cv–01602–GBW
Cause: 35:271 Patent Infringement

Date Filed: 11/29/2012
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Entered | # | Docket Text |
|---|---|---|
| 01/25/2021 | 248 | ORAL ORDER: Having reviewed the parties' submissions relating to various motions to strike, IT IS HEREBY ORDERED that Google and Motorola's motion to strike those portions of Dr. Smedley's reports that disclose, discuss, analyze, or opine on theories of infringement under the doctrine of equivalents ("DOE") (C.A. No. 12–1601 D.I. 230; C.A. No. 13–919 D.I. 237), and LG's similar motion directed to DOE theories and references in Dr. Levy's reports (C.A. No. 12–1595 D.I. 235) are GRANTED. Arendi's passing reference to DOE in its complaints followed by its lack of affirmative disclaimer of DOE theories (see, e.g., C.A. No. 12–1595 D.I. 238 at 5) ("Arendi has never asserted that its claims were limited to literal infringement") does not come close to satisfying Arendi's obligation to articulate, in a timely manner, contentions and then expert opinion and linking evidence specifically directed to the claim elements it contends are met (at least contingently) by a theory of equivalents, under the function/way/result and/or insubstantial differences tests (see, e.g., id. D.I. 240 at 2 n.2) ("As the party with the burden of proof, Arendi had to do far more than not limit its claims to literal infringement; it had to affirmatively disclose any DOE theories."). Not even attempting to meet this burden (and, in any event, failing to meet this burden even when it belatedly tried) until a reply expert report is surprising, harmful, and unfairly prejudicial to Google, Motorola, and LG and not substantially justified. Defendants had no opportunity to pursue fact or even expert discovery to counter the new DOE theories, which they might have done by pursuing, for example, different theories of non–infringement, such as ensnarement. While no trial date has been set, and it is possible that further discovery and delay could remedy much of the prejudice, there is no reason to consider such steps, given Arendi's failures with respect to DOE. Arendi's explanation – that Defendants' experts somehow relied on new and improper claim constructions in their non–infringement reports, to which Drs. Smedley and Levy were entitled to reply – is unpersuasive and unavailing. No expert will be permitted to present an opinion that contradicts the Court's claim constructions; Arendi has not shown this has occurred nor that, if it has, the appropriate relief would be to permit Arendi to expand this case to include DOE theories Arendi was obligated to disclose long ago. The Pennypack factors, as a whole, favor striking. No portion of the teleconference today will be devoted to arguing the motions resolved by this Order. ORDERED by Judge Leonard P. Stark on 1/25/21. Associated Cases: 1:12–cv–01595–LPS, 1:12–cv–01601–LPS, 1:13–cv–00919–LPS (ntl) (Entered: 01/25/2021) |

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| XPERTUNIVERSE, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 09-157-RGA |
| | : | |
| CISCO SYSTEMS, INC., | : | |
| | : | |
| Defendant. | : | |

## ORDER

Before the Court are the parties' Motions in Limine (D.I. 581, Exs. 15 and 16) and supplemental letters (D.I. 576, 597). The Court had the benefit of oral argument on February 22, 2013. It is **ORDERED** that:

1. Plaintiff's first Motion, regarding Defendant's Exhibits 92 and 93, is **DENIED**. The exhibits are authenticated; their associated metadata and the circumstances of their creation and production make it reasonable to conclude they were authored by Plaintiff's CEO, Victor Friedman. As such, they are party statements and are not hearsay. They are probative on the issues of causation and damages. They are not unfairly prejudicial, and, to the extent there would be any danger of unfair prejudice (because, for example, Mr. Friedman did not have all relevant facts at his command when writing the document, or because it is less than clear what Mr. Friedman intended to do with the document), the danger of unfair prejudice does not substantially outweigh the probative value.

2. The parties resolved Plaintiff's second Motion at oral argument.

1

3.  Plaintiff's third Motion, regarding the ipCapital recordings, is **GRANTED**.  The burden is on Defendant to produce clear and convincing evidence of authenticity and accuracy as a foundation.  *See United States v. Starks*, 515 F.2d 112, 121 (3d Cir. 1975).  Defendant's proffered authentication of some of the speakers in the recordings could be accomplished via live witnesses out of the presence of the jury.  However, one seventh of the recording is missing; this is tantamount to a deletion from the tape, and indicates that the recording has not been adequately preserved.  Defendant has proffered identification of some of the speakers "TBA" - those XU employees who Defendant plans to call at trial would be asked, presumably outside the presence of the jury, which voices they could identify.  The rest of the speakers, who probably are XU employees, but may not be, would remain unidentified.  The middle of trial is not a good time to be trying to identify the speakers. Defendant has to date failed to lay the proper foundation, and its ability to do so later is extremely doubtful.  While not the basis for decision, the Court notes that Cisco has advised which portions of the recordings it believes are pertinent to invalidity,  (D.I. 596), but the Court does not understand how any of the four excerpts, even if admitted, would be probative.  It is possible that argument on that point would help.  That would be an argument for another day, if the recordings were otherwise admissible.

4.  Defendant's first Motion, regarding the ipScan report, is **GRANTED**.  The out of court statements by ipCapital are hearsay.

5.  Defendant's second Motion, regarding Defendant's products that Plaintiff has not accused of any infringement or in any misappropriation, is **GRANTED IN PART**. The parties resolved the issue about renamed accused products over the course of the briefing and at

2

oral argument. Mr. Hayden's deposition testimony and declaration, and the spreadsheet at XU's Trial Exhibit 294, may not be offered to show damages. The testimony and declaration lack a sufficient foundation. Mr. Hayden's deposition testimony and declaration linking Cisco's Latin American sales to Plaintiff's "intellectual capital," "concept" of "realtime collaboration," and "confidential information" fails to show the spreadsheet's Latin American sales of unaccused products are convoyed sales. *See* (D.I. 597-4 at 4-5, 7, 12-13). Mr. Hayden is not an expert on intellectual property and does not have any personal knowledge of what is or is not XU's confidential information, trade secrets or protected by its patents. Mr. Hayden is not on any party's witness list, and Plaintiff offers no other proof that the $94 million in Latin American sales were sold with or functionally related to any product accused of infringement or embodying any of Plaintiff's allegedly misappropriated trade secrets. Even if there were a sufficient foundation, the conclusory nature of the testimony, and therefore its probative value for the ultimate point it is intended to support – the convoyed sales – would still be substantially outweighed by the danger of misleading the jury as to how much Mr. Hayden actually knew to make the statement.

6. The parties resolved a portion of Defendant's third Motion at oral argument, agreeing that the New York Times article mentioned in footnote 3 and the Wall Street Journal article listed on page 3 will not be shown to the jury due to the prejudicially large market numbers they include.[1] Defendant's third Motion is **GRANTED IN PART** with regard

---

[1] As indicated at the argument, if Plaintiff had not agreed to not use the two articles, the Court would have excluded them under Rule 403.

3

to XU's Trial Exhibits 312 and 314.[2] Those exhibits may not be used to prove the truth of any matter asserted therein, as they are hearsay.[3] While that is a sufficient reason to exclude the exhibits, it is worth noting that even if the various hearsay objections were overcome, the probative value of the exhibits would be diminished by the fact that they are "guesstimates" (D.I. 590-2, at 6) based on discussions with Plaintiff's management about Plaintiff's future performance, which is inherently speculative, even if XU did not have a substantial motive to paint a rosy picture.

Also before the Court is Cisco's request in the Joint Proposed Pretrial Order that XU not be allowed to add contentions regarding the doctrine of equivalents immediately before trial. (D.I. 580, Ex. 7 at 1 n.1). This request is **GRANTED**. XU does not contend that they ever provided infringement contentions based on the doctrine of equivalents. Dr. Nourbakhsh's

---

[2] The additional exhibits Cisco identified in the version of its Motion appearing in the Joint Pretrial Order (D.I. 581, Ex. 16) are not properly before the Court.

[3] In the Motion in Limine, XU said exhibits fell within the hearsay exception for market reports. Fed. R. Evid. 803(17). (D.I. 581, Exh. 16, Third Motion in Limine, at 2). Without waiting for that theory to fall of its own weight, XU's most recent submission was that the exhibits were "unquestionably" business records of S&P or were admissible under Rule 807. (D.I. 602, at 2-3). As to business records, there is no "custodian" or certification, *see* Fed. R. Evid. 803(6)(D). Even if there were, it is unlikely that the custodian could state that the record [that is, an approximately 30 page report] was "made at or near the time" the information was transmitted to S&P, *see* Fed. R. Evid. 803(6)(A). While it may be true that the making the report was a regular practice of S&P, and that it was kept in the course of S&P's regularly conducted activity, that does not mean that each separate statement (which would be the sort of "record" that the business records exception was meant to address) is either. Finally, the only reason that S&P wrote the report, it appears, was so that XU could raise money or sell itself, which indicates a lack of trustworthiness in the source of the information, to the extent it comes from XU employees. *See* Fed. R. Evid. 803(6)(E). The report would fare no better if analyzed under Rule 807. The basic problem is that XU is trying to take unreliable hearsay (XU employees talking to S&P employees) which S&P then writes down (adding a second, ordinary hearsay level) to which S&P may add some expertise (thereby implicating the expert rules).

4

cursory recitation of the law of the doctrine of equivalents and passing references to alleged

equivalencies are an insufficient basis to make the doctrine of equivalents a triable issue in the

case. (D.I. 597-1, Ex. A, ¶¶ 12, 76, 77, 82, 98, 99, 168, 185, 209).

Entered this 18th day of February, 2013.

*Richard G. Andrews*

United States District Judge

# EXHIBIT F
# EXCERPTED
# HIGHLY
# CONFIDENTIAL

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>OPENING EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.</u>

By: _____

May 31, 2017

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    CREDENTIALS AND QUALIFICATIONS .................................................... 2

III.   MATERIALS CONSIDERED ........................................................................... 3

IV.    PATENT LAW STANDARDS .......................................................................... 4

       A.    A Person of Ordinary Skill in the Art ................................................... 4

       B.    Claim Construction ................................................................................. 5

       C.    Infringement ............................................................................................ 6

V.     SUMMARY OF MY INFRINGEMENT OPINIONS ..................................... 7

VI.    TECHNOLOGY BACKGROUND AND STATE OF THE ART ................... 8

       A.    Automotive Driveline Systems ............................................................... 8

       B.    Reactive and Resistive Attenuation of Bending and Shell Mode Vibrations ....... 10

       C.    Experimental Modal Analysis of Propshafts and Liners ...................... 15

VII.   THE '911 PATENT ............................................................................................ 25

       A.    The Patent Specification ....................................................................... 25

       B.    The Asserted Claims ............................................................................. 28

       C.    Claim Construction of the Asserted Claims .......................................... 30

             1.    The Agreed Claim Constructions .............................................. 30

             2.    The Court's Claim Constructions .............................................. 31

VIII.  BACKGROUND AND SUMMARY OF THE ACCUSED PRODUCTS ...... 32

       A.    GM's 31XXN Program ........................................................................... 32

       B.    4.0 Inch Accused Products .................................................................... 35

             1.    GM part no. 23282324 ("the 324 Accused Product") .............. 35

       C.    4.5 inch Accused Products ..................................................................... 37

             1.    GM part no. 94769076 ("the 076 Accused Product") .............. 38

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

2.      GM part no. 84059647 ("the 647 Accused Product")...............................40

3.      GM part no. 84148488 ("the 488 Accused Product")...............................42

4.      GM part no. 84059642 ("the 642 Accused Product")...............................43

5.      GM part no. 23214716 ("the 716 Accused Product")...............................44

6.      GM part no. 84059645 ("the 645 Accused Product")...............................46

7.      GM part no. 23464082 ("the 082 Accused Product")...............................47

D.      5.0 inch Accused Products...........................................................................49

1.      GM part no. 84059646 ("the 646 Accused Product")...............................49

2.      GM part no. 94769073 ("the 073 Accused Product")...............................51

E.      5.775 inch Accused Products.......................................................................53

1.      GM part no. 84059643 ("the 643 Accused Product")...............................53

2.      GM part no. 23225169 ("the 169 Accused Product")...............................57

3.      GM part no. 84148489 ("the 489 Accused Product")...............................59

4.      GM part no. 84059644 ("the 644 Accused Product")...............................61

5.      GM part no. 23253781 ("the 781 Accused Product")...............................63

6.      GM part no. 23377650 ("the 650 Accused Product")...............................65

F.      Summary of the Accused Products ........................................................68

IX.   THE ACCUSED PRODUCTS INFRINGE THE '911 PATENT .....................71

A.      The Neapco 4.0 inch Accused Products Infringe the '911 patent........................71

1.      GM part no. 23282324 (4.0" x 0.093" x 1704 mm) .................................71

a.      Claim 22.............................................................................71

b.      Claim 23.............................................................................93

c.      Claim 24.............................................................................93

d.      Claim 26.............................................................................94

e.      Claim 27.............................................................................96

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

        f.     Claim 31......................................................................................... 97

        g.    Claim 34......................................................................................... 98

        h.    Claim 35....................................................................................... 101

        i.     Claim 36....................................................................................... 102

B.     The Neapco 4.5 inch Accused Products Infringe the '911 patent........................ 104

    1.     GM part nos. 94769076 and 84059647 (4.5" x 0.085" x 1912 mm)...... 105

        a.    Claim 22....................................................................................... 105

        b.    Claim 23....................................................................................... 126

        c.    Claim 24....................................................................................... 126

        d.    Claim 26....................................................................................... 127

        e.    Claim 27....................................................................................... 129

        f.     Claim 31....................................................................................... 130

        g.    Claim 34....................................................................................... 131

        h.    Claim 35....................................................................................... 134

        i.     Claim 36....................................................................................... 136

    2.     GM part nos. 84148488, 23214716, and 84059642 (4.5" x 0.085" x 1891 mm) ....................................................................................... 137

        a.    Claim 22....................................................................................... 138

        b.    Claim 23....................................................................................... 158

        c.    Claim 24....................................................................................... 158

        d.    Claim 26....................................................................................... 159

        e.    Claim 27....................................................................................... 161

        f.     Claim 31....................................................................................... 163

        g.    Claim 34....................................................................................... 164

        h.    Claim 35....................................................................................... 166

        i.     Claim 36....................................................................................... 168

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

3.       GM part nos. 84059645 and 23464082 (4.5" x 0.085" x 1799 mm) ...... 170

        a.     Claim 22 ........................................................................................ 170

        b.     Claim 23 ........................................................................................ 190

        c.     Claim 24 ........................................................................................ 190

        d.     Claim 26 ........................................................................................ 191

        e.     Claim 27 ........................................................................................ 193

        f.     Claim 31 ........................................................................................ 194

        g.     Claim 34 ........................................................................................ 195

        h.     Claim 35 ........................................................................................ 198

        i.     Claim 36 ........................................................................................ 200

C.     The Neapco 5.0 inch Accused Products Infringe the '911 patent ....................... 201

    1.       GM part nos. 84059646 and 94769073 (5.0" x 0.080" x 1956 mm) ...... 202

        a.     Claim 22 ........................................................................................ 203

        b.     Claim 23 ........................................................................................ 222

        c.     Claim 24 ........................................................................................ 223

        d.     Claim 26 ........................................................................................ 224

        e.     Claim 27 ........................................................................................ 226

        f.     Claim 31 ........................................................................................ 227

        g.     Claim 34 ........................................................................................ 228

        h.     Claim 35 ........................................................................................ 230

        i.     Claim 36 ........................................................................................ 232

D.     The Neapco 5.775 inch Accused Products Infringe the '911 patent .................. 234

    1.       GM part nos. 84059643 and 23225169 (5.775" x 0.079" x 2222 mm) ...................................................................................................... 234

        a.     Claim 22 ........................................................................................ 235

        b.     Claim 23 ........................................................................................ 260

| | | | |
|---|---|---|---|
| | c. | Claim 24 | 261 |
| | d. | Claim 26 | 262 |
| | e. | Claim 27 | 264 |
| | f. | Claim 31 | 266 |
| | g. | Claim 34 | 267 |
| | h. | Claim 35 | 269 |
| | i. | Claim 36 | 271 |
| 2. | | GM part nos. 84148489, 84059644, and 23253781 (5.775" x 0.079" x 2200 mm) | 273 |
| | a. | Claim 22 | 273 |
| | b. | Claim 23 | 295 |
| | c. | Claim 24 | 296 |
| | d. | Claim 26 | 297 |
| | e. | Claim 27 | 299 |
| | f. | Claim 31 | 301 |
| | g. | Claim 34 | 302 |
| | h. | Claim 35 | 304 |
| | i. | Claim 36 | 306 |
| 3. | | GM part no. 23377650 (5.775" x 0.079" x 2172 mm) | 308 |
| | a. | Claim 22 | 308 |
| | b. | Claim 23 | 329 |
| | c. | Claim 24 | 330 |
| | d. | Claim 26 | 331 |
| | e. | Claim 27 | 333 |
| | f. | Claim 31 | 335 |
| | g. | Claim 34 | 336 |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

h.    Claim 35 ...................................................................................... 338

i.    Claim 36 ...................................................................................... 340

X.    CONCLUSION .............................................................................................. 342

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

267.    As I describe more fully below, my opinion is that the Neapco 4.5 Accused Products listed above each infringe claims 22-24, 26, 27, 31, 34-36 of the '911 patent.

### 1.    GM part nos. 94769076 and 84059647 (4.5" x 0.085" x 1912 mm)

268.    As described herein, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 076 Accused Product.  The 647 Accused Product has similar dimensions and characteristics, and includes the same number and type of liners, as the 076 Accused Product described above.  Indeed, the 647 Accused Product has the same Neapco part no., Neapco "TUBE DRV/SHT" part no., and  Neapco "TUBE & DMPR ASY" part no. as the 076 Accused Product.  (*Compare* NEAPCO000880 *and* NEAPCO000106.)  I understand the similarities between the 647 Accused Product and the 076 Accused Product are a result of a "swage length increase from 101.6 to 128 mm." (NEAPCO195905.)  The resulting 101.6 to 128 mm swage length increase from the 076 Accused Product to the 647 Accused Product is an insubstantial change that would not affect whether the 647 Accused Product satisfies the claim limitations of the '911 patent.  (*See, e.g.*, GM_AAM000000248-58.)  In other words, modal analysis testing of the 647 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 076 Accused Product.  (*See, e.g.*, GM_AAM000000248-58.)  Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 076 Accused Product for each of the 076 Accused Product and 647 Accused Product.

        a.    Claim 22

        (1)    **22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration. To the extent that Neapco does not literally satisfy this limitation for the 076 and 647 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

306.   Neapco therefore satisfies the 22[e] limitation for the 076 and 647 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations." ('911 patent, claim 22[e].)

       (6)    **22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."**

307.   Neapco inserts the at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 076 and 647 Accused Products. (*See* '911 patent at claim 22[f].)

118

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

308.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |

309.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the two NPFT2G-4978-BA liners positioned within 076 and 647 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

310.    As described above with regard to limitation 22[e], documents produced by Neapco are ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ (*See, e.g.,* NEAPCO000212 (presentation describing ██████████████████████ including ███████████████████████████ for 4.5" liner, "GM █ ████████████ █ and ███████████████████████ NEAPCO001564-68 (presentation describing ███ ███ ██████████████████████████" including ████████ of ██████████████████████ for 4.5" liner, "GM █ ██████████████ ," and ████████████████████████████; NEAPCO001573-82  (same);  NEAPCO001103-11 (presentation describing ██████████████████████████ including description of ████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



311.    The liners associated with the 076 Accused Products have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K show that the liners of the 076 Accused Products have ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

312.    As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and, if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

313.    Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

==opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.==

314.     As described above, I directed B&K to test the NPFT2G-4978-BA liners associated with the 076 and 647 Accused Products to determine whether the liners were matched to any bending modes of the propshaft.  The testing results from B&K confirm that these liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  For example, the ███████████████ of the NPFT2G-4978-BA liners ███ ███ (Ex. C) ████████████████████████████████████████████████ ██████ (Ex. C).  (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████████████████████████████ ████████████████████████

315.     The matching of the NPFT2G-4978-BA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF plots for the 076 Accused Product.  (Ex. C.)  As described above, I directed B&K test the propshaft with and without the liners installed and calculate the FRFs, relevant bending mode natural frequencies, and bending mode damping.  To ensure that the FRFs measure bending mode vibration, I directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing.  To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

316.     I have reproduced the bending mode FRF plot for the 076 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals added to best measure ████████████████████████ (Ex. C.)

# **EXHIBIT G**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>OPENING EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.</u>

By: _____

May 31, 2017

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the relevant third bending mode natural frequency.

211.   Neapco therefore satisfies the 22[f] limitation for the 324 Accused Product by inserting at least one liner, namely three NPFT2G-4978-ABA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." ('911 patent, claim 22[f].)

212.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 324 Accused Product because the NPFT2G-4978-ABA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.   To the extent that Neapco does not literally satisfy this limitation for the 324 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-ABA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.   For example, the NPFT2G-4978-ABA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.   The NPFT2G-4978-ABA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.   The NPFT2G-4978-ABA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

322.    Neapco therefore satisfies the 22[f] limitation for the 076 and 647 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." ('911 patent, claim 22[f].)

323.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 076 and 647 Accused Products because the NPFT2G-4978-BA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  To the extent that Neapco does not literally satisfy this limitation for the 076 and 647 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

429.   Neapco therefore satisfies the 22[f] limitation for the 488, 716, and 642 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." ('911 patent, claim 22[f].)

430.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because the NPFT2G-4978-BA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations. To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

# **EXHIBIT H**

*Highly Confidential* – Reply Expert Report of Christopher D. Rahn, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>REPLY EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.</u>

By: _____

July 21, 2017

*Highly Confidential* – Reply Expert Report of Christopher D. Rahn, Ph.D.

Accused Product with and without the NPFT2G-4978-ABA liners is expressly contemplated and supported by the '911 patent.

76.     Neapco therefore satisfies the 22[f] limitation for the 324 Accused Product by inserting the at least one liner into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."

77.     *Doctrine of Equivalents*: As I set forth in my Opening Report (¶ 212), to the extent that Neapco does not literally satisfy this limitation for the 324 Accused Product, Neapco satisfies claim limitation 22[f] under the doctrine of equivalents.  Mr. Becker responds to my doctrine of equivalents opinions for all Accused Products, rather than separately for the 324 Accused Product.  (Becker Rebuttal Rep. ¶¶ 112-114.)   I also respond separately below in Section IX.F.

78.     Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 324 Accused Product.

### b.     Claims 23 and 24

79.     As set forth in my Opening Report (¶¶ 214-223), Neapco satisfies each and every limitation of, and therefore infringes, claims 23 and 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 324 Accused Product.

80.     Relying on his analysis of claim 22, Mr. Becker alleges that "[n]one of the Accused Products infringe" dependent claims 23 and 24 because, according to Mr. Becker, "none of the Accused Products are tuned to any shell mode" and "none of the Accused Products are tuned to any bending mode."   (Becker Rebuttal Rep. ¶¶ 117-118.)   I disagree with Mr. Becker's opinions at least for the reasons set forth in my Opening Report and above concerning Neapco's infringement of claim 22.

*Highly Confidential* – Reply Expert Report of Christopher D. Rahn, Ph.D.

112.    Neapco therefore satisfies the 22[f] limitation for the 076 and 647 Accused Products by inserting the at least one liner into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."

113.    *Doctrine of Equivalents*: As I set forth in my Opening Report (¶ 323), to the extent that Neapco does not literally satisfy this limitation for the 076 and 647 Accused Products, Neapco satisfies claim limitation 22[f] under the doctrine of equivalents.  Mr. Becker responds to my doctrine of equivalents opinions for all Accused Products, rather than separately for the 076 and 647 Accused Products.  (Becker Rebuttal Rep. ¶¶ 112-114.)  I also respond separately below in Section IX.F.

114.    Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 076 and 647 Accused Products.

### a.    Claims 23 and 24

115.    As set forth in my Opening Report (¶¶ 325-334), Neapco satisfies each and every limitation of, and therefore infringes, claims 23 and 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 076 and 647 Accused Products.

116.    Relying on his analysis of claim 22, Mr. Becker alleges that "[n]one of the Accused Products infringe" dependent claims 23 and 24 because, according to Mr. Becker, "none of the Accused Products are tuned to any shell mode" and "none of the Accused Products are tuned to any bending mode."  (Becker Rebuttal Rep. ¶¶ 117-118.)  I disagree with Mr. Becker's opinions at least for the reasons set forth in my Opening Report and above concerning Neapco's infringement of claim 22.

117.    Mr. Becker further alleges that my "use of peak picking, rather than modal analysis, makes it speculative that the various modes he identifies are the first, second, third, or

*Highly Confidential* – Reply Expert Report of Christopher D. Rahn, Ph.D.

motive. Rather, Neapco (and others) may satisfy these claim limitations by, for example, providing a "liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration" without any state of mind, e.g., intent, as to matching that relevant frequencies or frequencies.

140. Mr. Becker addresses the 4.5 inch accused products together, and does not provide a separate, individual analysis as to the 488, 716, and 642 Accused Products. (*See supra* n.3.) I thereby incorporate my analysis set forth above and in my Opening Report concerning the 076 and 647 Accused Products, as well as the analysis set forth in my Opening Report concerning the 488, 716, and 642 Accused Products.

141. Neapco therefore satisfies the 22[f] limitation for the 488, 716, and 642 Accused Products by inserting the at least one liner into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."

142. *Doctrine of Equivalents*: As I set forth in my Opening Report (¶ 430), to the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies claim limitation 22[f] under the doctrine of equivalents. To the extent Mr. Becker responds to my doctrine of equivalents opinions for 489, 644, and 781 Accused Products, he does so as to all Accused Products, rather than separately for the 489, 644, and 781 Accused Products. (Becker Rebuttal Rep. ¶¶ 112-114.) I also respond separately below in Section IX.F.

143. Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – Reply Expert Report of Christopher D. Rahn, Ph.D.

### c.    Claim 36

308.    Mr. Becker does not provide any analysis concerning Neapco's infringement of claim 36 other than an opinion "that the Accused Products do not infringe claim 36 for the same reasons they do not infringe claim 22."  (Becker Rebuttal Rep. ¶ 119.)  Nor does Mr. Becker dispute that Neapco performs claim limitation 36[e] by inserting at least one liner into the propshaft of the 650 Accused Product "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36.)

309.    For at least the reasons set forth in my Opening Report concerning Neapco's infringement of claim 36 (¶¶ 1034-1040) and set forth above concerning Neapco's infringement of claim 22, which I incorporate herein by reference, Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### F.    Doctrine of Equivalents

310.    As I stated in my Opening Report, to the extent that Neapco does not literally satisfy claim limitations 22[c], 22[e], and 22[f], and the corresponding claim limitation of claim 36, my opinion is that Neapco satisfies these limitations for each Accused Product under the doctrine of equivalents.  (Opening Rep. ¶¶ 168, 191, 212, 283, 305, 323, 392, 412, 430, 500, 520, 538, 609, 629, 647, 719, 742, 763, 833, 856, 875, 944, 967, 987.)

311.    In his Rebuttal Report, Mr. Becker states that he has "reviewed these paragraphs" and that he "disagree[s] that the Accused Products infringe any Asserted Claim under the doctrine of equivalents."  (Becker Rebuttal Rep. ¶¶ 112.)  In particular, Mr. Becker alleges:

> [I]t is not the substantially same function / way / result for a claim step requiring tuning liners as both a resistive absorber for attenuating shell mode vibrations and a reactive absorber for attenuating bending mode vibrations to not perform any tuning, or controlling characteristics of the liners to match the relevant modal frequencies. One skilled in the art would not understand that a damper that was

*Highly Confidential* – Reply Expert Report of Christopher D. Rahn, Ph.D.

not "tuned" for a particular frequency, and has the differences in frequencies discussed above, to perform substantially the same function, in the substantially same way, with the substantially same result as a damper, or liner, that was required to be tuned to match a frequency. Such an interpretation would effectively eliminate the requirement of tuning from the claims altogether."

(Becker Rebuttal Rep. ¶ 113.)

312.    I disagree with Mr. Becker's opinion.  As I described in my Opening Report (¶¶ 168, 191, 212, 283, 305, 323, 392, 412, 430, 500, 520, 538, 609, 629, 647, 719, 742, 763, 833, 856, 875, 944, 967, 987), the liners of the Accused Products are configured to substantially match a relevant shell mode and bending mode frequency or frequencies and attenuate vibration at a relevant shell mode and bending frequency or frequencies such that any difference is insubstantial.  In particular, the FRF data corresponding to those Accused Products show how those liners effectively attenuate vibration at the relevant shell mode and bending frequency or frequencies such that any difference between the liners of the Accused Products and liners having a frequency or frequencies that correspond 1-for-1 to a relevant shell mode and bending mode frequency is insubstantial.

313.    I also provided doctrine of equivalents opinions concerning claims 34 and 35. (Opening Rep. ¶¶ 249, 257, 360, 368, 467, 475, 575, 583, 684, 692, 800, 808, 912, 920, 1024, 1032.)  Mr. Becker does not address my remaining doctrine of equivalents opinions concerning claims 34 and 35.

## X.    MR. BECKER'S ALLEGED DESIGN ALTERNATIVES TO TUNED LINERS

314.    I have been asked by Mr. Hansen to respond to opinions offered by Mr. Becker relating to alternative designs and relied on by Mr. Chase in his damages analysis.  Specifically, Mr. Hansen asked me to respond to opinions offered by Mr. Becker relating to alternatives that he alleges Neapco could have used in 2013 or 2014 for the Accused Products.  As explained

# **EXHIBIT I**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-LPS |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

**REBUTTAL EXPERT REPORT OF STEVEN BECKER**

**HIGHLY CONFIDENTIAL**

Dated:  ___6/30/17_____          _____

                                                                            Steven Becker

internal damper, or liner, will change the propshaft modal frequencies, including shell, bending, and torsion, merely due to its mass, whether "tuned" to a frequency or not.  This phenomenon is described in Czep: "On the other hand, the vibration behavior and resonance frequency of the component to be damped is changed by the damping mass."  (Invalidity Report, App. G; Czep, at col. 2.)  Dr. Rahn has not demonstrated that these change in frequencies have anything to do with any alleged "tuning" as required by the claims.

### 3.      Doctrine of Equivalents

112.    Dr. Rahn alternatively opines that the Accused Products infringe under the doctrine of equivalents, the "tuning a mass and stiffness of at least one liner," "tuned resistive absorber for attenuating shell mode vibrations," and "tuned reactive absorber for attenuating bending mode vibrations" limitations.  (*See e.g.,* Rahn Report, ¶¶ 168, 191, 212, 283, 305, 323, 609, 629, 647, 719, 742, 763, 833, 856, 875, 944, 967, and 987.)   I have reviewed these paragraphs, and I disagree that the Accused Products infringe any Asserted Claim under the doctrine of equivalents.

113.    Dr. Rahn purports to apply a doctrine of equivalents analysis for these limitations, however, besides reciting the legal test and claim elements, his opinion is devoid of any real analysis, besides, apparently, repeating the accused structure and steps he cites in his literal infringement analysis.  Regardless, Neapco does not infringe claim 22 under the doctrine of equivalents because it does not perform the steps required of the claims and the differences between the claimed steps and the actions of Neapco are substantial and Neapco does not perform substantially the same function, in substantially the same way, with substantially the same result.  For example, it is not the substantially same function / way / result for a claim step requiring tuning liners as both a resistive absorber for attenuating shell mode vibrations and a reactive absorber for attenuating bending mode vibrations to not perform any tuning, or

controlling characteristics of the liners to match the relevant modal frequencies.  One skilled in the art would not understand that a damper that was not "tuned" for a particular frequency, and has the differences in frequencies discussed above, to perform substantially the same function, in the substantially same way, with the substantially same result as a damper, or liner, that was required to be tuned to match a frequency.  Such an interpretation would effectively eliminate the requirement of tuning from the claims altogether.  Dr. Rahn has cited no evidence otherwise and merely makes a conclusory statement.

114.    Because Dr. Rahn has not provided any doctrine of equivalents analysis besides repeating the legal test and referring to his literal infringement analysis, he has not provided any substantive opinion to respond to.  I reserve the right to further respond should Dr. Rahn be permitted to provide additional doctrine of equivalents testimony.

## B.  Claim 22 Dependent Claims

115.    It is further my opinion that none of the asserted dependent claims are infringed by the Accused Products.  AAM also asserts the following claims that depend from claim 22:

| |
|---|
| [23] The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode. |
| [24] The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode. |
| [26] The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member. |
| [27] The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion. |
| [31] The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof. |
| [34] The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node. |
| [35] The method of claim 34, wherein a second one of the liners is positioned along the shaft |

# **EXHIBIT J**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERICAN AXLE & MANUFACTURING, INC., )
)
)
Plaintiff, )
)
v. )
) C.A. No. 15-1168-LPS
NEAPCO HOLDINGS LLC and NEAPCO )
DRIVELINES LLC, ) **JURY TRIAL DEMANDED**
)
Defendants. )
)
)

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF STEVEN BECKER REGARDING INFRINGEMENT OF THE NEW ASSERTED CLAIMS OF U.S. PATENT NO. 7,774,911

## HIGHLY CONFIDENTIAL



Dated: _____ 11/3/2017

Steven Becker

vibrations dampened due to the alleged "tuning" and not simply the mass damping effects any liner would provide.  For example, Dr. Rahn did not compare the damping that would occur with a similar sized non-tuned liner.  As I indicated in my Invalidity Report, any liner, including prior art untuned liners, would provide resistive damping and bending mode attenuations up to and above a 2% damping ratio.[19]

### 3.      Doctrine of Equivalents

78.      Dr. Rahn alternatively opines that the Accused Products infringe under the doctrine of equivalents, claim elements 1[b] and 1[d].  I have reviewed these paragraphs, and I disagree that the Accused Products infringe any New Asserted Claim under the doctrine of equivalents.

79.      As in his Opening Infringement Report, Dr. Rahn purports to apply a doctrine of equivalents analysis for these limitations, however, besides reciting the legal test and claim elements, his opinion is devoid of any real analysis, besides, apparently, repeating the accused structure and steps he cites in his literal infringement analysis.  Regardless, Neapco does not infringe claim 1 under the doctrine of equivalents because it does not perform the steps required of the claims and the differences between the claimed steps and the actions of Neapco are substantial and Neapco does not perform substantially the same function, in substantially the same way, with substantially the same result.   For example, it is not the substantially same function / way / result for a claim step requiring tuning liners to a frequency or frequencies to dampen both shell mode vibrations and bending mode vibrations to not perform any tuning, or controlling characteristics of the liners to match the relevant modal frequencies.  One skilled in the art would not understand that a damper that was not "tuned" for a particular frequency, and

---

[19] As I also indicated in my three Invalidity Reports, it is unclear what level of damping is required to be dampened, as required by the claims.

has the differences in frequencies discussed above, to perform substantially the same function, in the substantially same way, with the substantially same result as a damper, or liner, that was required to be tuned to match a frequency.  Such an interpretation would effectively eliminate the requirement of tuning from the claims altogether.  Dr. Rahn has cited no evidence otherwise and merely makes a conclusory statement.

80.     Because Dr. Rahn has not provided any doctrine of equivalents analysis besides repeating the legal test and referring to his literal infringement analysis, he has not provided any substantive opinion to respond to.  I reserve the right to further respond should Dr. Rahn be permitted to provide additional doctrine of equivalents testimony.

## B.  Claim 1 Dependent Claims

81.     It is further my opinion that none of the asserted dependent claims are infringed by the Accused Products.  AAM also asserts the following claims that depend from claim 1:

| |
|---|
| [2] The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. |
| [3] The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. |
| [4] The method of claim 3, wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. |
| [5] The method of claim 3, wherein the shell mode is at least one of a first shell mode, a second shell mode and a third shell mode. |
| [6] The method of claim 5, wherein the bending mode is at least one of a first bending mode, a second bending mode and a third bending mode. |
| [12] The method of claim 3, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member. |
| [13] The method of claim 12, wherein the at least one resilient member extends helically about and along the structural portion. |
| [19] The method of claim 12, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof. |
| [20] The method of claim 3, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node. |
| [21] The method of claim 20, wherein a second one of the liners is positioned along the |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | C. A. No.: 15-1168-GBW |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) ) | |
| Defendants. | ) | |

## <u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 1</u>

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated:  December 11, 2023

Plaintiff cannot dispute that its Final Infringement Contentions do not disclose a theory of DOE for any limitation other than 1[c].  (Ex. A at 6-7; MIL at 1.)  That is reason enough to grant the motion limiting Plaintiff's DOE proof from going outside its narrow disclosure.

But Plaintiff admits it intends to ignore this boundary.  Plaintiff argues that it can extend its DOE argument "across the *tuning limitations*," whatever those may be (Plaintiff does not say).  (Resp. at 1-2 (emphasis added).)  But "proof of equivalents must be **limitation specific**, not focused only on the claim as a whole."  Ex. K, *VLSI Tech. LLC v. Intel Corp.*, No. 2022-1906, slip op. at 15 (Fed. Cir. Dec. 4, 2023) (emphasis added).  A DOE theory on one limitation thus cannot simply apply "across" other unnamed limitations.  Notably, when including a DOE theory for 1[c], Plaintiff recognized that DOE is on a limitation-by-limitation basis when it expressly reserved the right to add DOE for other limitations.  (*See* Ex. A at Claim Chart, p. 1-6.)

Plaintiff also relies on disclosure of DOE theories about limitations in Claim 22, which has already been held invalid and is not being tried.  That is no justification.  First, Plaintiff's disclosure of a DOE theory for limitations 22[c], 22[d], and 22[f] proves that Plaintiff's disclosure of a DOE theory on only 1[c] was deliberate.  If Plaintiff wanted a DOE theory on 1[d] and 1[f], it knew how to do it.  The omission is telling.  Second, Plaintiff went to great lengths to distinguish Claim 1 from Claim 22 at summary judgment in order to save Claim 1 from the same fate as invalid Claim 22.  Having succeeded in saving Claim 1 from invalidity on that basis, Plaintiff should now be estopped from taking the opposite position and relying on supposed evidence regarding Claim 22 as applying to Claim 1.

Plaintiff is also wrong that there is no prejudice if it expands its DOE theory to other limitations.  This Court routinely excludes DOE theories not disclosed in Final Contentions, even if an expert could respond.  *E.g.*, Exs. C-D.  No deviation from the Court's practice is warranted.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated:  December 11, 2023   *Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

31045062.1

2

# EXHIBIT K

# United States Court of Appeals for the Federal Circuit

———————————

**VLSI TECHNOLOGY LLC,**
*Plaintiff-Appellee*

**v.**

**INTEL CORPORATION,**
*Defendant-Appellant*

———————————

2022-1906

———————————

Appeal from the United States District Court for the Western District of Texas in No. 6:21-cv-00057-ADA, Judge Alan D. Albright.

———————————

Decided: December 4, 2023

———————————

JEFFREY A. LAMKEN, MoloLamken LLP, Washington, DC, argued for plaintiff-appellee. Also represented by RAYINER HASHEM, MICHAEL GREGORY PATTILLO, JR.; MORGAN CHU, BENJAMIN W. HATTENBACH, ALAN J. HEINRICH, AMY E. PROCTOR, DOMINIK SLUSARCZYK, CHARLOTTE J. WEN, Irell & Manella LLP, Los Angeles, CA; BABAK REDJAIAN, Newport Beach, CA.

WILLIAM F. LEE, Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, argued for defendant-appellant. Also represented by ALISON BURTON, LAUREN B. FLETCHER, JOSEPH J. MUELLER; STEVEN JARED HORN, AMANDA L.

MAJOR, Washington, DC; MARY VIRGINIA SOOTER, Denver, CO.

————————————

Before LOURIE, DYK, and TARANTO, *Circuit Judges*.

TARANTO, *Circuit Judge*.

VLSI Technology LLC owns U.S. Patent No. 7,523,373, titled "Minimum Memory Operating Voltage Technique" and U.S. Patent No. 7,725,759, titled "System and Method of Managing Clock Speed in an Electronic Device."  VLSI sued Intel Corporation, alleging infringement of both patents, and after a trial, the jury found infringement of both patents and awarded separate damages for each.  The district court then denied Intel's post-trial motions on various issues concerning infringement and damages.  It simultaneously denied Intel's pre-trial motion seeking to add a license defense to the case and to sever that defense from the rest of the case and stay its adjudication.

Intel appeals.  We affirm the judgment of infringement of the '373 patent but reverse the judgment of infringement of the '759 patent.  We vacate the award of damages for the '373 patent and remand for a new trial limited to damages.  We reverse the denial of the motion for leave to amend to add the license defense.

I

On April 11, 2019, VLSI sued Intel for patent infringement.  VLSI asserted claims 1, 5, 6, 9, and 11 of the '373 patent and claims 14, 17, 18, and 24 of the '759 patent.  After a six-day trial, the jury found that Intel literally infringed all asserted claims of the '373 patent and that Intel infringed all asserted claims of the '759 patent, but only under the doctrine of equivalents.

A

The '373 patent describes, among other things, a featured embodiment in which an integrated circuit has a memory and a processor; the memory has a minimum operating voltage; and when the processor is provided power at a voltage below the memory-minimum level (*e.g.*, when the processor is in a low-power state), the memory is provided power at a higher voltage than the processor. '373 patent, Abstract. Figure 1 illustrates the circuit of that embodiment:



*FIG. 1*

Figure 1 discloses a memory 18, which has a minimum operating voltage. *Id.*, col. 6, lines 33–36. Figure 1 also discloses two voltage regulators: voltage regulator 24, which provides a scalable power supply voltage, VDDlogic, to both processor 16 and memory 18; and voltage regulator 26, which provides a substantially fixed power supply voltage, VDDmem, just to memory 18. *Id.*, col. 3, lines 21–29. The memory 18 includes a power supply selector 21, which receives both power supply voltages VDDmem and VDDlogic, and provides one of them to memory array 22 as the memory operating voltage. *Id.*, col. 2, lines 50–57. "In one embodiment, while VDDlogic remains above a minimum operating voltage required for successful reads of memory array 22, power supply selector 21 selects VDDlogic as the

memory operating voltage provided to memory array 22 . . . ." *Id.*, col. 3, lines 30–35. "When VDDlogic is scaled to a voltage that is below the minimum memory operating voltage required for reads, power supply selector 21 selects the higher voltage, VDDmem . . . ." *Id.*, col. 3, lines 35–39.

The claims are not limited to the featured embodiment just described. Independent claim 1 claims a method:

> 1. A method, comprising:
>
>> providing an integrated circuit with a memory;
>>
>> operating the memory with an operating voltage;
>>
>> determining a value of a minimum operating voltage of the memory;
>>
>> providing a non-volatile memory (NVM) location;
>>
>> storing the value of the minimum operating voltage of the memory in the NVM location;
>>
>> providing a functional circuit on the integrated circuit exclusive of the memory;
>>
>> providing a first regulated voltage to the functional circuit;
>>
>> providing a second regulated voltage, the second regulated voltage is greater than the first regulated voltage;
>>
>> providing the first regulated voltage as the operating voltage of the memory when the first regulated voltage is at least the value of the minimum operating voltage; and
>>
>> providing the second regulated voltage as the operating voltage of the memory when

the first regulated voltage is less than the
value of the minimum operating voltage,
wherein while the second regulated voltage
is provided as the operating voltage of the
memory, the first regulated voltage is pro-
vided to the functional circuit.

*Id.*, col. 13, lines 7–28. Independent claim 9 claims a cir-
cuit, using non-identical but similar language related to
the points in issue on appeal:

9. An integrated circuit, comprising:

a memory that operates using an operating
voltage, wherein the memory is character-
ized as having a minimum operating volt-
age;

a memory location that stores a value rep-
resentative of the minimum operating volt-
age;

a first voltage regulator for supplying a
first regulated voltage;

a circuit that provides a function and uses
the first regulated voltage;

a second voltage regulator for supplying a
second regulated voltage, wherein the sec-
ond regulated voltage is greater than the
first regulated voltage; and

a power supply selector that supplies the
first regulated voltage as the operating
voltage of the memory when the first regu-
lated voltage is at least the minimum oper-
ating voltage and supplies the second
regulated voltage as the operating voltage
when the first regulated voltage is below
the minimum operating voltage, wherein
while the second regulated voltage is

supplied as the operating voltage, the cir-
cuit uses the first regulated voltage.

*Id.*, col. 13, line 59–col. 14, line 15. Those claims are rep-
resentative for purposes of this appeal.

The Intel products that are the subject of VLSI's alle-
gations of infringement of the '373 patent are Intel's
Haswell and Broadwell microprocessors. Each such micro-
processor contains a plurality of processor cores that run
computer programs. It also contains a Ring domain, con-
taining other circuitry; the Ring domain is sometimes
called a CLR domain, reflecting that the domain contains,
though is not limited to, circuitry referred to as *C*BO cir-
cuitry, *L*ast Level Cache circuitry, and *R*ing circuitry. The
Ring (CLR) domain contains, in addition to the CLR cir-
cuitry, a static random access memory, *i.e.*, a C6 SRAM.
The C6 SRAM, as long as it is adequately powered, can
store information about the state of a core before the core
goes into low power mode, enabling the core, when it
"wake[s] back up," to use the stored information to "pick up
where [it] left off." J.A. 1395.

The accused microprocessors also contain two voltage
regulators: VCCR and VCCIO. Ordinarily, the VCCR sup-
plies power to the entire Ring domain, including the C6
SRAM,     at     variable     power     supply     levels:
RING_VF_VOLTAGE_0,    RING_VF_VOLTAGE_1,    and
RING_VF_VOLTAGE_2. Each of these power supply lev-
els is stored in a fuse, a type of memory that retains its data
even if power is removed from it. Another fuse stores a
different power supply level from the three just mentioned:
It stores RING_RETENTION_VOLTAGE, which an Intel
document characterizes as the "worst case retention volt-
age" for the memory device (the C6 SRAM). J.A. 9574,
12642; *see* J.A. 1859, 1951, 2655–57, 2730. If all cores are
idle, Intel's accused microprocessors can enter a sleep state
called Package C7. In that state, substantial evidence
shows, the cores and CLR components of the Ring domain

VLSI TECHNOLOGY LLC v. INTEL CORPORATION                    7

are put to sleep, the VCCR voltage is brought below the RING_RETENTION_VOLTAGE, and the C6 SRAM receives power not from the VCCR but from the VCCIO, at a voltage higher than the reduced VCCR voltage. *See* J.A. 1388, 1845-49, 1862–63, 1938–40, 2661–66, 3225–26.

## B

The '759 patent describes a system in which at least two devices, such as computer processors, are coupled to a bus that can operate at a variety of frequencies (clock speeds); one of the devices, based on its workload (which, *e.g.*, indicates a need for faster operations), asks a clock controller to change a clock frequency; and the controller is programmed to respond by outputting a clock frequency to control the speed of the bus and a second device coupled to the bus. '759 patent, Abstract. Figure 1 illustrates the system:



**FIG. 1**

In Figure 1, master device 120 is coupled to a bus 102. *Id.*, col. 2 line 66–col. 3, line 3 and col. 3, lines 22–25. A programmable clock controller 150 can control the clock 152 to set the frequency of the bus 102 or devices coupled to the bus, including master device 122. *Id.*, col. 3, lines

29–51 and col. 4, lines 20–29.  Master device 120 can pro-
vide a trigger input to the controller, *e.g.*, in response to a
desired increase in device performance, *id.*, col. 3, line 64–
col. 4 line 8, and the controller can receive the trigger input
and adjust the clock frequency of the bus or of a second
master device 122.  *Id.*, col. 4, lines 42–47.

Independent claim 14 is representative for present pur-
poses:

> 14. A system comprising:
>
> > a bus capable of operation at a variable
> > clock frequency;
> >
> > a first master device coupled to the bus, the
> > first master device configured to provide a
> > request to change a clock frequency of a
> > high-speed clock in response to a prede-
> > fined change in performance of the first
> > master device, wherein the predefined
> > change in performance is due to loading of
> > the first master device as measured within
> > a predefined time interval; and
> >
> > a programmable clock controller having an
> > embedded computer program therein, the
> > computer program including instructions
> > to:
> >
> > > receive the request provided by the
> > > first master device;
> > >
> > > provide the clock frequency of the
> > > high-speed clock as an output to
> > > control a clock frequency of a sec-
> > > ond master device coupled to the
> > > bus in response to receiving the re-
> > > quest provided by the first master
> > > device; and

> provide the clock frequency of the
> high-speed clock as an output to
> control the variable clock frequency
> of the bus in response to receiving
> the request provided by the first
> master device.

*Id.*, col. 8 line 50–col. 9, line 4.

The Intel products that are the subject of VLSI's allegations of infringement of the '759 patent are various Intel microprocessors with "Lake" in their names. The accused microprocessors feature cores and a Ring bus connecting the cores. As VLSI describes the microprocessors and their operation as relevant here, VLSI Br. at 13–15, 35–39, the microprocessors also include a power control unit (PCU), which is a microcontroller running software called p-code ("programs," VLSI Br. at 13) and which controls the frequency of the cores and the Ring bus. This control is exercised when a core monitors its workload and sends a Core_Active signal to the power control unit. J.A. 2690–92. Based on that signal, core-specific p-code in the power control unit (described as one "module" of p-code) calculates a speed change, to a higher or lower frequency, and provides a request for that speed change to another "module" of the p-code software in the power control unit, namely, a "decision instructions" module. J.A. 2706–09; *see* VLSI Br. at 14, 38–39. The decision instructions module receives the request and in turn outputs a signal from the power control unit to change the frequency of the Ring bus or of another core on the bus. J.A. 2699–703, 2707–10.

### C

A jury trial was held in late February and early March 2021. The jury found literal infringement of all the asserted claims of the '373 patent. J.A. 9. For all the asserted claims of the '759 patent, the jury found no literal infringement but found infringement under the doctrine of

10    VLSI TECHNOLOGY LLC v. INTEL CORPORATION

equivalents. J.A. 9–10.[1] The jury awarded VLSI nonoverlapping damages for the infringement of the two patents—$1.5 billion for the '373 patent and $675 million for the '759 patent—each award a lump sum payment for all past and future infringement over the life of the patent. J.A. 13–14.

The district court denied various post-trial motions concerning infringement and damages. J.A. 16–64, 74–97. The court also ruled, after the trial, on a motion that Intel had filed in the fall of 2020, a few months before trial, in which Intel (a) sought to amend its answer to assert a defense that it was licensed to practice both VLSI patents but (b) requested that the defense be severed from the rest of the case and its adjudication stayed. The motion was based on a recent change in ownership of Finjan, Inc., which had a license agreement with Intel. Intel argued that the license now covered VLSI's '373 and '759 patents because VLSI and Finjan were now both under the control of Fortress Investment Group LLC. The district court denied the motion. J.A. 65–73.

On April 21, 2022, the district court entered final judgment. J.A. 98–100. Intel timely appealed. We have jurisdiction to hear the appeal under 28 U.S.C. § 1295(a)(1).

## II

We first address the appeals of the infringement verdicts. We review the verdicts of infringement for substantial-evidence support. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309–10 (Fed. Cir. 2009).

### A

With respect to the '373 patent, Intel argues on two grounds that the evidence is insufficient to support the

---

  [1] The jury also found no willfulness on Intel's part and rejected Intel's defense of invalidity for anticipation. J.A. 11–12. Neither ruling is at issue before us.

infringement verdict.  First, Intel argues that the RING_RETENTION_VOLTAGE in the accused microprocessors, which is what VLSI contended is the "minimum operating voltage" required by the claims, is not actually the minimum voltage at which the C6 SRAM can retain data and therefore does not come within the several claim limitations requiring a "minimum operating voltage." Second, Intel argues that the RING_RETENTION_VOLTAGE is not used in the microprocessors to determine which voltage to supply to the C6 SRAM (VCCR or VCCIO) and therefore the several "when" limitations (the last two limitations of claim 1, the last limitation of claim 9) are not satisfied. We reject these arguments.

<div align="center">1</div>

There is ample expert testimony, with adequate support in Intel's internal documents, that Intel's RING_RETENTION_VOLTAGE is the minimum operating voltage of the C6 SRAM.  At trial, VLSI identified Intel's C6 SRAM as the claimed "memory" and Intel's RING_RETENTION_VOLTAGE as the claimed "minimum operating voltage."  J.A. 2661.  VLSI's expert, Dr. Conte, pointed to Intel's component specifications for the Haswell and Broadwell microprocessors, which defined the RING_RETENTION_VOLTAGE as the "worst case retention voltage" for the Ring domain, and he explained that this constituted "the lowest voltage for memory to still remember." J.A. 2656–57, 9574, 12642. Dr. Conte made explicit that the worst case retention voltage is the minimum operating voltage for the C6 SRAM, which is in the Ring domain. J.A. 2656–57.

Intel's argument that this evidence does not constitute substantial evidence on the point in dispute is that Intel's C6 SRAM is operational and retains data at a RING_VF_VOLTAGE_0 voltage, even when it is lower than RING_RETENTION_VOLTAGE.  Intel relied critically for this argument on a comparison done by its expert,

Dr. Sylvester. *See, e.g.*, J.A. 1854–55, 1859–61, 1945–50, 15342–43. But the jury could reasonably credit VLSI's evidence that the comparison presented by Intel was faulty, in that the two voltages compared by Dr. Sylvester were measured under critically different conditions.

Specifically, Dr. Conte testified that Dr. Sylvester's comparison of RING_VF_VOLTAGE_0 and RING_RETENTION_VOLTAGE values does not show that RING_VF_VOLTAGE_0 is ever lower than RING_RETENTION_VOLTAGE under comparable conditions, because the relevant memory's retention voltage is (inversely) dependent on temperature, and Dr. Sylvester had compared RING_VF_VOLTAGE_0 at 100 degrees Celsius to RING_RETENTION_VOLTAGE at 0 degrees Celsius. J.A. 2429–30. Dr. Conte testified: "When you compensate for temperature, [RING_VF_VOLTAGE_0] is going to be always above the RING_RETENTION_VOLTAGE." J.A. 2430. Additionally, Dr. Conte relied on an Intel technical manual containing graphs showing a "Vretention" line and (among other things) a "v/f 0" value, the former lower than the latter. *See* J.A. 19243. Dr. Conte testified that Vretention corresponded to RING_RETENTION_VOLTAGE and v/f 0 corresponded to RING_VF_VOLTAGE_0. J.A. 2426. The jury reasonably could credit this evidence and reject Intel's contention on the point.

Accordingly, substantial evidence supports the jury's verdict in favor of VLSI on this point.

### 2

Intel's second argument against the sufficiency of the infringement evidence regarding the '373 patent also fails. Intel's argument turns entirely on its contention that the claims require that falling below the minimum operating voltage be the causal trigger for switching from one voltage source to a different one. But that is an argument for a claim construction, and Intel sought no claim construction

on this point. When a claim phrase is not construed, we defer to the jury's view of the claim element unless that view is contrary to the only reasonable view of the claim element. *Avid Technology, Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1048–49 (Fed. Cir. 2016); *Hewlett-Packard Co. v. Mustek Systems, Inc.*, 340 F.3d 1314, 1320–21 (Fed. Cir. 2003). And under that standard, Intel cannot succeed on appeal.

The "when" claim language can reasonably be understood to mean simply "at the time that." Dr. Conte testified, with support from the Intel "Vretention" document, that VCCR is the power source for the C6 SRAM at the time that VCCR voltage is above RING_RETENTION_VOLTAGE and that "[w]hen VCCR is powered down, the [multiplexer] will switch the [C6 SRAM] memory over to the VCCIO supply which never powers down," and thereby ensures that the C6 SRAM has sufficient voltage to retain data. J.A. 2666; *see* J.A. 2430–31, 2757–58, 2664–70. This was sufficient evidence for the jury to find that the voltage source switches at the time that VCCR voltage drops below the minimum for C6 SRAM's data retention—RING_RETENTION_VOLTAGE. Intel did not present evidence requiring a contrary finding on those points. And no further explanation of the decision mechanism is required in the absence of the claim construction that Intel now effectively urges but did not seek in the district court.

Accordingly, substantial evidence supports the jury's verdict on this point—and, hence, on infringement of the '373 patent. The judgment of infringement of the '373 patent is therefore affirmed.

## B

With respect to the '759 patent, Intel argues on two grounds that the verdict of infringement—under the doctrine of equivalents—must be reversed. First, Intel argues that prosecution history estoppel bars VLSI's theory of

equivalents.  Second, Intel argues that VLSI's evidence of equivalents was legally insufficient.  We agree with the second argument and do not reach the first.

1

The doctrine of equivalents provides a limited exception to the principle that claim meaning defines the scope of the exclusivity right in our patent system: "Applied more broadly, the doctrine [of equivalents] would conflict with the primacy of the claims in defining the scope of a patentee's exclusive rights." *Sage Products, Inc. v. Devon Industries, Inc.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997); *see Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29 (1997); *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961); *Johnson & Johnston Associates Inc. v. R.E. Service Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc); *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356 (Fed. Cir. 2012).  The limits reflect a familiar balance among the importance of preserving the public's ability to rely on claims' meaning to define patent scope, the ability of patentees to protect their inventions through their claim drafting, and (yet) the occasional need to recognize some non-literal scope of protection to avoid undermining the exclusivity rights authorized by Congress to incentivize certain innovations.  *See Mahn v. Harwood*, 112 U.S. 354, 361 (1884) ("The public is notified and informed . . . that [the patentee's] claim to invention is for such and such an element or combination, and for nothing more."); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002) ("If patents were always interpreted by their literal terms, their value would be greatly diminished.  Unimportant and insubstantial substitutes . . . could defeat the patent[.]"); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373–74 (1996); *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607 (1950).  We have explained that liability under the doctrine is "exceptional," *Honeywell International, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304,

1313 (Fed. Cir. 2008), and "[w]e have emphasized . . . that the doctrine of equivalents is the exception, however, not the rule," *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1330 (Fed. Cir. 2019) (internal quotation marks omitted).

The exceptional character of the doctrine's use is maintained by closely related demands that restrict the availability of liability under the doctrine. Among them are the following. First, proof of equivalents must be limitation specific, not focused only on the claim as a whole, though the limitation-specific inquiry of equivalence may be informed by the "role played by each element in the context of the specific patent claim." *Warner-Jenkinson*, 520 U.S. at 40; *see DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed. Cir. 1998); *Dawn Equipment Co. v. Kentucky Farms Inc.*, 140 F.3d 1009, 1015 (Fed. Cir. 1998). Second, for the determination of whether a substitute element is only insubstantially different from a claimed element and hence an equivalent, a traditional formulation—appropriate for this case, as VLSI's use of it indicates—asks "whether a substitute element matches the function, way, and result of the claimed element." *Warner-Jenkinson*, 520 U.S. at 40. Such matching requires that each of function, way, and result be "substantially the same," *see Spectrum Pharmaceuticals, Inc. v. Sandoz Inc.*, 802 F.3d 1326, 1337 (Fed. Cir. 2015), with the "way" requirement of particular importance, as a practical matter, in keeping the doctrine properly limited. *See Warner-Jenkinson*, 520 U.S. at 35, 39; *Union Paper-Bag Machine Co. v. Murphy*, 97 U.S. 120, 125 (1877) (stressing the crucial importance of "way"); *Advanced Steel Recovery, LLC v. X-Body Equipment, Inc.*, 808 F.3d 1313, 1320 (Fed. Cir. 2015) (similar); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1569 (Fed. Cir. 1996) (similar); *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 932 F.2d 1453, 1457–58 (Fed. Cir. 1991) (similar). Third, we have long demanded specificity and completeness of

proof as crucial to enforcing the limits on the doctrine: The patentee must provide "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device." *Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016) (internal quotation marks omitted); *see Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014); *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566–67 (Fed. Cir. 1996); *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1426 (Fed. Cir. 1989).

2

VLSI's proof of equivalence for the '759 patent, though limitation specific, was insufficient under those principles.

VLSI's equivalents contention is best understood in light of its literal-infringement case (which the jury rejected). VLSI's expert, Dr. Conte, testified that a specified core in the accused microprocessors is the "first master device" under the claim, the Core_Active signal is the required "request to change a clock frequency," and the power control unit is the "programmable clock controller"—to which the core "provide[s]" the request (the Core_Active signal) and which "receive[s]" that request (the Core_Active signal). J.A. 2694–99. That mapping of claim terms onto the accused microprocessors embodied the ordinary notion of signals (carrying messages) going from one physical component to another. But there was evidence that the signal sent by the specified cores is not a request to change frequency based on changes the cores identified in their own performance, because it is only software running on the (receiving) power control unit that, based on observations of system conditions, calls for a frequency change. *See* J.A. 2083–85, 2188–89, 2748–51. And the jury eventually found no literal infringement. J.A. 9.

VLSI's alternative infringement theory, invoking the doctrine of equivalents, sought to accommodate the

evidence of the role played by the power control unit in making the claim-required request.  Under this theory, the equivalent of the "first master device" as the provider of the "request to change a clock frequency" is the combination of (a) the core and (b) the core-specific p-code (a software module) residing on the power control unit that makes the frequency-change request, and the equivalent of the "programmable clock controller" is a different software module residing on the same power control unit, namely, the "decision instructions," with this software module receiving the request sent by the first software module, both software modules being within the power control unit.  J.A. 2705–09.  The jury found infringement under the doctrine of equivalents.  J.A. 10.

Dr. Conte presented his evidence for equivalence using the function, way, result framework, *see* J.A. 2705, 2707, and the appropriateness of that framework is not disputed here.  *See, e.g.*, *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1346–47 (Fed. Cir. 2013).  Using that framework, VLSI had to show that the core and certain code, which resides on the power control unit, together perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed "first master device" and that certain other instructions on the same power control unit perform substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed "programmable clock controller."  And VLSI had to present particularized testimony and linking argument to make that showing.

On the crucial point, Dr. Conte testified as follows:

MR. HEINRICH (ATTORNEY FOR VLSI).  Okay.  So now, let's go back to your Doctrine of Equivalents analysis.  Did you apply the function/[way]/result test?

> DR. CONTE.  I did.  So let's put a box around the core and the Core 1's [p]-code.  And then this provides the same function as required by the claim, that is to provide a request.
>
> Q.  And does it provide a request in substantially the same way as the claim?
>
> A.  Yeah.  The claims says[,] "the first master device provides a request."  Now, it's the first master device and its [p]-code that provides the request.
>
> Q.  And how do you characterize the difference between those two?
>
> A.  It's just a difference of where an engineer draws this data line.
>
> Q.  Is it a design choice?
>
> A.  It's a design choice.
>
> Q.  And what's the result?
>
> A.  Well, the result is that a request is provided.
>
> Q.  And is it the same result in each case?
>
> A.  Yes.  No, not really.  So[,] each will provide a different—you mean in terms of—
>
> Q.  That was a bad question.  So[,] is the result of the core and its [p]-code sending a request to the [power control unit] the same result as what's required by the claim?
>
> A.  Oh, I see.  I misunderstood your question.  Yes, it's the same result as required by the claim.

J.A. 2707–08.

That testimony is insufficient.  It contains no meaningful explanation of why the way in which the request is made is substantially the same as what the claim prescribes.  The question is not whether, in a schematic

drawing used to illustrate functions, an engineer could "draw[] . . . [a] line" in different places. The question is about actual functionality-location differences. It is not enough, moreover, to say that the different functionality-location placements were a "design choice." That label does not indicate whether, or begin to explain why, the options in the choice are substantially different or substantially the same: In both circumstances, the choice between the options is a design choice. The question that must be addressed is whether the difference in the way the functionalities are actually allocated between devices is an insubstantial one.

Here, the claim requires that the request function be performed by one component (master device) and the receipt and output functions be performed by a distinct component (programmable clock controller). According to VLSI itself, what occurs in Intel's accused microprocessors is that the request function is split between two physical components (core and power control unit), with the request complete only in the second component, and receipt and output occur within the second component as well. The request provision and the receipt/output are performed not by distinct physical components but by different software "modules"—one p-code module or a second instruction module. VLSI had to prove—with particularized testimony and linking argument—that the elements of the Intel arrangement were substantially the same as the elements of the claimed arrangement. But VLSI offered no meaningful testimony doing so. The above testimony says nothing remotely sufficient, especially in light of Intel's evidence about the significance of using the power control unit, rather than other particular components such as cores within the system, for making frequency decisions based on workload information. *See*, *e.g.*, J.A. 2146–47, 2195–96.

Based on the evidence presented, VLSI's doctrine of equivalents theory fails as a matter of law. The judgment of infringement of the '759 patent is therefore reversed.

### III

Intel challenges the award of damages for infringement of the '373 patent.[2] In a pretrial motion under Federal Rule of Evidence 702, Intel challenged various aspects of the damages analysis set forth by VLSI's damages expert, and it made similar arguments in seeking a new trial after the jury verdict. *See* J.A. 1–2, 3533, 4107–09. As relevant here, the district court's denial of both motions is reviewable for abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, 141 (1997); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010); *Fornesa v. Fifth Third Mortgage Co.*, 897 F.3d 624, 627 (5th Cir. 2018). An abuse of discretion exists, for purposes of this appeal, if the damages analysis departed from an economically sound methodology under the legal principles governing royalty damages, overall and as applied, and if that departure cannot be deemed harmless. *See Summit 6, LLC v. Samsung Electronics Co.*, 802 F.3d 1283, 1295–96 (Fed. Cir. 2015); *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

### A

Certain well-established principles are relevant to Intel's challenge to the damages award at issue on appeal—which is a (lump-sum life-of-patent) reasonable-royalty award designed to compensate "for the use made of the invention by the infringer." 35 U.S.C. § 284. "The 'value of what was taken'—the value of the use of the patented technology—measures the royalty." *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014) (quoting *Dowagiac Manufacturing Co. v. Minnesota Moline Plow*

---

[2] Although Intel also challenges the award of damages for infringement of the '759 patent, we need not address that challenge because we hold that judgment of non-infringement of that patent is required.

*Co.*, 235 U.S. 641, 648 (1915)).  Any reasonable royalty must seek to measure the value of the patented technology—it must be "apportion[ed]" to that value—by separating out and excluding other value in economic products or practices. *See Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018); *see also Garretson v. Clark*, 111 U.S. 120, 121 (1884); *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021); *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018); *Commonwealth Scientific & Industrial Research Organization v. Cisco Systems, Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015); *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

An economically sensible, commonly used method for determining this market value posits a "hypothetical negotiation" between the parties (based on certain assumptions, including validity of the patent) to "attempt[] to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Technologies*, 580 F.3d at 1324. The analysis must be one that "tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement," recognizing that some steps in a sound analysis may involve unavoidable "approximation and uncertainty." *Id.* at 1325 (internal quotations omitted); *see Dowagiac*, 235 U.S. at 647.  Substantively, subject to conditions not in dispute here, "the core economic question is what the infringer" in the hypothetical negotiation "would have anticipated the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives." *Aqua Shield*, 774 F.3d at 770 (italicization of "anticipated" removed); *see Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2015) ("A key inquiry in the analysis is what it would have been worth to the defendant, as it saw things at the time, to obtain the authority to use

the patented technology, considering the benefits it would expect to receive from using the technology and the alternatives it might have pursued.").

Also of relevance to the appeal before us is what we have said about the use of licenses in a royalty analysis. We have recognized that prices paid in actual licenses may have a proper role to play in valuing the patented technology at issue in a case, *see Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022); *Prism Technologies LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1368–69 (Fed. Cir. 2017), but the basic evidentiary precondition is that such licenses be "sufficient[ly] comparab[le]" to the royalty proposed by a party for the technology at issue, *Apple*, 25 F.4th at 971 n.5 (citing *Elbit Systems Land & C41 Ltd. v. Hughes Network Systems, LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019)). That requirement often precludes use of other licenses that involve (only or even partly) technology other than the patented technology at issue in the case at hand, *e.g.*, where there is an inadequate basis for soundly extracting from such licenses information that is truly informative about the value of the technology in the case at hand. *See*, *e.g.*, *Apple*, 25 F.4th at 973–74; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 81 (Fed. Cir. 2012); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872–73 (Fed. Cir. 2010).

## B

In the present case, Intel, for its part, presented a damages theory based on a comparable-license analysis, J.A. 2776–84, but we have no issue before us about whether Intel's analysis met the requirement of comparability in terms of the basic economic inquiry into value over alternatives, which could differ from technology to technology. Rather, what is before us is VLSI's damages proof, which led to a figure close to what the jury awarded. Intel's principal challenge to that proof is to the analysis developed by VLSI's experts, which, in four steps, sought, without

reliance on licenses, to identify the incremental value over non-infringing alternatives added to Intel's accused products by use of the asserted patents and the share of that value that Intel and VLSI would have agreed Intel would pay in a start-of-infringement hypothetical negotiation.

The first step in VLSI's royalty calculation, as applied to the '373 patent, was to quantify the effect of use of the '373 patent technology on the speed of Intel's Broadwell and Haswell microprocessors, derived from quantifying its effect on power savings. J.A. 3446. This quantification was based on testing done by one of VLSI's experts, Dr. Annavaram. *See* J.A. 1525–87. He tested Intel's Broadwell and Haswell microprocessors and determined that the power savings attributable to the '373 patent technology was 5.45%. J.A. 1593, 2681–82. Dr. Conte (the VLSI expert whose testimony on equivalents was discussed *supra*) then translated this power savings benefit into a speed benefit, finding a one-to-one ratio for Intel's Broadwell and Haswell microprocessors, so that the 5.45% power savings from use of '373 patent technology provided a 5.45% speed benefit. J.A. 2682–83.

Next, VLSI calculated the effect of a speed improvement on the price Intel could fetch for its products, including in its study a number of Intel products, not only the Broadwell and Haswell microprocessors. VLSI's damages expert, Dr. Sullivan, used a regression model to measure this effect of a speed improvement on price. J.A. 1609–13. Dr. Sullivan found that, as relevant here, each 1% improvement in speed was associated with a 0.764% increase in price for Intel's products. J.A. 1613–14, 15277–78.

Then, based on the quantified effect of the '373 patent technology on the speed of Intel's Broadwell and Haswell microprocessors and the calculated effect of a speed improvement on price for Intel's products, VLSI made a calculation of the incremental revenue attributable to Intel's use of the '373 patent technology in its Broadwell and

Haswell microprocessors. Specifically, Dr. Sullivan multiplied the 5.45% speed benefit, by the 0.764% price benefit, by the known total infringing revenues for Intel's Haswell and Broadwell microprocessors. J.A. 1655–1656, 15290. Dr. Sullivan determined the incremental revenue attributable to use of the '373 patent technology to be $2,115,862,744. J.A. 15290.

Finally, VLSI had to determine how Intel and VLSI would have divided up the calculated incremental revenues to set a royalty Intel would have paid VLSI for the right to use the patent technology. Reflecting the role of profits (not revenues per se) in the inquiry, J.A. 1658–59, 3449, Dr. Sullivan concluded that there were no incremental manufacturing costs incurred by adopting the technology, only other small, incremental costs, *e.g.*, costs of making sales, J.A. 1659–60, 3450–51. He then inquired into the "relative contributions" of Intel and VLSI to the production of the incremental revenues (and hence profits). J.A. 1660; *see* J.A. 3452–53. He did so by considering Intel's "total spending," including sales and marketing, research and development (R&D), and general and administrative (G&A) costs, seemingly allocating a proportionate share to the products at issue, and on that basis making "a reasonable estimate of Intel's contribution for purposes of the contribution apportionment." J.A. 3453, 1661–62; *see* J.A. 3461. The Intel contribution figure was 23.8% of total revenue for the two products, with a 76.2% contribution figure for VLSI (actually, VLSI's predecessor in interest, Freescale). J.A. 1662, 3461–62. Multiplying the VLSI figure by the incremental revenue gave the reasonably royalty. J.A. 1662–64, 3461–62, 15301–03. The net result was a proposed royalty of $1,611,609,964. J.A 15303. The jury awarded $1.5 billion. J.A. 13.

## C

Intel challenges several aspects of the foregoing analysis, but it suffices for vacatur of the award that, in

determining the power savings attributable to use of the
'373 patent, Dr. Annavaram made a readily identifiable er-
ror. The step at issue departed from the essential logic of
the value-of-the-patented-technology assessment. It is not
a matter of choosing one reasonable step over another or of
estimation in the face of acceptable imprecision or uncer-
tainty.

VLSI's damages model required VLSI to calculate the
incremental technical benefit attributable to Intel's in-
fringement. For the '373 patent, Dr. Annavaram pur-
ported to calculate this benefit by calculating the power-
savings benefit attributable to the accused processor func-
tion of using the multiplexer to change the source of voltage
to the C6 SRAM (allowing all cores to go to sleep without
loss of re-startup data, thereby saving power)—what the
parties before us call using the C6 SRAM. J.A. 1557–58.
It is undisputed that when Intel's accused microprocessor
enters the Package C7 sleep state, in which all cores are
asleep, that function is performed (the C6 SRAM is used),
but that it is not performed when Intel's accused micropro-
cessor enters the Core C7 sleep state, in which individual
cores are asleep. J.A. 1559–60. Thus, Core C7 and Pack-
age C7 are different states, and only the latter reflects the
benefits of the infringement at issue. Nevertheless, Dr.
Annavaram made use of Core C7 state residency data—
data on how much time a processor spends in a given
state—in making a choice of inputs into his calculation.

Specifically, he ran experiments on six Intel devices,
two with accused Broadwell processors (the other four not
accused of infringement of the '373 patent), to collect data
on the residency of the devices in particular states when he
put them through selected workloads. He compiled the re-
sults in a table, one line of which showed residency in the
Core C7 state, while another line residency in the Package
C7 state. *See* J.A. 3132–33. The residency figures for the
former (where any core is shut down, J.A. 18670–71) were
close to double those of the latter (where all cores are shut

down, J.A. 18671–72). Then, in the next stage of his analysis, which was to employ an Intel analytic tool (Power Model) that estimates power use (and hence power savings) under specified conditions (including residency and workload), Dr. Annavaram used at least the Core C7 figures, and perhaps also the Package C7 figures, in carrying out some kind of "match[ing]" process in order "to select the residency and workload settings in the Intel Power Model." J.A. 1580–81; *see* J.A. 1533–34, 1555–61, 3137–41.[3]

The results of using the Power Model with the selected inputs were the power savings that were crucial to VLSI's damages calculation. Yet to produce the power-savings results, Dr. Annavaram used inputs that he chose by trying to match (only or in part) data not from use of infringing functionality. That step undermines the reliability of the results as a calculation of power savings from use of the infringing functionality.

We cannot say that this error "could not have changed the result," namely, the precise amount of damages, so as to render it harmless. *See* Wright & Miller § 2886; *Voda v. Cordis Corp.*, 536 F.3d 1311, 1328 (Fed. Cir. 2008); *CytoLogix Corp. v. Ventana Medical Systems, Inc.*, 424 F.3d 1168, 1174 (Fed. Cir. 2005); *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1374 (Fed. Cir. 2002). The difference between the Core C7 residency data and the Package C7 residency data is on its face significant—75.86% and 75.95% for the Core C7 state versus 41.01% and 57.49% for the Package C7 state. J.A. 3132. Residency in particular states matters to the power savings, *see* J.A. 3138, and residency inputs chosen in an effort to match non-infringing-

---

[3] Dr. Annavaram stated at least once that the Core C7 state was "the one" state he used from his experiment-results table. J.A. 1579–81. The problem we identify exists even if Dr. Annavaram used that state along with the Package C7 state (or others).

state numbers (at least in part) could well affect the bottom line. *See also* J.A. 1975–76, 1994 (testimony of Intel's expert, Dr. Sylvester). On this record, we cannot deem this step in the damages calculation harmless as to the bottom-line amount of damages. The damages award must be set aside, without our adjudicating Intel's other allegations of error bearing on the damages.

<div align="center">D</div>

The proper relief is a remand for a new trial on the issue of damages. We see no sound basis, given the nature of the error found or of the other errors alleged, for denying VLSI an opportunity to provide a corrected damages case. Nor do we see a sound basis, in the error found or the other errors alleged, for setting aside the liability verdict as infected by the damages verdict.

We do not address Intel's other allegations of error in VLSI's damages case, except to state the following, which bears on what should occur on remand. First, Intel challenges VLSI's introduction of certain concededly noncomparable licenses in the trial, which were not part of the experts' damages calculation described *supra*. Given the conceded noncomparability, the law restricting use of noncomparable licenses, *see supra* p. 22, would clearly bar admission of that evidence unless admission of the evidence could be justified on the ground—which VLSI urges here and which we read the district court as having adopted—that the evidence was a proper response to Intel's presentation, through cross-examination of VLSI's expert, of prices at which certain sports teams were sold. *See* J.A. 2328–29; J.A. 17. The Intel line of questioning was allowed over VLSI's objection and unavoidably conveyed a message of relevance of the sheer size of the proposed award, through facts (about sports teams) self-evidently unconnected to the question of the value of the specific technology at issue. We do not decide whether VLSI's evidence of noncomparable licenses, itself focusing only on sheer size

(in VLSI's case, of license payments Intel made for other technology), could be admitted as a response to Intel's presentation. And we need not do so. We expect that, on remand, there will be no recurrence of comparable references, to sports-team prices or other facts about size of a proposed award alone (one way or the other), not focused on answering the question of the value of the specific technology at issue.

Second, we similarly do not adjudicate the merits of Intel's other challenges to VLSI's damages-calculation methodology. We note only this: Intel, in this court, has not persuasively shown that the regression analysis used to determine price effects of speed improvements is an improper or unreasonable one, and VLSI has not adequately elucidated how the last-step cost-and-contribution analysis (*see supra*, section III.B) reasonably establishes the choice Intel and VLSI would have made in the hypothetical negotiation about the sharing of the incremental benefits of implementation of the patent technology. On remand, the opportunity to provide better explanations should be made available.

## IV

We address, finally, Intel's license defense.

On September 4, 2020, as the case was approaching trial (which began in late February 2021), Intel filed a motion to stay the litigation, arguing that it had newly acquired a license defense to the alleged infringement. Intel alleged that it had a license to practice VLSI's asserted patents because, as relevant, (a) in 2012, Intel entered into an agreement with Finjan, in which Finjan granted Intel a perpetual and irrevocable license to patents owned and controlled by Finjan's "affiliates" and (b) in July 2020, Fortress acquired "control" of Finjan, through funds Fortress manages, making VLSI and Finjan "affiliates" under the license agreement. J.A. 3005–06; *see* J.A. 65–66. On November 10, 2020, Intel filed the motion now at issue: It

sought leave to amend its answer in this case to add the license defense, and it requested that the defense be severed from the rest of the case and its adjudication stayed. J.A. 3635–36. The district court ruled on the motion only after trial, denying it on March 18, 2022. J.A. 65. We now reverse that denial.

The license agreement invoked by Intel was entered into on November 20, 2012, between Intel, on one side, and Finjan Software, Inc. and Finjan, Inc., on the other, and in the license agreement "Finjan" granted to Intel a broad license to "Finjan's Patents." J.A. 3684–96. The license agreement defines "Finjan" as Finjan Software, Inc., Finjan, Inc., and their "Affiliates"; it defines "Affiliates" as "any Person that, now or hereafter, directly or indirectly through one or more entities, controls or is controlled by, or is under common control with" "Finjan"; and it defines "control" to mean "the possession, direct or indirect, of the power to direct the management and policies of a Person, whether through the ownership of any percentage of voting interests of such Person, through contract or otherwise." J.A. 3684. The license agreement also broadly defines "Finjan's Patents" as "all Patent Rights that are owned or controlled at any time on or after November 6, 2012[,] by Finjan." J.A. 3685. Intel alleged that on July 24, 2020, Fortress "funds acquired Finjan, Inc., causing Finjan and VLSI to be under the common control of Fortress, and therefore 'affiliates' under the provisions of the license." J.A. 3635.

Addressing Intel's motion, the district court applied the four-factor approach set forth in *Meaux Surface Protection, Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010), considering (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. J.A. 67–72. The district court denied the motion on the grounds

of untimeliness, prejudice, and—most significantly—unimportance because of the futility of the defense. *Id.*

We follow regional circuit law in reviewing the denial of a motion to amend, *Healthier Choices Management Corp. v. Philip Morris USA, Inc.*, 65 F.4th 667, 675 (Fed. Cir. 2023), and Fifth Circuit law provides for review here for abuse of discretion, *Meaux*, 607 F.3d at 167. A district court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). We find such an abuse of discretion.

We conclude that the district court's conclusion that Intel unduly delayed filing its motion—between the time of the July 24 acquisition and the filing of the November 10 motion—was an abuse of discretion. Intel was required by the 2012 license agreement to follow certain procedures, J.A. 3694, and Intel acted with diligence in doing so. On August 17, 2020, in accordance with the process requirements, Intel sent a letter to Finjan, VLSI, and Fortress stating that Intel holds a license to VLSI's patents under the 2012 Intel-Finjan license agreement and that Intel would like to begin the dispute resolution process. J.A. 3018. Then, on September 2, 2020, Intel filed its motion to stay in light of the new license defense. J.A. 3001. This motion to stay was in accordance with the contract's choice of law and venue provisions. J.A. 3696. VLSI opposed the motion on September 18, 2020, *see* J.A. 156, and when the district court had not ruled by early November, Intel filed the motion now at issue on November 10, 2020, stating that it moved to amend its answer "[t]o avoid any doubt that Intel has preserved its defense of license in this case." J.A. 3635. Considering timing alone, we see no reasonable basis for a determination of undue delay.

Regarding prejudice, the district court, which expressly considered its futility conclusion in addressing this factor, did not conclude that, even if the defense was meritorious,

it would deny the motion because of prejudice to VLSI
alone.  J.A. 71.  And we see no basis on which prejudice
alone could support denial of the motion.  Intel requested
severance of the defense from the rest of the case and a stay
of its adjudication, so trial of the other issues was not to be
delayed.  Although entry of a final judgment in the district
court for appeal might have been delayed, the district court
said nothing about how long such a delay would have been.
The court said that having a district court judgment sooner
rather than later (subject to appeal) would help VLSI se-
cure licenses, but it offered no basis for that conclusion that
is independent of the merits of the defense.  Nor did the
district court consider that it was Fortress (with its close
relationship to VLSI), not Intel, that was responsible for
the action creating the possibility of the license defense:
"Fortress acquired Finjan," J.A. 70.  The district court con-
sidered relevant to the prejudice factor Intel's interest in
not being liable if its defense is valid, but it dismissed that
interest only by an unelaborated reference to the possibil-
ity of a contract action by Intel against Finjan as an alter-
native remedy for Intel, without explaining why that was
a meaningful avenue (legally or practically) for recovering
from Finjan the damages Intel would pay in this case (in-
correctly if the license defense was valid).  For such rea-
sons, we see no basis on which, futility aside, prejudice
could sustain the denial of Intel's motion.

   What is determinative, then, is the soundness of the
district court's conclusion that the record developed makes
the license defense so clearly meritless that allowing it
even to be pleaded is a futile act.  We hold that conclusion
to be wrong as a matter of law.  This is a very narrow hold-
ing.  We do not conclude that the license defense is merito-
rious.  We conclude only that the governing law is such that
the defense requires additional litigation of the sort that
begins once it is added to the case, whether that process is
a fully developed motion to dismiss, with fuller analysis of
the governing law than has yet occurred, or more fact-

based litigation. Intel might well fail to sustain the defense, but we do not see failure as foreordained on the material supplied to date.

The district court turned to Delaware law, which, subject to any overriding federal law, is the applicable law chosen by the 2012 license agreement. J.A. 3696. The district court stated, without qualifiers, that "Delaware law provides that a non-party to a contract is not bound by that contract." J.A. 70. But the precedential authority cited in support states the principle as only "the ordinary rule," subject to exceptions for "unusual circumstances." *Alliance Data Systems Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 760 & n.47 (Del. Ch. 2009), aff'd, 976 A.2d 170 (Del. 2009) (footnote quoting statement from *Wallace ex rel. Cencom Cable Income Partners II, Inc., v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999), that this is "a general principle"). Three cited nonprecedential decisions are to the same effect. *Sheehan v. AssuredPartners, Inc.*, No. 2019-0333-AML, 2020 WL 2838575, at *9 (Del. Ch. May 29, 2020) ("'ordinary rule,'" quoting *Alliance Data*, 963 A.2d at 760–61); *Wenske v. Blue Bell Creameries, Inc.*, No. 2017-0699-JRS, 2018 WL 5994971, at *3 (Del. Ch. Nov. 13, 2018) ("ordinarily"); *Kuroda v. SPJS Holdings, L.L.C.*, No. 4030-CC, 2010 WL 4880659, at *3 (Del. Ch. Nov. 30, 2010) ("[g]enerally").

In 2019, the Delaware Supreme Court stated that "[c]ontracts may impose obligations on affiliates" in certain contexts, and it affirmed the Delaware Chancery Court's determination that the case before it involved such a context. *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57 (Del. 2019). In so ruling, the Delaware Supreme Court cited, *id.* at 57 n.86, two nonprecedential decisions of the Delaware Chancery Court that are to the same effect, describing them as involving contract provisions covering certain affiliates and non-signatories who were, or came to be, owned or under the control of a signatory party. *Medicalgorithmics S.A. v. AMI*

*Monitoring, Inc.*, No. 10948-CB, 2016 WL 4401038, at *18 (Del. Ch. Aug. 18, 2016); *MicroStrategy Inc. v. Acacia Research Corp.*, No. 5735-VCP, 2010 WL 5550455, at *12 (Del. Ch. Dec. 30, 2010).

This case law does not definitively enough answer questions of potential significance here to make the license defense proposed by Intel futile. Perhaps it makes a difference whether the affiliate sought to be bound was an affiliate at the time of contract or whether it controlled or was controlled by the signatory, rather than merely under common control, even when the contractual definition of "affiliate" includes the common-control situation. Under the authorities presented and arguments made on whether VLSI, as a non-party, could be bound by the 2012 license agreement, we do not think that there is a sufficiently clear answer for there to be a determination of futility. *See Stripling v. Jordan Production Co., LLC*, 234 F.3d 863, 872–73 (5th Cir. 2000).

In so concluding, we do not prejudge the answer to that question or the answer to other questions about whether VLSI's particular circumstances bring it within the contract's terms. Nor do we prejudge the appropriate processes for deciding the merits of the license defense, *e.g.*, whether a motion to dismiss may suffice, whether discovery is warranted, or whether summary judgment may be justified. Nor do we prejudge whether certification of a legal question to the Delaware Supreme Court is appropriate or whether any federal patent-law question is involved. *See, e.g.*, 35 U.S.C. § 261. We hold only that it was error to deny the motion to add the license defense to the case.

## V

The judgment of infringement of the '373 patent is affirmed. The judgment of infringement of the '759 patent is reversed. The damages award for the '373 patent is vacated. The denial of the motion for leave to amend is

reversed.  The matter is remanded for further proceedings consistent with this opinion.

The parties shall bear their own costs.

**AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED**

# NEAPCO'S
# MOTION *IN LIMINE* NO. 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMERICAN AXLE & MANUFACTURING, INC., )
)
)
Plaintiff, )
)
v. )
)
NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, )
)
)
Defendants. )

C. A. No.:  15-1168-GBW

**JURY TRIAL DEMANDED**

**HIGHLY CONFIDENTIAL**

**DEFENDANTS' MOTION *IN LIMINE* NO. 2 TO PRECLUDE ARGUMENT OR EVIDENCE ████████████**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated:  November 20, 2023

Defendants move *in limine* pursuant to Fed. R. Evid. 401, 402, and 403 to preclude or limit Plaintiff from referencing any ███████████████████████████████████████ ████████ which is highly prejudicial, has little probative value if any, and will confuse and mislead the jury.  Specifically, Defendants move for an order that:

1.     Plaintiff is entirely precluded from presenting any argument, evidence, or testimony of █████████████████████████████████████████ unless and until Defendants present an obviousness defense at trial, including in opening statements.  Exhibits that should be excluded, and that Plaintiff should be precluded from referencing in connection with such argument, include correspondence or documents drafted by Neapco employees that refers to: (a) ███████████████ (PTX-004, PTX-010, PTX-013, PTX-014, PTX-015, PTX-019, PTX-037, PTX-050, PTX-051, PTX-052, PTX-066, PTX-067, PTX-206, PTX-234, PTX-524, PTX-540, PTX-579, and PTX-583), (b) ██████████████ (PTX-584, PTX-585), (c) ██████████████ (PTX-005, PTX-006, PTX-012, PTX-017, PTX-573), or (d) ████████████████ (PTX-011, PTX-016, PTX-020, PTX-275, PTX-278) (these exhibits are attached hereto as Ex. A);[1] and

2.     Plaintiff is permitted to introduce argument, evidence, or testimony of ██████ ███████████████ **only** if Defendants present an obviousness defense at trial, and the Court should issue a limiting instruction to the jury to ensure that it does not impermissibly conflate the ████████████████████████████████████ ██████████████ has no bearing on direct infringement, a strict liability claim, which is the only infringement claim asserted. ███████████████████████████████

---

[1] This list is based off documents that Neapco was reasonably able to identify from Plaintiff's list of 628 exhibits. To the extent that Plaintiff identifies additional documents that fall within the listed categories, Neapco reserves the right to object to those documents based on this motion. █████████████████████████████████████

██████████████████████████████████████████████ (D.I. 180 at 7-8).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████████

[redacted]

Defendants request that the Court prohibit any and all references [redacted] [redacted] and any supposed evidence concerning it, including during Plaintiff's opening statement, unless and until Defendants present an obviousness defense.  And, to the extent this evidence is admitted, Defendants request that Plaintiff be permitted to use such evidence only to rebut Defendants' obviousness defense.  Defendants also request a limiting instruction to ensure that the jury considers [redacted] only in relation to non-obviousness, and does not consider it with respect to infringement.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated:  November 20, 2023

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

30991404.1

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-GBW |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**AMERICAN AXLE'S OPPOSITION TO NEAPCO'S MOTION *IN LIMINE* NO. 2**

_____

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████ *See* D.I. 279 at 8–11; D.I. 304 at 17 n.9.  Neapco wants to escape this evidence,

so it mischaracterizes it as only relevant to obviousness (which Neapco admits is an issue for trial)

████████████████  Neapco's motion is based entirely on this false premise.  This evidence bears on

every remaining claim and defense, not just obviousness. The Court should deny Neapco's motion.

**Infringement**: First, this evidence is at least circumstantial evidence that ███████████

██████████████████████████████████████████████

██████████████████ *See* Neapco's MIL No. 3; D.I. 256 at 29–35; D.I. 296 at 12–16.  The

Court already concluded that, "although Neapco contends that it 'did not configure its liners to

match any frequency in order to dampen shell mode vibrations,' at a minimum, the present record

raises a genuine dispute."  D.I. 304 at 22 (citation omitted).  And the Court relied on much of the

evidence Neapco now seeks to exclude.  D.I. 304 at 22 (citing D.I. 278 ¶¶ 10, 13 (citing as "Ex.

15" and "Ex. 16," PTX-005 and -006)).  This alone should dispose of Neapco's motion.

But, as yet another example, PTX-013 shows that, at the outset of Neapco's design efforts

in 2014, ███████████████████████████████████████████

███████████████████████████████████ *See also* PTX-012.  Here again, that ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████ is at least circumstantial evidence

that ██████████████████████████████████████████████

███████████████████████ Neapco cannot have it both ways—it cannot dispute that it

████████████████████████████████████████████████████████████████

Second, Neapco alleges that AAM's bench testing is "unreliable" because it "does not represent in-vehicle conditions."   D.I. 171 at 8; Ex. D ¶¶ 58–66; Ex. E ¶¶ 21–50.  Again, ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████   *See* D.I. 279 at 11–13; D.I. 282 at Ex. 72 [pp. 385–91].

Third, AAM raises DOE, and ██████████████████████████████████

█████████████   *Adv. Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1287 (Fed. Cir. 2000).

**Damages**: Neapco also ignores that this evidence is relevant to damages.  *See* Ex. F; Ex. G ¶¶ 38–71 (lost profits: demand and non-infringing alternatives), ¶¶ 127–150 (reasonable royalty: *Georgia Pacific* factors 9 and 10); Ex. H ¶¶ 15–30.  PTX-010, as one example, is correspondence

████████████████████████████████████████████████████████████████

███████████████████████████████████████████  This evidence ████████████████

████████████  Ex. G ¶¶ 50, 139, 144, 171; Ex. H ¶¶ 17, 18.  PTX-037, -066, and -015 show

████████████████████████████████████████████  and, as Mr. Hansen further explains (*e.g.*, Ex. G ¶ 64), ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████  *Id*. ¶¶ 52, 55–59, 60–71, 141.[1]  Neapco never challenged Mr. Hansen's opinions.

**Obviousness**: Neapco admits this evidence is admissible to show non-obviousness.

**Lack of Enablement**: ████████████████████  may defeat assertions of nonenablement."

---

[1] Courts regularly allow ████████████████  to establish the absence of acceptable non-infringing alternatives.  *See ITW v. MOC*, 2014 WL 2508724, *6 (S.D. Cal. 2014); *Minemyer v. R-Boc*, 2012 WL 2155240, *11 (N.D. Ill. 2012); *AMP v. Lantrans*, 1991 WL 253796, *17 (C.D. Cal. 1991).

*Medtronic v. Cardiac Pacemakers*, 721 F.2d 1563, 1583 (Fed. Cir. 1983); *see Intex v. Metalast*, 01-1213, 2005 WL 1214600, *10 (D.D.C. May 20, 2005).   Here, Neapco asserts that the specification does not teach a person of ordinary skill how to make and use tuned liners.  Yet, in the same breath, ███████████████████████████████████████████████████████████ ███████████████████████████████████████   Neapco cannot have it both ways.

**Lack of Written Description**: "[T]here is often significant overlap between" enablement and written description.  *Univ. Of Rochester v. G.D. Searle*, 358 F.3d 916, 921 (Fed. Cir. 2004).

**Indefiniteness**: That ███████████████████████████████████████   contradicts any allegation that the claims are indefinite.  Ex. J ¶¶ 14, 23–41; Ex. I ¶¶ 170, 183–230.

**Anticipation**: Neapco argues that the asserted claims are anticipated by a product manufactured by Neapco's predecessor, the 2003 Econoline.  Ex. I ¶¶ 124–136, 291–324; Ex. J ¶¶ 44–56.  But Neapco's engineers ████████████████████████████████████████████ ███████████████████████████████████████   *See* PTX-066 ███████████████████ ██████████████████████████████████   This tends to show that the 2003 Econoline lacks tuned liners that reduce propshaft vibration and does not anticipate the asserted claims.

At bottom, this evidence is highly probative of infringement, damages, enablement, written description, indefiniteness, and anticipation—not just obviousness.   Neapco's cited cases (*Leapfrog*, *Personalized User*, *Olaf*, *Shure*, *Fairchild*, *Helios*, *Finjan*) are inapposite because they ████████████████████████   unrelated to issues that remained.  None of those cases concern evidence that bears on so many remaining issues, including infringement, § 112, and damages.  And Neapco, which ignored the relevance of this evidence to these issues, cannot meet its burden of showing that the probative value is "substantially outweighed" by the danger of unfair prejudice.  Excluding this evidence would, instead, prejudice AAM and prevent it from fairly presenting its case.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

AMERICAN AXLE & MANUFACTURING, )
INC., )
 )
 ) C. A. No.: 15-1168-GBW
Plaintiff, )
 ) **JURY TRIAL DEMANDED**
v. )
 ) **HIGHLY CONFIDENTIAL**
NEAPCO HOLDINGS LLC and NEAPCO )
DRIVELINES LLC, )
 )
Defendants. )

## <u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 2</u>

YOUNG CONAWAY STARGATT & TAYLOR,
LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI 48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL 60606-1734
(312) 701-9300

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated: December 11, 2023

Neapco's opening brief cites on-point authority recognizing the severe prejudice and propensity to confuse and mislead from showing a jury ███████████████████ *See* Op. Br. at 2 (string citing cases).  The prejudice is compounded here because that evidence ██████ ████████████████ Yet two of the three patents are no longer asserted, half of the claims of the '911 patent are invalid, and none of the evidence specifically refers to the remaining claims. And whole categories of originally-accused products are no longer accused.

Plaintiff does not deny this confusion and prejudice.  Plaintiff only argues relevance.  But under FRE 403, relevant evidence is properly excluded where, as here, it is unduly prejudicial. That is because the only issues on which this evidence fairly bears ████████████████ ████████████ are not being tried.  And Plaintiff must make a credible showing of a nexus tied to the specific remaining asserted claims before this evidence could be relevant to obviousness.

Plaintiff's assertion that the evidence bears on every remaining issue to be tried (infringement, DOE, damages, validity, enablement, written description, indefiniteness, anticipation, and obviousness) is without merit.  What this scattershot argument shows is that the evidence has very little (if any) probative value on any triable issue, let alone enough to outweigh the prejudice.  Also, Plaintiff's attempt to use ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████

Finally, Plaintiff's position is inconsistent with its other motions.  Plaintiff seeks to exclude (i) evidence about other patents and invalid claims, and (ii) testimony that Neapco specifically avoided the '911 patent.  If Plaintiff is permitted to ██████████████████ Neapco would be incurably prejudiced if not permitted to rebut it with the evidence Plaintiff wants excluded.

1

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated:  December 11, 2023

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

31045052.1

# EXHIBIT A
# HIGHLY
# CONFIDENTIAL

REDACTED IN ITS

ENTIRETY

# EXHIBIT B
# EXCERPTED

1    Michele L. Rolfe, RPR, CRR

2    Judge Williams

3    American Axle versus Neapco

4    15-1168

5

6

7              THE COURT:  Good afternoon.  You may be seated.

8    All right.  We are here for oral argument on a number of

9    motions in American Axel & Manufacturing, inc., v. Neapco

10   Holdings, LLC, et al.  Civil Action No. 15-1168.

11             We'll allocated two hours for this hearing.  So

12   have counsel talked about the order in which they want to

13   proceed with the various motions?

14             ^   ATTORNEY 2:  We have, Your Honor.  We

15   haven't come to complete agreement on that.  I think both

16   parties moved on the 101 issue and both parties would like

17   to proceed first on that.  As the plaintiff, we certainly

18   would like to do that, but I think the defendants feel

19   certainly the same way.

20             THE COURT:  Okay.  We'll start with the 101

21   motions, that's fine.  And then what is -- thereafter, we

22   have the summary judgment motions on noninfringement --

23             ^   ATTORNEY 2:  And the anticipation.

24             THE COURT:  Anticipation, yes.

25             So why don't we do the 101 motions first, the

1            MR. NUTTALL:  Good afternoon, Your Honor.  Jay

2    Nuttal on behalf of plaintiff, American Axle.  With me here

3    is Kate Tellez, Robert Kappers and Jeff Castellano from DLA

4    Piper here in Delaware.

5            May I provide, Your Honor?

6            THE COURT:  Yes.

7            MR. NUTTALL:  Thank you.  I appreciate that Your

8    Honor was recently assigned this case and probably is having

9    a lot a thrown at him in a short period of time, but I'll

10   keep the background brief.  But I do think it will be

11   helpful in evaluating this issue of patent eligibility.

12           We did hear a little bit about prior art liners.

13   We don't dispute that cardboard liners existed before, but

14   what is very clear is that no prior art liner ever had a

15   specific frequency that matched the bending mode frequency

16   and no prior art liner was used at a bending anti-node.

17   These were large cardboard liners that were shoved into

18   propshafts to just provide some general damping of what's

19   called shell mode damping.  So that's a very important

20   distinction.

21           And I think one thing we have to keep in mind is

22   just because somebody made a cardboard liner before doesn't

23   mean that nobody else can ever use cardboard for a liner,

24   doesn't mean you can't make improvements on that that are

25   patentable, it just means they have to be different than

1    what was done before.

2              Neapco ████████████████████  And that is

3    clear, their 30(b)(6) witness ████████████████████

4    ████████████████████████████████████████████████

5    ████████████████████████████████████████████████

6    ██████████████████████████████████████████████████

7    ████████████████████████████

8              Now, we agree that other dampers existed before

9    that may have been used to tune bending mode, but those were

10   either heavy metal objects or other kind of plugs.  They are

11   not liners.  They are heavier, they are more expensive, they

12   have other drawbacks so that's why those are different than

13   some of the liners we're talking about.

14             I want to make sure we keep those clear.  You

15   have dampers and you have liners, and Neapco at times wants

16   to kind of waive their hands between the distinction of

17   those, but it's very clear liners were not used to have a

18   specification frequency at a bending anti-node and these

19   plugs and liners and metal objects are not liners, they have

20   other drawbacks and that's not what we've claimed.

21             So the inventions of the '911 patent, you've

22   heard a little bit about, making liners with specific

23   frequencies that match propshaft frequencies, and that's how

24   you damp these bending modes.  And they also discovered, you

25   know, you can use these liners and if you make them the

1    right way they'll damp both in shell and bending modes.

2              Let's skip through some of this.  But this might

3    be more relevant for infringement, but earlier on in the

4    project ███████████████████████████████████████████

5    ██████████████████████████████████████████████████████

6    ████████

7              And, again, some testimony from their witnesses

8    that they were ███████████████████████████████

9    ████████████████████████████████████████    And

10   how did they do that?  They went and got American Axle's

11   patent, the '911 patent, and they studied it.  And this is

12   what we're trying to achieve.

13              They called it a low cost, extremely good

14   solution, but there's something else on this slide that I

15   think is important because it's going to come up in some of

16   my other points.  They wanted a full test plan, which

17   includes a shaker test, that's how you determine what the

18   frequency is, so they wanted to know the frequency of our

19   liners.  And they also said we want to know the liner

20   placement -- so two of the things we're going to talking

21   about is what's the frequency of the liner and is its

22   placement important.  And they recognized that from day one

23   that these were advances in American Axle's patent.

24              So they went and hired an engineer who had never

25   worked in this area, who did some testing and figured out

1    how do you determine a propshaft frequency, how do you

2    determine a liner frequency.  And studying the '911 patent,

3    they said we're going to look at these different variables.

4                    Now, the next slide in our presentation, the

5    next two slides are ███████████████    And counsel has

6    asked us not to present those on the screen, so I'll just

7    reference them for the Court.  But what they show is that

8    ████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████

10   ██████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████

12   █████████████████████████████████

13                   So we've heard a lot about infinite

14   possibilities and you need some computer modeling and all

15   these things that is not the case, that is certainly not our

16   position.  Our position is you can change the length, you

17   can change the diameter, you can change the thickness of the

18   material.  The point is you want to get the liner to the

19   right frequency and the patent teaches you how to do that.

20   And ████████████████████████████████████████████████████

21   █████████████████████████████████████████    So there's

22   an infinite number of possibilities and there's not

23   sophisticated computer monitoring that is needed in order to

24   practice the claims.

25                   THE COURT:  Show me in the patent where it

# EXHIBIT C
# EXCERPTED

# AAM v. Neapco

# AAM's Summary Judgment and Daubert Presentation

January 5, 2023





# **EXHIBIT D**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-LPS |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## REBUTTAL EXPERT REPORT OF STEVEN BECKER

## HIGHLY CONFIDENTIAL

Dated:  ___6/30/17_____        _____

                                                                          Steven Becker

5% to about 30%" and, alternatively to attenuating bending mode vibrations, the "tuned reactive absorber" could also attenuate "torsion mode vibrations."

## IX.        ANALYSIS OF DR. RAHN'S METHODOLOGY

58.    Dr. Rahn's analyses consisted of several flawed techniques.  My opinions below apply to each of the Accused Products and Asserted Claims.

59.    First, the testing relied upon by Dr. Rahn does not represent in-vehicle conditions. Dr. Rahn opines that experimental determination of natural frequencies, damping ratios, and mode shapes of structures are well-known. (Rahn Report, ¶ 43.)  Dr. Rahn instructed Brüel and Kjaer ("B&K") to perform testing of the accused propshafts.  He directed B&K as to the method of testing (¶ 54) using single axis "top and bottom" accelerometers at three locations along the length of the shaft, an impact hammer for excitation while the ends of the shaft are pinned. However, Dr. Rahn inappropriately assumes that a pinned condition is equivalent to as installed in a vehicle.  In-vehicle differs from pinned conditions due to influences from the mode shapes (greater in frequency than first bending) of the vehicle powertrain and influence of the stiffness and mass of the as installed universal joint ends.[17]  Dr. Rahn shows no evidence that the pinned tests and vehicle tests' boundary conditions result in similar values for either modal frequency or damping for bending modes.

60.    Additionally, there are obvious differences in shaft stiffness relative to the universal joint ends, as they are not symmetrical.  There are two "ears" that also cause a difference in lateral versus vertical bending mode frequencies relative to the four (two at each end) universal joint ears shown in Dr. Rahn's Figure #4.2:

---

[17] Invalidity Report, App. E; SAE International's Universal Joint and Driveshaft Design Manual, Advances in Engineering No. 7 was published in 1979 ("AE07"), p. 232.



61.     In B&K's analysis, the liner was tested in a fixture made with a portion of the shaft and two clamps.  To remove the liner, the ends of the shaft with half of the universal joint must be removed.  Testing the liner frequencies while installed in a thin walled shaft will be influenced by the fixture of the both the thin-walled shaft and potentially the clamps.  During the FEV testing of the 2003 Econoline, described in and attached to my Invalidity Report, a thick walled shaft and a soft supported ends with modes well above and below, respectively, the modal frequencies of the liner were used to eliminate these effect.  Dr. Rahn's B&K testing further shows that one skilled in the art may utilize different testing end conditions that result in differences in both frequencies and damping for the liner.

62.     Second, the testing relied upon by Dr. Rahn did not account for lateral versus vertical bending responses.  Dr. Rahn inappropriately assumes the mode shapes based on the location of the accelerometers, summation and subtraction of top and bottom accelerometer FRFs to determine if the mode shape is bending or a shell mode.  This ignores lateral versus vertical bending responses that are different for the shaft.  The 2003 Econline testing performed by FEV shows that there are differences for lateral versus vertical bending, and Dr. Rahn does not account for those.

63.     Third, Dr. Rahn's method of identifying the various modes was also flawed.  In Dr. Rahn's Figure #6.1-2 the method for mode shape determination is based on the peaks in the

frequency response function plots.  This method of analysis is commonly referred to as "peak picking."  Peak picking is used for determination of obvious modes that are well separated from other mode shape frequencies and peaks, such as first bending.[18]  But shell modes and higher order bending modes from Figure #6.1-2 and the FRF for the 324 Accused Product (¶ 185, for example) at frequencies greater than the first bending are complex and contain several peaks that are close in frequency to each other.  Moreover, Dr. Rahn's methodology does not account for complex, or coupled, modes where closely interacted shell and bending modes create a new mode with aspects of both of the pure modes.  Therefore there is no way without calculating mode shapes to determine whether you are measuring a pure mode or complex mode.  Dr. Rahn selects modes based on the frequency by picking the peaks.  But peak picking is not commonly done in the industry anymore, nor at around the time of the invention.  That is because this method can produce substantially different results than modern techniques and provides ambiguity as to whether the various modes he identifies are, in fact, the alleged modes.[19]  Therefore, for all of his analyses where he identifies second and higher shell and bending modes, it is unclear whether those modes are in fact the alleged modes due to the use of peak picking.

64.    Modern modal analyses utilize polynomial estimation analyses to determine mode shapes.[20]  This is performed in software created by the former SDRC, B&K, LMS/Siemens and others, that correlates how all of the accelerometer sensors are moving relative to each other as

---

[18] App. AL; Fu, Zhi-Fang, He, Jimmy, *Modal Analysis*, Butterworth Heinmann (2001), ISBN 0750650796, at 163-164 ("Fu"); App. AM; Mehdi Batel, *Operational Modal Analysis – Another Way of Doing Modal Testing,* Brüel & Kjær, Sound and Vibration Magazine (Aug. 2002), 22-27 ("Batel").

[19] *Id.*

[20] *See* Fu, 159-162; Batel, 22-27.

vectors.[21]   The modal analysis technician can then visualize the mode shape of each peak selected and determine if the shape matches the description of the mode shape, if there are a sufficient number of sensors to display the mode shape.[22]   Typically modal testing utilizes three-axis sensor to visualize movement in the all directions.   During the FEV testing triaxis (three) sensors were used, compared to the B&K testing that used single axis accelerometers.   This resulted in the B&K testing having just 4 sensor directions to determine the shaft and liner mode shapes, compared to the FEV testing with 582 sensor directions to determine the mode shape. As such, the B&K testing provided an insufficient amount of data to determine the mode shapes. A modal assurance criteria (MAC) is developed to confirm that the peaks represent a given mode shape across all of the sensors and are not just frequencies that do not correspond to a common mode shape.[23]   MAC compares the relationship between two adjacent mode shapes by comparing their linearity.[24]   One skilled in the art would not use peak peaking for complex mode shapes and modal frequency peaks that are near other frequency peaks[25] as peak picking is inherently inaccurate.[26]   Peak picking use dates to before modal analysis software, as illustrated by the B&K application note for using their 2033 and 2034 analyzers from 1977.[27]

---

[21] App. AN; Randall J. Allemang, *The Modal Assurance Criterion – Twenty Years of Use and Abuse*, Sound and Vibration Magazine (Aug. 2003), 14-21.

[22] *See* Fu, 159-162; Batel, 22-27.

[23] *See* Fu, 159-162; Batel, 22-27.

[24] *Id*.

[25] *See* Fu, 159-163; Batel, 22-27.

[26] Fu, 159-163; Batel, 22-27; App. AO; Peter Avitabile, *101 Ways to Extract Modal Parameters – Which is the One For Me*?, 30 Experimental Techniques, Issue 5 (Sept. / Oct. 2006).

[27] App. AP; *How to determine the modal parameters of simple structures*, Brüel & Kjær, BO 0177-11 application notes (1977), 1-4.

65.     Further, the damping defined by Dr. Rahn was the damping ratio relative to critical damping based on the half power bandwidth.[28]  Damping in mechanical systems may be represented in numerous formats.   Dr. Rahn is defining damping $\xi$, where $\xi$ is the viscous damping ratio or fraction of critical damping.  The Q value is the quality factor which is equal to the modal peak transfer function magnitude for a single-degree-of freedom system.  This simple equivalency does not apply if the system is a multi-degree-of-freedom system or for complex modes, such as in this case.[29]  Another damping parameter for the "half-power" is the frequency width ($\Delta$f) between -3 dB points on the FRF curve.  So if other mode shapes interact with the peak, then they have a damping contribution to the mode shape peak in which damping is being calculated.  This alters the accuracy of calculating the damping for adjacent mode shapes with the half power bandwidth method.[30]  Thus Dr. Rahn's calculations of damping ratios for each mode in his report are inherently flawed.

66.     Also, B&K noted that during testing of the propshafts that were swaged, and the swaged ends did not have similar lengths.  Quarter-length positions for the test sensors were applied from the side with the shorter swaged side.  But this creates a source of inaccuracy and deviation for the test engineer utilizing peak-picking method of analysis as to where to apply the sensors.  Deviations in the application of single pair of sensors along the length of the shaft would miss the peak of the bending anti-node of the shaft.  One skilled in the art could apply the sensor pairs on either the short side or the long side and determine differences in the damping based on the differences in longitudinal placement of the accelerometer when utilizing Dr.

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

Rahn's test method.  And, although it is a relatively short region, the transition from one size to another and the slope or distance of that changeover from swaged to full diameter is a factor that not a controlled metric, and has a tolerance of a few inches.  The length of the swag also have variations of a couple inches on either side, so the short or long swag end may change for the same design shaft.  A true calculation of the anti-node would result from a full modal analysis. A single pair of sensors would have greater variation and greater potential for missing the anit-node (and node) locations of higher frequency bending modes such as 2nd and 3rd bending.

## X.      THE ACCUSED PRODUCTS DO NOT INFRINGE

67.      The Accused Products generally fall into two groups: 1) propshafts having liners that were originally designed to address a single bending mode (certain 4.0 inch propshafts and the 5.775 inch propshafts); and 2) propshafts having liners that are not tuned to address any modes (4.5 inch and 5.0 inch propshafts).  I understand that AAM and Dr. Rahn accused the following parts of infringing the Asserted Claims of the '911 patent (Rahn Report, at 7-8):

| Accused Products | | |
|---|---|---|
| (GM Part No.) | Propshaft Diameter | Liner(s) (Quantity; Part No.) |
| 23282324 | 4.0 inch | (3) NPFT2G-4978-ABA |
| 94769076 | 4.5 inch | (2) NPFT2G-4978-BA |
| 84059647 | 4.5 inch | (2) NPFT2G-4978-BA |
| 84148488 | 4.5 inch | (2) NPFT2G-4978-BA |
| 23214716 | 4.5 inch | (2) NPFT2G-4978-BA |
| 84059642 | 4.5 inch | (2) NPFT2G-4978-BA |
| 84059645 | 4.5 inch | (2) NPFT2G-4978-BA |
| 23464082 | 4.5 inch | (2) NPFT2G-4978-BA |
| 84059646 | 5.0 inch | (2) NPFT2G-4978-CA |
| 94769073 | 5.0 inch | (2) NPFT2G-4978-CA |
| 84059643 | 5.775 inch | (1)NPFT2G-4978-DBA; (2)NPFT2G-4978-DCA |

- 26 -

# **EXHIBIT E**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-LPS |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF STEVEN BECKER
REGARDING INFRINGEMENT OF THE NEW ASSERTED CLAIMS
OF U.S. PATENT NO. 7,774,911**

**HIGHLY CONFIDENTIAL**



Dated:  11/3/2017

Steven Becker

19.     If any of the Accused Products were found to infringe any of the New or Original Asserted Claims of the '911 patent, Neapco had multiple commercially available and acceptable non-infringing alternatives that could have been implemented by Neapco in 2013 and 2014.  I incorporate my discussion of non-infringing alternatives from my Rebuttal Report herein.

20.     I incorporate my discussion of the '911 Patent and the background of relevant technology from my Invalidity Report, Sections VI – VII herein, as well as my discussion of the Development History and Analysis of Dr. Rahn's method from by Rebuttal Report, Sections VII and IX, and my understanding of the legal principals to apply herein.

## VI.     ANALYSIS OF DR. RAHN'S METHODOLOGY

21.     As I discuss in my Rebuttal Report (Section IX) and my Reply Invalidity Report (Section II), Dr. Rahn's analyses consisted of several flawed techniques.  My opinions below apply to each of the Accused Products and the New Asserted Claims.

22.     First, the testing relied upon by Dr. Rahn does not represent bending mode frequency of the propshaft as installed in the driveline system.  Claims 1-4 require a liner frequency to be "tuned" to a "bending mode natural frequency of the shaft assembly as installed in the driveline system."   The driveline system includes the first and second driveline components that the propshaft is attached to (*see* claim 1 preamble), which are typically the transmission or transfercase and the rear axle.  (*See* '911 patent, col. 4:24-26 "The driveline 16 can include a transmission 18, a propshaft assembly 20, a rear axle 22 and a plurality of wheels 24.")  This is consistent with the specification that confirms that the "term 'propshaft assembly as installed in the driveline' will be understood to include not only the shaft assembly, but also the boundary conditions under which the shaft assembly is installed to the two driveline components."  ('911 patent, col. 6:20-29.)

23.     In his Opening Report, Dr. Rahn opined that experimental determination of natural frequencies, damping ratios, and mode shapes of structures are well-known.   (Rahn Report, ¶ 43.)  Dr. Rahn instructed Brüel and Kjaer ("B&K") to perform testing of the accused propshafts.  He directed B&K as to the method of testing (¶ 54) using single axis "top and bottom" accelerometers at three locations along the length of the shaft, an impact hammer for excitation while the ends of the shaft are pinned.  However, Dr. Rahn inappropriately assumes that a pinned condition is equivalent to as installed in a vehicle.  In-vehicle differs from pinned conditions due to influences from the mode shapes (greater in frequency than first bending) of the vehicle powertrain and influence of the stiffness and mass of the as installed universal joint ends.[1]  Dr. Rahn shows no evidence that the pinned tests and vehicle tests' boundary conditions result in similar values for either modal frequency or damping for bending modes for the claimed infringed  products.   ██████████████████████████████

████████ (Neapco Driveline ████ Capability (NEAPCO080563), at 568, 570, 574; Neapco Ram 2500 Competitive Benchmark Study (AAM0000718) (testing performed in-vehicle on a dynamometer);   AAM  NVH  Facilities  and  Capabilities  (AAM0000626),  at  628-32;  AAM Propshaft Technology, October 17, 2014 (AAM0005073), at 5085-88; 2015 31xxN Technical Review (AAM0042821), at 42869-74.)  If both measurement schemes generated the same data, one would not need to test both in-vehicle and on a test bench.

24.     The modal testing performed by FEV on the Econoline propshaft both in-vehicle and on a test bench confirms my opinion.  Page 33 of the 2003 Econoline Analysis contains the in-vehicle test of the propshaft with and without its liners at ambient temperature using an impact hammer at all reference points:

---

[1] Invalidity Report, App. E; SAE International's Universal Joint and Driveshaft Design Manual, Advances in Engineering No. 7 was published in 1979 ("AE07"), p. 232.

## FREQUENCY AND DAMPING COMPARISON

| Shaft 1 Ambient | In Vehicle | All | Shaft 1 w/o Liners Ambient | In Vehicle | All | Frequency Delta | | Damping Delta | |
|---|---|---|---|---|---|---|---|---|---|
| Mode Shape | Freq [Hz] | Damp [%Cr] | Mode Shape | Freq [Hz] | Damp [%Cr] | Absolute | Relative | Absolute | Relative |
| 1st Vert 0º | 72.5 | 1.33% | 1st Vert 0º | 74 | 1.54% | -1.5 | -2% | -0.21% | -16% |
| 1st Lat | 76.5 | 1.25% | 1st Lat | 80.5 | 1.13% | -4.0 | -5% | 0.12% | 9% |
| 1st Vert 180º | 80.5 | 2.60% | 1st Vert 180º | 83 | 1.94% | -2.5 | -3% | 0.67% | 26% |
| Pinion Vert | 119 | 1.86% | Pinion Trans Vert | 118.5 | 2.49% | 0.5 | 0% | -0.62% | -33% |
| Pinion Trans Vert | 127 | 1.16% | Pinion Trans Vert | 127.5 | 1.29% | -0.5 | 0% | -0.13% | -11% |
| Trans Vert | 142 | 2.81% | Trans Vert | 142.5 | 3.56% | -0.5 | 0% | -0.75% | -27% |
| Trans Lat | 156 | 2.12% | Trans Lat | 156.5 | 2.64% | -0.5 | 0% | -0.52% | -25% |
| Pinion Trans Vert | 162.5 | 0.50% | Pinion Trans Vert | 162.5 | 0.81% | 0.0 | 0% | -0.32% | -64% |
| Trans Lat | 182 | 0.55% | Trans Lat | 182 | 0.55% | 0.0 | 0% | -0.01% | -1% |
| Trans Vert | 217.5 | 5.05% | Trans Vert | 211.5 | 5.11% | 6.0 | 3% | -0.06% | -1% |
| 2nd Lat | 276.5 | 3.73% | 2nd Lat | 278 | 2.01% | -1.5 | -1% | 1.72% | 46% |
| 2nd Lat | 310.5 | 4.51% | 2nd Lat | 317.5 | 4.44% | -7.0 | -2% | 0.07% | 2% |
| 2nd Vert | 318 | 2.40% | 2nd Vert | 325 | 1.69% | -7.0 | -2% | 0.71% | 30% |
| 2nd Lat | 354 | 2.56% | 2nd Lat | 356 | 2.83% | -2.0 | -1% | -0.27% | -10% |
| 1st Bi-Lobe | 570.5 | 0.33% | 1st Bi-Lobe | 610.5 | 0.12% | -40.0 | -7% | 0.21% | 65% |
| 2nd Bi-Lobe | 608.5 | 0.37% | 2nd Bi-Lobe | 633.5 | 0.23% | -25.0 | -4% | 0.14% | 37% |
| 3rd Vert | 629.5 | 2.49% | 3rd Vert | 669 | 1.85% | -39.5 | -6% | 0.64% | 26% |
| 3rd Lat | 632 | 1.82% | 3rd Lat | 657.5 | 1.64% | -25.5 | -4% | 0.18% | 10% |
| 3rd Bi-Lobe | 664.5 | 0.24% | 3rd Bi-Lobe | 697 | 0.22% | -32.5 | -5% | 0.02% | 8% |
| 4th Bi-Lobe | 749.5 | 1.02% | 4th Bi-Lobe | 815 | 0.21% | -65.5 | -9% | 0.81% | 80% |
| 5th Bi-Lobe | 978 | 1.93% | 5th Bi-Lobe | 1000.5 | 0.46% | -22.5 | -2% | 1.47% | 76% |
| 4th Lat | 1087 | 3.49% | 4th Lat | 1170 | 0.98% | -83.0 | -8% | 2.51% | 72% |
| 4th Vert | 1123.5 | 2.61% | 4th Vert | 1153.5 | 1.16% | -30.0 | -3% | 1.45% | 55% |
| 6th Bi-Lobe | 1164 | 1.16% | 6th Bi-Lobe | 1239 | 0.25% | -75.0 | -6% | 0.91% | 79% |
| 5th Vert | 1513 | 2.18% | 5th Vert | 1660.5 | 2.50% | -147.5 | -10% | -0.32% | -15% |
| 7th Bi-Lobe | 1558 | 2.02% | 7th Bi-Lobe | 1512.5 | 0.27% | 45.5 | 3% | 1.75% | 87% |

25.     As can be seen, the in-vehicle modal data for third bending mode (vertical) shows an increase in damping from 1.85% to 2.45% tested at ambient temperature and a decrease in frquency from 669 to 629.5 Hz when tested at ambient temperature.   Second bending mode (vertical) shows an increase in damping from 1.69% to 2.40% and a decrease in frequency from 325 to 318 Hz when tested at ambient temperature.

26.     Page 79 of the 2003 Econoline Analysis shows a comparision of the modal frequencies and damping ratios measured between in-vehicle and bench tests with the liners (using all data at ambient) is as follows:

## Shaft 1: Ambient [In-Vehicle vs Test Bench ]

### FREQUENCY AND DAMPING COMPARISON

| Shaft 1 Ambient Mode Shape | In Vehical Freq [Hz] | All Damp [%Cr] | Shaft 1 Ambient Mode Shape | Test Ben Freq [Hz] | All Damp [%Cr] | Frequency Delta Absolute | Frequency Delta Relative | Damping Delta Absolute | Damping Delta Relative |
|---|---|---|---|---|---|---|---|---|---|
| 1st Vert 0° | 72.5 | 1.33% | 1st Vert | 77 | 1.37% | -4.5 | -6% | -0.04% | -3% |
| 1st Lat | 76.5 | 1.25% | 1st Lat | 80.5 | 1.83% | -4.0 | -5% | -0.58% | -47% |
| 2nd Lat | 276.5 | 3.73% | 2nd Lat | 299.5 | 0.65% | -23.0 | -8% | 3.08% | 83% |
| 2nd Vert | 318 | 2.40% | 2nd Vert | 295 | 0.70% | 23.0 | 7% | 1.70% | 71% |
| 1st Bi-Lobe | 570.5 | 0.33% | 1st Bi-Lobe | 569 | 0.45% | 1.5 | 0% | -0.12% | -37% |
| 2nd Bi-Lobe | 608.5 | 0.37% | 2nd Bi-Lobe | 608.5 | 0.24% | 0.0 | 0% | 0.13% | 35% |
| 3rd Vert | 629.5 | 2.49% | 3rd Vert | 603.5 | 1.00% | 26.0 | 4% | 1.49% | 60% |
| 3rd Lat | 632 | 1.82% | 3rd Lat | 619 | 0.55% | 13.0 | 2% | 1.27% | 70% |
| 3rd Bi-Lobe | 664.5 | 0.24% | 3rd Bi-Lobe | 664.5 | 0.23% | 0.0 | 0% | 0.01% | 3% |
| 4th Bi-Lobe | 749.5 | 1.02% | 4th Bi-Lobe | 750.5 | 0.88% | -1.0 | 0% | 0.14% | 14% |
| 5th Bi-Lobe | 978 | 1.93% | 5th Bi-Lobe | 982 | 1.58% | -4.0 | 0% | 0.34% | 18% |
| 4th Lat | 1087 | 3.49% | 4th Lat | 1075 | 0.26% | 12.0 | 1% | 3.23% | 93% |
| 6th Bi-Lobe | 1164 | 1.16% | 6th Bi-Lobe | 1159 | 1.48% | 5.0 | 0% | -0.32% | -28% |
| 5th Vert | 1513 | 2.18% | 5th Vert Complex | 1583 | 1.66% | -70.0 | -5% | 0.52% | 24% |

27. As can be seen, the in-vehicle data compared to the test bench data at ambient temperatures shows different frequencies (sometimes by as much as 8%) and a marked increase in bending mode damping with the liners. Third vertical bending mode frequency changed from 629.5Hz to 603.5Hz (a 4% difference), third lateral bending when from 632Hz to 619Hz, and second vertical bending mode moved from 318Hz to 295Hz for a 7% difference.  The damping had a 60% relative increase for third vertical bending, 70% for third lateral bending, and a 71% increase for second vertical bending.  (2003 Econoline Analysis, at 79.)  The in-vehicle testing is more appropriate, as that is where the customer seeks improvement in damping.  The FEV test engineers also noted that the "[v]ariability in bending modes is likely attributed to driveline stiffness and mass damping effects at the u-joint boundaries that are not present on a rigid pin-pin test fixture."  (2003 Econoline Analysis, at 79.)  But Dr. Rahn's testing does not account for the in-vehicle boundary conditions for his bending mode analysis.   As I described in my Invalidity Report, AAM's witnesses acknowledge that the boundary conditions in the vehicle affect bending modes.  (Invalidity Report, ¶ 199.)

28.     The test data from FEV for the Econoline further shows that mode shape animations are not similar and are not symmetrical (as Dr. Rahn assumes using his testing method.)  Below are the mode shapes generated by FEV for in-vehicle and on a bench at ambient both with and without liners:





(App. Q; 2003 Econoline Analysis, at 111-13, 124-126, 282-84, 291-93.)  The shaft 1 test at ambient with a full modal in-vehicle data for 2nd bending has different end conditions and 3rd bending modes display different symmetry (in addition to the different frequencies and damping).  As can be seen above, these mode shapes, frequencies, and damping differ when comparing in-vehicle to bench testing.  (*Id*.)  Testing at 100 degrees in the vehicle versus the bench, showed similar differences.  (*Id*. at 136-138, 149-151.)  You can see the differences in mode shapes, frequencies, and damping between in-vehicle and bench testing for the various permutations of the testing by excitation source and temperature in the FEV Econoline testing at pages 103-377.

29.     Second, Dr. Rahn purports to compare propshafts with and without liners on a bench while using peak picking and a single sensor position along the length of the shaft.  But

Dr. Rahn's methodology is inappropriate and unreliable.  As I indicated in my Rebuttal Report for his analysis of the Accused Products, and in my Reply Invalidity Report, Dr. Rahn's method of identifying the various modes was flawed.  Dr. Rahn's method for mode shape determination for the accused products and the Econoline product was based on the peaks in the frequency response function plots, or "peak picking."  Peak picking is used for determination of obvious modes that are well separated from other mode shape frequencies and peaks, such as first or second bending.[2]  But shell modes and higher order bending modes at frequencies greater than the first or second bending (depending on propshaft and vehicle) are complex and contain several peaks that are close in frequency to each other.  Dr. Rahn's methodology does not account for complex, or coupled, modes where closely interacted shell and bending modes create a new mode with aspects of both of the pure modes.  Therefore there is no way without calculating mode shapes to determine which mode is picked and whether the mode picked is a pure mode or complex mode.  Dr. Rahn selects modes based on the frequency by picking the peaks.  But peak picking was not commonly performed done in the industry for anything more than a quick check of a first or second bending frequency around the time of the invention.  That is because this method produces substantially different results than modern techniques and provides ambiguity as to whether the various modes he identifies are, in fact, the alleged modes, and does not allow for as accurate of damping measurements.[3]  As an example, for all of Dr. Rahn's analyses where he identifies second and higher shell and bending modes, it is unclear whether those modes are in fact the alleged modes due to the use of peak picking as explained in more detail below.

---

[2] App. AL; Fu, Zhi-Fang, He, Jimmy, *Modal Analysis*, Butterworth Heinmann (2001), ISBN 0750650796, at 163-164 ("Fu"); App. AM; Mehdi Batel, *Operational Modal Analysis – Another Way of Doing Modal Testing,* Brüel & Kjær, Sound and Vibration Magazine (Aug. 2002), 22-27 ("Batel").

[3] *Id*.

30.     Modern modal analyses utilize polynomial estimation analyses to determine mode shapes, which requires multiple transducers.[4]   This is performed in software created by the former SDRC, B&K, LMS/Siemens and others, that correlates how all of the accelerometer sensors are moving relative to each other as vectors.[5]   One skilled in the art can then visualize the mode shape of each peak selected and determine if the shape matches the description of the mode shape, if there are a sufficient number of sensors to display the mode shape.[6]   Typically modal testing utilizes three-axis sensor to visualize movement in the all directions.   During the FEV testing tri-axial (three-direction) sensors were used, compared to the B&K testing that used uniaxial accelerometers.   This resulted in the B&K testing having just 4 sensor directions to determine the shaft and liner mode shapes, compared to the FEV testing with 582 sensor directions to determine the mode shape.   As such, the B&K testing provided an insufficient amount of data to determine the mode shapes.   The method used by FEV, however, used the correlated 3-dimensional shape estimate generated by 582 independent locations with all directions (x,y,z) at each of 194 nodes distributed across the entire propshaft assembly.   For FEV's 6-reference (all) or 6-impact hammer locations combined, that is 6 x 582 = 3,492 measurements per mode shape.   That means that FEV's "All" reference values are based on essentially 3,492 measurements, versus one measurement in Dr. Rahn's analysis.   (*See* 2003 Econoline Analysis, at 8-25, 107-115, 103-377.)   This does not even include the advanced geometry and math used by FEV to ensure that they are true mode shapes (and independent via the MAC).   (*Id*.)

---

[4] *See* Fu, 159-162; Batel, 22-27.

[5] App. AN; Randall J. Allemang, *The Modal Assurance Criterion – Twenty Years of Use and Abuse*, Sound and Vibration Magazine (Aug. 2003), 14-21.

[6] *See* Fu, 159-162; Batel, 22-27.

31.     As I explained in my Invalidity Reports, the effects of a single sensor position compared to a full modal analysis are further shown a Neapco Presentation entitled Development of Test Method for ████████████████████████████████ dated October 21, 2014 (NEAPCO001619, at 27) for liner test data:



32.     A modal assurance criteria (MAC) is often developed to confirm that the peaks represent a given mode shape across all of the sensors and are not just frequencies that do not correspond to a common mode shape.[7]  MAC compares the relationship between two adjacent mode shapes by comparing their linearity.[8]  One skilled in the art would not use peak peaking for

---

[7] *See* Fu, 159-162; Batel, 22-27.

[8] *Id*.

complex mode shapes and modal frequency peaks that are near other frequency peaks[9] as peak picking is inherently inaccurate.[10]   Peak picking use dates to before modal analysis software, as illustrated by the B&K application note for using their 2033 and 2034 analyzers from 1977.[11] Further, the B&K testing was not modal testing even as referenced in the B&K application note from 1977 on "*How to determine the modal parameters of simple structures*".[12]   In that note, B&K states in the introduction on the first page "The modal parameters can be determined from a set of frequency response measurement between a reference point and a <u>number</u> of measurement points on the structure … However to accurately modal the mode shape, frequency response measurements must be made over a number of points completely covering the structure."   Dr. Rahn's testing, however, used one measurement point after he added or subtracted and did not cover the complete structure.   While B&K indicated in its July 17, 2017 presentation (cited by Dr. Rahn in his Reply Infringement Report) that they have performed this form of testing for numerous clients, it does not make the testing appropriate here.   First, the data and goals of their alleged testing with other clients were not disclosed.   Second, while it may be fine for a quick-check of clearly separated mode frequencies that their customers may have been interested in, it has no bearing on the determination of patent infringement here where the value of complex or coupled modes are important. As discussed above, B&K's testing method outlined by Dr. Rahn contradicts B&K's own instruction material for performing that type of analysis.

---

[9] *See* Fu, 159-163; Batel, 22-27.

[10] Fu, 159-163; Batel, 22-27; App. AO; Peter Avitabile, *101 Ways to Extract Modal Parameters – Which is the One For Me*?, 30 Experimental Techniques, Issue 5 (Sept. / Oct. 2006).

[11] App. AP; *How to determine the modal parameters of simple structures*, Brüel & Kjær, BO 0177-11 application notes (1977), 1-4.

[12] *Id.*

33.     Moreover, the damping defined by Dr. Rahn was the damping ratio relative to critical damping based on the half power bandwidth.[13]  Damping in mechanical systems may be represented in numerous formats, as I explained in my Invalidity Report.  Dr. Rahn is defining damping ξ, where ξ is the viscous damping ratio or fraction of critical damping.  The Q value is the quality factor which is equal to the modal peak transfer function magnitude for a single-degree-of freedom system.  This simple equivalency does not apply if the system is a multi-degree-of-freedom system or for complex modes, such as in this case. [14]   Another damping parameter for the "half-power" is the frequency width (Δf) between -3 dB points on the FRF curve.  So if other mode shapes interact with the peak, then they have a damping contribution to the mode shape peak in which damping is being calculated.  This alters the accuracy of calculating the damping for adjacent mode shapes with the half power bandwidth method.[15]  Thus Dr. Rahn's calculations of damping ratios for each mode in his report are inherently flawed and unreliable.

34.     The unreliability of the data can be again demonstrated by actual testing performed by FEV on the Econoline propshaft.  As I discuss in my Reply Report, Dr. Rahn had B&K perform testing of the Econoline propshaft using the same methodology he used to determine infringement in this case.  For the Econoline, the first and second bending modes, the shapes and peaks are fairly clear.  Below are the data in the B&K report (page 8) with and without the liner using Dr. Rahn's peak-picking and single direction sensors at one shaft location

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

(after averaging top and bottom frequency response functions ("FRFs")), with the modes shape peaks highlighted:



As you can see in the plots, the first and second bending mode peaks are fairly defined and separated—the peaks and shapes are highlighted in green above—although there are still lessor modal peaks near both first and second bending.

35.    In contrast, third bending mode, highlighted in blue, is within the frequency range of 500 to 850 Hz and is not clearly defined.  As the graphs show, for third bending there are numerous peaks adjacent to each other that influence a peak picking analysis and confuses which shape is which mode shape.  When there are adjacent peaks, the modal contribution of one peak

(amount of decay and damping) is influenced by each adjacent peak.[16]   The following plots described in Agilent (page 10) show the contribution of multiple modes (see ω 1, ω2, ω3) to each other:



36.     Below are the adjacent peaks in the plot used by Dr. Rahn to illustrate his analysis of third bending mode (Rahn Rebuttal, ¶ 234):

---

[16] App. AC; Fundamentals of Modal Analysis, Agilent Technologies Application Note 243-3, Agilent Technologies (2000), at 10 ("Agilent").



As can be seen above, there are several adjacent peaks around the peaks that Dr. Rahn identifies as third bending.  Of particular note is the peak adjacent to the left of the peak that he chose for the third bending mode with liner, which if selected for third bending would result in greater damping of the mode and a decrease in frequency with the liner compared to without the liner. Regardless, with the limited method used, it is unclear to what extent one peak interacted with and affected the other as far as the measured frequencies and damping.

37.    Below is a chart showing the data in the B&K Rebuttal Report (page 8) with delta damping ratios and percentage change with the liner added:



38.     Below are data from the B&K Rebuttal Report (page 9) with and without the liner using Dr. Rahn's peak-picking and single direction sensors at one shaft location (after subtracting the top and bottom FRFs) for shell modes, with the modes shape peaks highlighted:



39.     Below is a chart showing the data in the B&K Rebuttal Report (page 9) with delta damping ratios and percentage change with the liner added:



40.    The data shows, using peak picking, Dr. Rahn picked the exact same frequency for both third shell and third bending (658 Hz) with the liner.  From Dr. Rahn's data, the 2003 Econoline liner damped the bending modes first to third by 97%, 40%, and -7% respectively. From Dr. Rahn's data the Econoline damper highly damped all of the shell modes.   But, as I discuss above, one skilled in the art would not compare damping using peak picking as you cannot distinguish the damping associated with the data for the peak of bending and shell modes with adjacent peaks or the same frequency.

41.    The testing at FEV of an Econoline propshaft on a bench at ambient yields many FRFs, but one direction (cited in Rahn Rebuttal, ¶ 254) is plotted here (App. Q, 2003 Econoline Analysis, at 55):



42.     As can be seen, the first and second modes have clearly identified peaks and no influence from nearby peaks.  As can be seen, third bending has adjacent peaks identified as shell modes.  The FEV data for the single impact location (Plane 10) cited by Dr. Rahn showed third vertical bending without liners as 657 Hz (noting it was "complex") and with liners as 603.5 Hz.

43.     FEV also generated values for the bench testing using data from all accelerometers, which is far more accurate (although less so than the in-vehicle data for bending modes).  The following tables for both shell and bending modes were created from the FEV data (FEV 2003 Econoline Analysis, at 56) using data from all accelerometers:

*Bending modes*:



23

*Shell modes*:



44.     The FEV testing, using all accelerometers, shows third vertical bending mode without the liner is 635.5 Hz, whereas B&K determined it is 668 Hz.  Similarly, the FEV testing determined third vertical bending with the liner is 603.5 Hz (notably, both single impact location and all data showed the same), whereas Dr. Rahn determined it to be 658 Hz by peak picking.  Thus the methodology used by Dr. Rahn produced a substantial difference in chosen frequency.

45.     As I indicated in my Rebuttal Report at paragraph 63, the B&K data for the Accused Products also demonstrates the flaws with Dr. Rahn's methodology.  In my Rebuttal Report I noted that a clear example of complex modes close in frequency to each other are shown by Dr. Rahn's FRF plots for the 324 Accused Product (not accused as to the New Asserted Claims), shown below with nearby peaks or modes highlighted in green:

**Bending Mode Identification**          **Shell Mode Identification**



(*See* Rahn Open. Infr. Report, Ex. C, at 8, 9.)  As shown above, the frequency peaks for Dr. Rahn's chosen ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are all close, largely between ▮▮▮▮▮ which means those modes could be complex or coupled due to how close they are.  (Rahn Open. Infr. Report, Ex. C, at 9-10.)  Indeed, Dr. Rahn picks the same frequency— ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the 324 Accused Propshaft without liners.  (*Id.*)  Because of the complex nature of these modes, there is no way, without calculating mode shapes, to determine whether a pure mode or complex mode is being measured.

46.    The same is true for every other Accused Product.  The higher order bending modes identified by B&K using Dr. Rahn's methodology at frequencies greater than the first bending are complex and contain several peaks that are close in frequency to each other or to various shell modes.  For example, B&K's testing of the 488 Accused Product shows that ▮▮▮▮ bending has two adjacent peaks:



(*See* Rahn Open. Infr. Report, Ex. C, at 13.)   Without more information, Dr. Rahn's analysis method of peak picking can not distingish the proper bending mode peak (Dr. Rahn identifies ▮▮ Hz as the peak) or the influence of the other peak on the damping.   And Dr. Rahn's description of how his method isolates some peaks and accentuates others is also flawed as the peak near first bending shows very little amplitude reduction between the quarter position as compared to the mid position.

47.   For the 646 Accused Product, the plots also show several adjacent peaks around what Dr. Rahn identifies as ▮▮ bending mode:

26



(*See* Rahn Open. Infr. Report, Ex. C, at 17.)  The other Accused Products have similar adjacent peaks around ███████████████ as well.  I incorporate the plots in Dr. Rahn's Exhibit C for the other Accused Products.  (*See e.g.*, Rahn Open. Infr. Report, Ex. C, at 15 (645 Accused Product); 19 (643 Accused Product); 21 (489 Accused Product); 23 (650 Accused Product).)

48.     For the 643 Accused Product, the Dr. Rahn selected a █████████████ peak of ███ Hz is indisquishable from several adacent peaks in the testing without the liner, and in the quarter shaft position the amplitude is greater compared to the middle position data, where Dr. Rahn's method would suggest the opposite should occur:



49.     The 489 Accused Product testing has a similar issues for the third bending mode

peaks (*See* Rahn Open. Infr. Report, Ex. C, at 21):



50.     Finally, Dr. Rahn's analysis of the shell mode peaks for Accused Products, including, but not limited to the 488, 076, 645, and 646 Accused Products, shows the ███ ███ mode peaks are adjacent to other peaks.   Moreover, the chosen ██████████ frequencies increase with the addition of the liners, whereas most of the testing shows mode frequency decreases for the other shafts.  Below are the plots for the 488 Accused Product show that Dr. Rahn's selected ███████ peak for with the liners is influenced by adjacent peaks.



(*See* Rahn Open. Infr. Report, Ex. C, at 14.)  The plots for the shell modes for the 324, 076, 645,

646, 643, 489, and 650 Accused Products are similar.  (*See* Rahn Open. Infr. Report, Ex. C, at

10, 12, 16, 18, 20, 22, 24.)

### VII.      THE ACCUSED PRODUCTS DO NOT INFRINGE

51.      The Accused Products generally fall into two groups: 1) propshafts having liners

that were ███████████████████████████ (the 5.775 inch propshafts); and

2) propshafts having liners that are ████████████ (4.5 inch and 5.0 inch

propshafts).  I understand that AAM and Dr. Rahn accused the following parts of infringing the

New Asserted Claims of the '911 patent:

# **EXHIBIT F**

**Expert Reports of John Hansen: Exhibits Identified by Neapco in Exhibit A to its Motion *In Limine***

| Exhibit | Description of Exhibit | Hansen Report[1] |
|---|---|---|
| PTX-010 (NEAPCO126824) | 03/20/14 Email from N. Das regarding ███ ██ █████ ███ ████ ███ 03/20/14 Email from G. Parker regarding ██ ████ | Opening ¶ 50 (n.104) (lost profits: demand for the patented invention) Opening ¶ 139 (n.277) (reasonable royalty: *Georgia Pacific* factors 9 and 10) Opening ¶ 144 (n.290) (reasonable royalty: *Georgia Pacific* factors 9 and 10) Reply ¶ 17 (n.39) (demand for the patented invention) Reply ¶ 18 (n.47) (absence of non-infringing alternatives) |
| PTX-015 (NEAPCO152795) | 03/2014 presentation titled ████ ████ ██ ██ █████ | Opening ¶ 52 (n.111 and 112) (demand for the patented invention) Opening ¶ 57 (n. 123–125) (demand for the patented invention) Opening ¶ 63 (n. 132, 133) (absence of non-infringing alternatives) Opening ¶ 64 (n.134) (absence of non-infringing alternatives) Opening ¶ 141 (n.280) (reasonable royalty: *Georgia Pacific* factors 9 and 10) |
| PTX-016 (NEAPCO177596) | 05/14/2015 Email correspondence regarding "GM31xxN ████ ████ | Opening ¶ 51 (n.110) (demand for the patented invention) Opening ¶ 139 (n.279) (reasonable royalty: *Georgia Pacific* factors 9 and 10) |

[1] Exhibit 4 is a copy of excerpts from Mr. Hansen's Opening Report.  Exhibit 5 is a copy of excerpts from Mr. Hansen's Reply Report.

| Exhibit | Description of Exhibit | Hansen Report[1] |
|---|---|---|
| PTX-017 (NEAPCO126490) | 05/27/2014 Email from R. Wehner attaching presentation: | Opening ¶ 50 (n.105, 106) (demand for the patented invention) |
| PTX-037 (NEAPCO155585) | 02/13/2014 Email from R. Wehner, | Opening ¶ 55 (n.117) (demand for patented invention) |
| PTX-050 (NEAPCO000217) | 02/10/2014 and 02/11/2014 Email correspondence regarding | Opening ¶ 41 (n.75–77) (demand for the patented invention)<br>Opening ¶ 64 (n.136) (absence of non-infringing alternatives)<br>Opening ¶ 136 (n.269) (reasonable royalty: *Georgia Pacific* factors 9 and 10) |
| PTX-066 (NEAPCO186187) | 03/2014 Email correspondence regarding | Opening ¶ 55 (n.118, 119) (demand for patented invention)<br>Opening ¶ 56 (n.120, 121) (demand for patented invention)<br>Opening ¶ 57 (n.122) (demand for patented invention) |

| Exhibit | Description of Exhibit | Hansen Report[1] |
|---|---|---|
| PTX-275 (NEAPCO002333) | 2015 Neapco presentation ███████████ ...which appears better tuned for the 2nd bending." | Opening ¶ 51 (n.108, 109) (demand for the patented invention) |
| PTX-278 (NEAPCO017353) | 10/03/2014 Email from N. Das regarding ███████████ | Opening ¶ 50 (n.107) (demand for the patented invention) |

# **EXHIBIT G**

AMERICAN AXLE MANUFACTURING, INC.,

V.

NEAPCO HOLDINGS LLC AND NEAPCO DRIVELINES LLC,

CIVIL ACTION NO. 1:15-CV-01168-UNA

EXPERT REPORT OF JOHN L. HANSEN

TM FINANCIAL FORENSICS, LLC
MAY 31, 2017

Case 1:15-cv-01168-GBW Document 323-11 Filed 01/05/24 Page 226 of 668 PageID #: 21766

JOHN L. HANSEN

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to its propshaft competitors.[62]   Mr. Jonas also testified that customers, including GM, Chrysler and Toyota, have all indicated to AAM that its patented invention is the best solution on the market.[63]   Mr. Jonas testified that customers have approached AAM with NVH problems, and that AAM's tuned liner propshafts have fixed the issues.[64]   To Mr. Jonas's knowledge, AAM has never won aluminum propshaft business without use of its SYLENT technology, and that SYLENT technology was one of the drivers for AAM's recent business win for the heavy-duty RAM truck project.[65]   Furthermore, Toyota recently gave AAM a vehicle with NVH issues, and AAM successfully retrofitted the vehicle with a propshaft implementing tuned liners.[66]   Toyota's feedback was positive and resulted in Toyota asking AAM to present in Japan.[67]

38.      In the paragraphs below, I address demand for the patented invention as evidenced by



39.      On March 31, 2011, Neapco presented its                                   [68]   In the presentation, a series of                                   were presented, along with Neapco counter-proposals.                                   [69]   Neapco's counter-proposal confirmed that its aluminum

---

[62] Discussions with Eduardo Jonas.  Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: pp. 101-102.

[63] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: pp. 48-49.

[64] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: p. 52.

[65] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: pp. 98-99, 129.  I understand that SYLENT technology is a tradename for AAM's tuned liners that practice the patent-in-suit.  Discussions with Michael Voight, Senior Manager of Propshaft Engineering at AAM.

[66] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: p. 181.

[67] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: pp. 180-181.

[68]                                   March 31, 2011: NEAPCO066625-659.

[69]                                   March 31, 2011: NEAPCO066625-659 (at 631).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and carbon fiber ("CF") propshafts would have two rubber-type spiral wrapped cardboard liners.[70]   The document describes the product specifications for each of the quoted propshafts.   All the aluminum and CF propshafts include liners with either silicone or EPDM winding.[71]

40.   Additionality, ████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████  ████████████████████████████████
████████████████████████████████████████████████████
████████████████[74]

41.   ██████████████████████████████████   On February 10, 2014, Niladri Das, Engineering Manager for Driveshafts at Neapco, sent several Neapco employees a meeting invitation for the next day.[75]  In the body of the email, Mr. Das wrote ████████
████████████████████████████████████████████████████
████████  ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████

[70] ████████████████████████████████████████████ March 31, 2011: NEAPCO066625-659 (at 631).

[71] "████████████████████████████████████████ March 31, 2011: NEAPCO066625-659 (at 645-650).

[72] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: p. 16; Discussion with Dr. Christopher D. Rahn.

[73] "31XXN 15.04.01 Propshafts Subsystem Technical Specification," May 17, 2011: NEAPCO000129-175 (at 150, 165, 172); Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 86-87.

[74] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 17, 19, 22-23.

[75] Neapco Email Correspondence, February 11, 2014:  NEAPCO000217-230 (at 217).

[76] Neapco Email Correspondence, February 11, 2014:  NEAPCO000217-230 (at 217). Arvind Srinivasan replied to Mr. Das and ████████████████████████████████████████████
        See Neapco Email Correspondence, February 11, 2014:  NEAPCO000217-230 (at 217).

[77] ████████████████████████████████████████████████
████████████████████████████████  ██████████  ████
████████████████████████████████████████████████

42.    Brian Mahnken, GM Noise and Vibration Development Engineer on the 31XXN Project, ███████████████████████████████████████████████[78]  Mr. Mahnken testified that ████████████████████████████████████████████ ██████████████████████████████████████[79]  Several of the trucks received a ████████████████████████████████████████████████████ ██████  Therefore, Neapco's 31XXN propshafts ███████████████████

43.    By February 17, 2014, it became more evident certain propshafts proposed by Neapco ████████████████████████████████████████████████████ ████████████████████[81]  Specifically, ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █  ███████████████████████████  ██████  ████████████ ████████████████████[82] [emphasis added]  The  ███████████ ████████████████████████████████████████████████████ ████████████████  ███████████████████████████████████ ███████████████  [emphasis added]

44.    Niladri Das, Engineering Manager for Driveshafts at Neapco, who was responsible for addressing engineering issues with GM on the 31XXN program, testified ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

████████████████████████████████████████████████████ ██████
████████████████████████████████[77] *See* P. Exhibit 44: NEAPCO004240-253 (at 253);
"31xx LFX MYB RWD Long Wheel Base ████████████████████" February 17, 2014:
NEAPCO002584-593 (at 593).
[78] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 41-42.
[79] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp 18-19.
[80] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 19, 22-23; "31XXN Axle & Propshaft NVH," June 17, 2014: AAM000000711.
[81] "31xx LFX MYB RWD Long Wheel Base ██████████████████" February 17, 2014:
NEAPCO002584-593.
[82] "31xx LFX MYB RWD Long Wheel Base ██████████████████" February 17, 2014:
NEAPCO002584-593 (at 593). ██████████████████████████████████████
█████████████████████  ." *See* P. Exhibit 44: NEAPCO004240-253 (at 253).
[83] "31xx LFX MYB RWD Long Wheel Base ████████████████ February 17, 2014:
NEAPCO002584-593 (at 593).



[84] Mr. Das further testified it was determined that ███████████████████████████████████████████████████████████

45.     ***Neapco Use of AAM Tuned Liner Technology***:   Mr. Robert Wehner, Neapco's Core Product Development Manager, testified that ████████████████ ████████████████████[86]  For example, GM's Long Wheel Base ████████████████████ from February 2014 included the following ████ ██████████████████████████████ ████████████████████████████████[87] [emphasis added] As the document indicates, and as Mr. Wehner confirmed, it was ████████ ████████████████████████████████ ██████████[88]  Mr. Wehner further testified that ████████████ ████████████████████████████ ████████████[89]

46.     ████████████████████████████████ ████████████████████████████ ████████████████████████[90]  Further, ██ ████████████████████████  █ ██████████████ ████████████████████████ ████████████████[91]  After determining that █████████████ ██████████████████████

[84] Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 19-21, 30.
[85] Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 19-21, 30.
[86] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: p. 84.
[87] "31xx LFX MYB RWD Long Wheel Base Vehicle Axle Noise Investigation," February 17, 2014: NEAPCO002584-593 (at 585).  Mr. Niladri Das testified that ████████████████████ ████████████████████████████.  Mr. Das testified that the ████████████████ Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 19-21.
[88] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: p. 85.
[89] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: p. 85.
[90] "31xxN Driveline Global Modes Separation and Axle Gear Mesh FE Analysis," NEAPCO004240-253.
[91] "31xx LFX MYB RWD Long Wheel Base ████████████████████████" February 17, 2014: NEAPCO002584-593 (at 587, 593).

██████████████████████████████████████████████████████████████
████████████████████████████ 92

47.    AAM's tuned liner technology was █████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████ █████████████████████
████████████████████████████████████████████████████████████
██████████████████████████

48.    Mr. Mahnken testified that the █████████████████████████████
████████ 95  Niladri Das also testified that the ████████████████
████████████████████████████████████████████ 96  Mr. Das testified
that he was ██████████████████████████████████████████████████████
█████████████████████████████████████████████████ 97  The
"Action Plan" to address the ████████████████████████████████████
████████████████████████████████████████████████████████████
██████████  A March 2014 ████████████████████████████████████
████████████████████████████████████████████████████████

49.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████  The results were included in a presentation titled "Neapco Driveline ████
████████████████████████████████████████████████████████████
██████████████████████   ███████████████████████████   █████████████████

92 "31xx LFX MYB RWD Long Wheel Base ████████████████████" February 17, 2014: NEAPCO002584-593 (at 593).
93 AAM0035954.
94 "31xx LFX MYB RWD Long Wheel Base ████████████████████" February 17, 2014: NEAPCO002584-593 (at 593); Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 19-21, 30.
95 Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 43-44.
96 Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 38-39.
97 Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 39-40.
98 "31XXN Axle & Propshaft NVH," June 17, 2014: AAM000000711.
99 "██████████," March 27, 2014: GM_AAM000000037-45 (at 041).
100 "Neapco Driveline ███ Capability," February 2014: NEAPCO080563-574 (at 568).
101 "Neapco Driveline ███ Capability," February 2014: NEAPCO080563-574 (at 568).

██████████████████████████████████████████████ [102] [emphasis added] Mr. Wehner confirmed that the final design for the ████████████████████████████████ ████ ██████████████████████ ████████████████

50.     On March 20, 2014, Niladri Das sent an email to other Neapco employees stating, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ In May 2014, Robert Wehner, Core Product Development Manager at Neapco, emailed Paul Roman and Gary Parker at Neapco and stated ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ [105] In the same email correspondence, Mr. Wehner states that Neapco has ████████████████████████████████████████████ ████████████████████████ [106] In October 2014, Mr. Das emailed several Neapco employees stating ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████ [107]

51.     In 2015, Neapco continued to ████████████████████████████████ For example, in August 2015 Neapco published a report ████████████████ ████████████ Neapco's objectives included: ████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ [108] Neapco determined that "[t]he ████████████████████████████████████████████████ ████████████████████████████ [109] In May 2015, Mr. Wehner



[102] "Neapco Driveline ████ Capability," February 2014: NEAPCO080563-574 (at 568).
[103] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 94-95.
[104] Neapco email exchange, March 20, 2014: NEAPCO126824-828 (at 824).
[105] Neapco email correspondence, May 21, 2014: NEAPCO126490-492 (at 491).
[106] Neapco email correspondence, May 21, 2014: NEAPCO126490-492 (at 490).
[107] Neapco email correspondence, October 3 2014: NEAPCO017353-357 (at 353).
[108] "████████████████████████████████████████" August 28, 2015: NEAPCO002333-380 (at 334).
[109] "████████████████████████████████████" August 28, 2015: NEAPCO002333-380 (at 380).

emailed Paul Roman of Neapco and stated that █████████████████████████
████████████[110]

52.  Additionally, a March 2014 Neapco presentation lists ███████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████[112]

53.  Ultimately, the use of ████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████.[113]  As described in *Georgia-Pacific* Factor 11 below, between June 2014 and
March 2015 ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████  Mr. Mahnken of GM testified that
████████████████████████████████████████████████████████████
████████████████████████████[114]

54.  Neapco used ████████████████████████████  All of these ████████████
████████████████████████████████████████████████████████████[115]
However, only Neapco's ██████████████████████████████████████████████
████████████████████████████████████████████████[116]

---

[110] Neapco email correspondence, May 14, 2015: NEAPCO177596-599 (at 596).
[111] "████████████████████████████ Revision 1" March 28, 2014: NEAPCO152795-805 (at 799).
[112] ██████████████████████████ Revision 1" March 28, 2014: NEAPCO152795-805 (at 803).
[113] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 42-43, 63-65; "████████████████████████████" March 10, 2014: GM_AAM000000027-036 (at 031).
[114] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 74-75.
[115] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: p. 31; Deposition of Zhaohui Sun (Senior NVH Engineer at Neapco), April 26, 2017: p. 26.
[116] *See* "█████████████████████████████" March 12, 2015: NEAPCO135043-044; "Quote EWO 2111948 – ████████████ rev. 1," September 11, 2014: GM_AAM000000127; "████████████████████████████ June 13, 2014: NEAPCO135041.

55. [redacted]

56. The following day, March 26, 2014, Mr. Wehner wrote to his team at Neapco stating that [redacted]

57. On March 27, 2014, Mr. Wehner wrote that [redacted][122] The email correspondence referenced [redacted][123] The presentation included [redacted][124] Additionally, the presentation [redacted][125]

[117] *See* Plaintiff Ex. 37, NEAPCO0155585.
[118] Neapco Email Correspondence, March 25-27, 2014: NEAPCO186187-189 (at 189).
[119] Neapco Email Correspondence, March 25-27, 2014: NEAPCO186187-189 (at 189).
[120] Neapco Email Correspondence, March 25-27, 2014: NEAPCO186187-189 (at 188).
[121] Neapco Email Correspondence, March 25-27, 2014: NEAPCO186187-189 (at 188).
[122] Neapco Email Correspondence, March 25-27, 2014: NEAPCO186187-189 (at 187).
[123] "[redacted] Revision 1," March 28, 2014: NEAPCO152795-805.
[124] "[redacted] Revision 1," March 28, 2014: NEAPCO152795-805 (at 804-805).
[125] [redacted] Revision 1," March 28, 2014: NEAPCO152795-805 (at 803).

58. Despite ███████████████████████████ by June 2014 Neapco began implementing design changes ███████████████████ to multiple 31XXN aluminum propshafts.[126]

59. As stated above, the SSTS required ███████████████████████████████████████ ████████████████████████████████████████████████████████[127]  In order to meet ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████

## 2.   Absence of Non-Infringing Alternative

60. The *Grain Processing* opinion addresses the analysis of acceptable, non-infringing substitutes, including consideration of alternatives available to the defendant in determining what would have happened but for the alleged infringement.[128]

61. In *Grain Processing*, the court acknowledged that the "but for" market must account for options available to the infringer at the time of infringement, including products it could have offered for sale.  In evaluating available, acceptable non-infringing substitutes, I have evaluated what alternative damping technologies, if any, would have been available and acceptable to GM for the 31XXN aluminum propshafts, either from Neapco or a third-party.  I understand that Neapco, AAM and Dana Incorporated ("Dana") are the primary competitors that sell aluminum propshafts to large OEM vehicle manufacturers.[129]  I further understand that AAM does not believe that Dana has used tuned liners or AAM's patented tuned liner technology, and AAM would not have been willing to grant Dana a license to

---

[126] "Quote EWO 2111948 – ██████████████████████ rev. 1," September 11, 2014: GM_AAM000000127; ████████████████████████████ rev. 1," June 13, 2014: NEAPCO135041; "████████████████████████████████" March 12, 2015: NEAPCO135043-044.
[127] "31XXN 15.04.01 Propshafts Subsystem Technical Specification," May 17, 2011: NEAPCO000129-175 (at 152-153, 172); "31xxN Propshaft NVH Requirements," GM_AAM000000763-768.
[128] *Grain Processing Corporation v. American Maize-Products Company*, 185 F.3d 1341 (Fed. Cir. 1999).
[129] Discussions with Eduardo Jonas, Managing Director of Driveshaft Business Unit at AAM; Discussions with Michael Voight, Senior Manager of Propshaft Engineering at AAM; Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: p. 196.

use its patented tuned liner technology.[130]  For purposes of evaluating available, acceptable non-infringing substitutes for the 31XXN aluminum propshafts, I have evaluated alternative technologies that could have been considered by either Neapco or Dana.[131]

62.    I understand that in addition to AAM's patented tuned liner technology there are damping technologies available to use in aluminum propshafts, including: (1) un-tuned cardboard liners; (2) internal tuned dampers ("ITDs"); (3) slip yoke dampers; and (4) foam liners / stuffers.  As described below, the alternative damping technologies do not provide the same benefits as AAM's patented tuned liner technology.   The record indicates that these

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████

63.    ***Un-tuned Cardboard Liners***:  I understand that Neapco had included cardboard liners in its propshafts prior to the NVH testing that took place in 2014 discussed above.  For example, a Neapco presentation from March 2014 states Neapco's ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████[132] [emphasis added]  Additionally, Neapco documents address █████████████

███████████████████████████████████████████████████████████████

████████████████████████[133]   Furthermore, as addressed in *Georgia-Pacific* Factor 11

below, ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[130] Discussions with Eduardo Jonas, Managing Director of Driveshaft Business Unit at AAM.  Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: p. 196.
[131] As of the date of this Report, experts on behalf of Neapco have not set forth a specific proposed alternative non-infringing design.  However, Neapco stated that non-infringing alternatives include non-tuned liners and ITDs "alone, or in combination with another prior art vibration attenuation device, such as prior art liner or foam."  I address untuned liners and ITDs in my analysis of non-infringing alternatives below.  NEAPCO Drivelines LLC First Supplemental Objections and Responses to AAM's First Set of Interrogatories to Defendants (NOS. 1-9): pp. 10-11.
[132] "Prop Shaft Liners & Vibration Absorbers: Revision 1" March 28, 2014: NEAPCO152795-805 (at 803).
[133] "Prop Shaft Liners & Vibration Absorbers: Revision 1" March 28, 2014: NEAPCO152795-805 (at 797).

64.   **_ITDs_**:  In its March 2014 presentation ████████████████████████████
████████████████████████████ [134]  While the presentation states that ██████████
████████████████████████  Zhaohui Sun, Senior NVH Engineer at Neapco, testified that ITDs will attenuate very little shell mode vibration and are not effective. [135]  I understand that ████████████████████████████████████████████
████████████████ [136]  Additionally, Mr. Wehner testified that ██████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ [137]
Despite Neapco's ████████████████████████████████████████████████
██████████████████████████████

65.   Additionally, in April 2014, Neapco presented "An Introduction to Neapco" to GM related to  the  ████████████████████████████████████████████ [138]  The presentation stated that a "key enabler" for Neapco's propshafts moving forward would be ████████████████████████████████████████████████████████ [139]
However, by November 2016, ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████ [140]  The ██████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████  ██  ████████████████████████████████████████████████
████████████████████████████████ [142]  The presentation

---

[134] ████████████████████████  Revision 1" March 28, 2014: NEAPCO152795-805 (at 801).
[135] Deposition of Zhaohui Sun (Senior NVH Engineer at Neapco), April 26, 2017: p. 82.
[136] Neapco Email Correspondence, February 11, 2014:  NEAPCO000217-230 (at 217); "31xx LFX MYB RWD Long Wheel Base ████████████████████" February 17, 2014: NEAPCO002584-593 (at 585, 593).
[137] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 167-168.
[138] "An Introduction to Neapco," April 28, 2014: NEAPCO004891-991 (at 926).
[139] "An Introduction to Neapco," April 28, 2014: NEAPCO004891-991 (at 988).
[140] "████████████████████████████████████" November 9, 2016: NEAPCO194899-905. Mr. Wehner testified, as of his deposition, ████████████████████████
████████████  Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 233-237.
[141] "████████████████████████████████" November 9, 2016: NEAPCO194899-905 (at 900).
[142] "████████████████████████████████" November 9, 2016: NEAPCO194899-905 (at 901).  The document does show ████████████████████

concludes by stating, the ████████████████████████████████████████████
████████████████████████[143]

66.    Furthermore, Mr. Wehner testified that he is ████████████████████████████
████████████████████████████████████████████████████████████████[144]

Additionally, the inventor of the patent-in-suit testified that, when compared to an ITD, a tuned liner: (1) covers more of the tube's surface; (2) is tuned for both reactive and resistive vibration (i.e., bending/torsion and shell vibration modes) where an ITD can only be tuned for one bending/torsion frequency; (3) provides richer damping characteristics; and (4) is more cost-effective than ITDs.[145]    Therefore, Neapco's ████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████

67.    ***Slip Yoke Dampers***:  Brian Mahnken, Noise and Vibration Development Engineer on the 31XXN Project at GM, defined slip yoke dampers as steel rings mounted via rubber to the driveline (on the axle itself or on the slip yoke) designed to attenuate torsional resonance.[146] As discussed in *Georgia-Pacific* Factors 9 and 10, in its products sold to GM, AAM eliminated the need to include slip yoke dampers (to address torsional mode vibration) by using tuned liners.[147]  Michael Voight, Senior Manager of Propshaft Engineering at AAM (and previously supervisor of AAM's NVH lab), and Eduardo Jonas, Managing Director of Driveshaft Business Unit at AAM, stated that slip yoke dampers are rarely used by AAM as the technology is inferior to tuned liners, is more expensive and adds additional weight to the propshafts.[148]

68.    Similarly, Neapco's engineering manager for driveshafts testified that Neapco has ████
████████████████████████████████████████████████████████████████████

---



████████████████████████████████████████████████████████████████
████████████████████████████████████ Discussions with Dr. Christopher D. Rahn.
████████████████████████████████████" November 9, 2016:

[143] NEAPCO194899-905 (at 905).
[144] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 171-172.
[145] Deposition of Zhaohui Sun (Senior NVH Engineer at Neapco), April 26, 2017: pp. 22, 136-137.
[146] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: p. 11.
[147] Discussion with Michael Voight.
[148] Discussion with Michael Voight; Discussion with Eduardo Jonas.

███████████████████████████[149]   Additionally, Mr. Mahnken of GM testified that ████

██████████████████████████████████████████████████████████████████████

███████[150]   Mr. Robert Wehner further testified that Neapco ██████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████[151]

69.   ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████   █████████████████████████████████

█████████████████████████████████[152]   As such, slip yoke

dampers are not an acceptable alternative technology for the 31XXN aluminum propshafts.

70.   ***Foam Liners***:   ████████████████████████████████████████████████

████████[153]   However, as Brian Mahnken of GM testified, █████████████████████

██████████████████████████████████████[154]   Foam liners are not an

acceptable non-infringing alternative to AAM's patented tuned liner technology for the

31XXN aluminum propshafts.

71.   As described above, there is no evidence in the record that ███████████████

██████████████████████████████████████████████████████████████████████

Furthermore, there is no evidence that ████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████   Dana is the other primary competitor that manufacturers aluminum

propshafts, and Dana does not utilize tuned liners.  As addressed above, there is no evidence

of acceptable non-infringing alternatives to the tuned liner technology.  Therefore, there is

---

[149] Deposition of Niladri Das (Engineering Manager for Driveshafts at Neapco), April 18, 2017: pp. 74-75.
[150] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: p. 75.
[151] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 68-69.
[152] ████████████████████████████████████████████████████: GM_AAM000000260-273 (at 273).
[153] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: p. 36.
[154] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 36-37.

no evidence that Dana would be able to sell the 31XXN aluminum propshafts without employing an infringing tuned liner solution if Neapco would not have won the business.

### 3.   Manufacturing and Marketing Capability to Meet Demand

72.    In analyzing AAM's capacity and ability to manufacture the Accused Products, I analyzed the incremental increase in production the Accused Product sales would represent over AAM's planned production level each year. ███████████████████████
████████ ████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
████████████████
████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

█ █████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
███████████████████████ As the lost units represent a small increase to the total planned production level in the given years, AAM would not need to add significant capacity to manufacture the Accused Products.  However, as discussed in more detail below, I have included costs associated with the purchase of new equipment for the 31XXN project in my quantification of lost profits.

74.    Additionally, Scott Avery, Finance Director, Financial Planning and Analysis at AAM, indicated that AAM would have had the capacity to manufacture the 31XXN propshafts as

---

[155] Deposition of Scott Avery (Finance Director, Financial Planning and Analysis at AAM), April 27, 2017: p. 173-4.

GM's requirements), indicating NVH issues that most customers would complain about.[271] Additionally, as addressed above, ███████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████[272]

138.  As addressed above in my *Panduit* analysis, to resolve the ███████████████ █████████████████████████ ██████████████████████████ ██████████████████████████████████████[273] Furthermore, a March 2014 GM presentation stated ████████████████████████████ ████████████████████████[274] Additionally, █████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████[275] Ultimately, ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████[276]

139.  Furthermore, as addressed above in my *Panduit* analysis, ████████████████ ██████████████████████████████████████ For example, in March 20, 2014, Niladri Das, Engineering Manager for Driveshafts at Neapco, sent an email to other Neapco employees stating, ██████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████[277] Another example is in October 2014, Mr. Das emailed several Neapco employees stating ██████████████████████████████████████████

[271] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 19, 22-23; "31XXN Axle & Propshaft NVH," June 17, 2014: AAM000000711.
[272] "31xx LFX MYB RWD Long Wheel Base ████████████████████" February 17, 2014: NEAPCO002584-593 (at 593).
[273] "31xx LFX MYB RWD Long Wheel Base ████████████████," February 17, 2014: NEAPCO002584-593 (at 585 and 593).
[274] "████████" March 27, 2014: GM_AAM000000037-45 (at 041).
[275] "Neapco Driveline ████ Capability," February 2014: NEAPCO080563-574 (at 568).
[276] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 42-43, 63-65; "2015 31XXN LWB 3.42 Rear Axle Noise," March 2014: GM_AAM000000027-036 (at 031).
[277] Neapco email exchange, March 20, 2014: NEAPCO126824-828 (at 824).

███████████████████████████████████████████████████████████████████████████

████████     Furthermore, in May 2015, Mr. Wehner emailed Paul Roman of Neapco and stated that ██████████████████████████████████████████████[279]

140.   <u>Non-Infringing Alternatives</u>:  As addressed in the lost profits analysis above, I considered alternative damping technologies available to Neapco for the 31XXN aluminum propshafts sold to GM.  My analysis considered the following damping technologies:  (1) un-tuned cardboard liner; (2) ITDs; (3) slip yoke dampers; and (4) foam liners / stuffers.  As described above, the alternative damping technologies do not provide the same benefits as AAM's patented tuned liner technology, and ████████████████████████████████ ████████████████████████████████████████████████████████

141.   In multiple presentations to GM, ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████

---

[278] Neapco email correspondence, October 3 2014: NEAPCO17353-357 (at 353).
[279] Neapco email correspondence, May 14, 2015: NEAPCO177596-599 (at 596).

**TABLE 10:** ███████████████



142.    As illustrated in **TABLE 10** above, of the solutions proposed by Neapco, only the ████████████████████████████████████████████ I understand that the alternatives suggested by Neapco ██████████████████████[283] Specifically, ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████.[284]

143.    I understand that a tuned cardboard liner with elastomer wrap that practices the '911 patent is tuned to function both as a reactive absorber (addressing bending and/or torsion modes

[280] "Prop Shaft Liners & Vibration Absorbers: Revision 1," March 28, 2014: NEAPCO152795-805 (at 797-802); "Neapco Driveline NVH Capability," February 2014: NEAPCO080563-574 (at 565).
[281] I understand cardboard liners with or without elastomer wrap would only attenuate shell mode unless they utilized the '911 patent and were tuned to attenuate bending mode or torsional mode vibrations. Discussions with Dr. Christopher D. Rahn.
[282] Although Neapco's presentation states that cardboard liners with elastomer wrap contain ████████ ██████████████████ I understand that it would require tuned liners utilizing AAM's '911 patent to attenuate both a resistive mode (e.g., shell mode) and a reactive mode (e.g., bending mode or torsional mode) vibration.  As such, I understand that only *tuned* liners practicing the '911 patent would give █████████ ███████████████████████████ Furthermore, Mr. Wehner, who prepared the presentation, testified that ████████ ████████████████████████████ Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 151, 159, P. Exhibit 15; Discussions with Dr. Christopher D. Rahn.
[283] Discussions with Michael Voight, Senior Manager of Propshaft Engineering at AAM.
[284] Discussions with Michael Voight, Senior Manager of Propshaft Engineering at AAM; Deposition of Zhaohui Sun (Senior NVH Engineer at Neapco), April 26, 2017: p. 138.

of vibration) and as a resistive absorber (addressing shell mode vibration).[285]  As such, by reducing bending and shell mode vibrations the patented technology both: ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████.[286]  Additionally, I address other shortcoming of alternative damping technologies in the analysis of lost profits above, including ███████████████████████████████████████████

████████████████████████████████.[287] Consideration of the benefits of the patented technology described above has an upward influence on a determination of a reasonable royalty analysis.

144.   Michael Voight, Senior Manager of Propshaft Engineering at AAM, testified that the primary benefit of the patent-in-suit is solving NVH issues while reducing weight.[288]  Mr. Voight identified cost savings as an additional benefit of the patent-in-suit.  Similarly, Mr. Jonas testified that while the patented technology primarily has the advantage of providing AAM with the best quality propshaft and superior NVH performance, the patented invention also provides cost savings.[289]  Additionally, as stated above, on March 20, 2014, Niladri Das, Engineering Manager for Driveshafts at Neapco, sent an email to other Neapco employees stating, ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████  ██████████████████████████████████████████████████

████████████████████████████

---

[285] Discussions with Michael Voight, Senior Manager of Propshaft Engineering at AAM; Discussion with Dr. Christopher D. Rahn.
[286] Neapco's ability to ████████████████████████████████████████████████
████████  For example, Mr. Wehner testified that a propshaft that ████████████████████████ *See* Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: p. 113.
[287] ██████████████████████████████████████  November 9, 2016: NEAPCO194899-905 (at 901).  The document does show that █████████████████
████████████████████████████████████  Discussions with Dr. Christopher D. Rahn.
[288] Deposition of Michael Voight (Senior Manager of Propshaft Engineering at AAM), April 13, 2017: pp. 93-95, 111.
[289] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: p. 50.
[290] Neapco email exchange, March 20, 2014: NEAPCO126824-828 (at 824).

- [REDACTED]

- Non-patented elements contribute to Neapco's sales and profits for the 31XXN aluminum propshafts.  These factors include Neapco's global footprint, technical capabilities, customer base, and breadth of products.

169. [REDACTED]

170. [REDACTED]

171. *Georgia-Pacific* factors 9, 10 and 11 generally address the nature of the invention and its importance to the licensee and of the Accused Product.  Primary considerations under these factors include:

- The benefits of the patented-technology include: (1) the ability to reduce noise and vibration in a vehicle without adding weight or potentially reducing weight compared to other damping technologies; (2) multi-mode attenuation, including the ability to reduce vibrations in one or more mode (including shell mode, bending mode and torsional mode); (3) the ability to provide modal separation; (4) cost savings; and (5) contribute to the ability to use aluminum propshafts instead of steel propshafts;

- The patented inventions cover important technology that has been critical for AAM to differentiate itself from its competitors by allowing it to offer aluminum propshafts with superior damping characteristics and dynamic tuning capabilities;

- Automakers, including GM, Chrysler and Toyota, have all indicated to AAM that its patented invention is the best solution on the market;



- Neapco ████████████████████████████████████

- Other damping technologies available to use in aluminum propshafts, including un-tuned cardboard liner, ITDs, slip yoke dampers and foam liners / stuffers are inferior and often times more expensive than AAM's tuned liner technology;

- ██████████████████████████████████████ and

- The '911 patent provides cost savings of approximately ████ per product relative to utilizing alternative non-infringing solutions. However, the ██████████ understates the value of the '911 patent, as it does not include the value of providing a superior NVH solution while reducing weight.

172. The patented technology was AAM's most important technology to differentiate its aluminum propshafts from competitors. Despite considering alternative technologies, Neapco ████████████████████████████████████ ██████████████████████████ Additionally, the '911 patent provides cost savings of ██████████ per unit relative to a non-infringing alternative, while also providing a superior solution. Furthermore, ██████████████████ ████████████████████████████████████████ ████████████████████████

173. *Georgia-Pacific* factors 3, 4 and 7 address the nature and scope of the hypothetical license. Primary considerations under these factors include:

- The hypothetical negotiation would be for a non-exclusive license to patent-in-suit for the United States;

# **EXHIBIT H**

AMERICAN AXLE MANUFACTURING, INC.,

V.

NEAPCO HOLDINGS LLC AND NEAPCO DRIVELINES LLC,


CIVIL ACTION NO. 1:15-CV-01168-UNA

EXPERT REPLY REPORT OF JOHN L. HANSEN


TM FINANCIAL FORENSICS, LLC
JULY 21, 2017

JOHN L. HANSEN

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Product Development Manager at Neapco, testified that ███████████████ ████████████████████████████████████████████████████████████ ████████████████[27]  In fact, Mr. Chase states ██████████████████ ████████████████████████████████████████████████████████████ (emphasis added)[28]  Therefore, it is speculative for Mr. Chase to assume that ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████[29]  Based on what actually happened, ██████████████████████████████████████████████ █████████████████████████████████████████████████[30]

**B.      Demand for the Patented Product / Patented Invention**

15.      Mr. Chase agrees with my opinion that there is demand for the patented product.[31] However, regarding demand for the patented invention, Mr. Chase concludes ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████[32]  As described in my discussion of the absence of acceptable alternatives, the lack of technical solutions outside of the patented invention indicates that ████████████████ ██████ is a tuned liner solution in this instance.  Regarding my analysis of demand for the patented invention, Mr. Chase states: (1) I have incorrectly assumed that ██████████ █████████████████████████ "somehow equates to demand for the AAM patented technology"; and (2) I have not addressed the "impact of AAM's significantly higher pricing on ████████████████████████████"[33]  I address Mr. Chase's analysis of demand for the patented invention and his critiques of my analysis of demand in the paragraphs below.

---

[27] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 171-172.
[28] The Chase Report: p. 21.
[29] The Chase Report: p. 31.
[30] The Chase Report: p. 31.
[31] The Chase Report: p. 17.
[32] The Chase Report: p. 22.
[33] The Chase Report: pp. 17, 19.

1.     **Mr. Chase's Analysis of Demand for the Patented Product is Incomplete and Misleading**

16.     Mr. Chase's conclusion that ████████████████████████ ██████████████████ is speculative and unsupported.[34]  As addressed in the Initial Hansen Report and below in my critique of Mr. Chase's analysis of non-infringing alternatives, Mr. Chase's assertion that ████████████████████████████████ speculative and contrary to the facts of this case.  ████████████████████ ██████████████████████████████████████ ███████[35]

17.     As addressed in the Initial Hansen Report, I demonstrate demand for the patented invention through various analyses that Mr. Chase largely fails to address.  For example, the Initial Hansen Report addresses: (1) the benefits of the '911 patent and tuned liner technology; (2) evidence that tuned liner technology has been critical for AAM to differentiate itself from its competitors; (3) evidence of ██████████████████████████████ ████████████████████████████ (4) evidence of █████████████████ ████████████████████ and (5) ████████████████████████████ ████████████████████████[36]  For example, Mr. Chase fails to address that ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████ ███████████[37]  Mr. Chase also does not address that █████████████████ ██████████████████████████████████████████ ████████████████████████████████████████[38]  Mr. Chase also does not address that ██████████████████████████████ ███████████  For example, ██████████████████████████

---

[34] The Chase Report: p. 22.
[35] Initial Hansen Report: pp. 22-26.
[36] Initial Hansen Report: pp. 13-22.
[37] Initial Hansen Report: pp. 17-22.
[38] Initial Hansen Report: pp. 18-20, 24.

████████████████████████████████████████████████████████████

███████████████████████████[39]

### 2. Mr. Chase's Statement That I Assumed GM's SSTS Required the Patented Technology is Misleading

18.    Mr. Chase's assertion that I view GM's "SSTS requirement is a requirement for the patented technology" is inaccurate.[40]  In the Initial Hansen Report, I stated that GM's SSTS included the following: ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ ████████████████

████████████████████████████████████████████████████████████

████████████████████████████[42]  For example, Brian Mahnken, GM Noise and Vibration Development Engineer on the 31XXN Project, testified that ██████████████████

████████████████████████████████████████████████████████████

██████████████ ███████████████████████████████████████████████

██████████████████ █████████████████████████████████████████████

██████████████████████████████████████████ ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████ As summarized in the Initial Hansen Report, ████████████

████████████████████████████████████████████████████████████

---

[39] Neapco email exchange, March 20, 2014: NEAPCO126824-828 (at 824); Neapco email correspondence, October 3, 2014: NEAPCO017353-357 (at 353).

[40] The Chase Report: p. 17.

[41] "31XXN 15.04.01 Propshafts Subsystem Technical Specification," May 17, 2011: NEAPCO000129-175 (at 150,152-153, 165, 172). The document also states that ████████████████████████████████████████ ████████████████████████████; Initial Hansen Report: p. 9.

[42] Initial Hansen Report: pp. 15-17.

[43] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 19, 22-23.

[44] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 18-19; "31XXN Axle & Propshaft NVH," June 17, 2014: AAM000000711.

[45] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 19, 22-23; "████████████████████████████," June 17, 2014: AAM000000711.

[46] "31xx LFX MYB RWD Long Wheel Base ███████████████████████████," February 17, 2014: NEAPCO002584-593 (at 593).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
Page 8

███████████████████████ ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

19.   Mr. Chase further asserts that since the 31XXN program did not have ████████████████

████████████████████████ there is a strong indication that demand for the

patented invention was not present.[48]  However, ███████████████████████████

████████████████████████████████████████████████████

██████████████████.  The ███████████████ does not demonstrate a

lack of demand for the patented invention as suggested by Mr. Chase.

### 3.   Mr. Chase Incorrectly States That I Do Not Address the Price Differences Between AAM and Neapco

20.   Mr. Chase's assertion that I have not addressed the ██████████████████████

████████████████████████████████████ is inaccurate.[49]  Mr. Chase compares

the bid prices of Neapco and AAM to determine that ███████████ ████████████

███████████████████████████████[50]  Mr. Chase states that I have ██████████

████████████████████████████████████████████████████

██████████[51]  However, Mr. Chase's statements ignore that I did not assume that GM would

have agreed to pay AAM's bid prices.

21.   To determine the but for price GM would have paid AAM, it is appropriate to consider the

prices actually paid by GM.  Therefore, in the Initial Hansen Report, I compare AAM's

quoted prices to the prices Neapco actually charged. ████████████████████████

██████████████████████ ████████████████████████████

██████████████████████[52]  In the Initial Hansen Report, I analyzed ████████████

███████████████████████████████, as evidenced by ████████████████████

---

[47] "Neapco Driveline NVH Capability," February 2014: NEAPCO080563-574 (at 568); Neapco email exchange, March 20, 2014: NEAPCO126824-828 (at 824).
[48] The Chase Report, p. 18.
[49] The Chase Report: p. 19.
[50] The Chase Report: p. 19.
[51] The Chase Report: p. 20.
[52] The Chase Report: p. 19; Initial Hansen Report: p. 29, **Attachment 13**. [$147.81 - $137.48 = $10.33].

█████████████████████████████████████████████████████████████████

███████████████████████████████████ ██ █████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████[54]  Mr. Chase fails to consider AAM's long history of providing GM with propshafts, and the impact of AAM's desire to maintain GM as a customer on its willingness to lower prices.

22.     Furthermore, Mr. Chase bases his entire critique on comparing Neapco and AAM bid prices, while ignoring that Neapco's bid pricing does not reflect payment for its use of AAM's patented tuned liner technology.[55]  Therefore, Mr. Chase's analysis is erroneous, as he assumes that Neapco would receive a pricing advantage by infringing AAM's technology without having to pay for the right to use the technology.

### C.     Non-Infringing Alternatives

#### 1.     Mr. Chase's Opinion That Acceptable Non-infringing Alternatives Exist is Speculative, Unsupported and Contrary to the Facts of This Case

23.     Mr. Chase opines "several non-infringing alternatives were available to GM and Neapco."[56]  I understand from Dr. Rahn that: 1) untuned liners; 2) ITDs, alone or in combination with untuned liners; and 3) foam cylinders are not acceptable alternatives to the tuned liners of the Accused Products.[57]

24.     Specifically, Mr. Chase opines that ITDs "represent an acceptable non-infringing alternative to the accused liners," and that ██████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████[58]  Mr. Chase's opinion that ITDs were acceptable non-infringing alternatives is speculative, unsupported and contrary to the facts of this case.

---

[53] "█████████████████████████████████████████," September 11, 2014: GM_AAM000000127; "█████████████████████████████" June 13, 2014: NEAPCO135041; "████████████████████████," March 12, 2015: NEAPCO135043-044.
[54] Initial Hansen Report: p. 30.
[55] The Chase Report: p. 19-20, ATTACHMENTS 600, 610, 620.
[56] The Chase Report: p. 23
[57] Rahn Reply Report ¶¶ 314-323.
[58] The Chase Report: pp. 14, 24.

25.     In the Initial Hansen Report, I address that ITDs would not be a viable alternative technology for the 31XXN aluminum propshafts.  Mr. Chase's analysis of ITDs as an acceptable non-infringing alternative does not address the technical limitations of ITDs testified to by Neapco's own witnesses, as well as the inventor of the '911 patent.[59] █



26.     Mr. Chase states [REDACTED][61]  The only support for this statement is discussion with Robert Wehner, Core Product Development Manager at Neapco.[62]  However, Mr. Chase does not address that as of April 10, 2017, [REDACTED][63]  Furthermore, Mr. Chase does not address that in November 2016 [REDACTED]

[59] Initial Hansen Report: pp. 24-25.
[60] Initial Hansen Report: pp. 24-25.
[61] The Chase Report: p. 25.
[62] The Chase Report: p. 25.
[63] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 171-172.
[64] [REDACTED] November 9, 2016: NEAPCO194899-905. Mr. Wehner testified, as of his deposition, [REDACTED] Deposition of Robert Wehner (Core Product Development Manager at Neapco), April 10, 2017: pp. 233-237.
[65] [REDACTED] November 9, 2016: NEAPCO194899-905 (at 900).
[66] [REDACTED] November 9, 2016: NEAPCO194899-905 (at 901, 904). [REDACTED] Discussions with Dr. Christopher D. Rahn.
[67] [REDACTED] November 9, 2016: NEAPCO194899-905 (at 904).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

27. Additionally, according to Dr. Christopher D. Rahn, Professor of Mechanical Engineering at Pennsylvania State University, ITDs are not an acceptable alternative for the Accused Products. Dr. Rahn opines that ITDs are only intended to attenuate one mode, either a single bending mode or single torsion mode, but not both, and do not attenuate shell mode vibrations. As ███████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████[68] Dr. Rahn opines that Mr. Becker's alleged ITD and untuned liner combination was not acceptable and that there was no evidence that █████████ ████████████████████████████████████████████████████████ ████████████████████[69]

28. Mr. Chase's assumption that ITDs were acceptable non-infringing alternatives is speculative, unsupported and contrary to the facts of this case, particularly given Mr. Chase's opinion that ██████████████████████████████████████[70] Approximately 1.5 years after July/August 2014, ████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████[71] As addressed in the Initial Hansen Report, un-tuned cardboard liners, slip yoke dampers and foam liners were also not acceptable alternative technologies.[72]

29. Furthermore, I note that Mr. Chase states that ██████████████████████ ████████████████████████[73] According to Dr. Rahn, foam cylinders cannot sustain the heat treatment that most of the Accused Products are subject to by Neapco, and foam cylinders are effective only for shell mode attenuation.[74] There is no evidence regarding

---

[68] Rahn Reply Report ¶¶ 317-321.
[69] Rahn Reply Report ¶¶ 317-321.
[70] The Chase Report: p. 31.
[71] ████████████████████████████████████████ November 9, 2016: NEAPCO194899-905 (at 901, 904). Furthermore, I note that Mr. Chase states that ████████████ █████████████████████████████████████████████████████████ ██████, further illustrating the speculative nature of Mr. Chase's assumption that an ITD would have been available and acceptable to GM in 2014.
[72] Initial Hansen Report: pp. 22-27.
[73] The Chase Report: p. 29.
[74] Rahn Reply Report ¶¶ 322-323.

███████████ Dr. Rahn opines that foam cylinders are not acceptable alternatives to tuned liners for the Accused Products.[75]  Additionally, as stated in the Initial Hansen Report, Brian Mahnken of GM testified that ████████████[76] ████

█████████████[77]

### 2. Mr. Chase's Assumption That ████████████ ████ is Unsupported and Speculative

30. Mr. Chase states ███████████████████████[78] As acknowledged by Mr. Chase, ██████████████████████ Furthermore, Eduardo Jonas, Managing Director of the Driveshaft Business Unit at AAM, testified that ███████████████████████[80] As stated above, I ████████████████████[81] ████████████

█████

---

[75] Rahn Reply Report ¶¶ 322-323.
[76] Deposition of Brian Mahnken (Noise and Vibration Development Engineer on the 31XXN Project at GM), May 10, 2017: pp. 36-37.
[77] Deposition of Gary Parker (Core Product Development Engineer at Neapco), April 4, 2017: Ex. 35: ████████████████████████, January 17, 2014: NEAPCO031274-286 (at 286).
[78] The Chase Report: p. 26.
[79] The Chase Report: p. 26.
[80] Deposition of Eduardo Jonas (Managing Director of the Driveshaft Business Unit at AAM), May 19, 2017: pp. 200-201.
[81] Initial Hansen Report: p. 30.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY
Page 13

# **EXHIBIT I**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**INITIAL EXPERT REPORT OF STEVEN BECKER,
<u>REGARDING THE VALIDITY OF U.S. PATENT NO. 7,774,911</u>**

**HIGHLY CONFIDENTIAL**

Dated: <u>May 31, 2017</u>                          _____

physics behind the effects of a cardboard liner.  (*Id*. at 176.)  The new analytical approach combines the use of Coulomb friction and viscous friction.  (*Id*. at 176-195.)  The authors used a uniform shape cardboard that was pressfit to the inner portion of an aluminum shaft.  (*Id*. at 177.) This model does not address the acoustic radiated noise.  Three thicknesses of cardboard liner were tested for modal frequency response functions.  (*Id*. at 176, 184.)  Singh 2016 explicitly models the relative motion between shell and liner and determines that the shell mode damping utilizes several damping mechanisms, including structural damping as well as frequency-dependent viscous and Coulomb interfacial damping.  (*Id*. at 188-189, *see also id*. at 176-189 generally.)

123.     The liner and propeller shaft are both thin cylindrical shells of length l, thickness h, and radius a (from the central axis to the mid-plane of the shell).  The material properties of the shaft or shell and liner consist of an elastic material with Young's modulus E, a mass density $\rho$, a Poisson's ratio $\nu$, a structural (material) loss factor $\eta$, and an interference fit.  (*Id*. at 177.) The friction damping is due in part to the interaction between material properties of the liner and shell consisting of a viscous force coefficient and a Coulomb friction coefficient.  (*Id*. at 179.)

**VIII.       THE 2003 E-150 ECONOLINE PROPSHAFT**

124.     The 2003 model year E-150 Econoline ("2003 Econoline") was a propshaft originally manufactured by Visteon, Inc., as a business unit of the Ford Motor Company.  I understand that the Visteon driveshaft business eventually became Neapco Drivelines LLC.

125.     The 2003 Econoline propshaft assembly drawing is depicted below:



(App. M; 3C24-4602-MB Drawing (NEAPCO000031.)

126.    The 2003 Econoline van was Ford platform code VN127 and had propshafts having the following Ford part numbers:  3C24-4602-SA, 3C24-4602-MB, and 3C24-4602-AA. (App. M; 3C24-4602-MB Drawing.)  The corresponding Visteon / Neapco part numbers are: VP3C2W-4602-BA, VP3C2W-4602-AA, VP3C2W-4602-CA.  (*Id*.)  The propshaft assembly drawing is dated October 28, 2002.  (*Id*.)  I understand from Robert Wehner that this assembly drawing reflects the design of the 2003 model year Econoline propshaft.  I further understand that Visteon / Automotive Components Holdings (ACH) / Neapco manufactured the 3C24-4602-MB propshafts for the 2003, 2004, and 2005 model year Econoline vehicles.

127.    The 2003 Econoline liner drawings are depicted below:





SECTION A-A



(App. O; 2C2W-4978-AA Drawing (NEAPCO0000609); *see also* App. N; (NEAPCO000030.)

128.    The drawings also indicate the particular EPDM specifics for the winding and that

the liner is paperboard:

COMMENTS:
1.)   All Paperboard Must Show a Minimum of 80% Adhesion.
2.)   EPDM Per ASTM D2000, M2BA557 A14, B13, C12, F17, Z = 50 - 60 Shore A Durometer

(*Id.*)

129.     In the spring of 2017, I understand that Neapco purchased a 2003 Econoline E-150 XLT van and several service part replacement propshafts.  (App. P; Econoline Purchase Documents (NEAPCO000195942-52).)   A photograph of the Econoline van from the sales listing is below:



(*Id*. at NEAPCO0000195944.)  The 2003 Econoline van had its original propshaft.

130.     I understand that due to the selling of the driveshaft business from Ford to Visteon to ACH and then to Neapco, Neapco has only limited records as to the testing done on the design of the 2003 Econoline propshaft.  From the records, it appears that Visteon undertook an effort to at least analyze the performance characteristics of the propshaft and liner for the 2003 Econoline propshaft.  Those records and usage charts are contained in the documents below:

- NEAPCO000035-63;

- NEAPCO002815-2914;

- NEAPCO002929;

- NEAPCO007500;

- NEAPCO007502;

- NEAPCO007503;

- NEAPCO007504;

- NEAPCO0064432; and

- NEAPCO00117812.

131.    Neapco also commissioned an independent third party company, FEV, to perform testing on the 2003 Econoline propshaft and liner to determine its NVH characteristics.  FEV prepared a "Neapco Propshaft Modal Analysis 2003 Ford Econoline E-150 XLT" report on May 19, 2017 (App. Q; Neapco Propshaft Modal Analysis 2003 Ford Econoline E-150 XLT, FEV, May 19, 2017 (NEAPCO195966-196366) ("2003 Econoline Analysis").)   According to the analysis, FEV performed "propshafts modal analysis on a 2003 Ford Econoline E-150 XLT (VIN: 1FMRE11W73HA18689) to extract natural frequencies and damping values to understand the influence of the cardboard / rubber liners."  (*Id*. at 2.)  FEV performed FRF testing on the propshaft with a modal hammer at 6 locations (determined by FEV) and a modal shaker at the pinion in the vertical direction.  (*Id*.)  FEV performed certain analyses on two propshafts:  "Shaft 1: Original Shaft as received with vehicle: Ford P/N 3C24-4602-MB; Shaft 2: New service shaft (provided in box) purchased from Ford dealer: Ford P/N 5C2Z-4602-K."  On the original shaft, FEV performed the following tests:

- Shaft 1 w/ liners ambient: In-Vehicle and component test bench

- Shaft 1 w/ liners 100F: In-Vehicle and component test bench

- Shaft 1 w/o liners ambient: In-Vehicle and component test bench

- Shaft 1 w/o liners 100F: In-Vehicle and component test bench

- Shaft 1 Liner 1 & 2 Ambient: Liner test rig (free free)

- Shaft 1 Liner 1 & 2 100F: Liner test rig (free free)  (*Id*.)

132.     The testing was done at two different temperatures, ambient and 100F.  "Ambient test region is defined as 65ºF to 80ºF and referred to as Ambient Test throughout the document." (*Id*. at 26.)  "100º F test region is defined as 91º F to 109º F and referred throughout the document as 100F Test."  (*Id*.)  In my experience, these temperatures ranges to test for are two valid temperatures to test a component at.  In fact, automobile manufactures routinely test for, and require parts to be tested for, an even wider range of temperatures as the testing results will drastically vary depending on temperature.  (*See* Section XII discussion above regarding temperature testing.)

133.     FEV further "utilize[d] the acquired FRF's to extract natural frequencies including 1st – 5th bending and shell."  (*Id*.)  FEV also "assessed the influence of the cardboard / rubber liners on the natural frequencies and damping of the propshaft."  (*Id*.)

134.     Page 5 depicts the in-vehicle installation of the propshaft.  The original shaft 1 is consistent with 3C24-4602-AA.  Visteon at the time used color codes that wear off over time.  I understand from Robert Wehner that the 02M0711615 serial number is the assembly serial number that indicates the year and location of manufacture, 2002 and the Monroe, MI plant.  The propshaft serial number is included in a photograph.  (*Id*. at 5.)

135.     The propshaft had two installed liners.  The part numbers stamped on the rear and middle liners are noted as "2C2 4978-AA."  I note that the "W" from the part number indicated

- 49 -

in the drawing (App. O; 2C2W-4978-AA Drawing) is not visible on the stamp in the liners.  I understand from Robert Wehner that Visteon, ACH, and Neapco never made a part number for an Econoline propshaft of this size with any liner other than part number 2C2W-4978-AA.  The dimensions of these liners match those in the drawing, and I understand that there are no other liners manufactured that would have fit with a 2C2 in the model number.  I therefore understand that the liners in the original propshaft match the specifications of the 2C2W-4978-AA liner. Further, because the serial number of the propshaft confirms it was made in 2002, the liners must have been manufactured no later than late 2002.  Page 26 depicts the rear and middle liners in the propshaft:



136.    Pages 7 through 30 describe the instrumentation and test setup used for the testing.  I have reviewed the methodology outlined in the 2003 Econoline Analysis and I agree with the various methods and conditions used for determining natural frequencies and damping of the propshafts and liners.  As I discuss below, there are many different methodologies and test conditions that could be chosen in this field.  I incorporate the 2003 Econoline Analysis into my report.

about 5% to about 30%" and, alternatively to attenuating bending mode vibrations, the "tuned reactive absorber" could also attenuate "torsion mode vibrations."

## X.    SUMMARY OF OPINIONS

170.    As described more fully below, it is my opinion that the Asserted Claims of the '911 Patent claim laws of nature or natural phenomenon, fail to inform those skilled in the art with reasonable certainty the scope of the claims, fail to inform those skilled in the art how to make and use the claimed inventions without undue experimentation, and are anticipated and/or obvious in view of the prior art, including at least the following references:

- U.S. Patent No. 7,214,135 (Laskey) alone or in combination with DE3632418A1 (Czep) or U.S. Patent No. 6,312,340 (Gassen)

- 2003 Ford E-150 Econoline Propshaft alone or in combination with DE3632418A1 (Czep) or U.S. Patent No. 6,312,340 (Gassen)

## XI.    THE '911 PATENT ASSERTED CLAIMS ARE DIRECTED TO LAWS OF NATURE

171.    It is my opinion that the asserted claims of the '911 Patent do nothing more than attempt to claim well-known laws of nature or natural phenomenon.  It is further my opinion that none of the asserted claims contains any inventive concept and therefore the claims are invalid under Section 101 of the Patent Act.

172.    I will use claim 22 of the '911 patent as representative.  Claim 22, in relevant part, has the following elements:

[22b] tuning a mass and a stiffness of at least one liner; and

[22c] inserting the at least one liner into the shaft member;

[22d] wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations

discussed below in Section XIV, each of those modes were well-known properties of propshafts at the time the patent application was filed.  Claims 26, 27, and 31 merely add specific details about the structure of the liner—none of which were inventive as of the date of filing for the patent.  In fact, the patent specification incorporates the prior art '361 patent for details as to these elements.  ('911 patent, col. 2:23-38; 6:49-59.)  The '361 patent describes a traditional cardboard vibration damper having helically wound wipers to press fit the liner into the bore of a drive shaft.  ('361 patent, at Abstract.)  Figure 1 from the '361 patent is reproduced above and describes the features of claims 26, 27, and 31.  Finally, claims 34 and 35 require placing one or two liners along the shaft symmetrically about bending anti-nodes.  As discussed below in Section XIV with regards to Czep and Gassen, placing an internal vibration attenuation device at an anti-node is not inventive, as that is the most common placement location for internal tuned attenuation devices.

182.    Similarly, independent claim 36 of the '911 patent is nearly identical to claim 22, except that it adds a particular ratio of the mass of the liner to the shaft of 5 to 30 percent.  There is nothing inventive or new about the large ratio of the mass of the liner to the propshaft, as the choice of mass for the liner is in part just part of basic physics on tuning the liner, and the large range would encompass many, if not most, liners that would be used with an aluminum propshaft, which have less mass than steel propshafts.  For example, as discussed below in Section XIV with regards to claim 36, the 2003 Econoline liners are each over 5 percent of the mass of the propshaft.

## XII.    THE '911 PATENT FAILS TO INFORM AS TO THE SCOPE OF THE ASSERTED CLAIMS

183.    In my opinion, one of ordinary skill cannot determine the precise scope of the asserted claims of the '911 Patent and therefore the claims are invalid due to indefiniteness.  As

discussed below, these claims and specification fails to inform, with reasonable certainty, those skilled in the art of the scope of the alleged invention.

184.    I note that the Court has ruled that many of the originally asserted claims are invalid as indefinite.  (App. B; D.I. 113, Memorandum on Claim Construction, Apr. 7, 2017, at 12-14.)   Using similar rationale, the remaining asserted claims also fail to inform, with reasonable certainty, those skilled in the art of the scope of the alleged invention.   I have reviewed the Declaration of Nejat Olgac, Dr. Eng. Sci. in Support of Defendants' Opening Claim Construction Brief and the Rebuttal Declaration of Nejat Olgac, Dr. Eng. Sci. in Response to Declaration of Christopher D. Rahn, Ph.D.  I agree with the opinions expressed by Dr. Olgac in his declarations.  Moreover, similar reasoning used by Dr. Olgac for the now indefinite claims applies to the remaining asserted claims as construed by the Court.

185.    As discussed previously, the remaining asserted claims require "tuning" a liner to "match a frequency or frequencies" of the driveline system or to dampen shell, bending, or torsion mode vibrations.  Claim 22 requires "tuning" a mass and stiffness of a liner, which requires "controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies" as construed by the Court.  The claim further requires the "tuned" liner to be both a "tuned resistive absorber for attenuating shell mode vibrations" and a "tuned reactive absorber for attenuating bending mode vibrations."  As construed by the Court, this requires, in part, the liner to have been "configured to match a relevant frequency or frequencies . . . to absorb the vibration energy to dampen shell mode vibrations" and "configured to match a relevant frequency or frequencies . . . to dampen bending mode vibrations."  Claim 36 has the same limitations.

186.    First, the specification of the '911 Patent lacks any guidance as to whether modeling or physical testing should be used to evaluate whether one practices the alleged inventions.  One skilled in the art could use computer modeling, such as Finite Element Analysis ("FEA") and/or Computer Aided Engineering ("CAE") to perform the measurements. Alternatively, one skilled in the art could perform physical testing.  Both methods are acceptable methods of determining frequencies and damping of propshafts and liners as installed in a driveline system, and are both commonly done.  Notably, however, one could, and likely would, obtain different results using modeling than they would with physical testing and there are a variety of physical testing methods, of which the conditions of one would need to be defined.

187.    FEA modeling is widely used in many industries, including automotive, for modeling structures and machines to model frequencies and vibration responses of structures. (App. R; Inman, at 534.)  A first step in performing FEA modeling is to divide the structure up into a number of simple parts called finite elements.  Each element has an endpoint, called a node.  The equation of vibration for each finite element is then determined and solved into individual polynomial solutions which are then assembled together.  The assembly has a resulting mass and stiffness, which describes the vibration of the structure as whole.  (*Id.*)

188.    FEA modeling in the automotive field for propshaft analysis is widely used and accepted.  As Dr. Sun testified, FEA modeling is preferred and that the goal is to get rid of costly physical testing.  (App. S; Sun Tr. at 139:14-140:10.)  AAM uses both FEA modeling and physical testing to FEA model correlation.  (*Id.*)  As described in an AAM presentation by Dr. Sun, AAM performed FRF testing and FEA modeling of its liners.  (App. W; Attenuation of Driveline Vibrations (AAM00001436), at 1440.)  Notably, one typically does not get the same results from FRF physical testing and FEA modeling.  (*Id.*)  Dr. Steyer and Dr. Sun's SAE article

from 2004, entitled *Balanced Competing Design Imperatives to Achieve Overall Driveline NVH Performance Objectives*, describes how FEA Modeling and mode mapping can be used to prepare component level specifications.   (App. AH; Steyer, G. et al., *Balanced Competing Design Imperatives to Achieve Overall Driveline NVH Performance Objectives*, Society of Automotive Engineers, Technical Paper 05NVH-265 (2004) (AAM0001539).)

189.   Moreover, 

(App. X;

_2016-09-09 (NEAPCO195140).)

190.   As to the physical testing, there are a myriad of different ways the testing could be performed.  Each could, and likely would, result in different values.  As discussed in more detail below, one skilled in the art could prepare a set of test conditions and measurement protocols and determine that a liner is "tuned" as claimed.  Another designer could prepare a different set of

test conditions and measurement protocols and determine that the exact same liner is not "tuned." Neither the claims nor specification in the '911 Patent provides any guidance to determine whether a system practices these claim elements. Whether a system meets these claim elements is left to the subjective choice of the engineer in preparing test conditions and methodologies.

191. Second, neither the claims nor the specification provides any guidance as to what the baseline propshaft state is—*i.e.*, whether the modal frequency that is being "tuned" for is of the propshaft without the liner or with the liner's mass factored in. Dr. Rahn has opined that the baseline would be of the propshaft without the liner. (App. Y; Resp. Decl. Christopher D. Rahn, ¶ 19.) I disagree that the specification or knowledge of those skilled in the art would lead to that conclusion. While the '911 patent gives an example referring to the "undamped propshaft assembly" as "e.g., the propshaft assembly 20 without the at least one liner," its use of "e.g." indicates that it is not the only example.

192. In fact, in my experience in the industry, it is common to target frequencies of the driveshaft that reflect the mass loading effects of the internal damper, or insert. Any internal damper, or liner, will change the propshaft modal frequencies, including shell, bending, and torsion, merely due to its mass, whether "tuned" to a frequency or not. Therefore, engineers will "tune" the dampers to the modal frequency of the propshaft that represents real life (*i.e.*, the propshaft *with* the internal damper mass) by configuring the stiffness of the internal damper after its mass has been calculated and accounted for. This phenomenon is described in Czep: "On the other hand, the vibration behavior and resonance frequency of the component to be damped is changed by the damping mass." (App. G; Czep, at col. 2.) Therefore, whether one is tuning for a modal frequency of an empty propshaft (which does not reflect any mode once the damper or

liner is inserted) or the modal frequencies of the propshaft *with* the liner has a key effect on whether something is "tuned" or not.  Using one procedure, a liner could be considered "tuned," using another, it would not be "tuned."

193.    Third, neither the claims nor specification provides any guidance as to how to determine if vibrations are dampened or frequencies are matched.  Each claim requires that shell mode and either bending or torsion mode vibrations are dampened.    According to the specification, for shell mode vibrations, 2% or more damping is apparently a threshold to be considered "tuned."  (App. A; '911 patent, col. 8:44-47.)  While certain patent claims include the 2% threshold as a limitation (those that were already invalidated by the Court), the remaining asserted claims lack clarity.

194.    The lack of clarity is important.  Even non-tuned liners provide some level of damping or vibration attenuation in a propshaft.   One of the inventors, Dr. Zhaohui Sun, admitted as much during his deposition.  According to Dr. Sun, even "older style" "rolled paper liners" dampen shell mode vibrations by 2%.  (App. S; Sun Tr. at 123:8-124:1 (citing App. Z).)  According to AAM's own presentation, older style non-tuned liners also dampened first bending mode vibrations by .75%.  (App. Z; AAM Liner Testing Summary (AAM0000477), at 483.))  When asked whether .75% was considered "effective damping," Dr. Sun answered: "It depends. If I'm care about it, if it contribute to noise, I want more damping.  If it doesn't contribute to the noise I'm dealing with, I don't care."   (Sun Tr. at 124:2-12.).   AAM's presentation also acknowledges that the prior art non-tuned liners attenuated bending mode vibrations by 2%. (App. Z; AAM Liner Testing Summary, at 483.))  When asked whether 2% damping for bending mode was effective, Dr. Sun's response was simply "[t]wo percent is effective, it's better than .75."  (Sun Tr. at 124:13-17.).  He then indicated that a "tuned liner" would see damping "even

better than 2 percent." (*Id.* at 124:18-125:1.)  But the patent specification lacks any guidance as to how much damping is within the scope of the claims.  For example, if a liner's frequency matches a bending mode frequency or some subjectively chosen range, but it dampens only by an additional 1%, a question arises whether the liner "dampens bending mode vibrations" (or shell) as required by the claims.  The lack of clarity is particularly important as any liner will have a natural frequency and will dampen both shell and bending mode vibrations to some extent.  Thus, whether a liner "matches" a relevant frequency or frequencies "to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy" and "to deform as vibration energy is transmitted through the liner to absorb the vibration energy" and therefore dampen shell or bending mode vibrations turns on a subjective view as to whether the vibrations are dampened by enough.  Further the definition of the damping calculation is not presented in the '911 patent.  Damping is the effect of reducing a vibration's amplitude.  Percent damping is a dimensionless quantity.  There are many valid ways to calculate damping also, such as "loss factor," "damping factor," or "quality factor," or "percent critical damping."  (App. R; Inman at 388, Fig. 5.16; App. AK; How to calculate damping from an FRF - Siemens PLM Community (2016); available at https://community.plm.automation.siemens.com/t5/Testing-Knowledge-Base/How-to-calculate-damping-from-a-FRF/ta-p/355050, last visited May 31, 2017.)

195.    Moreover, it is unclear from the claims and specification what frequencies are required to be "matched" for damping shell, bending, and torsion mode vibrations.  As explained in the specification, "a liner[] can be considered tuned to a relevant frequency if a frequency at which it achieves maximum attenuation is within 20% of that relevant frequency."  ('911 patent, col. 8:32-46.)  But the specification also gives examples where the target frequency is (i) within 15% of the relevant frequency; (ii) 10% of the relevant frequency; or (iii) 5% of the relevant

frequency.  Thus, the range varies depending on the context.  Therefore, because *all* liners have a natural frequency (*e.g.*, a frequency controlled by its mass and stiffness) and will dampen shell, bending, and torsion mode vibrations by some amount, one skilled in the art is left guessing whether a liner is "tuned" as required by the claims.  Put another way, questions arise as to whether *any* liner that has a natural frequency within some artificial range of a bending mode frequency is "tuned" for that bending mode, who determines the appropriate range, and what that range is.  It is an inherently subjective analysis.

196.    Fourth, there is no indication in the specification whether the bending or torsion mode measurements (e.g., frequencies and damping) are taken in the shaft member as installed on a vehicle or assembled on a test stand.  Both measurement schemes would result in different findings as the boundary conditions are varied.  Boundary conditions have to do with the way in which the system components are bonded to each other.  (*E.g.*, '911 patent, col. 6:20-25.) Boundary conditions can vary for testing or targeting bending or torsional frequencies and measuring modes and/or damping.  One can setup a test using a test bench having fixed ends (typically called pinned-pinned or pin-pin).  Alternatively, an engineer could also setup a test in-vehicle where the boundary conditions include the full driveline system and the effects from the engine, transmission, axle and their mounts.  Each of these can change the measurement and results, but are considered valid by one skilled in the art.

197.    The 2003 Econoline testing confirms my opinion.  As discussed in Section VII, the testing for the 2003 E-150 Econoline propshaft shows differences in the bending mode frequencies and measured damping, depending on whether the shaft was installed in the vehicle or on a test stand.  For example, in-vehicle the propshaft 3rd vertical bending frequency is 629.5 Hz with the liner installed, and 669 Hz without the liner, with a change of damping from 1.85%

without the liner to 2.49% with the liner at ambient temperature.  (App. Q; 2003 Econoline Analysis, at 33.)[4]  On the bench the propshaft 3rd vertical bending frequency is 603.5 with and 635.5 Hz without the liner, for a change of 32 Hz, and a change of damping from 1.25% without the liner to 1.0% with the liner at ambient temperature.  (2003 Econoline Analysis, at 56.)  These differences are important where the claims require "matching" a liner to that frequency and determining if bending mode vibrations are dampened.  In other words, in-vehicle, the 2003 Econoline propshaft's 3rd vertical bending mode is damped by 2.49%, an increase in damping with the liner; but on the test stand, the damping drops from 1.25% to 1.0% by adding the liner— a difference of meeting the claims or not (*i.e.*, damping bending mode vibrations).

198.    Fifth, in certain vehicle applications, the testing conditions at the boundary conditions can play a key role in the measured frequencies and damping relating to the propshaft assembly.  The most prominent example is the temperature the tests are performed at.  Testing of vehicle components is commonly done at operating temperatures, either normal operating temperature and/or extreme temperatures.  This is because certain vibration issues in a driveline only occur during operation under specific conditions.  Depending on the testing conditions, the driveline system frequency responses, whether it be bending, torsion, or shell modes could vary dramatically.  The specification acknowledges that motion variation is "not constant" and that it will "typically vary as a function of load, temperature, gearset build position, break-in wear." ('911 patent at col. 1:28-37.)  Yet the specification does not provide any guidance as to under what conditions any evaluation or testing should be done.

---

[4] Unless otherwise noted, in my report, to be consistent with the 2003 Econoline Analysis, the damping percentage used herein is referred to as the percentage of critical damping [%Cr] which is the ratio of the energy dissipation as a percent of a critically damped mode and is defined as %Cr = Damping Ratio * 100%.  (App. Q; 2003 Econoline Analysis, at 4.)

199.   I note that Plaintiff's witnesses have confirmed that a propshaft resonant frequencies, including bending and torsion modes, can change due to boundary and operating conditions (such as high or low temperatures).   Dr. Sun admitted that in certain vehicle applications, such as a passenger car that uses a rubber coupling on the axle, even low temperatures in the boundary conditions would have an effect on bending mode frequencies:

Q.   So if I change the connection, the characteristics, the stiffness of the axle, for example, would it change the bending mode frequencies of the propshaft?

A.   It depend on how you define your -- change your definition of the connection at the axle end.

Q.   Under what circumstances would it change the bending mode frequencies –

A.   For this –

Q.   -- of the propshaft?

A.   -- traditional truck/SUV application with Cardan joint, I haven't seen any example that different axle, different working environment would influence the bending.

Q.   What about outside of the truck or the SUV applications?

A.   Okay. I'll give you example of a passenger car application, steel prop.  You use a joint that's rubber in nature called a flexible couplings. Okay? It has a lot of compliance of that joint. Okay? So that compliance will influence your bending of the prop.

Q.   And why is that?

A.   Because you got it out of compliance that is low stiffness or that stiffness contribute to your bending, but for your Cardan-Cardan joint, it's a pivot point, you don't have that.

Q.   **In your passenger car example where you've got a different stiffness because of the rubber, would that stiffness change in operation in extreme operating temperatures, as well**?

A.   **Yeah, it change as a function of temperature, even low**.

Q.   **So the prop bending mode frequency in the passenger car example could change due to the temperature of the environment**?

A.   **Yeah**, well, compare -- that application [is] totally irrelevant to, in my mind, to the application we talk about here.  You could influence the bending you could influence the torsion and that example probably more influence on torsion.  (App. S; Sun Tr. at 151:3-152:14.)

200.   Dr. Steyer also testified that the propshaft's bending mode and torsion mode frequencies are dependent on the particular mass and stiffness of the pinion flange of the axle, *i.e.*, the boundary conditions.  (App. V; Steyer Tr. at 39:7-12; *see also id.* at 39:13-14 (torsion mode); *see also id.* at 69:1-70:1.)  Plaintiff's engineers therefore admit that propshaft bending

and torsion mode frequencies can vary in certain applications due to both boundary conditions (*e.g.*, how you setup the propshaft) and the operational, or testing, conditions.

201.    The 2003 Econoline Analysis confirms my opinion.   Page 52 of the 2003 Econoline Analysis contains a summary of the frequency and damping deltas for the propshaft with liners between testing at ambient versus 100F for the in-vehicle testing for all references:

## FREQUENCY AND DAMPING COMPARISON

| Shaft 1 Ambient Mode Shape | In Vehicle All Freq [Hz] | Damp [%Cr] | Shaft 1 100F Mode Shape | In Vehicle All Freq [Hz] | Damp [%Cr] | Frequency Delta Absolute | Relative | Damping Delta Absolute | Relative |
|---|---|---|---|---|---|---|---|---|---|
| 1st Vert 0° | 72.5 | 1.33% | 1st Vert 0° | 72 | 1.00% | 0.5 | 1% | 0.33% | 25% |
| 1st Lat | 76.5 | 1.25% | 1st Lat | 75 | 1.19% | 1.5 | 2% | 0.06% | -5% |
| 1st Vert 180° | 80.5 | 2.60% | 1st Vert 180° | 79.5 | 1.83% | 1.0 | 1% | 0.78% | 30% |
| Pinion Vert | 119 | 1.86% | Pinion Vert | 117.5 | 1.62% | 1.5 | 1% | -0.24% | 13% |
| Pinion Trans Vert | 127 | 1.16% | Pinion Trans Vert | 125 | 1.60% | 2.0 | 2% | -0.44% | -38% |
| Trans Vert | 142 | 2.81% | Trans Vert | 139 | 2.16% | 3.0 | 2% | 0.65% | 23% |
| Trans Lat | 156 | 2.12% | Trans Lat | 152.5 | 3.44% | 3.5 | 2% | -1.32% | -62% |
| Pinion Trans Vert | 162.5 | 0.50% | Pinion Trans Vert | 161.5 | 0.27% | 1.0 | 1% | 0.23% | 45% |
| Trans Vert | 217.5 | 5.05% | Trans Vert | 212.5 | 3.97% | 5.0 | 2% | 1.08% | 21% |
| 2nd Lat | 276.5 | 3.73% | 2nd Lat | 281 | 0.71% | -4.5 | -2% | 3.02% | 81% |
| 2nd Lat | 310.5 | 4.51% | 2nd Lat | 305.5 | 3.99% | 5.0 | 2% | 0.53% | 12% |
| 2nd Vert | 318 | 2.40% | 2nd Vert | 314.5 | 2.31% | 3.5 | 1% | -0.09% | -4% |
| 2nd Lat | 354 | 2.56% | 2nd Lat | 350 | 1.78% | 4.0 | 1% | 0.79% | 31% |
| 1st Bi-Lobe | 570.5 | 0.33% | 1st Bi-Lobe | 564 | 0.45% | 6.5 | 1% | -0.12% | -36% |
| 2nd Bi-Lobe | 608.5 | 0.37% | 2nd Bi-Lobe | 604 | 0.35% | 4.5 | 1% | 0.02% | 6% |
| 3rd Vert | 629.5 | 2.49% | 3rd Vert | 621 | 2.47% | 8.5 | 1% | 0.01% | 1% |
| 3rd Lat | 632 | 1.82% | 3rd Lat | 622 | 1.31% | 10.0 | 2% | 0.51% | 28% |
| 3rd Bi-Lobe | 664.5 | 0.24% | 3rd Bi-Lobe | 659.5 | 0.29% | 5.0 | 1% | -0.05% | -20% |
| 4th Bi-Lobe | 749.5 | 1.02% | 4th Bi-Lobe | 723.5 | 1.75% | 26.0 | 3% | -0.73% | -72% |
| 5th Bi-Lobe | 976 | 1.91% | 5th Bi-Lobe | 958 | 1.42% | 22.0 | 2% | 0.51% | 26% |
| 4th Lat | 1087 | 3.49% | 4th Lat | 1130 | 2.29% | -43.0 | -4% | 1.20% | 34% |
| 4th Vert | 1123.5 | 2.61% | 4th Vert Complex | 1121.5 | 2.81% | 2.0 | 0% | -0.20% | -8% |
| 6th Bi-Lobe | 1164 | 1.16% | 6th Bi-Lobe | 1112.5 | 2.63% | 51.5 | 4% | -1.47% | -126% |
| 5th Vert | 1513 | 2.18% | 5th Vert | 1461 | 3.01% | 52.0 | 3% | -0.83% | -38% |
| 7th Bi-Lobe | 1558 | 2.02% | 7th Bi-Lobe | 1523.5 | 1.64% | 34.5 | 2% | 0.38% | 19% |

202.    As can be seen above, the natural frequencies of the propshaft with liners and the damping are affected by temperature.   (2003 Econoline Analysis, at 52.)   For example, 3rd bending vertical and lateral frequencies drop from 629.5Hz to 621Hz (vertical) and 632Hz to 622Hz (lateral), a drop of 8.5Hz to 10Hz respectively.   The 3rd lateral bending damping changes from 1.82% to 1.31%, or a change of 28% on a relative basis.   4th lateral bending mode frequency changes by 43Hz, from 1087Hz (ambient) to 1130Hz (100F), a 4% relative change, and its damping goes from 3.49% to 2.29%, a 34% relative change.   Similarly, 2nd bending frequency changes by as much as 2% relative, and its damping by as much as 81% on a relative

- 80 -

basis.  The effect is felt in shell mode also.  The 4th shell mode frequency changes by 26Hz, decreasing from 749Hz (ambient) to 723.5Hz (100F), a 3% relative difference.  The 3rd shell mode damping changes by 20% on a relative basis, going from .24% (ambient) to .29% (100F).  Similarly, the 4th shell mode damping increases from 1.02% (ambient) to 1.75% (100F), a 72% relative change.   The modal frequencies of the propshafts without liners also vary depending on temperature.  (*Id*. at 33, 36.)  For example, the 3rd bending mode frequencies change by 8.5 - 9Hz at 100F from ambient, depending on whether lateral or vertical bending.

203.    The technical specifications for the GM 31xx and T1xx programs further supports my opinion.  For example, Section 3.1.3 of the 31xx SSTS ███████████████████████ ██████████████████████████████████████ (App. AA; GM Subsystem Technical Specification for the 31xx Aluminum Propshafts (NEAPCO00129), at 142 ("31xx SSTS").)  The 31xx SSTS ██████████████████████████████████████████████████ ████████████████████████████████. (*Id*.) ████████████████████████████ ████████████ (App. AB, Subsystem Technical Specification for the T1xx Aluminum Propshafts (NEAPCO004433), at 442.)  In my experience, these temperature ranges are consistent with the requirements in the automotive industry, although each customer or supplier may use slightly different ranges, or even larger ranges for certain vehicle applications where higher temperatures are expected, such as passenger cars.

204.    Sixth, the claims and specification fail to identify any type of excitation source— the choice of which can change the results.  The lack of disclosure is again important as one would obtain different results for the measurement of frequencies and damping, depending on how the tests are setup.  Both the excitation source and the measuring devices play a key role in determining whether a frequency of a liner "matches" any particular frequency or frequencies

and how much damping occurs.  For example, a manual relied upon by AAM's technical expert during the claim construction process, "The Fundamentals of Modal Testing," demonstrates the importance of choosing the appropriate excitation source:

**Exciting the Structure**

The next step in the measurement process involves selecting an excitation function (e.g., random noise) along with an excitation system (e.g., a shaker) that best suits the application. The choice of excitation can make the difference between a good measurement and a poor one.

(App. AC; Fundamentals of Modal Analysis, Agilent Technologies Application Note 243-3, Agilent Technologies (2000), at 18.)

205.    By way of example, one skilled in the art could measure the propshaft frequencies (shell, bending, torsion) using static (impact hammer) or dynamic (shaker) testing of the response of a propshaft that is not rotating, either in-vehicle or on a test stand.  A static test could include using an impact hammer on the shaft and measuring the decay times and frequencies of the corresponding oscillations and their amplitudes.   An impact hammer consists of a hammer with a force transducer built into the head of the hammer.  The hammer is then used to hit (impact) the test structure and thus excite a broad range of frequencies.  (App. R; Inman, at 498.) Impact hammer testing is still reliable, but less modally confident compared to shaker testing, as it generates off mode shape motions.

206.    Alternatively, one could continually excite the shaft with a "dynamic" energy source, such as a shaker, and vary the frequency of input energy to determine which input frequency produces the maximum radial vibration response from the liner.  (Inman, at 497-98.) For dynamic testing, an engineer would need to know how many shakers to use, where to place

these shakers, the amount of energy used, and what type of signal to use (*e.g.*, periodic random, swept sine, chirp, wideband, bandlimited). (*Id.*) The two methods are reliable to generating the mode shape frequencies and damping, but there are differences requiring the method of testing to be defined. These unspecified choices could result in considerably different test results and different damping amounts, which create uncertainty as to the scope of the claims.

207. Additionally, using a shaker versus an impact hammer reduces the modal confidence. As the shaker input is always the same, it eliminates the human error that inherently occurs when a hammer is wielded by a human. Even though the impact force is normalized due to the load cell built into the impact hammer, impact angle and position vary effecting the results.

208. My opinion is corroborated by the testing of the 2003 E-150 Econoline propshaft. As discussed in Section VII, the testing for the 2003 E-150 Econoline propshaft shows differences between the frequencies and damping measured using the impact hammer (single point), impact hammer (all points), or a shaker. For example, page 49 of the 2003 Econoline Analysis shows that the propshaft with liner frequencies and damping varies according to excitation source (*i.e.*, multi-reference impact hammer, single reference impact hammer, shaker):

### FREQUENCY AND DAMPING COMPARISON
Reference: All, R6:P10 [180º], and Shaker

| Shaft 1 Ambient | In Vehicle All | | R6:P10 | | R6: P3a | | P10 Frequency Delta | | P34 Frequency Delta | | P10 Damping Delta | | P34 Damping Delta | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Mode Shape | Multi-reference Impact All | | Single Point Impact | | Shaker | | Single Point Impact | | Shaker | | Single Point Impact | | Shaker | |
| | Freq [Hz] | Damp [%Cr] | Freq [Hz] | Damp [%Cr] | Freq [Hz] | Damp [%Cr] | Absolute | Relative | Absolute | Relative | Absolute | Relative | Absolute | Relative |
| 1st Vert 0° | 72.5 | 1.33% | 72.5 | 1.96% | 73 | 1.11% | 0.0 | 0% | -0.5 | -1% | 0.27% | 20% | 0.23% | 17% |
| 1st Lat | 76.5 | 1.25% | 76.5 | 0.98% | 76 | 0.95% | 0.0 | 0% | -0.5 | 1% | 0.27% | 22% | 0.29% | 24% |
| 1st Vert 180° | 80.5 | 2.60% | 80.5 | 2.46% | 79 | 1.92% | 0.0 | 0% | 1.5 | 2% | 0.14% | 5% | 0.69% | 26% |
| Pinion Vert | 119 | 1.66% | 118.5 | 1.11% | 116 | 1.95% | 0.5 | 0% | 3.0 | 3% | 0.75% | 40% | 0.51% | 7% |
| Trans Vert | 142 | 2.81% | | | 142 | 1.73% | | | 0.0 | 0% | | | 1.08% | 38% |
| Pinion Trans Vert | 162.5 | 0.50% | 162.5 | 0.19% | 161.5 | 0.27% | 1.0 | 0% | 1.0 | 1% | 0.30% | 61% | 0.22% | 45% |
| Trans Lat | 182 | 0.55% | | | 188 | 0.36% | | | -4.0 | -2% | | | | |
| Trans Vert | 217.5 | 5.05% | 217.5 | 3.72% | | | 0.0 | 0% | | | 1.33% | 26% | | |
| 2nd Lat | 276.5 | 3.73% | 281 | 0.38% | 278.5 | 1.29% | -4.5 | -2% | -2.0 | -1% | 3.35% | 90% | 2.44% | 65% |
| 2nd Vert | 316 | 2.40% | 316 | 2.13% | 315 | 2.23% | 2.0 | 1% | -3.0 | 1% | 0.27% | 11% | 0.17% | 7% |
| 2nd Lat | 354 | 2.56% | 355 | 1.76% | 352 | 0.24% | -1.0 | 0% | -2.0 | 1% | 0.78% | 30% | -2.33% | 91% |
| 1st Bri Lobe | 570.5 | 0.37% | 570 | 0.39% | 570.5 | 0.34% | 0.5 | 0% | 0.0 | 0% | 0.86% | -18% | -0.01% | -2% |
| 2nd Bri Lobe | 608.5 | 0.37% | 608.5 | 0.38% | 609 | 0.38% | -1.0 | 0% | -0.5 | 0% | 0.01% | -4% | 0.01% | 2% |
| 3rd Vert | 629.5 | 2.49% | 632 | 1.67% | 629 | 1.86% | -2.5 | 0% | 0.5 | 0% | 0.62% | 33% | 0.63% | 25% |
| 3rd Bri Lobe | 864.5 | 0.34% | 864.5 | 0.92% | 864.5 | 0.32% | 0.0 | 0% | 0.0 | 0% | 0.56% | -161% | -0.18% | -32% |
| 4th Bri Lobe | 748.5 | 1.03% | 758.5 | 1.13% | | | -5.0 | 0% | | | -0.11% | -11% | | |
| 5th Bri Lobe | 978 | 1.93% | 982.5 | 1.82% | 980.5 | 2.64% | -4.5 | 0% | -2.5 | -1% | 0.52% | 20% | 1.39% | 72% |
| 4th Bri Lobe | 1123.5 | 2.81% | 1125 | 2.09% | 1126 | 2.60% | -1.5 | 0% | -2.5 | 0% | 0.62% | 20% | -0.18% | -7% |
| 5th Bri Lobe | 1164 | 1.16% | 1168.5 | 1.28% | | | -5.5 | 0% | | | -0.10% | -9% | | |
| 5th Vert | 1513 | 2.18% | 1478.5 | 2.05% | | | 34.5 | 2% | | | 0.12% | 5% | | |

209.    As can be seen from the above chart, the excitation source can have an effect on the measured damping.  For example, the 3rd vertical bending mode is damped 1.67% (single reference hammer), 1.86% (shaker), or 2.49% (multi-reference hammer).  The difference is important depending on the subjective views of the customer or engineer designing the product. For example, as discussed above, Dr. Sun testified that a tuned liner would attenuate bending mode vibrations by over 2% (a seemingly arbitrary number to begin with).  (App. S; Sun Tr. at 124:13-125:1.)   But, using Dr. Sun's views on what amount of damping equates to being effectively "tuned" for bending modes, the 2003 Econoline would be "tuned" if an impact hammer were used in the test, but not a shaker.

210.    Alternatively, one could determine the shell, bending, and torsion mode frequencies in a vehicle simulating driving conditions, such as by using a chassis dynamometer. According to a GM witness, Brian Manhken, ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████

211.    Moreover, the measured bending and torsion modes can vary using a dynamometer depending on other excitation variables, such as load.  According to a GM presentation entitled ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████. (App. AE; ███████████

████████ June 6, 2014 (GM_AAM000051), at 52.) ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████



212.   Similarly, excitation forces can cause a liner's resonant frequency to change, which affects its damping properties.  As confirmed in Laskey, torsional and flexural loads on the liner and driveshaft causes stress on cardboard liners and causes their resonant frequency to change:

> As the tube transmits power, it can experience changes in its shape because of torsional and flexural loads. It has been found that engagement of the solid helical bead with the inner surface of the tube causes the insert to change its shape with the hollow article. As a

██████

result of this change of shape, the resonant frequency of the cardboard insert changes also, resulting in an undesirable reduction in its ability to dampen noise and vibration. (App. J; Laskey at col. 1:53-61.)

213.   Seventh, decisions as to how to measure the response using some type of transducer, such as an accelerometer, microphone, or laser scanner, could greatly affect the results of the testing.   Accelerometers, which are sometimes used in the relevant automotive industry, are small transducers weighing from 1 gram to over 10 grams each that detect and monitor vibration.   For each type of application, an engineer must decide how many accelerometers to physically place on the component being measured, such as a propshaft or a liner.   I am not aware of a standard set of locations or number of accelerometers to use for propshafts and liners, or a standard weight of accelerometer to use.   Indeed, it ███████████ ████████████████████████████████████████████████████   The mass of the component will increase due to the mass of the accelerometers used for a test.   The increase in mass will change the resulting frequencies of the component due to mass loading.   (App. R; Inman, at 498.)   For a relatively lightweight component, such as a liner, or even an aluminum propshaft, the mass loading effect of the accelerometers could be very large, resulting in skewed results.

214.   Lasers are measurement instruments for obtaining high spatial density vibration measurements.   A laser sensor is non-contact, as it relies on the doppler shift of a reflected laser beam to determine the velocity of the test subject.   (Inman, at 501.)   Lasers can provide highly accurate and detailed measurements, if setup correctly.

215.   During the development of the propshafts for the 31XX program, ██████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████



(*Id.* at 1666.)

216. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*Id.*)

217. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)  I understand from Rob Wehner that this study was conducted

████████████████████ The same mass loading effect, *i.e.*, different frequency results,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████ Oct. 31,

2014 (NEAPCO0001619).)

218.    Moreover, the 2003 Econoline Analysis confirms my opinion.  According to the testing of the 2003 Econoline propshaft, the addition of each pair of 2 gram accelerometers changed the resulting frequencies.   As can be seen on page 379 of the 2003 Econoline Analysis, the frequency peaks lowered as more accelerometers were added progressively and symmetrically in pairs about the center plain:



219.    Each accelerometer has a mass of 2.0 grams.   FRF point 3 showed a 35Hz difference going from 2 to 6 accelerometers in pairs.  (App. Q; 2003 Econoline Analysis, at 379.) FRF point 4 showed a shift of 45Hz.  (*Id*.)  These variances are due to the mass loading effects of the accelerometers.  Moreover, mass loading during the testing of the propeller shaft was 0.37 % due to using 1 gram sensors on a 9.19 kg part in a linear model.  (*Id*. at 25.)  Using 1-2 gram sensors yields lower mass loading effects and change in frequency compared to 5 to 10 gram sensors, which are also used in the industry.   As discussed above, Neapco uses heavier accelerometers for its in-house testing, which produces additional mass loading effects.  For the 2003 Econoline testing, the mass loading effects of the accelerometers would have been much greater had larger, but also common, sized accelerometers been used.  Therefore, depending on how you perform the testing—*i.e.*, using two accelerometers or 6, one could expect a relatively large frequency shift.

220.    I also reviewed the deposition testimony of Dr. Sun, who testified that AAM uses two or more accelerometers on its liners at 5 grams or smaller.  (App. S; Sun Tr. at 143:18-23; 144:20-21.)  Dr. Sun testified that he believed the difference in results between 5 gram and 1 gram accelerometers would have been minimal.  (Sun Tr. at 144:22-145:1.)  But as can be seen in the Neapco testing, the frequency change can be large, depending on the number and weight of accelerometers used.  The disagreement between the two companies, as well as the evidence of actual testing, shows that one skilled in the art cannot determine with reasonable certainty the scope of the claims.

221.    Eight, certain conditions, such as temperature, can significantly affect damper / liner testing results to determine both its natural frequencies (*i.e.*, what it is "tuned" to) and the damping in a propshaft.  Specific tests to simulate these conditions are required.  As Inman explains, "[a] part manufactured for use in a machine or structure must obviously be able

function in its operating environment." (App. R.; Inman, at 523.) As explained, "the device under consideration must be able to withstand all the dynamic loads that might be applied to it and must continue to function." (*Id*. at 523-524.) "The most difficult part of this procedure is estimating a reasonable description of the dynamic load tools that a given device is likely to experience during its useful service life. The next problem is to devise a test procedure that faithfully reproduces the dynamic input data specified for the devices." (*Id*. at 524.) These concepts apply to vibration attenuation devices in the automotive industry, including for tuned damper devices for propshafts.

222.    For example, Dr. Steyer and Dr. Sun's SAE article from 2004, entitled *Balanced Competing Design Imperatives to Achieve Overall Driveline NVH Performance Objectives*, (App. AH (AAM0001539)) describes how extreme operating temperatures can affect "tuned absorbers" (the article refers to slip yoke dampers), resulting in a 5 to 10% shift in "tuning" (*i.e.*, its frequency) and a large reduction in its effectiveness:

> Model tuning variations may also be of concern for other applications in which the system design is being finessed through the use of a tuned absorber. In this instance it is critical that the natural frequency of a component, e.g. a tuned torsional absorber, must be sufficiently closely aligned with the natural frequency of some other system mode, e.g. the driveshaft system torsional resonance. In this instance there can be considerable degradation of the system performance as the modal tuning varies even a small amount from the design nominal. Typical tuned absorbers with rubber for the elastic elements will exhibit at least a +/- 5% variation in tuning just from batch to batch differences in the rubber composition. Furthermore, extremes of the operating temperatures may result in another 5 – 10% shift in tuning. Thus it becomes necessary to perform specific tests in which the effective tuning of the absorber is evaluated over the full range of variation that will be experience. As a result the effectiveness of such a tuned absorber will often be only within a range of 3-6 dB total reduction rather than the 15 dB that might be demonstrated with a perfectly tuned nominal system.

(*Id.* at 1542.)  As the article instructs, "it becomes necessary to perform specific tests in which the effective tuning of the absorber is evaluated over the full range of variation that will be experienced."  (*Id.*)  Similarly, Dr. Sun admitted that operational temperature affects the tuning frequency of "tuned absorbers" for certain applications, *e.g.*, in a passenger car environment, and also affects the measurable damping:

> Q.   Okay. The next sentence is, "Furthermore, extremes of the operating temperatures may result in another 5 to 10 percent shift in tuning," do you see that?
> A.   Yes.
> Q.   What does that refer to?
> A.   **That means if you have extreme condi – temperature conditions for the rubber material, the rubber material change, property change, can cause another 5 to 10 percent shift of the tuning frequency.**
> Q.   **And a 5 to 10 percent shift in the tuning frequency of a tuned absorber would change the amount of damping that you would measure for that propshaft, right?**
> A.   **That's right**.

(App. S; Sun Tr. at 119:3-15 (discussing App. AH (AAM0001539), at 1542.))  Dr. Sun further admitted that *specific tests* need to be performed to cover the full operating range of the products:

Q.     The next sentence says, "Thus it becomes necessary to perform specific tests in which the effective tuning of the absorber is evaluated over the full range of variation that will be experience."

A.     Yeah.

Q.     Why does it become necessary to perform the specific tests?

A.     If needed, **we have to cover the full operating range.  We as a manufacturer, we want to make sure we – our products are robust**, that robust in terms of part to part variation, **robustness regarding to operation consistency and all kind of operating conditions**.

(Sun Tr. at 119:16-120:3.)  Moreover, Dr. Sun confirmed that tuned liners are susceptible to changes in operating temperature in at least certain applications one would test for those conditions:

Q.     Would a tuned liner be a tuned absorber?

A.     It is a more sophisticated multiple tuned absorber, can -- but be a more -- yeah, we can say it's a composite or it is a multiple tuned absorber mechanism.

Q.     **The tuned liner would also be susceptible to changes in tuning due to extremes of operating temperatures, right**?

A.     **Theoretically. It depends on the operating temperature.**
                                          * * *

Q.     In a passenger car environment if you were to use a tuned liner, would you test for its results, test for the tuning results --

A.     **I would.  If you use a passenger car, which is like a enclosed chamber, we know it's going to have a 200 Fahrenheit, for instance, or 350 Fahrenheit, we may look into it**.

(Sun Tr. at 120:16-22; 121:11-17.)  Moreover, Dr. Steyer also confirmed that internal dampers for propshafts, including internal tuned dampers and tuned liners would experience thermal sensitivity that would have an effect on the tuning frequencies, especially in certain vehicle applications, such as passenger cars.  (Steyer Tr. at 69:1-75:6.)  Thus, Plaintiff's witnesses confirm that thermal sensitivity of the liners can have an effect on the measurable frequency of the liner.

223.     Similarly, AE07 describes that when establishing tuning requirements for an ITD, the temperature range must be factored.  (App. E; AE07, at 259.)  Fig. 3 shows a typical frequency response curve at ambient temperature for an axle noise tuned torsional damper where the damping is to be 5-10% of critical damping.  (*Id.*)



Fig. 3 — Tuned absorber frequency response curve

224.    In establishing the tuning requirements for this particular damper, AE07 instructs that the desired resonant frequency must fall within the temperature band, such as one shown in Fig. 4:



Fig. 4 — Effect of temperature on tuning frequency

225.    Hence, the resonant or peak frequency of the damper producing the frequency response curve in Fig. 3 may be tuned to the problem frequency of the car.   (*Id*. at 260.)

However, in some instances the optimum tuning of a damper has been found to differ from the problem frequency experienced in the car.  (*Id*.)  By analyzing this frequency response curve, it can be determined whether it meets the required damping of the intended drivetrain installation.  (*Id*.)  Damping is the effect of converting mechanical energy into heat, where critical damping is the quickest path to reduce a vibration amplitude to near zero.  As the energy is converted to heat, different temperatures during testing greatly affect damping.

226.    Another SAE paper from 2007 that reviews tuned damper design theory confirms my opinion.  (App. F; Aubert, A. et al., *Design Issues in the Use of Elastomers in Automotive Tuned Mass Dampers*, Society of Automotive Engineers, Technical Paper 07NVC-217 (2007) ("Aubert").)  Aubert describes that the "modulus and damping properties of elastomers vary with the amplitude and frequency of excitation, as well as the operating temperature."  (Aubert, at 2.)  Aubert studied the effect of operating a tuned mass damper in a range of temperatures commonly encountered by devices in automotive service.  (*Id*. at 4.)  As explained by Aubert, "at 30 degrees F, the elastomer [of the damper] stiffens and the tuning is shifted higher in frequency, resulting in a reduction to 4dB of improvement."  (*Id*.)  Similarly, "at 120 degrees F, the elastomer softens, and the performance is degraded from the ideal 7.5dB to 5.3dB of improvement."  (*Id*.; *see also id*. at Fig. 11.)

227.    The FEV testing of the 2003 Econoline propshaft confirms my opinion as well. The change from ambient to 100 degrees F altered the rear liner natural bounce frequency from 697 to 618.5 Hz, a change of 78 Hz, or a 12.6% change.  (2003 Econoline Analysis, at 392, 395.)

228.    I have attached as Exhibit E, a chart comparing the various modal frequencies of the propshafts under the possible combinations of testing methodologies and testing conditions. As can be seen in the chart, the minimum and maximum frequencies for the propshaft modal

frequencies obtained during physical testing varies from around 5% to over 20%, depending on the testing methodology and conditions.  This wide variance is important for one skilled in the art to determine whether any liner is "tuned" to match a particular frequency, as he or she would not know which of these exemplary, valid, methods to use.

229.    Finally, the direction of the testing for the bending mode is not specified in the '911 patent claims.  Commonly during vehicle testing bending mode shapes are described by the direction.  As such lateral mode shapes (side-to-side) are separate from vertical mode shapes.  Different shape modes often have different frequencies.  From the specification of patent '911, the "various excitation sources can typically cause the propshaft to vibrate in a bending (lateral) mode, a torsion mode and a shell mode." (App. A; '911 patent at 1:42-44.)  So one skilled in the art is left with the question of tuning for lateral bending when a vertical bending mode is the problem.  As described in the FEV testing, the 2nd bending mode is different by more than 10 % when compared to vertical (354 Hz) and lateral (276 to 318 Hz).  (App. Q; 2003 Econoline Analysis, at 52.)

230.    Therefore, a company that wants to avoid the scope of the '911 Patent and use non-tuned liners, which have existed for decades, would have no idea how to determine the bounds of the alleged inventions claimed in the '911 Patent.  As such, the asserted claims fail to inform, with reasonable certainty, those skilled in the art of the scope of the alleged invention.

### XIII.        THE '911 PATENT ASSERTED CLAIMS CANNOT BE PRACTICED WITHOUT UNDUE EXPERIMENTATION

231.    In my opinion, one of ordinary skill in the art cannot make and use the claimed inventions without undue experimentation and therefore the claims are invalid due to lack of enablement.  For the same reasons discussed in Section XII with regards to indefiniteness, the '911 patent specification, at the time the application for the '911 patent was filed, would not have

289.    As discussed above with regards to element 22[d], Laskey discloses that the liner is a tuned resistive absorber for attenuating shell mode vibrations.  Alternatively it would have been obvious to modify Laskey in view of the knowledge of one skilled in the art or other prior art references.  I incorporate my discussion from above for this element.

290.    As discussed above with regards to element 22[e], Laskey discloses that the liner is a tuned reactive absorber for attenuating at least one of bending mode vibrations. Alternatively it would have been obvious to modify Laskey in view of the knowledge of one skilled in the art or other prior art references.  I incorporate my discussion from above for this element.

### B.  The 2003 E-150 Econoline Propshaft Alone or in Combination with Other References

291.    I understand that the 2003 Ford E-150 Econoline propshaft ("2003 Econoline") qualifies as prior art under at least 35 U.S.C. § 102(a) or (b) because it was known or used by others in this country and on sale in this country more than one year prior to the date of the application for the patents.  In my opinion, each of the asserted claims of the '911 Patent are anticipated or obvious in light of 2003 Econoline, either alone or in combination with one or more other prior art references.  The citations herein are exemplary, and additional citations describing 2003 Econoline propshaft are contained in Exhibit D to my report.  I incorporate my discussion of the 2003 Econoline from Section VIII of my report.

### 1.    CLAIM 22 of '911 patent

| [22P] A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component, the method comprising. |
|---|
| [22a] providing a hollow shaft member; |
| [22b] tuning a mass and a stiffness of at least one liner; and |

| [22c] inserting the at least one liner into the shaft member; |
| [22d] wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations |
| [22e] and wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations. |

292.    The 2003 Econoline discloses each element of claim 22.  Alternatively, to the extent that the claim limitations are not disclosed, they are rendered obvious in light of the 2003 Econoline by itself or in combination with the knowledge of one skilled in the art and/or one or more other prior art references identified in my analysis.

293.    The 2003 Econoline teaches a method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component.  For example, the 2003 Econoline propshaft assembly depicts the assemblies for connecting to the driveline components:



(App. M; 3C24-4602-MB Drawing.)

294.    The 2003 Econoline discloses a hollow shaft member.  (App. M; 3C24-4602-MB Drawing.)  The 2003 Econoline also discloses inserting the liner into the shaft member.  (*Id*.)

295.    The 2003 Econoline discloses tuning the mass and stiffness of the liner (controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies).  Similarly, the 2003 Econoline also discloses a tuned resistive

absorber for attenuating shell mode vibrations (a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibrations).  The 2003 Econoline also discloses a tuned reactive absorber for attenuating bending mode vibrations (a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations).

296.    I understand that AAM contends that Neapco's 31xxN propshaft assemblies are "tuned" to particular shell mode frequencies.  I further understand that Neapco has not controlled the mass and stiffness of the accused liners to configure the liner to match a relevant shell mode frequency or frequencies.  To the extent AAM contends that any Neapco accused product is "tuned" to a particular shell mode frequency if its natural frequency is close to a shell mode frequency, whether controlled to be so or not, then the 2003 Econoline propshaft meets the claim for the same reasons.

297.    Attached as Exhibit E is a chart comparing liner frequencies to the propshaft under various possible combinations of testing methodologies and testing conditions.  As can be seen in the chart, the liners for the 2003 Econoline have a natural frequency very close to the various modal frequencies, under most testing methodologies and testing conditions.  For example, the 2003 Econoline Analysis indicates that the middle liner has a rocking frequency of 673Hz at ambient temperature.  (2003 Econoline Analysis, at 385.)  The rear liner has a bounce frequency of 697Hz and bending frequencies at 967Hz and 1027Hz.  (*Id*. at 392.)  The 2003 Econoline propshaft without liners in-vehicle at ambient temperature has a 3rd vertical bending mode at 669Hz and 3rd lateral bending at 657.5Hz.  (*Id*. at 33.)  Also, the 3rd shell mode is

697Hz.  (*Id.*)  The 4th lateral and vertical bending mode is 1170Hz and 1153.5Hz.  (*Id.*)  The 4th shell mode is 815Hz.  (*Id.*)

298.    Therefore, both the liners have frequencies that are very close to bending and shell mode frequencies of the propshaft in-vehicle at ambient temperature.  The middle liner is "tuned" to within 4Hz of the 3rd vertical bending and 15.5Hz to 3rd lateral bending, or within less than 1% to 2.36% of those modal frequencies.  (Exhibit E.)  The rear liner is also "tuned" to within 28Hz of the 3rd vertical bending and 39.5Hz to 3rd lateral bending, or within about 5% of those modal frequencies.  (*Id.*)  Moreover, the middle liner frequency is only 3% off of the 3rd shell mode frequency; the rear liner has the same frequency as the 3rd shell mode.  (*Id.*)  Other viable permutations of the analysis, *e.g.*, in-vehicle v. bench, modal frequencies with and without liners, hammer v. shaker, and ambient v. 100F, produce similar results whereby a liner frequency is matched to within 5-20% of a propshaft modal frequency.  (Exhibit E.)  I reserve the right to cite to any of the data in Exhibit E to support my analysis.  According to the specification, to some people, a liner having a frequency within 5% of a relevant propshaft modal frequency is considered "tuned," others 10%, 15%, or 20%.  ('911 patent, col. 8:25-43.)[5]

299.    Moreover, one skilled in the art would recognize that the 2003 Econoline liner design necessarily provides friction damping to act as a resistive absorber.  As discussed above in Section XI, cardboard liners with rubber winding act as a resistive absorber to provide friction damping to dampen shell mode vibrations.  (*See* Section XI discussion of friction damping, Singh 2003, Singh 2016, '361 Patent, and Dr. Sun testimony.)  As I discuss above, the damping is due in part to the interaction between material properties of the liner and shell consisting of a viscous force coefficient and a Coulomb friction coefficient.  (*Id.* at 179.)  The rate of dissipation

---

[5] As discussed above, the claims are indefinite and lack enablement because one skilled in the art cannot determine when a liner is "tuned" to a relevant frequency.

from the friction damping by contact between the propshaft and the liner is due to a sufficient amount of the propshaft surface in contact with the absorber.  (*Id.*)

300.    Finally, one skilled in the art would recognize that the 2003 Econoline liner design necessarily acts as a reactive absorber as construed.  As discussed above in Section XI, a damper or liner matched to a relevant bending mode frequency will act as a reactive absorber to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations, which is basic physics.  Thus, under the varying metrics identified in the '911 Patent, the 2003 Econoline liners are "tuned" to relevant frequencies and act as tuned reactive and resistive absorbers as claimed.

301.    Alternatively, these tuning claim limitations are rendered obvious in view of 2003 Econoline alone, in combination with the knowledge of one of skill in the art, or in combination with the teachings of other references, such as Czep or Gassen.  I incorporate my discussion of Czep and Gassen from above in Sections VII and XIV.A.  One skilled in the art at the time of the invention would recognize that it would have been obvious to modify 2003 Econoline propshaft and liner to configure the liner to match to a particular bending mode frequency to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations or configure the liner of 2003 Econoline to match to a particular shell mode frequency to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibrations.

302.    For example, one skilled in the art would be motivated to combine the teachings of 2003 Econoline with the knowledge of those skilled in the art or with Czep or Gassen. As discussed above, 2003 Econoline already discloses that its liners are configured to match a frequency or range of frequencies close to the relevant modal frequencies of the propshaft.  One

- 124 -

of ordinary skill would readily look to other types of vibration damping or attenuation devices for driveshafts, especially internal dampers such as Czep or Gassen, and would combine those known concepts with 2003 Econoline as a matter of course and with a reasonable expectation of success.  Using the teachings of Czep or Gassen and/or the knowledge of those skilled in the art that internal tuned dampers can be "tuned" to particular frequencies, especially shell, bending, or torsion mode frequencies, modifying the 2003 Econoline is merely the routine selection of known elements operating according to well-known techniques to achieve predictable results. Indeed, as discussed above, tuning any single-degree of freedom mass-spring-damper system, such as a liner described in 2003 Econoline, involves the application of basic physics, such as by changing the mass and/or stiffness of either the cardboard or the rubber winding of 2003 Econoline.  (*See* Section XI above.)  There are a finite set of frequencies that all tuned absorbers for propshafts are tuned to, namely, the various shell, bending, and torsion mode frequencies.  It is a simple design choice to tune a liner to one of the modal frequencies of the propshaft, especially where one of the modal frequencies provides vibration issues with the vehicles.  That is the purpose of a tuned absorber of any kind, including a liner.

303.    Therefore, one of ordinary skill in the art would be readily able to utilize the teachings of Czep or Gassen to tune the rubber wound internal tuned liner of 2003 Econoline, and have reason to do so with a reasonable expectation of success of matching the desired modal frequency and dampen vibrations.

### 2.    CLAIM 23 of '911 patent

[23] The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode.

304.    Claim 23 depends from claim 22. As discussed above, 2003 Econoline discloses the elements of independent claim 22.  The 2003 Econoline also discloses the elements of claim 23.

305.    The 2003 Econoline discloses a liner tuned to at least one of a first shell mode, a second shell mode and a third shell mode.  As discussed above with regards to claim 22 (b)(d), and (e), the middle liner frequency is within 3% of the 3rd shell mode frequency; the rear liner has the same frequency as the 3rd shell mode.  (Exhibit E.)

### 3.    CLAIM 24 of '911 patent

[24] The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode.

306.    Claim 23 depends from claim 23, which depends from claim 22. As discussed above, 2003 Econoline discloses the elements of independent claim 22 and claim 23. The 2003 Econoline also discloses the elements of claim 24.

307.    The 2003 Econoline discloses a liner tuned to at least one of a first bending mode, a second bending mode and a third bending mode.  As discussed above with regards to claim 22 (b)(d), and (e), the middle liner is "tuned" to within 4Hz of the 3rd vertical bending and 15.5Hz to 3rd lateral bending, or within less than 1% to about 2.36% of those modal frequencies.  The rear liner is also "tuned" to within 28Hz of the 3rd vertical bending and 39.5Hz to 3rd lateral bending, or within about 5% of those modal frequencies.  (Exhibit E.)

### 4.    CLAIM 26 of '911 patent

[26] The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member.

308.    Claim 26 depends from claim 24, which depends from claim 23, which depends from claim 22. As discussed above, 2003 Econoline discloses the elements of independent claim 22 and claims 23 and 24.  2003 Econoline also discloses the elements of claim 26.

309.    The 2003 Econoline discloses a liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member. The 2003 Econoline has the propshaft assembly with the liner inserted into it depicted below:



(App. M; 3C24-4602-MB Drawing.)

310.    Below are the drawings for the liner, depicting the resilient member helically winding around the liner to provide a press fit with the propshaft:



- 127 -





(App. O; 2C2W-4978-AA Drawing.)  The drawings also indicates the particular EPDM specifics

for the resilient member and that the liner is paperboard.  (*Id*.)

### 5.    CLAIM 27 of '911 patent

[27] The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion.

311.    Claim 27 depends from claim 26, which depends from claims 24, 23, and 22. As

discussed above, 2003 Econoline discloses the elements of independent claim 22 and claims 23,

24, and 26.  The 2003 Econoline also discloses the elements of claim 27.  The 2003 Econoline discloses the at least one resilient member extends helically about and along the structural portion.  I incorporate my citations for element 26 above.

### 6.    CLAIM 31 of '911 patent

[31] The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof.

312.    Claim 31 depends from claim 26, which depends from claims 24, 23, and 22. As discussed above, 2003 Econoline discloses the elements of independent claim 22 and claims 23, 24, and 26.  The 2003 Econoline also discloses the elements of claim 31.  The 2003 Econoline discloses the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof.  I incorporate my citations for element 26 above.

### 7.    CLAIM 34 of '911 patent

[34] The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node.

313.    Claim 34 depends from claim 22. As discussed above, 2003 Econoline discloses the elements of independent claim 22.  The 2003 Econoline also discloses the elements of claim 34.

314.    As discussed above, the 2003 Econoline discloses a liner positioned along the shaft member symmetrically about a bending anti-node.  For example, an FEA simulation of the Econoline propshaft prepared by Robert Wehner depicts the liner placements relative to the 3rd bending mode below:



(App. AI; FEA Simulation of Antinodes Versus Liner Placement, P/N 3C24-4602-MB (03 Econoline) (NEAPCO195965) ("Econoline FEA Simulation").)  As can be seen, the middle liner is placed symmetrically around the bending antinode.

### 8.   CLAIM 35 of '911 patent

[35] The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node.

315.    Claim 35 depends from claim 34, which depends from claim 22.  As discussed above, 2003 Econoline discloses the elements of independent claim 22 and claim 34.  The 2003 Econoline also discloses the elements of claim 35 either alone, in combination with the knowledge of one of skill in the art, or in combination with the references described below.

316.    While the 2003 Econoline rear liner is not positioned symmetrically about a bending anti-node, it is positioned to overlap with a bending anti-node:



(App. AI; Econoline FEA Simulation.)

317.    One of skill in the art would find it obvious in view of the 2003 Econoline and the knowledge of one skilled in the art and/or in combination with Czep or Gassen to tune the liner to a particular bending mode, such as first, second, or third and position the liner symmetrically about the antinode.  One skilled in the art would be motivated to place a tuned liner at an antinode and have had a reasonable expectation of success in doing so because that is the normal location for the placement of an internal damper device.  There are a finite number of modes in a typical driveshaft, with bending modes one through four being the most common modes that are addressed using a vibration damping device, although other modes are possible in certain propshafts. As described in Czep and Gassen, as discussed above, an internal tuned damper is located at an antinode, and more than one internal tuned damper or liner can be used at different antinodes.  For example, as described by Gassen, the absorber is placed at an antinode:  "[t]he elastic coupling element is configured as a rubber ring and exhibits only slight longitudinal expansion. In this way, the vibration absorber can be mounted in a targeted manner on the particular vibration maximum (vibration antinode) of the hollow tube."  (App. H; Gassen at col. 2:26-29; *see also* App. G; Czep at col. 3 ("The damping mass can . . . be provided only where the largest amplitudes - antinodes - occur. . . . Depending on where the antinodes of the individual frequencies are located, the arrangement can then exhibit multiple damping masses distributed within the hollow space."))  Similarly, as described in AE07, the ideal location for an ITD is at the antinode.  (App. E; AE07, at 259.)  This is the point of maximum angular velocity or highest amplitude of oscillation.  (*Id*.)  Here the damper will be most effective.  (*Id*.)  One skilled in the art would understand that a damper tuned to match the particular frequency of a relevant mode would ideally be placed at the relevant antinode.

### 9.    CLAIM 36 of '911 patent

| [36P] A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component, the method comprising: |
|---|
| [36a] providing a hollow shaft member; |
| [36b] tuning a mass and a stiffness of at least one liner; and |
| [36c] inserting the at least one liner into the shaft member; |
| [36d] wherein a ratio of the mass of the at least one liner to a mass of the shaft member is about 5% to about 30%, |
| [36e] wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations; and |
| [36f] wherein the at least one liner is a tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations. |

318.    2003 Econoline discloses each element of claim 36.  Alternatively, to the extent that the claim limitations are not disclosed, they are rendered obvious in light of 2003 Econoline by itself or in combination with the knowledge of one skilled in the art and/or one or more other prior art references identified in my analysis.

319.    As discussed above with regards to element 22[a], 2003 Econoline discloses providing a hollow shaft member.  I incorporate my discussion from above for this element.

320.    As discussed above with regards to element 22[b], 2003 Econoline discloses tuning a mass and a stiffness of at least one liner.  Alternatively it would have been obvious to modify the 2003 Econoline in view of the knowledge of one skilled in the art or other prior art references.  I incorporate my discussion from above for this element.

321.    As discussed above with regards to element 22[c], 2003 Econoline discloses inserting the at least one liner into the shaft member.  I incorporate my discussion from above for this element.

322.    With regards to element 36[d], 2003 Econoline discloses that a ratio of the mass of the at least liner to a mass of the shaft member is about 5% to about 30%.  The ratio of the

mass of each liner to the mass of the empty propshaft is 5.6%.   (App. AI, Econoline FEA Simulation, at 2.)

323.    As discussed above with regards to element 22[d], 2003 Econoline discloses that the liner is a tuned resistive absorber for attenuating shell mode vibrations.  Alternatively it would have been obvious to modify the 2003 Econoline in view of the knowledge of one skilled in the art or other prior art references.  I incorporate my discussion from above for this element.

324.    As discussed above with regards to element 22[e], 2003 Econoline discloses that the liner is a tuned reactive absorber for attenuating at least one of bending mode vibrations. Alternatively it would have been obvious to modify the 2003 Econoline in view of the knowledge of one skilled in the art or other prior art references.   I incorporate my discussion from above for this element.

## C.  Secondary Considerations Are Not Present

325.    I have considered evidence of secondary factors of non-obviousness, such as commercial success, long felt need, failure of others, copying by others, and the like.  In my opinion, none of these factors support non-obviousness of the claimed subject matter in this case, especially in view of the overwhelming evidence discussed above.

326.    I have reviewed AAM's response and first supplemental responses to Neapco's interrogatory no. 13 where AAM identifies alleged secondary considerations of non-obviousness, including commercial success, copying, long-felt need, and unexpected results.  I have not seen any nexus to the alleged inventions and any of those alleged secondary considerations of non-obviousness.

327.    For example, AAM refers to the commercial success of its own sales of the alleged commercial embodiments and Neapco's sales of the alleged infringing 31xx products. As a preliminary matter, AAM has not identified any evidence that its products are, in fact,

# **EXHIBIT J**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-LPS |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

**SUPPLEMENTAL EXPERT REPORT OF STEVEN BECKER,
<u>REGARDING THE VALIDITY OF U.S. PATENT NO. 7,774,911</u>**

**HIGHLY CONFIDENTIAL**

Dated:  ____10/17/2017____

_Steven Becker_
_____

Steven Becker

the mass and stiffness of at least one liner" and the "tuned resistive absorber for attenuating shell mode vibrations" and the "tuned reactive absorber for attenuating bending mode vibrations" applies to these claims as well.  I incorporate my discussion of those elements from claim 22 in my Invalidity Report and Reply Invalidity Report herein as it pertains the new asserted claim 1 elements 1b, 1c, and 1d shown above and dependent claims 2, 3, and 4.

12.     The new asserted dependent claims have the same scope as dependent claims to claim 22 discussed in my Invalidity Report.  Dependent claims 5 and 6 are similar to dependent claims 23 and 24 discussed in my Invalidity Report.  Dependent claim 12 is similar to dependent claim 26 discussed in my Invalidity Report.  Dependent claim 13 is similar to dependent claim 27 discussed in my Invalidity Report. Dependent claim 19 is similar to dependent claim 31 discussed in my Invalidity Report.  Dependent claim 20 is similar to dependent claim 34 discussed in my Invalidity Report.  Finally, dependent claim 21 is similar to dependent claim 35 discussed in my Invalidity Report.  I incorporate my discussion of those claims in my Invalidity Report and Reply Invalidity Report herein as it pertains the new asserted dependent claims.

## IV.     LEVEL OF SKILL IN THE ART

13.     Nothing in the subject matter of the New Asserted Claims changes my previously rendered opinions regarding the appropriate level of skill in the art to apply.  I therefore incorporate my discussion of the appropriate level of skill in the art from my Invalidity and Reply Invalidity Reports and my Rebuttal Infringement Report.

## V.     SUMMARY OF OPINIONS

14.     As described more fully below, it is my opinion that the New Asserted Claims of the '911 Patent claim laws of nature or natural phenomenon, fail to inform those skilled in the art with reasonable certainty the scope of the claims, fail to inform those skilled in the art how to make and use the claimed inventions without undue experimentation, and are anticipated and/or

obvious in view of the prior art, including at least the following references:

- 2003 Ford E-150 Econoline Propshaft alone or in combination with DE3632418A1 (Czep) or U.S. Patent No. 6,312,340 (Gassen)

- U.S. Patent No. 7,214,135 (Laskey) alone or in combination with DE3632418A1 (Czep) or U.S. Patent No. 6,312,340 (Gassen)

## VI.   THE '911 PATENT ASSERTED CLAIMS ARE DIRECTED TO LAWS OF NATURE

15.     It is my opinion that the New Asserted Claims of the '911 Patent do nothing more than attempt to claim well-known laws of nature or natural phenomenon.  It is further my opinion that none of the New Asserted Claims contains any inventive concept.

16.     As discussed above, the New Asserted Claims do not require that the liners are "tuned resistive absorbers for attenuating shell mode vibrations" or that they are "tuned reactive absorbers for attenuating bending mode vibrations."   Instead, as it relates to the "tuning" concepts, the asserted claims require the steps of:

| [1b] tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member; and |
| --- |
| [1c] positioning the at least one liner within the shaft member such that the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%, |
| [1d] and the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. |

17.     As discussed in my Invalidity Report and my Reply Invalidity Report, the concept of "tuning" a liner to attenuate vibrations transmitted through a propshaft merely applies Hooke's law for a single degree of freedom spring mass damper system.  A single degree of freedom spring mass damper system is when a spring-mass system moves constrained in one direction.  A liner can be viewed as a multi-degree of freedom system, in that it is comprised of numerous single degrees of freedom that can be separately adjusted.  But to satisfy the claims, which require only "tuning" the liner to attenuate vibrations, a liner can be mathematically

mechanism that would apply, therefore either laws of physics would meet the claims.   I incorporate my discussion of friction damping and Hooke's law as it relates to claim 22 herein.

19.     Further, as with claim 22, the preamble and element 1[a], shown above in Section III, merely require providing a propshaft that is installed between two driveline components where the "tuned" liner is inserted.  Nothing about these elements or the claim as a whole is directed to anything more than applying the laws of nature and/or natural phenomenon discussed above and in my Invalidity and Reply Invalidity Reports as it relates to claim 22.  The same rationale applies to the New Asserted Claims.

20.     As I discuss in my previous reports, the claims at issue, including claim 1, further lack any inventive concept.  The remaining discussion of claim 22 in my Invalidity Report and Reply Invalidity Report applies to claim 1 and its dependent claims as well.  I incorporate my discussion herein.

21.     Further, dependent claims 2, 3, and 4 do nothing more than claim a particular range of "tuning" for the liners.  For the same reasons as claim 1, these claims are also directed towards a law of nature / natural phenomenon and lack inventive concept.

22.     Claims 5, 6, 12, 13, and 19-21 are of a similar scope of the dependent claims of claim 22, as I discuss above in Section III.  I incorporate my discussion of the corresponding dependent claims related to claim 22 herein with regards to these new asserted dependent claims.

**VII.     THE '911 PATENT FAILS TO INFORM AS TO THE SCOPE OF THE ASSERTED CLAIMS**

23.     As I stated in my Invalidity Report and Reply Invalidity Report, one of ordinary skill cannot determine, with reasonable certainty, the scope of the asserted claims of the '911 Patent.  The New Asserted Claims, as discussed, above, have specific tuning ranges for the liners.  For the same reasons as discussed in my Invalidity Report and Reply Invalidity Report as

8

it relates to independent claim 22 and the dependent claims, and further discussed below, it is my opinion that New Asserted Claims and the '911 patent specification fails to inform, with reasonable certainty, those skilled in the art of the scope of the alleged invention. Each of the concerns I identify in Section XII of my Invalidity Report and Section III of my Reply Invalidity Report apply to the New Asserted Claims.[2]

24.     Additionally, I note that claims 1, 2, 3, and 4 require liner to be tuned to a frequency in a range of the "bending mode natural frequency of the shaft assembly as installed in the driveline system."  As discussed in my Invalidity Report and Reply Invalidity Report, in-vehicle testing versus testing in a pin-pin condition on a test bench can result in vastly different test results for modal frequencies, liner frequencies, or damping values.  (Invalidity Report, Section XII, at ¶¶ 196-197, 210-211; Reply Invalidity Report, Section III.A.).  ████

████████████████████████████████████████ (Neapco Driveline ████ Capability (NEAPCO080563), at 568, 570, 574; Neapco Ram 2500 Competitive Benchmark Study (AAM0000718) (testing performed in-vehicle a dynamometer); AAM NVH Facilities and Capabilities (AAM0000626), at 628-32; AAM Propshaft Technology, October 17, 2014 (AAM0005073), at 5085-88; 2015 31xxN Technical Review (AAM0042821), at 42869-74.)  I further understand, however, from AAM's Supplemental Final Paragraph 7(c) Disclosures, pages 6 to 7, for the New Asserted Claims that AAM relies on Dr. Rahn's analysis of the B&K bench testing to support its infringement allegations for these new claims.  To the extent AAM contends that in-vehicle (as claimed) and bench testing (as done by Dr. Rahn) are the same, it is my opinion the claims are indefinite.  I incorporate my discussion in Section XII

---

[2] Additionally, each of the additional bases I discuss related to claim 1 applies to claim 22 as well.  I incorporate my discussion herein into my opinions regarding claim 22.

of my Invalidity Report and Section III.A of my Reply Invalidity Report herein as it relates to in-vehicle versus bench testing.

25.     As to the New Asserted Claims, each requires "controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member." While a frequency range for matching a bending mode frequency is given (*i.e.*, +- 20%, 15%, 10%, 5%), no such range or indication is given as to the second type of vibration to be dampened and how it would be considered to "match," such as a shell mode frequency as identified as infringing in AAM's Supplemental Final Paragraph 7(c) Disclosures, at 5. Similarly, while the New Asserted Claims require shell mode vibrations to be dampened by 2%, no such range or indication is given as to how much bending mode vibrations are to be dampened. As I discuss in paragraphs 193-195 of my Invalidity Report, the claims fail to inform with reasonable certainty whether those shell mode frequencies are "matched" or whether the bending mode vibrations are "dampened." I incorporate my analysis therein for the New Asserted Claims.

26.     Additionally, the choice of testing methodology related to liner frequencies could also mean the difference between whether a product infringes the New Asserted Claims (and the original asserted claims). I asked FEV to perform additional testing on the liners for the 2003 Econoline propshaft that was tested by Dr. Rahn and the original liners that FEV tested from an original 2003 part. I asked FEV to perform the liner testing using a clamped test fixture made out of the service shaft tested by Dr. Rahn and to measure the liner frequencies using Dr. Rahn's methodology of calculating liner frequencies as best as I can understand from Dr. Rahn's Infringement Report and Exhibit C and D, reflecting the testing done by B&K. Curiously, Dr. Rahn's Exhibit E to his Rebuttal Report indicates B&K performed liner testing for the 2003

10

Econoline propshaft, but he did not include any liner data obtained using his methodology. I have attached the FEV report that details the methodology they used as Exhibit C at pages 4 to 19. I incorporate the description of the testing included in Exhibit C herein in its entirety. I will refer to that testing as the "2003 Econoline Clamped Liner Testing."

27. As can be seen in a comparison of the 2003 Econoline Clamped Liner Testing and the original FEV 2003 Econoline Analysis of the original middle and rear liners using a free-free condition, testing methodology makes a large difference in the testing results—a difference that could dramatically effect whether a product infringes or not. For example, in the original 2003 Econoline liner testing, FEV used a free-free boundary condition using bungee cords. (App. Q, 2003 Econoline Analysis, at 18-20.) ████████████████████████████████

████████████████████. (Neapco Driveline ██████ Capability (NEAPCO080563), at 567 (liner fixture resting on foam supports); ████████████████████████████████ (NEAPCO001486), at 1494-95 (foam testing and bungee cord testing); GM K2xx Composite Liner – Design Study 2011 (AAM001054); Attenuation of Driveline Vibrations (AAM00001436), at 1440-41.) Industry publications also confirm that performing this free-free testing on liners is valid and common in the industry. (App. AV; H. Koruk, et al., *Modal analysis of thin cylindrical shells with cardboard liners and estimation of loss factors*, Mech. Syst. Signal Process (2013).) FEV performed a modal analysis to determine the type of mode shape for the liners at both ambient and elevated temperatures. (App. Q, 2003 Econoline Analysis at 386-87, 393-94.) Using this methodology, at ambient temperature for example, the middle liner had a rocking frequency of 673 Hz and bounce frequencies of 719.5 Hz and 843 Hz, along with several complex frequencies. (App. Q, 2003 Econoline Analysis at 379, 385.) The

11

rear liner had a bounce mode at 697 Hz and a bending mode at 967 Hz and 1027 Hz.  (*Id*. at 392.)

28.     In contrast, the 2003 Econoline Clamped Liner Testing shows the results of using a pin-pin condition test fixture for the 2003 Econoline original liners, the setup as described on pages 4 to 19.  (Ex. C; 2003 Econoline Clamped Liner Testing, at 4-23.)  Of note, the same original middle liner tested as having mode frequencies at 363Hz, 448Hz, 507Hz, 610Hz, 618Hz, 786Hz, 895Hz, and 897Hz, as examples, depending on whether the modal frequencies were calculated using a summation or subtraction formula, as characterized by Dr. Rahn as bending or shell modes (Rahn Opening Report, Ex. C, at 25-29).  (Ex. C; 2003 Econoline Clamped Liner Testing, at 21.)  The same original rear liner tested as having mode frequencies at 248Hz, 410Hz, 525Hz, 582Hz, 688Hz, 748Hz, 749Hz, 841Hz, and 894Hz.  (*Id*. at 23.)[3]

29.     As can be seen from the data, the use of both methods for testing liner conditions results in vastly different liner frequencies.  Without any clarity as to the appropriate method to use in testing liners, whether the above two or another (such as testing on foam, as Neapco also does, shown in the above cited documents), one skilled in the art would lack any guidance as to how to evaluate whether any liner meets the claim limitations.  I incorporate these data and opinions into my opinions regarding claim 22 as well.

30.     Further, as I discuss in my Initial Invalidity and Reply Invalidity Reports, the choice excitation source can play a key role in determining whether a product infringes, *i.e*.,

---

[3] Similar to the propshaft testing, Dr. Rahn states (Rahn Opening Report, ¶ 61) that summing sensor data accentuates in-phase movement to capture bending modes, and subtracting accentuates out-of-phase movement to capture shell modes.  The formula in the B&K report (*Id*. at Exhibit C) shows (left top + right top) + (left bottom + right bottom) for summation, and subtraction was (left top + right top) - (left bottom + right bottom).  Adding left and right accelerometers accentuates bounce modes (in-phase movement of the left and right sides) and diminishes rocking modes (where the phase of the right side is out-of-phase compared to the left side).

25725934.6

whether a liner frequency "matches" a particular bending mode frequency or "dampens" vibrations.  (Invalidity Report, Section XII, at ¶¶ 204-212; Reply Invalidity Report, Section III.A-H.)  The same rationale applies to the New Asserted Claims and I incorporate my previous reports discussions herein.  As I discussed therein, whether one uses a shaker or an impact hammer as an excitation source can play a key role in determining whether a product meets the claims or not.  Both are valid methodologies as noted and, in particular, ████████████████

██████████████████████████████████████████████████████████████████

████████████████   (*See* Neapco Propshaft Liner ██████████ (NEAPCO0000112), at 113-127; 3/2104 E-mail Roman to Wehner (NEAPCO000717-19); Neapco Driveline ██████ Capability (NEAPCO080563), at 567; ████████████████████████████████████████████

██████ (NEAPCO0001619), at 6.; An Introduction to Neapco (NEAPCO006661), at 6743-44; Durfy, Investigation of damping treatments for propeller shaft vibration, University of Windsor (2000) (NEAPCO007319), at 7358; App. AW; Avitable, *Is there any difference between a modal test with a shaker excitation or impact citation*, SEM Experimental Techniques (June 1998); AAM Propshaft Technology, October 17, 2014 (AAM005073), at 5088; 2015 31xxN Technical Review (AAM0042821), at 42875.)  The same rationale applies to the New Asserted Claims and I incorporate my previous reports discussions herein.

31.     As I also discuss in my Initial Invalidity and Reply Invalidity Reports, the choice measurement device can play a key role in determining whether a product infringes, *i.e*., whether a liner frequency "matches" a particular bending mode frequency or "dampens" vibrations. (Invalidity Report, Section XII, at ¶¶ 213-220; Reply Invalidity Report, Section III.A-H.).  The same rationale applies to the New Asserted Claims and I incorporate my previous reports discussions herein.  As I previously discussed, the wide discrepancy in the results from

13

measurement devices is highlighted by ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ There

is no industry standard for number, size, or placement of accelerometers in testing propshafts or

dampers.  (*See id.*; *see also* App. W; Attenuation of Driveline Vibrations (AAM00001436), at

1441 (depicting a single accelerometer); GM K2xx Composite Liner – Design Study 2011

(AAM001054), at 1055 (depicting two accelerometers).)  I also note that FEV and B&K used

different sizes, numbers, and placements of accelerometers for testing propshaft modal

frequencies and damping and for testing liner frequencies.  I incorporate those varying setups

and data herein.

32.     Furthermore, as it relates to the step of "positioning the at least one liner within

the shaft member such that the at least one liner is configured to damp shell mode vibrations in

the shaft member by an amount that is greater than or equal to about 2%," claim 1 of the '911

patent lacks certainty as to whether that is absolute 2% damping or a relative 2% damping.

Absolute damping is the amount of damping provided by the propshaft configuration, without

regards to whether the liner or damper provided any improvement.  Relative damping in the

additional damping provided by the liner or damper.  Both are valid ways to represent damping.

The difference is critical.  For example, a propshaft having a liner whereby shell mode vibrations

are dampened by 3% would meet the claims if an unlined propshaft dampened shell mode

14

vibrations by .8% (as even a propshaft without a damper will dampen vibrations to some extent), but not if the unlined propshaft damped those vibrations by 1.5%.  Neither the claims nor the specification give any guidance as to whether the 2% damping measurement is relative or absolute.  For that reason, one skilled in the art would be unable to ascertain the scope of the claims with reasonable certainty.

33.     Further, even assuming one skilled in the art were to choose an excitation source, type of measurement device, and testing conditions (such as bench v. in-vehicle or temperature), there are still other, valid testing methods that could determine whether the same propshaft meets the claims.  For example, depending on the chosen impact and sensor locations, the propshaft modal frequencies and damping can be reflected in a number of ways, including showing that a product meets the claims, or it does not.  There is no one way used in the industry to determine where to impact a propshaft, where to measure the response with the sensor, or how to analyze the data.  To demonstrate, I re-analyzed the original FEV testing data for the 2003 Econoline original propshaft.  I requested the FEV testing data to be reprocessed to replicate the method used by Dr. Rahn that included peak picking with opposing accelerometer addition and subtraction and calculation of the damping with the half power method.  Exhibit A contains the Siemens/LMS active chart data from the re-processing of the FEV Econoline test data.  The testing data is from the testing of the original 2003 Econoline propshaft (Shaft 1) on a test bench at ambient temperature—the conditions Dr. Rahn tested at.  Attached to this report as Exhibit B at pages 1-5 are summaries of the results of my analysis.[4]  The impact and sensor locations noted

---

[4] As a preliminary matter, Dr. Rahn's method of analysis eliminates the phase information from the data, and thus eliminates the ability to determine the real and imaginary portions of the data, coherence, or to calculate modal assurance criteria.  Without these calculations, Dr. Rahn's peak picking method is subject to erroneous peak selection.

in Exhibit B are also described in the original 2003 FEV 2003 Econoline Analysis.  (App. Q; 2003 Econoline Analysis, at 8 to 25.)

34.     As I note in Exhibit B, using Dr. Rahn's method, the 1st and 3rd bending modes are peaks that are highlighted when adding top and bottom transducer FRF data measured near the middle of the shaft.  2nd bending mode is a peak that is highlighted when adding transducer FRF data measured near the quarter length of the shaft.  1st and 3rd shell modes are peaks that are highlighted when subtracting transducer FRF data measured near the middle of the shaft, and 2nd shell mode is a peak that is highlighted when subtracting transducer FRF data measured near the quarter length of the shaft.[5]  It is unclear what point Dr. Rahn used as a reference or impact location for the FRFs (middle or quarter).  Slides 2 and 3 of Exhibit B are most similar to Dr. Rahn's method where the impacts occurred on the top next to the sensor at the mid-point and at a quarter position.  Slides 4 and 5 are impacts from the side of the shaft.  As I have previously discussed, one skilled in the art would not use Dr. Rahn's method, but assuming one skilled in the art were to perform this type of analysis, both impact locations are as valid as the other.

35.     As can be seen in Exhibit B, depending on which impact or sensor location used, the measured frequencies and damping can substantially vary, for both shell and bending modes. These variances can be the difference between whether a propshaft and liner meet the asserted claims or not.  For example, as can be seen on pages 3 and 5 of Exhibit B, two different sets of shell mode frequencies and damping amounts are depicted that represent data obtained from slightly different impact locations and sensor positions.  The same is shown on pages 2 and 4 for bending modes.  ██ ████████████████████████████████████

████████████████████████████████████ ██ ████████████████████████████

---

[5] This is based on the shaft acting like a uniform cylinder (which it is not due to the yoke ends, manufacturing deviations in cylinder thickness, and in some shafts swaging).

████████████████████████████████████████████████████████

████████████████████████████████████████████  Thus whether bending mode vibrations are dampened (or frequencies are matched) can change depending on a myriad of different methods to analyze and view the data from different impact and sensor locations.  I incorporate these data and opinions into my opinions regarding claim 22 as well.

36.     Moreover, additional accelerometer data can be used to show even more dramatic differences for the same propshaft.  As shown at page 6 of Exhibit B, I analyzed the FEV data for the roughly 1/6th position accelerometers, instead of the mid and quarter points discussed above and on pages 1 to 5.  The data is shown analyzing the frequencies and damping ratios of the propshaft with and without liners for two directions at the same point (Y and Z.)  Because FEV performed a much more comprehensive analysis in order to generate full modal data, many more data points are available to look at.  While Dr. Rahn chose the mid-point and quarter-point locations for accelerometers, there is no scientific reason to do so, nor is any particular location customary in the industry.  As can be seen from the data from the 1/6th position, damping values for shell modes varies ███████████████████████████████████████ Likewise, ██  ███████████████████████████████████  (Z direction).  The frequencies for the various modes also vary from the data obtained from the mid and quarter point accelerometers. I incorporate these data and opinions into my opinions regarding claim 22 as well.

37.     As can be seen below, taken from the data in Exhibit A, reproduced at page 7 in Exhibit B, the various modal frequencies and measured damping can vary depending on which impact location and sensor reading is used.  The following plot shows the summation of the mid-

point sensor data for both with and without liners and two different reference points and impact locations as tested on the bench:



38.     The following plot shows the subtracted mid-point sensor data for both with and without liners and two different reference points and impact locations as tested on the bench and processed similar to Dr. Rahn:



39.     These plots contain cursors for 3rd bending from the FEV full modal, with ████████████████████████████████ The data shows that there are no corresponding peaks in the summation data that are not displayed in the subtraction data for the

18

area of 3rd bending mode, and the peaks that are displayed have adjacent peaks from other modes that will affect 3rd bending and the damping calculation using peak picking.  As I noted in my previous reports, the 3rd bending is complex as it is near the 1st thru 3rd shell modes, and has different lateral and vertical frequencies.  The re-analyzed FEV peak picking data shows that when comparing the middle point data in the range of ████████████ (the full modal values), there are numerous peaks and it is unclear which is 3rd bending mode as the peaks occur in both the addition and the subtraction data, and only the full modal analysis (originally done by FEV) shows which peak moves similar to a mode shape description with confidence.  But as can be seen in Exhibit B, page 2, using Dr. Rahn's peak picking method the closest peak to the true 3rd bending determined from the FEV full modal analysis from the bench test ████ App. Q, 2003 Econoline Analysis) would be a negative peak at █████ and the only peak that increases in amplitude between quarter and middle sensors is █████   Thus peak picking does not always give accurate results and certainly can result in values that vary from values obtained using a full modal analysis.

40.    Thus as discussed above, and shown in Exhibits A and B, the amount of attenuation or damping and the frequencies for the propshaft without liners and propshaft with liners can vary dramatically just by the choice of impact and sensor locations.  I reserve the right to rely on the underlying data contained in Exhibit A, including any plots able to be generated to demonstrate the concepts discussed herein.

41.    Moreover, the re-analyzed results differ from the original full-modal data that FEV obtained using the full set of impact and sensor data—to an extent that could determine whether a product meets the claims or not.  As I discuss in my previous reports, the differences between the in-vehicle and test bench data are dramatic.  From the modal bench test data analysis

3rd vertical mode is ████ without the liners, and ████ with the liners and the damping change is negative (indicating no damping improvement).  But from the modal in-vehicle test data analysis 3rd vertical mode is ████ without the liners, and ████ with the liners and the damping change is a relative ████ increase.  Compare those values to the peak picking method shown in Exhibit B.  Using one set of impact and sensor data, the 3rd bending mode frequency is ████ without a liner, and ████ with a liner, with an increase in damping from ████ (Exhibit B, at 2.)  Using another set of data with a different impact location, the 3rd bending mode frequency is ████ without a liner and ████ with a liner, with an increase in damping from ████ (Exhibit B, at 4.)  Thus, the same bench test of the same propshaft can show a *decrease* in damping for 3rd bending mode (full modal) or an *increase* (using peak picking and either impact location).  Moreover, the same bending mode frequency varies by ████ Both can be the difference as to whether a product infringes or not.

## VIII.    THE '911 PATENT ASSERTED CLAIMS CANNOT BE PRACTICED WITHOUT UNDUE EXPERIMENTATION

42.    As I stated in my Invalidity Report and Reply Invalidity Report, one of ordinary skill in the art cannot make and use the claimed inventions without undue experimentation and therefore, in my opinion, the claims are invalid due to lack of enablement.  The New Asserted Claims, as discussed, above, have specific tuning ranges for the liners, or damping amounts for shell mode vibrations, which highlights the problems one skilled in the art would have in making and using the claimed invention without undue experimentation due to the many different ways to test to determine whether a product practices the claimed inventions.  For the same reasons as discussed in my Invalidity Report and Reply Invalidity Report regarding enablement and indefiniteness, it is my opinion that New Asserted Claims and the '911 patent specification fails

20

to enable one of ordinary skill in the art cannot make and use the claimed inventions without undue experimentation.

43.     My opinion is supported by the breadth of the claims, nature of the invention, state of the art, and knowledge of one skilled in the art as discussed above an in my previous reports, as well as the level of predictability, lack of direction provided by the inventors and working examples, and the extraordinary quantity of experimentation needed due to the myriad of different ways that one skilled in the art could model, test, and therefore "tune" the claimed liners as discussed above and in my Invalidity and Reply Invalidity Reports.  I incorporate my discussion above in Section VII and my discussion on indefiniteness in my Invalidity and Reply Invalidity Reports as the underlying factual inquires in my analyses of both sections are similar.

## IX.     THE '911 PATENT ASSERTED CLAIMS ARE INVALID BASED ON THE PRIOR ART

### A.     2003 Econoline Alone or in Combination with Other References

#### 1.     CLAIM 1 of '911 patent

| |
|---|
| [1P] A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component, the method comprising: |
| [1a] providing a hollow shaft member; |
| [1b] tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member; and |
| [1c] positioning the at least one liner within the shaft member such that the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%, |
| [1d] and the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. |

44.     The elements of claim 1 are disclosed and/or rendered obvious in light of 2003 Econoline by itself or in combination with the knowledge of one skilled in the art and/or one or more other prior art references identified in my analysis.

45.     I understand that neither party has argued the preamble is a limitation to claim 1. Regardless, the 2003 Econoline discloses a method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component.  (*See* discussion of the 2003 Econoline in my Invalidity Report, Section XIV.B and VIII.)

46.     As discussed in my Invalidity and Reply Invalidity Reports with regards to element 22[a] and 22[c], 2003 Econoline discloses providing a hollow shaft member and positioning the at least one liner within the shaft member as claimed in elements 1[a] and [c].  I incorporate my discussions from my previous reports for these element.

47.     The 2003 Econoline discloses elements 1[b], [c], and [d] for the reasons discussed in my Invalidity Report and Reply Invalidity Report with regards to element 22[b], [d], and [e], as I labeled them.  The 2003 Econoline discloses providing a liner that dampens shell and bending mode vibrations and that has liners that are configured to match the relevant shell and bending mode vibrations. Alternatively it would have been obvious to modify the 2003 Econoline in view of the knowledge of one skilled in the art or other prior art references.  I incorporate my discussion from my previous reports for these elements.

48.     Additionally, according to Dr. Rahn's own data on the 2003 Econoline propshaft modes, and the using his liner testing methodology, the liner frequencies "match" the bending mode frequencies and shell mode frequencies as claimed (*i.e.*, within 20%), and dampen those vibrations.  As discussed above, I asked FEV to perform additional testing on the liners for the 2003 Econoline new propshaft that was tested by Dr. Rahn.  I asked FEV to perform the liner testing using a clamped test fixture made out of the new shaft tested by Dr. Rahn and to measure

the liner frequencies using Dr. Rahn's methodology of calculating liner frequencies based on B&K's method described in Dr. Rahn's Infringement Report and Exhibits C and D.  Details can be found in the 2003 Econoline Clamped Liner Testing, Exhibit C, at pages 4 to 19.  The results of using a pin-pin condition test fixture for the 2003 Econoline, the setup as described on pages 4 to 19 at ambient temperature, show that the liners are configured to within +- 20% of the bending mode natural frequency of the propshaft as Dr. Rahn measured on a test bench.  (Ex. C; 2003 Econoline Clamped Liner Testing, at 25, 27.)

49.     The middle liner tested as having mode frequencies at 336Hz, 387Hz, 398Hz, 407Hz, 444Hz, 457Hz, 472Hz, 516Hz, 540Hz, 715Hz, and 836Hz, among others, depending on whether the modal frequencies were calculated using a summation or subtraction formulas (as noted by Dr. Rahn as bending or shell modes (Rahn Opening Report, Ex. C, at 25-29).  (Ex. C; 2003 Econoline Clamped Liner Testing, at 25.)  The rear liner was tested at 383Hz, 409Hz, 475Hz, 495Hz, 518Hz, 778Hz, and 780Hz, among others.  (*Id*. at 27.)

50.     Compare those to the propshaft modal frequencies that Dr. Rahn obtained using his bench testing methodology at ambient temperature in Exhibit E to his Rebuttal Report at pages 8 and 9 where he obtained, as examples, first, second, and third bending modes of 85.5 Hz, 311Hz, and 668Hz respectively on the same new propshaft without liners and 596Hz, 622Hz, and 685Hz for the first through third shell modes, which also provided some level of bending and shell mode damping.  Various combinations of liner frequencies and modal frequencies for shell and bending modes are within 20%, 15%, 10%, and/or 5% as required by claim 1 and dependent claims 2, 3, and 4.  For example, the middle liner has a frequency (336Hz) within roughly 8% of 2nd bending mode (311Hz) and a frequency (715Hz) within roughly 7% of 3rd bending mode (668Hz).  Similarly, the same middle liner has a (715Hz) within 20%, 15%, and

4.4% of 1st, 2nd, and 3rd shell modes, respectively.  The rear liner has similar results.  I reserve the right to rely on any combination of liner and modal frequencies from the new FEV liner testing and Dr. Rahn's propshaft testing for the 2003 Econoline for claims 1 and 22 and their dependent claims.  I incorporate these data and opinions into my opinions regarding claim 22 as well.  Dr. Rahn's data also shows that the addition of the liners for 2nd bending and each shell mode increased damping.

51.     Moreover, the new clamped testing of the original liners (using Dr. Rahn's methodology for liner testing) also confirms my opinion as it relates to the original 2003 Econoline propshaft tested by FEV.  Under any permeation of the methods of determining modes and damping for the 2003 Econoline original propshaft and its liners, the original 2003 Econoline propshaft also meets the claims.  I incorporate the 2003 Econoline propshaft modal frequencies and damping identified in my Invalidity Report from the FEV testing here, including the frequencies and damping identified in Appendix Q and Exhibit E to my Invalidity Report and Exhibit D to my Reply Invalidity Report.  I reserve the right to rely on any combination of liner and modal frequencies from the original 2003 Econoline propshaft and liner testing for claims 1 and 22 and their dependent claims.  I further incorporate this data into my opinions regarding claim 22 as well.  Below is a chart (from Exhibit B, at 12) showing the various propshaft modal frequencies for the various peak picking analyses done on the original FEV testing data (Exhibit B at 1-5), discussed above, and the full modal in-vehicle and full modal bench testing performed by FEV using an impact hammer at ambient (*See* Exhibit D to my Invalidity Report):

| Matching Frequencies | | Clamped Middle | Clamped Rear | Free-Free Middle | Free-Free Rear |
|---|---|---|---|---|---|
| | Hz | 610 | 688 | 673 | 697 |
| **FEV Peak Pick w/o liners** | | | | | |
| 1st Shell | 611 | 0.16% | -12.60% | -10.15% | -14.08% |
| 2nd Shell | 634.5 | 3.86% | -8.43% | -6.07% | -9.85% |
| 3rd shell | 699 | 12.73% | 1.57% | 3.72% | 0.29% |
| 3rd bending | 615.5 | 0.89% | -11.78% | -9.34% | -13.24% |
| **FEV Peak Pick w/o liners (different impact location)** | | | | | |
| 1st Shell | 610.5 | 0.08% | -12.69% | -10.24% | -14.17% |
| 2nd Shell | 634.5 | 3.86% | -8.43% | -6.07% | -9.85% |
| 3rd shell | 699 | 12.73% | 1.57% | 3.72% | 0.29% |
| 3rd bending | 638 | 4.39% | -7.84% | -5.49% | -9.25% |
| **FEV full modal bench test** | | | | | |
| 1st Shell | 611.5 | 0.25% | -12.51% | -10.06% | -13.98% |
| 2nd Shell | 633.5 | 3.71% | -8.60% | -6.24% | -10.02% |
| 3rd shell | 698 | 12.61% | 1.43% | 3.58% | 0.14% |
| 3rd bending | 635.5 | 4.01% | -8.26% | -5.90% | -9.68% |
| **FEV full modal in-vehicle test** | | | | | |
| 1st Shell | 610.5 | 0.08% | -12.69% | -10.24% | -14.17% |
| 2nd Shell | 633.5 | 3.71% | -8.60% | -6.24% | -10.02% |
| 3rd shell | 697 | 12.48% | 1.29% | 3.44% | 0.00% |
| 3rd bending | 669 | 8.82% | -2.84% | -0.60% | -4.19% |

52.     As I discuss in my previous Invalidity Reports, the original liners for the 2003 Econoline dampened shell and bending mode vibrations using full modal analyses (*see e.g.*, Reply Invalidity Report, at ¶¶ 48, 71-76.)  The peak picking method discussed in Exhibit B also shows certain shell and bending mode vibrations are attenuated using similar impact and sensor locations as Dr. Rahn used.  (Ex. B, at 1-5.)  I incorporate these data and opinions into my opinions regarding claim 22 as well.

53.     The 2003 Econoline also meets the step of "positioning the at least one liner within the shaft member such that the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%."  As

25725934.6

discussed above in Section VII and shown on page 6 of Exhibit B, the original liners of the 2003 Econoline propshaft dampen shell mode vibrations by 6.11% and 28.05% when analyzed using the $1/6^{th}$ position accelerometers as tested on a test bench at ambient temperature, depending on which direction analyzed.

54.     Alternatively, to the extent AAM contends that a particular impact or sensor location is always required to evaluate shell mode vibrations, which I disagree with, the step of "positioning the at least one liner within the shaft member such that the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" would have been obvious to modify the 2003 Econoline in view of the knowledge of one skilled in the art or other prior art references.  Configuring or positioning a liner or damper device to attenuate or dampen vibrations by a particular amount is nothing more than the application of basic engineering principles and subjective interpretation by the test engineer to determine which location dampens vibrations the most.  As discussed in my previous reports, even non-tuned liners provide some level of damping or vibration attenuation in a propshaft.  One of the inventors, Dr. Sun, testified that even "older style" "rolled paper liners" can dampen shell mode vibrations by 2%.  (App. S; Sun Tr. at 123:8-124:1 (citing App. Z).) One skilled in the art would understand that they would have had a reasonable expectation of success in obtaining a damping amount of just 2% by simply configuring the characteristics of the 2003 Econoline liner, such as the mass or stiffness of the liner or the placement in the propshaft at an anti-node or other suitable location.[6]  As I discuss in my Invalidity Report and

---

[6] As I discuss above, it is unclear from the patent specification as to whether the 2% should be measured as an absolute damping percentage or a relative percentage to the propshaft without the liner.  For purposes of my opinions regarding the prior art, it does not matter as it would have been obvious to modify any liner to attenuate vibrations by any subjectively chosen amount, and a 2% goal is not a large target for relative percentage damping.

Reply Report with regards to claim 22 and the combination of the teachings of the 2003 Econoline with the knowledge of one skilled in the art and/or with the teachings of the prior art references, such as Czep or Gasson, one skilled in the art would have a reason and ability to use basic physics to modify the properties of any liner to obtain any desired frequency or damping amount and would have had a reasonable expectation of success.  I incorporate my discussions regarding the combination of the teachings of the 2003 Econoline with the knowledge of one skilled in the art, admissions of the inventors, and/or with the teachings of the prior art references, such as Czep or Gasson, herein.

### 2.      Claims 2, 3, and 4 of the '911 patent

| [2] The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. |
| [3] The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. |
| [4] The method of claim 3, wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system. |

55.      The elements of claims 2, 3, and 4 are disclosed or rendered obvious in light of 2003 Econoline by itself or in combination with the knowledge of one skilled in the art and/or one or more other prior art references identified in my analysis.  For the same reasons discussed above regarding claim 1 and discussed in my Invalidity Report and Reply Invalidity Report regarding claim elements 22[b],[c], and [d], the 2003 Econoline discloses the at least one liner is tuned within ±15, 10, and 5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system or it would have been obvious to tune the liners to the desired frequency or frequencies, including within 5% of a modal frequency.  Indeed, as I discuss in my Invalidity Report as it relates to claim 22, it is the goal for tuning any damper to tune it as close as possible to the target frequency, including bending mode frequencies.  I incorporate my discussion of those claims and elements herein.

### 3.     Claims 5, 6, 12, 13, 19-21 of the '911 patent

| |
|---|
| [5] The method of claim 3, wherein the shell mode is at least one of a first shell mode, a second shell mode and a third shell mode. |
| [6] The method of claim 5, wherein the bending mode is at least one of a first bending mode, a second bending mode and a third bending mode. |
| [12] The method of claim 3, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member. |
| [13] The method of claim 12, wherein the at least one resilient member extends helically about and along the structural portion. |
| [19] The method of claim 12, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof. |
| [20] The method of claim 3, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node. |
| [21] The method of claim 20, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node. |

56.     The new asserted dependent claims have the same scope as dependent claims to claim 22 discussed in my Invalidity Report.  Dependent claims 5 and 6 are similar to dependent claims 23 and 24 discussed in my Invalidity Report.  Dependent claim 12 is similar to dependent claim 26 discussed in my Invalidity Report.  Dependent claim 13 is similar to dependent claim 27 discussed in my Invalidity Report. Dependent claim 19 is similar to dependent claim 31 discussed in my Invalidity Report.  Dependent claim 20 is similar to dependent claim 34 discussed in my Invalidity Report.  Dependent claim 21 is similar to dependent claim 35 discussed in my Invalidity Report.  I incorporate my discussion of those claims in my Invalidity Report and Reply Invalidity Report herein as it pertains the new asserted dependent claims.  For the same reasons that the 2003 Econoline discloses or renders those elements obvious, these new asserted claims are disclosed and/or obvious to one skilled in the art.

# NEAPCO'S
# MOTION *IN LIMINE* NO. 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| | ) | C. A. No.:  15-1168-GBW |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **HIGHLY CONFIDENTIAL** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION *IN LIMINE* NO. 3: TO
PRECLUDE ARGUMENT OR EVIDENCE THAT THE ASSERTED CLAIMS
<u>COVER A PRODUCT REGARDLESS OF THE METHOD BY WHICH IT IS MADE</u>**

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated:  November 20, 2023

Neapco moves *in limine* pursuant to Fed. Rule Evid. 401, 402, and 403 to preclude Plaintiff from offering evidence or argument that the Accused Products can infringe the Asserted Claims regardless of the method by which the product is made.

The only remaining asserted claims recite a "method of manufacturing a shaft assembly of a driveline system."  The required method steps of claim 1 include, for example, the step of "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." (D.I. 1, Ex. A ('911 Patent), Claim 1.)  The Court construed this limitation to require the step of "controlling characteristics" of a liner to "match a relevant frequency or frequencies to reduce at least two types of vibration" of the shaft.  D.I. 113 at 9.  To save its claims from invalidity, Plaintiff argued that this step requires Neapco to satisfy these elements: (i) "identify relevant propshaft shell mode frequency;" (ii) "liner match shell mode frequency; (iii) "liner damp shell mode vibration;" (iv) "identify relevant propshaft bending mode frequency;" (v) "liner match bending mode frequency;" (vi) "liner damp bending mode vibration;" and (vii) "liner tuned to one or more frequencies."  *See, e.g.*, Ex. A, Principal Brief of Plaintiff-Appellant at 39-42, *American Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285 (Fed. Cir. 2020) (No. 18-1763).

Indeed, the '911 patent admits that there is nothing new about the "construct[ion]" of the claimed liner; rather "the liner . . . can be constructed in a manner" as "described in U.S. Pat. No. 4,909,361," a prior art patent assigned to a vendor that has made liners for both Plaintiff and Neapco for many years.  (D.I. 1, Ex. A ('911 Patent), 6:49-53.)  The patent is thus directed to "an improved **method** for damping various types of vibrations in a hollow shaft."  (*Id.* 2:39-41.)

Despite the fact that the '911 patent's only alleged improvement is the "method" recited in the claims, Plaintiff has at all times throughout this case argued that the patent covers an apparatus made by any method (even by accident).  During claim construction, Plaintiff stated:

> [Plaintiff's Attorney] Mr. Nuttall: If you make a liner that **achieves these results** that's within 20 percent of a bending mode frequency and damp shell mode by 2 percent, then that is an infringing product.
>
> The Court: Even if you didn't try to and didn't know you did it.
>
> Mr. Nuttall: **Exactly**, Your Honor.

(D.I. 96, CC Hearing Tr. 58:19-25 (emphasis added).)

Plaintiff's expert conducted his infringement analysis under this flawed theory.  He tested finished Neapco products, determined whether or not they reduced vibrations, and concluded that if they did, they infringed.  *See, e.g.*, Ex. B, Rahn Suppl. Infringement Rep. ¶¶ 45-48, 50-54, 57-58, 62-63, 67-68, 80-82, 85-88, 92-93, 97-98, 102-103, 117-119, 121-124, 128-129, 143-145, 147-150, 153-155, 158-160, 172-174, 176-179, 183-184, 188-189, 201-203, 205-208, 212-213.[1] Plaintiff's expert largely equated the "tuning" method step with the claim limitations that recite certain of the desired results of performing the method (*E.g.*, *id.* ¶ 41 (relying on analysis for "limitation 1[e] and 1[f]", the desired results, as alleged proof of the "tuning" method step); *see also* Ex. C, Dep. of Dr. Rahn (July 25, 2017), 57:4-16, 20-23, 58:2-7.)  Plaintiff's expert did not, however, base his infringement opinions on evidence of the method by which those products were made, and specifically whether and how they were "tun[ed]" as required by claim 1.

Arguing that a method claim infringes by reference solely to the characteristics of a finished product is legal error.  "A method patent . . . is not infringed unless all the steps are carried out."  *Limelight Networks, Inc. v. Akamai Techs., Inc.*, 572 U.S. 915, 921 (2014); *see also, e.g.*, *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328, (Fed. Cir. 2008).  It follows from this that "[a] patent granted on a product claim describing one process grants no monopoly as to

---

[1] Neapco does not contest that Dr. Rahn is entitled to rely on the test results themselves.  This motion is limited to precluding Dr. Rahn from testifying that the test results prove that Neapco has practiced the Asserted Claims.

identical products manufactured by a different process." *Paeco, Inc. v. Applied Moldings, Inc.*, 562 F.2d 870, 876 (3d Cir. 1977); *Roberts Dairy Co. v. U.S.*, 530 F.2d 1342, 1354 (1976) (finding that, "for plaintiffs to prevail on their charge of infringement . . . , it is necessary for plaintiffs to prove that the [] product . . . was produced by a process that included preheating of the ingredients to 135 F"). Where, as here, "a patentee" "does not distinguish his product from what is old except by reference . . . to the process by which he produced it," that patentee "cannot secure a monopoly on the product by whatever means produced." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1293 (Fed. Cir. 2009).

Plaintiff thus should be precluded from transforming its method claim into an apparatus claim by offering evidence or argument that a product may infringe the asserted claims regardless of the process by which it was made. Indeed, even the remotest suggestion—let alone blatant argument and evidence—that infringement may be found without regard to the method by which a product is made would badly confuse and mislead a jury. Nor is there any probative value in such argument or evidence as it is based on an erroneous view of black letter law governing infringement of a method claim.

To that end, Plaintiff's expert, Dr. Rahn, should be precluded from testifying to the jury that the results of his testing are evidence that Neapco practiced a particular method. And where Dr. Rahn offers opinions on infringement based on the same flawed reasoning, he should be precluded from offering an opinion of infringement. *See, e.g.*, *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1378 (Fed. Cir. 2017) ("[W]e must disregard the testimony of an expert that is . . . based on an incorrect understanding of the claim[s].") (internal quotations omitted); *VLSI Tech. LLC v. Intel Corp.*, C.A. No. 18-966, 2022 WL 2304112, at *3 (D. Del. June 27, 2022) ("I take it as a given that an expert's opinions that are incorrect as a matter of law are inadmissible as irrelevant under Rules 402 and 403 and unreliable under Rule 702.").

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated:  November 20, 2023

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

30991609.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-GBW |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

**AMERICAN AXLE'S OPPOSITION TO NEAPCO'S MOTION *IN LIMINE* NO. 3**

---

The Court denied Neapco's motion for summary judgment of non-infringement, finding that "there exist genuine disputes of material fact regarding whether Neapco 'controlled characteristics' to match a relevant shell or bending mode frequencies for the accused propshafts." D.I. 304 at 22.  Neapco repeats its same, rejected argument, this time relying on snippets from Section 101 appellate briefs and transcripts of attorney oral arguments, not Dr. Rahn's opinions, veiling a belated request for reconsideration and *Daubert* challenge as its third motion *in limine*. Neapco argues that AAM's "expert did not . . . base his infringement opinions on evidence of the method by which those products were made."  Opening Br. at 2.  That is not true, and the Court should flatly reject Neapco's strawman argument—yet again.

The asserted claims of the '911 patent are method claims, specifically "method[s] for manufacturing" automobile propshafts.  D.I. 1-1 at Claim 1.  The methods recite several steps, including "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member," which the Court construed to mean "controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member."  D.I. 114 at 1.  AAM and its technical expert, Dr. Chris Rahn, will prove that Neapco carries out each and every step, including the "tuning" step as construed by the Court.  Neapco never challenged Dr. Rahn's infringement opinions, under Rule 702 or otherwise, and the Court should reject Neapco's collateral attempt to do so now.

The Court should deny Neapco's motion for three additional reasons:

First, it is simply not true that AAM "has at all times throughout this case argued that the patent covers an apparatus made by any method," or that Dr. Rahn "did not . . . base his infringement opinions on evidence of the method by which those products were made."  Opening Br. at 1, 2.  Neapco cites Dr. Rahn's First Supplemental Report (*id*. at 2), but conveniently omits

1

his opinions about manufacturing steps taken by Neapco.  *See, e.g.*, Ex. D, Rahn Opening ¶¶ 377–1040; Ex. E, Rahn First Supplemental ¶¶ 32–214.  Dr. Rahn explains, for example, how Neapco "controls the characteristics of the [accused] liners" by controlling their material properties and dimensions, e.g., by selecting the material (e.g., ████████████████████████████ ████████████████████████████ and their size and shape (e.g., "outer diameter 'A' of ████ inch, inner diameter 'B' of ████ inch, and length 'C' of ████ inch").  Ex. D, Rahn Opening ¶¶ 389–390; *id.* ¶¶ 386–393, 494–501, 603–610, 712–720, 826–834, 938–945; Ex. E, Rahn First Supplemental ¶¶ 38–43, 73–78, 110–115, 136–141, 165–170, 194–199.  The steps Neapco takes, according to Dr. Rahn, "configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration."  Ex. E, Rahn First Supplemental ¶ 41; *id.* ¶¶ 76, 113, 139, 168, 197.  Dr. Rahn faithfully applies the Court's claim constructions, and his opinions will provide sufficient evidence for a reasonable jury to conclude that Neapco infringes the '911 patent.

Second, Neapco takes issue with Dr. Rahn's testing of the accused products, but its position is ambiguous, if not entirely inconsistent.  On the one hand, Neapco agrees that "Dr. Rahn is entitled to rely on the test results," but, on the other hand, Neapco seeks to exclude his opinions based on those test results.  Opening Br. at 2 n.1.  Neapco cannot credibly dispute that Dr. Rahn's testing of the accused products is relevant.  The asserted claims recite certain results of finished propshafts, such as 2% damping of shell mode propshaft vibration, so Dr. Rahn tested the finished propshafts after they were manufactured and confirmed that Neapco's manufacturing process achieves those results.  D.I. 1-1 at Claim 1.  It does not follow, though, that Dr. Rahn reached his opinions "by reference solely to the characteristics of a finished product" or that AAM is

"transforming its method claim into an apparatus claim." Opening Br. at 2, 3. Quite the opposite—Dr. Rahn provides great detail about the manufacturing steps taken by Neapco to tune liners to achieve the claimed results.

Third, to the extent that Neapco is arguing that test results of the accused propshafts cannot serve as evidence of the steps it took to achieve those results, such an argument also misses the mark. Here, Neapco denies that its engineers took steps to tune liners to both a bending mode and shell mode propshaft frequency when designing the accused propshafts in 2014. But there is ample evidence that Neapco's engineers were "trying to achieve" the inventions of the '911 patent (i.e., liners tuned to both a bending mode and shell mode propshaft frequency), and AAM's test results prove that the accused propshafts that Neapco manufactured do in fact, "achieve" those inventions (i.e., they have liners tuned to both a bending mode and shell mode propshaft frequency). In this case, the results achieved by Neapco's manufacturing process are at least circumstantial evidence of the manufacturing process itself, i.e., the steps its engineers took to tune liners to both a bending mode and shell mode propshaft frequency. "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Moleculon Rsch. Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) (affirming infringement of method claims based on circumstantial evidence, including extensive sales of product used to practice methods); *Synvasive Corp. v. Stryker Corp.*, 478 F. Supp. 2d 1193, 1199, 1205 (E.D. Cal. 2007) (test results of medical device showing that "a linear kerf is formed" by use of device provided circumstantial evidence of infringement of method claims, including step for achieving the desired result of "forming a somewhat linear kerf").

Neapco will have a fair opportunity to convince a jury that it does not infringe, but its arguments go to weight, not admissibility, of AAM's evidence. The Court should deny its motion.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | C. A. No.: 15-1168-GBW |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) ) | |
| Defendants. | ) | |

## <u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION *IN LIMINE* NO. 3</u>

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI 48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL 60606-1734
(312) 701-9300

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

Dated: December 11, 2023

Plaintiff now agrees it must prove infringement of method claims and that it cannot do so solely by reference to the characteristics of the finished product.  Neapco's motion is agreed on that point, and enforceable by the Court.

The parties disagree on whether Plaintiff's expert, Dr. Rahn, has evidence that would satisfy each method step of the asserted claims.  The Court need not decide that issue here.  What is necessary is a ruling that Dr. Rahn cannot testify or otherwise suggest that the characteristics of a propshaft and liner are proof of the method by which those liners were made.  Such testimony would improperly inject legal error into the trial and taint the jury.

Yet that is exactly what Plaintiff seeks.  Plaintiff says Dr. Rahn will testify that "test results of the accused propshafts" are "evidence of the steps [Neapco] took to achieve those results."  Opp. at 3.  That is wrong for at least two reasons.  First, such testimony improperly transforms (and expands) the asserted method claim into a "monopoly on the product by whatever means produced." *Gen. Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 374 (1938).  Second, this is not proper as "circumstantial" evidence because there is nothing showing that the measured properties of the finished product were **necessarily** the result of practicing the claimed method steps. *Rembrandt Vision Techs., L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1382-83 (Fed. Cir. 2013) (affirming exclusion of "circumstantial evidence"); *E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1222-23 (Fed. Cir. 2007) (patentee's circumstantial evidence "require[d] too speculative a leap").  Plaintiff's counsel could not rule out (in response to the Court's question) that one could "make a liner that achieves these results" even if you didn't try to and didn't know you did it."  D.I. 96 at 58:16-25.

Accordingly, the Court should prohibit Plaintiff and Dr. Rahn from stating or implying that test results can show the method used to make the accused propshafts and liners.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Melanie K. Sharp*

_____

Melanie K. Sharp (No. 2501)
James L. Higgins (No. 5021)
Taylor E. Hallowell (No. 6815)
1000 North King Street
Wilmington, DE  19801
(302) 571-6600
msharp@ycst.com
jhiggins@ycst.com
thallowell@ycst.com

HONIGMAN LLP
J. Michael Huget
Sarah E. Waidelich
315 East Eisenhower Parkway
Suite 100
Ann Arbor, MI  48108-3330
(734) 418-4200

Dennis J. Abdelnour
Jenna E. Saunders
155 North Wacker Drive
Suite 3100
Chicago, IL  60606-1734
(312) 701-9300

Dated:  December 11, 2023

*Attorneys for Neapco Holdings LLC and Neapco Drivelines LLC*

31044984.1

# EXHIBIT A EXCERPTED

No. 18-1763

# United States Court of Appeals for the Federal Circuit

AMERICAN AXLE & MANUFACTURING, INC.,

*Plaintiff-Appellant*,

*v.*

NEAPCO HOLDINGS LLC AND NEAPCO DRIVELINES LLC,

*Defendants-Appellees.*

Appeal from the United States District Court for the District of Delaware in C.A. No. 15-cv-1168, United States District Court Judge Leonard P. Stark

## PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT

James R. Nuttall
    (Lead Counsel)
jnuttall@steptoe.com
John L. Abramic
Katherine H. Johnson
Robert F. Kappers
STEPTOE & JOHNSON LLP
115 S. LaSalle Street, Suite 3100
Chicago, IL 60603
Telephone: (312) 577-1300
Facsimile: (312) 577-1370

*Counsel for Plaintiff-Appellant,*
*American Axle & Manufacturing, Inc.*

June 29, 2018

reverse or, at a minimum, vacate the district court's order as improper under Rule 56(f).

**b.      The District Court's Conclusion That The Claims Are Directed To Hooke's Law Is Erroneous**

**i.      Hooke's Law Is Far Removed From the Claims And Is Irrelevant To Critical Elements of the Claims**

Hooke's law relates to determining the frequency of a simple mass-spring system and, as shown below, is far removed from even determining the frequency of a liner.



Even if Hooke's law could determine a single liner frequency, the claims include many other elements.  *See, e.g.*, Appx34-35; Appx1046-1047 (claim 22

39

requiring "matching," "attenuating shell mode vibrations" and "attenuating bending mode vibrations"; claim 1 requiring "liner . . . configure[d] . . . to match," "damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" and "configured to damp bending mode vibrations").  This is shown in the demonstrative below.



Hooke's law simply has nothing to do with matching frequencies between multiple different objects (e.g., between a liner and a propshaft), how a liner

attenuates different types of vibration (e.g., reactive and resistive attenuation), or damping vibration.

The district court's determination that "[t]here is no dispute that adjusting the mass and stiffness of the liner will change the amount of damping of a certain frequency" is unsupported and demonstrably incorrect. Appx11.[2] Neapco's testing of the Econoline propshaft showed that liners having a frequency that allegedly "matched" a relevant propshaft bending mode frequency *amplified* vibration at that frequency, rather than dampen it. Appx1890-1891; *compare* Appx3096 *and* Appx3088 (addition of liners caused damping at second and third bending modes to decrease (from 0.88% to 0.76% and 1.25% to 1.00%, respectively), which means the liners increased vibration); Appx5217-5218; Appx1887-1888; Appx3417; Appx2822-2823, Appx2828; Appx1659; Appx6223-

---

[2] The evidence cited by the district court was taken out of context and contradicts its conclusion. Appx11. Specifically, the '911 patent inventor, Dr. Sun, explained that tuning a liner involves "adjusting the controlling variables . . . to get the tuning that is needed." Appx1757. Similarly, American Axle's executive director explained that a liner is tuned "by selection of its physical properties." Appx2547. American Axle's expert, Dr. Rahn, explained that "friction damping is a property of physics experienced by any two surfaces in contact," but nowhere did he suggest that friction damping results from an application of Hooke's law as erroneously concluded by the district court. Appx1930-1931. To the contrary, Dr. Rahn explained that friction damping is unrelated to "tuning a mass and stiffness of at least one liner" and "a liner having characteristics configured to match a relevant frequency." Appx1930.

6224; Appx3051, Appx3060; *supra* Statement of Facts V.A.  Thus, even assuming that Hooke's law was used to determine the liner frequency and that it matched a propshaft bending mode, the liner does not necessarily damp the bending mode vibration.

In addition, the specification of the '911 patent describes several "characteristics of the liner 204 [that] can be controlled to tune its damping properties." *Id*.  One liner characteristic that can be controlled—"location of the liners 204 within the shaft member 200"—is independent of its structure, e.g., its mass and stiffness.  Thus, even assuming *arguendo* that Hooke's law could determine the frequency of a liner, the damping properties of a liner also depend on other unrelated characteristics.

Because Hooke's law fails to explain matching, damping, and attenuation as required by the asserted claims, the district court's conclusion that the claims are "directed to" an "application[] of Hooke's law with the result of friction damping" was erroneous and should be reversed.  Appx11.

### ii. Neapco's Argument That Hooke's Law Applies Is Incorrect And Contrary To The Record

Neapco's patent eligibility argument is also based on the incorrect assumption that liners are simply single degree of freedom systems and that a single liner frequency can be calculated using Hooke's law.  The district court

42

# EXHIBIT B
# EXCERPTED
# HIGHLY
# CONFIDENTIAL

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

### FIRST SUPPLEMENTAL EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.

By: _____

October 17, 2017

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 3

II.  CREDENTIALS AND QUALIFICATIONS ....................................................... 4

III.  MATERIALS CONSIDERED ............................................................................. 5

IV.  PATENT LAW STANDARDS ............................................................................ 5

V.  SUMMARY OF MY INFRINGEMENT OPINIONS ......................................... 5

VI.  TECHNOLOGY BACKGROUND AND STATE OF THE ART ...................... 6

VII.  THE '911 PATENT ............................................................................................. 6

    A.  The New Asserted Claims ........................................................................ 7

    B.  Claim Construction of the New Asserted Claims .................................... 9

        1.  The Agreed Claim Constructions .............................................. 10

        2.  The Court's Claim Constructions .............................................. 10

VIII.  BACKGROUND AND SUMMARY OF THE ACCUSED PRODUCTS ...................... 11

IX.  THE ACCUSED PRODUCTS INFRINGE THE '911 PATENT ...................... 11

    A.  The Neapco 4.5 inch Accused Products Infringe the '911 patent ........................ 11

        1.  GM part nos. 84148488, 23214716, and 84059642 (4.5" x 0.085" x 1891 mm) ............................................................................. 11

            a.  Claim 1 ......................................................................... 13

            b.  Claim 2 ......................................................................... 19

            c.  Claim 3 ......................................................................... 19

            d.  Claim 4 ......................................................................... 20

        2.  GM part nos. 84059645 and 23464082 (4.5" x 0.085" x 1799 mm) ........ 21

            a.  Claim 1 ......................................................................... 22

            b.  Claim 2 ......................................................................... 28

            c.  Claim 3 ......................................................................... 29

            d.  Claim 4 ......................................................................... 30

B. The Neapco 5.0 inch Accused Products Infringe the '911 patent ......................... 31

    1. GM part nos. 84059646 and 94769073 (5.0" x 0.080" x 1956 mm) ........ 31

        a. Claim 1 ...................................................................... 32

        b. Claim 2 ...................................................................... 38

C. The Neapco 5.775 inch Accused Products Infringe the '911 patent .................... 39

    1. GM part nos. 84059643 and 23225169 (5.775" x 0.079" x 2222 mm) ................................................................ 40

        a. Claim 1 ...................................................................... 41

        b. Claim 2 ...................................................................... 47

        c. Claim 3 ...................................................................... 48

    2. GM part nos. 84148489, 84059644, and 23253781 (5.775" x 0.079" x 2200 mm) ................................................ 49

        a. Claim 1 ...................................................................... 50

        b. Claim 2 ...................................................................... 56

        c. Claim 3 ...................................................................... 57

    3. GM part no. 23377650 (5.775" x 0.079" x 2172 mm) ............................ 59

        a. Claim 1 ...................................................................... 59

        b. Claim 2 ...................................................................... 65

X. CONCLUSION ................................................................................ 66

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

### a. Claim 1

#### (1) 1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

38.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 488, 716, and 642 Accused Products. (*See* '911 patent at claim 1[c].)

39.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

40.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 386-93, 478-79; July 21 Report ¶¶ 125-29.)



41.    In those reports, As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



42.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████ To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████ I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

43.     Neapco therefore satisfies the 1[c] limitation for the 488, 716, and 642 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

> **(2)     1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

44.     Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 1[e].)

45.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how

Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 398-413, 478-79; July 21 Report ¶¶ 130-137.)

46.      In those reports, I described how the NPFT2G-4978-BA liners █████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

47.      I further note that that the ████████████████████████████████
(Ex. C) ███████████████████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

████████████████████ (*See* Ex. D.)  The propshaft of the 488 Accused Product

with its NPFT2G-4978-BA liners has a ████████████████████████

████████████████████████████████████████████ (Exs. C

& D.)

48.    Neapco therefore satisfies the 1[e] limitation for the 488, 716, and 642 Accused

Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft

member such that "the at least one liner is configured to damp shell mode vibrations in the shaft

member by an amount that is greater than or equal to about 2%."  ('911 patent, claim 1[e].)

> **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

49.    Neapco positions at least one liner within the shaft member such that "the at least

one liner is also configured to damp bending mode vibrations in the shaft member, the at least

one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft

assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused

Products.  (*See* '911 patent at claim 1[f].)

50.    I incorporate herein by reference my analysis of Original Asserted Claim

limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how

Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 414-31, 478-79; July 21 Report ¶¶ 138-43.)

51.    In those reports, I described how the NPFT2G-4978-BA liners ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

16

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

█████████████████████████████ The FRF of the sum of all four accelerometers (Ex. C) shows that the █████████████████████████████████████████

█████████████████████████████ In those reports, I also described how the NPFT2G-4978-BA liners are █████████████████████████

█████████ For example, the FRF data for the 488 Accused Product (reproduced below)

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████



52.  *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because the NPFT2G-4978-BA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

53.     Neapco therefore satisfies the 1[f] limitation for the 488, 716, and 642 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

54.     Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

**b.      Claim 2**

**(1)      "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

55.      As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

56.      Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 2.)

57.      As I described above in reference to limitation 1[f], ███████████████ ███████████████████████████████████████████████ ███████████████████████████████████████  (*See* Ex. D.)

58.      Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

59.      Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

**c.      Claim 3**

**(1)      "The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

60.    As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

61.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 3.)

62.    As I described above in reference to limitation 1[f] and 2, the ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

(*See* Ex. D.)

63.    Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 3.)

64.    Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

        **d.**    **Claim 4**

        **(1)**    **"The method of claim 3, wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

65.    As I described above in reference to claim 3, Neapco satisfies each and every limitation of claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

66.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 4.)

67.     As I described above in reference to limitation 1[f], 2, and 3, the ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*See* Ex. D.)

68.     Neapco therefore satisfies the additional limitation of claim 4, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 4.)

69.     Neapco satisfies each and every limitation of, and therefore infringes, claim 4 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

**2.     GM part nos. 84059645 and 23464082 (4.5" x 0.085" x 1799 mm)**

70.     As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 645 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 645 Accused Product modal analysis testing of the 082 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 645 Accused Product.  Therefore, where applicable, rely on the results of B&K's modal analysis testing of the 645 Accused Product for both the 645 Accused Product and 082 Accused Product.

71.     As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

78.    Neapco therefore satisfies the 1[c] limitation for the 645 and 082 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> (2)    **1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

79.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 1[e].)

80.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 506-21, 585-87; July 21 Report ¶¶ 159-66.)

81.    In those reports, I described how the NPFT2G-4978-BA liners match a relevant shell mode frequency of the propshafts of the 645 and 082 Accused Products.  In particular,

In those reports, I also described how the NPFT2G-4978-BA liners are

For example, the FRF data for the 645 Accused Product (reproduced below)

24

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



82.    I further note that the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*See* Ex. D.)  The propshaft of the 645 Accused Product with its

NPFT2G-4978-BA liners ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉ (Exs. C & D.)

83.    Neapco therefore satisfies the 1[e] limitation for the 645 and 082 Accused

Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft

member such that "the at least one liner is configured to damp shell mode vibrations in the shaft

member by an amount that is greater than or equal to about 2%."  ('911 patent, claim 1[e].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

> **(3)** **1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

84.     Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products. (*See* '911 patent at claim 1[f].)

85.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 522-39, 585-87; July 21 Report ¶¶ 167-72.)

86.     In those reports, I described how the NPFT2G-4978-BA liners ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ██████████████████████████████████████████████████████

███████████████████████████████ In those reports, I also described how the NPFT2G-4978-BA liners are ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



87.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because the NPFT2G-4978-BA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode

27

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

88.   Neapco therefore satisfies the 1[f] limitation for the 645 and 082 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

89.   Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**b.    Claim 2**

**(1)    "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

90.   As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

91.   Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

28

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

installed in the driveline system" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 2.)

92.     As I described above in reference to limitation 1[f], the ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████  (*See* Ex. D.)

93.     Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

94.     Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

### c.     Claim 3

**(1)     "The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

95.     As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

96.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 3.)

97.     As I described above in reference to limitation 1[f] and 2, the █████████

████████████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

███████████████████████████████████████████████████

(*See* Ex. D.)

98.    Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 3.)

99.    Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**d.    Claim 4**

**(1)    "The method of claim 3, wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

100.    As I described above in reference to claim 3, Neapco satisfies each and every limitation of claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

101.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 4.)

102.    As I described above in reference to limitation 1[f], 2, and 3, the ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

(*See* Ex. D.)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

103. Neapco therefore satisfies the additional limitation of claim 4, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 4.)

104. Neapco satisfies each and every limitation of, and therefore infringes, claim 4 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**B.     The Neapco 5.0 inch Accused Products Infringe the '911 patent**

105. I understand that AAM accuses Neapco of infringing the '911 patent for Neapco's manufacture, sale, and offer for sale of the following 5.0 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---|---|---|---|---|
| 94769073 | 5.0 | 0.080 | 1956 | (2) NPFT2G-4978-CA |
| 84059646 | 5.0 | 0.080 | 1956 | (2) NPFT2G-4978-CA |

106. As I describe more fully below, my opinion is that the Neapco 5.0 Accused Products listed above each infringe claims 1-2 of the '911 patent.

**1.     GM part nos. 84059646 and 94769073 (5.0" x 0.080" x 1956 mm)**

107. As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K. I asked B&K to perform testing on the 646 Accused Product. As I described in my May 31 Report, modal analysis testing of the 073 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 646 Accused Product. Therefore, where applicable, rely on the results of B&K's modal analysis testing of the 646 Accused Product for both the 646 Accused Product and 073 Accused Product.

108. As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims. I incorporate herein by reference

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

115.    Neapco therefore satisfies the 1[c] limitation for the 646 and 073 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

116.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 646 and 073 Accused Products.  (*See* '911 patent at claim 1[e].)

117.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 615-30, 694-96; July 21 Report ¶¶ 190-98.)

118.    In those reports, I described how the NPFT2G-4978-CA liners match a relevant shell mode frequency of the propshafts of the 646 and 073 Accused Products.  In particular, the

In those reports, I also described how the NPFT2G-4978-CA liners are

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



119.    Neapco therefore satisfies the 1[e] limitation for the 646 and 073 Accused Products by positioning at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

              **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

120.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 646 and 073 Accused Products. (*See* '911 patent at claim 1[f].)

121.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 631-48, 694-96; July 21 Report ¶¶ 199-210.)

122.    In those reports, I described how the NPFT2G-4978-CA liners match a relevant bending mode frequency of the propshafts of the 646 and 073 Accused Products.  In particular, the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓  (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓  In those reports, I also described how the NPFT2G-4978-CA liners are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



123.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because the NPFT2G-4978-CA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-CA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-CA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.    The NPFT2G-4978-CA liners achieve

37

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

124.    Neapco therefore satisfies the 1[f] limitation for the 646 and 073 Accused Products by positioning at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

125.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### b.    Claim 2

(1)    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

126.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

127.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 646 and 073 Accused Products. (*See* '911 patent at claim 2.)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

128.    As I described above in reference to limitation 1[f], the ████████

████████████████████████████████████████████████

████████████████████████████████████████████ (*See* Ex.

D.)

129.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

130.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### C.    The Neapco 5.775 inch Accused Products Infringe the '911 patent

131.    I understand that AAM accuses Neapco of infringing the '911 patent for Neapco's manufacture, sale, and offer for sale of the following 5.775 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---|---|---|---|---|
| 23225169 | 5.775 | 0.079 | 2222 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059643 | 5.775 | 0.079 | 2222 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23253781 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059644 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84148489 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23377650 | 5.775 | 0.079 | 2172 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |

132.    As I describe more fully below, my opinion is that the following Neapco 5.775 Accused Products listed above each infringe claims 1-3, 5, 6, 12, 13, 19-21 of the '911 patent:

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

142.     Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 1[e].)

143.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 725-43, 810-12; July 21 Report ¶¶ 228-36.)

144.     In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 643 and 169 Accused Products.  In particular, the ███████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ (Ex. C).  (*See* Ex. D.)  In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



145.    Neapco therefore satisfies the 1[e] limitation for the 643 and 169 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

          **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

146.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 643 and 169 Accused Products. (*See* '911 patent at claim 1[f].)

44

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

147.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 744-64, 810-12; July 21 Report ¶¶ 237-48.)

148.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products.  For example, the ██████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████ ███████████████████████████████████ In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



149. *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

150.    Neapco therefore satisfies the 1[f] limitation for the 643 and 169 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

151.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

**b.    Claim 2**

**(1)    "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

152.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

153.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

47

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

installed in the driveline system" for each of the 643 and 169 Accused Products. (*See* '911 patent at claim 2.)

154. As I described above in reference to limitation 1[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products. For example, the ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ (*See* Ex. D.)

155. Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 2.)

156. Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

     **c.**     **Claim 3**

     **(1)**     **"The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

157. As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

158. Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 643 and 169 Accused Products. (*See* '911 patent at claim 3.)

48

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

159.    As I described above in reference to limitation 1[f] and 2, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products.  For example, the ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ (*See* Ex. D.)

160.    Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 3.)

161.    Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### 2.    GM part nos. 84148489, 84059644, and 23253781 (5.775" x 0.079" x 2200 mm)

162.    As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 489 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 489 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 644 and 781 Accused Products.  Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 489 Accused Product for each of the 489, 644, and 781 Accused Products.

163.    As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco

49

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

170.    Neapco therefore satisfies the 1[c] limitation for the 489, 644, and 781 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

171.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[e].)

172.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 839-57, 922-24; July 21 Report ¶¶ 269-74.)

173.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████  (*See* Ex. D.)  In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are ████████████████████████

████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

(Exs. C & D.)



174.   Neapco therefore satisfies the 1[e] limitation for the 489, 644, and 781 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

> **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

175.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[f].)

176.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 858-76, 922-24; July 21 Report ¶¶ 269-74.)

177.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 489, 644, and 781 Accused Products.  For example, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As another example, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Ex. D.)  The FRF of the sum of all four accelerometers shows that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



178. *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

179.   Neapco therefore satisfies the 1[f] limitation for the 489, 644, and 781 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

180.   Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

### b.   Claim 2

(1)   **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

181.   As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

182.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 2.)

183.    As I described above in reference to limitation 1[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners ███████████████████████████████████████

███████████████████████████████ For example, the ████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ (*See* Ex. D.)  As another

example, the ██████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████ (*See* Ex. D.)

184.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 2.)

185.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

c.    **Claim 3**

(1)    **"The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

186.    As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

187.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 3.)

188.    As I described above in reference to limitation 1[f] and 2, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners ███████████████████████████████████████

██████████████████████████████████  For example, the ████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████  (*See* Ex. D.)   As another

example, the ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████   (*See* Ex. D.)

189.    Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 3.)

190.    Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member. To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report. (*See, e.g.*, July 21 Report ¶¶ 310-13.)

199.    Neapco therefore satisfies the 1[c] limitation for the 650 Accused Product by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

200.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for the 650 Accused Product. (*See* '911 patent at claim 1[e].)

201.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product. (*See, e.g.*, May 31 Report ¶¶ 950-68, 1034-36; July 21 Report ¶¶ 290-94.)

202.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 650 Accused Product. For example, the ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ (*See* Ex. D.) In those reports, I also described how the NPFT2G-4978-DBA and

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-DCA liners are ███████████████████████████████

████████████████ For example, the FRF data for the 650 Accused Product (reproduced below)

█████████████████████████████████████████████████████████████

██████████████████████████ In those reports, I also described how the propshaft of the 650

Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ████████

███████████████████████████████████████████████████████████ (Ex. C;

Ex. D.)



203.    Neapco therefore satisfies the 1[e] limitation for the 650 Accused Product by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

> **(3)**   **1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

204.   Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for the 650 Accused Product.  (*See* '911 patent at claim 1[f].)

205.   I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 969-88, 1034-36; July 21 Report ¶¶ 295-300.)

206.   In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 650 Accused Product.  For example, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*See* Ex. D.)  The FRF of the sum of all four accelerometers shows that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  In those reports, I also described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are ▮▮▮▮▮▮▮▮

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



207.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

208.    Neapco therefore satisfies the 1[f] limitation for the 650 Accused Product by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

209.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

   b.    **Claim 2**

       (1)    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

210.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

211.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

installed in the driveline system" for each of the 650 Accused Product.  (*See* '911 patent at claim 2.)

212.    As I described above in reference to limitation 1[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 650 Accused Product.  For example, the ██████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████ (*See* Ex. D.)

213.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

214.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

## X.    CONCLUSION

215.    I reserve the right to supplement, modify, or revise my opinions based on additional information that is provided to me in this litigation.

# EXHIBIT C EXCERPTED

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE



AMERICAN AXLE & MANUFACTURING, INC., )

                          Plaintiff,   )

             -vs-                      )   C.A. No.:

NEAPCO HOLDINGS LLC and                )   15-1168-LPS

NEAPCO DRIVELINES LLC,                 )

                          Defendants.  )



         The videotaped deposition of

CHRISTOPHER D. RAHN, Ph.D., called as a witness

herein for examination, taken pursuant to the

Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before ROSANNE M. NUZZO, a

Notary Public within and for the County of Will,

State of Illinois, and a Certified Shorthand

Reporter of said state, at the law offices of

Steptoe & Johnson, 115 South LaSalle Street,

Suite 3100, Chicago, Illinois on Tuesday, July 25,

2017, at 9:04 a.m.


   Job No. 5010
```

Fortz Legal Support

www.FortzLegal.com

844.730.4066



1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
2

3

4   AMERICAN AXLE & MANUFACTURING, INC., )

5                         Plaintiff,    )

6             -vs-                      )  C.A. No.:

7   NEAPCO HOLDINGS LLC and             )  15-1168-LPS

8   NEAPCO DRIVELINES LLC,              )

9                         Defendants.   )

10

11

12          The videotaped deposition of

13   CHRISTOPHER D. RAHN, Ph.D., called as a witness

14   herein for examination, taken pursuant to the

15   Federal Rules of Civil Procedure of the United

16   States District Courts pertaining to the taking of

17   depositions, taken before ROSANNE M. NUZZO, a

18   Notary Public within and for the County of Will,

19   State of Illinois, and a Certified Shorthand

20   Reporter of said state, at the law offices of

21   Steptoe & Johnson, 115 South LaSalle Street,

22   Suite 3100, Chicago, Illinois on Tuesday, July 25,

23   2017, at 9:04 a.m.

24

25      Job No. 5010

AMERICAN AXLE & MANUFACTURING vs NEAPCO HOLDINGS
Christopher Rahn on 07/25/2017

Job 5010
Pages 54..57

Page 54

1    And the Court's construction, you laid
2 out in the box next to that, right?
3    A.   Yes.
4    Q.   It says:
5        "A liner having characteristics
6    configured to match a relevant frequency
7    or frequencies to deform as vibration
8    energy is transmitted through the liner
9    to absorb the vibration energy to dampen
10    shell mode vibration."
11        Do you see that?
12    A.   Yes.
13    Q.   That's the Court's construction that
14 you understand you have to apply in this case?
15    A.   Yes.
16    Q.   And the Court's construction doesn't
17 refer at all to providing attenuation of shell
18 mode vibrations and maximum attenuation occurs
19 near that relevant frequency, does it?
20    A.   So let me just address the attenuation
21 part first.  There's two parts to that.
22        I believe that the Court's construction
23 does address attenuation because it talks about
24 absorbing vibration energy, and so the Court's
25 construction does address attenuation.

Page 55

1    Q.   The construction addresses attenuation.
2 The construction does not say the shell mode
3 frequency is matched if the liner provides
4 attenuation of shell mode vibration and maximum
5 attenuation occurs near the relevant frequency,
6 does it?
7    A.   So I address the first part of that
8 statement.  "If the liner provides attenuation of
9 shell mode vibration," that's definitely in that,
10 in the construction.
11        The maximum attenuation occurring near
12 the relevant frequency is related to the
13 specification of the '911 patent where it talks
14 about that as being an example of tuning.
15    Q.   That's an embodiment in the
16 specification?
17    A.   I would have to look at exactly where
18 that appears in the spec.  I could do that.
19    Q.   Well, we'll get back to that.
20        But you would agree with me that that
21 concept, "maximum attenuation occurs near the
22 relevant frequency," does not appear in the
23 Court's construction, right?
24    A.   Those words don't necessarily appear
25 in the construction, but I looked at the

Page 56

1 specification of the patent to kind of help me, to
2 guide me to understand how to -- how to interpret
3 the claim or how to actually apply the claim.  And
4 the specification does say that, you know, having
5 maximum attenuation near the relevant frequency is
6 an example of tuning.
7    Q.   That's an embodiment described in the
8 specification but --
9    A.   Again --
10    Q.   -- not in the Court's construction,
11 correct?
12    A.   Again, I'm not sure where that appears
13 in the specification.  I could find that, if you
14 wanted me to.
15    Q.   Well, let's just see if we can agree
16 that it doesn't appear in the Court's
17 construction.
18    A.   The words -- and what was the "it"
19 again, please?
20    Q.   "The maximum attenuation occurs near
21 the relevant frequency" part of your statement
22 here does not appear in the Court's construction;
23 is that fair?
24    A.   Those words do not appear in the
25 Court's construction, that's correct.

Page 57

1    Q.   And the concept of maximum attenuation
2 occurring near the relevant frequency does not
3 appear in the Court's construction, does it?
4    A.   Well, the Court construction is asking
5 us to determine whether the liner has
6 characteristics that are configured to match the
7 relevant frequency.
8        And as I said, you know, you look for
9 evidence of that in the accused product.  One way
10 would be to see if maximum attenuation occurs near
11 the relevant frequency.  That would be evidence if
12 those were close.
13        The other is to look at the liner and
14 see what its frequencies are and see if those are
15 matched; so matches in the construction, and this
16 is one way to assess matching.
17    Q.   It's one way that is in the patent
18 specification to assess matching?  Is that your
19 opinion?
20    A.   That's one way that's described in the
21 spec of the patent, yes.  And I think it's
22 "tuning" is what they use, the word they use in
23 that case.
24    Q.   And the other way is to compare the
25 liner's frequency to a particular frequency?

AMERICAN AXLE & MANUFACTURING vs NEAPCO HOLDINGS                                      Job 5010
Christopher Rahn on 07/25/2017                                                        Pages 58..61

Page 58

1 I believe that's what you said.  Is that right?
2    A.   So we're talking about matching, and
3 the -- and the Court's claim construction has
4 "match a relevant frequency or frequencies."
5         So one way to do that is to look at the
6 liner frequency and see if it is close to a shell
7 mode frequency.
8    Q.   Okay.  And in your opinion, is another
9 way to do that is to determine if maximum
10 attenuation occurs near the relevant frequency, is
11 that right?
12   A.   I don't see these as two different
13 ways.  I see them as both ways of assessing or
14 evidence of matching.  So you would look at both
15 of those things and determine, you know, is it
16 close in terms of maximum attenuation, is it close
17 in terms of liner frequency.  You know, if it's
18 close in both of those, then you would say it's
19 matched.
20   Q.   But we can agree that the Court's
21 construction does not say that you look at the
22 maximum attenuation to determine if it's matched;
23 is that fair?
24   A.   Well, the Court's construction just
25 uses the word matched to "a relevant frequency."

Page 59

1    Q.   Um-hum.
2    A.   So that is open to some interpretation
3 as to what that means.
4    Q.   And you're reading into that the
5 embodiment from the spec that looks at the maximum
6 attenuation occurring near the relevant frequency?
7    MR. NUTTALL:  Objection to form.
8 BY THE WITNESS:
9    A.   I'm not reading anything into that
10 construction.
11 BY MR. ARNOLD:
12   Q.   You're using an embodiment in the
13 specification to interpret the Judge's claim
14 construction; is that fair?
15   A.   Well, I'm using the specification as a
16 guide as to how you would go about assessing, for
17 a given product, whether or not it matches a
18 relevant frequency or frequencies.
19   Q.   And in that particular case, you're not
20 even looking at the frequency of the liner to
21 determine whether it matches, correct?
22   A.   I am -- I'm -- these are not two
23 separate things.  They are together.  I mean, they
24 are together as my analysis includes both of those
25 things.  One is not neglected for the other.

Page 60

1 They're both there.
2    Q.   Let's turn to paragraph 186, please.
3         Okay.  Let's step back to paragraph
4 185.  You've got -- above 185, you've got an
5 FRF plot.  This is from the B&K testing, is that
6 right?
7    A.   Yes.
8    Q.   And I just want to make sure I
9 understand some of the statements in here.  The
10 third sentence in on paragraph 185 says:
11        "The vertical axis is a log scale
12       so large changes in amplitude look
13       relatively small."
14        What does that mean?
15   A.   So the log scale tends to compress
16 numbers together.  So if you look at going from
17 300 to 1K, if you use a linear scale, then it
18 expands it out a lot more.
19   Q.   So just depending on how the scale in
20 the chart is, it can appear different?
21   A.   Well, I mean, it's just a -- it's a log
22 scale, so it's -- that's just the nature of the
23 log scale.
24   Q.   But I believe you said if you expand it
25 out, it appears bigger?  Is that what you said?

Page 61

1    A.   Well, the numbers are what they are
2 but, you know, I mean, you're plotting out the
3 real numbers of what the FRF is.
4         But using a linear scale tends to
5 spread things out more.
6    Q.   Okay.  If you look at --
7    A.   Now, I would just say that the log
8 scale is pretty standard in the industry to use on
9 these, these kind of results.
10   Q.   Okay.  If you look at the plot, ███
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████
15   A.   You're talking about the red curve?
16   Q.   The red curve.
17   A.   So the red curve, second peak from the
18 left, is ████████████████████████████████
19   Q.   Okay.  And the scale on the left, it
20 shows it going up to -- I don't know where that
21 would technically be, but 900 or so; 800?  Is that
22 roughly --
23   A.   Roughly that number, yes.
24   Q.   And then in blue, this is the FRF plot
25 of the -- this product with the liner, right?

# **EXHIBIT D**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>OPENING EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.</u>

By: _____

May 31, 2017

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

372.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its manufacture, offer for sale, and sale of the 076 and 647 Accused Products.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

> **(2)    36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"**

373.    Neapco inserts at least one liner into the propshafts of the 076 and 647 Accused Products, namely two NPFT2G-4978-BA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36.)

374.    As illustrated by the engineering drawings for the 076 and 647 Accused Products, the mass of the shaft member associated with those accused products is 3623 gram. (NEAPCO000107 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPFT2G-4A181-EA).)  The mass of a single NPFT2G-4978-BA liner is ▮▮ grams, for a total mass of the two NPFT2G-4978-BA liners of the 076 and 647 Accused Products of ▮▮ grams.  The ratio of the mass of the two NPFT2G-4978-BA liners to the mass of the shaft member is therefore 9.6%.

375.    Thus, for the two NPFT2G-4978-BA liners and the shaft member of the 076 and 647 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36[e].)

376.    Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 076 and 647 Accused Products.

> **2.     GM part nos. 84148488, 23214716, and 84059642 (4.5" x 0.085" x 1891**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

mm)

377.   As described herein, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 488 Accused Product.  The 488 Accused Product has similar dimensions and characteristics, and includes the same number and type of liners, as the 716 and 642 Accused Products described above.  I understand the similarities among the 488, 716, and 642 Accused Products are a result of the 488 Accused Product ██████████

████████████████████████████████████████████████████

██████████████████████████████████████ (NEAPCO195905.)  The resulting changes are insubstantial and would not affect whether the 716 and 642 Accused Products satisfy the claim limitations of the '911 patent.  (*See, e.g.*, GM_AAM000000248-58.) In other words, modal analysis testing of the 488 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 716 and 642 Accused Products. (*See, e.g.*, GM_AAM000000248-58.)  Therefore, where applicable, rely on the results of B&K's modal analysis testing of the 488 Accused Product for each of the 488 Accused Product, 716 Accused Product, and 642 Accused Product.

a.     **Claim 22**

(1)     **22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

378.   To the extent the preamble, 22[a], is considered a claim limitation, Neapco performs "[a] method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

379.   I understand that Neapco ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

380.   Neapco engineering drawings corresponding to the 488, 716, and 642 Accused Products illustrate the shaft assemblies manufactured by Neapco.   (NEAPCO000913 (488 Accused Product), NEAPCO001596 (716 Accused Product), NEAPCO001597 (642 Accused Product).)   For example, the propshaft assembly of the 488 Accused Product is reproduced below:



(NEAPCO000913; *see also* NEAPCO001596 (716 Accused Product), NEAPCO001597 (642 Accused Product).)   ██████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ These are what are considered to be

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

driveline components in the '911 patent as shown in Fig. 4 and described in the specification: "In the context of an automotive vehicle, the driveline components could be a transmission, a transfer case, a viscous coupling, an axle assembly, or a differential, for example." ('911 patent at 4:45-51.)

381.    Neapco therefore satisfies the preamble, 22[a], for the 488, 716, and 642 Accused Products by "manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

### (2)    22[b]: "providing a hollow shaft member"

382.    Neapco "provid[es] a hollow shaft member" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 22[b].)

383.    I understand that Neapco ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

384.    For example, engineering drawings for the 488, 716, and 642 Accused Products illustrate how they comprise an aluminum, hollow shaft member having a diameter of ███ inch and a shaft thickness of ███████  (*See, e.g.*, NEAPCO000913 (488 Accused Product), NEAPCO000920 (same), NEAPCO000922 (same); NEAPCO001596 (716 Accused Product), NEAPCO001679 (same), and NEAPCO000107 (same); NEAPCO001597 (642 Accused Product), NEAPCO001687 (same), and NEAPCO001598 (same); NEAPCO195905.)  The 488, 716, and 642 Accused Products each have two liners—identified by liner part no. NPFT2G-

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

4978-BA—positioned within their hollow shaft member.   (*See, e.g.*, NEAPCO000922; NEAPCO000107; NEAPCO195905.)

385.    Neapco therefore satisfies the 22[b] limitation for the 488, 716, and 642 Accused Products by "providing a hollow shaft member."  ('911 patent, claim 22[b].)

### (3)    22[c]: "tuning a mass and a stiffness of at least one liner"

386.    Neapco "tun[es] a mass and a stiffness of at least one liner" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 22[c].)

387.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning a mass and stiffness of at least one liner" | controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies |

388.    As described herein, Neapco engineering drawings confirm that the 488, 716, and 642 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-BA.  (*See, e.g.*, NEAPCO000922; NEAPCO000107.)  The Caraustar engineering drawing for the NPFT2G-4978-BA liner—which was "prepared for Neapco"—illustrates how Neapco controls the mass and stiffness of the NPFT2G-4978-BA liner to configure its properties.  (*See* NEAPCO000078.)

389.    Neapco controls the mass of the NPFT2G-4978-BA liners by controlling its material properties and dimensions.  (NEAPCO000078.)  In particular, a single NPFT2G-4978-BA liner is controlled to comprise ████████████████████ and a ████████████ ████████████████  (NEAPCO000078.)   A single NPFT2G-4978-BA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, and length "C" of ████ inch.  (NEAPCO000078.)   These controlled material and dimensional

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

properties for a single NPFT2G-4978-BA liner in turn control the mass of the liner. (NEAPCO000078.)

390.    Similarly, Neapco controls the stiffness of the NPFT2G-4978-BA liners by controlling its material properties and dimensions. (NEAPCO000078.)  As described above, stiffness is a measure of the resistance of an object in response to an applied force, and is affected by, among other things, material and dimensions of the object.  For each NPFT2G-4978-BA liner, Neapco controls the material of the liner, e.g., ███████████████ ███████ and ███████████████████████ and Neapco controls the shape of the liner by controlling at least the outer diameter, inner diameter, and length of the liner. (NEAPCO000078.)  These controlled material and dimensional properties for a single NPFT2G-4978-BA liner in turn control the stiffness of the liner.  (NEAPCO000078.)

391.    As I describe below in reference to limitations 22[e] and 22[f], Neapco's control of the mass and stiffness the two NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products configure those liners to match a relevant frequency or frequencies.  A liner can match a relevant frequency of the driveshaft for either bending mode vibrations or shell mode vibrations.  Configuring the liner to have a natural frequency near a relevant driveshaft bending mode natural frequency is one way of matching.  Relevant bending mode frequencies include, for example, the first, second, and third bending mode frequencies.  Configuring the liner to provide attenuation of shell mode vibration where the maximum attenuation occurs near the relevant frequency is another way of matching.  Relevant shell mode natural frequencies include, for example, the first, second, and third shell mode frequencies.  As I describe below in reference to limitations 22[e] and 22[f], the Neapco NPFT2G-4978-BA liners are configured to match at least one bending mode natural frequency and at least one shell mode natural frequency.

142

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

392.    *Doctrine of Equivalents*:   My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because Neapco controls a mass and stiffness of the NPFT2G-4978-BA liners to configure the liners to match a relevant frequency or frequencies.  As I describe below in reference to limitations 22[e] and 22[f], to the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

393.    Neapco therefore satisfies the 22[c] limitation for the 488, 716, and 642 Accused Products by "tuning a mass and stiffness of at least one liner."  ('911 patent, claim 22[c].)

### (4)    22[d]: "inserting the at least one liner into the shaft member"

394.    Neapco "insert[s] the at least one liner into the shaft member" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 22[d].)

395.    I understand that Neapco admits ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

396.    For example, Neapco engineering drawings for the 488, 716, and 642 Accused Products illustrate how each of the 488, 716, and 642 Accused Products have two NPFT2G-4978-BA liners—positioned within the shaft at "Liner Insertion D."   (NEAPCO000922; NEAPCO000107.)  Further, the Caraustar engineering drawing corresponding to the NPFT2G-

143

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

4978-BA liner—which was "prepared for Neapco"—provides a "propshaft description" for the corresponding propshaft receiving the NPFT2G-4978-BA liners.  (NEAPCO000078.)

397.    Neapco therefore satisfies the 22[d] limitation for the 488, 716, and 642 Accused Products by "inserting the at least one liner into the shaft member."  ('911 patent, claim 22[d].)

<div align="center">(5)    22[e]: "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations"</div>

398.    Neapco "insert[s] the at least one liner into the shaft member . . . wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 22[e].)

399.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |

400.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of the two NPFT2G-4978-BA liners positioned within the 488, 716, and 642 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

401.    As I discussed above in reference to the 076 and 647 Accused Products, documents produced by Neapco, including documents relating to tuned liners for use in 4.5 inch propshafts like the 488, 716, and 642 Accused Products, are consistent with my opinion that Neapco configures the NPFT2G-4978-BA liners positioned within the 488, 716, and 642 Accused Products to match a relevant frequency or frequencies of the propshafts of those

<div align="center">144</div>

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

accused products to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

402.    The testing results from B&K confirm that the two NPFT2G-4978-BA liners associated with the 488, 716, and 642 Accused Products have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  The liners associated with the 488, 716, and 642 Accused Products have characteristics configured to match a relevant shell mode frequency.  A relevant shell mode frequency is matched if the liner provides attenuation of shell mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K show that the liners of the 488, 716, and 642 Accused Products have characteristics configured to match ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

403.    As described above, the shell mode mechanics dictate that the liner provides damping through resistive means.  Shell modes involve ovalizing of the cross-section of the propshaft as it deflects or bends along one or more axes.  An ovalizing propshaft squeezes the liner inside the propshaft and, if it is properly tuned, the liner resists, thereby dissipating energy.  Thus, in shell mode damping the tuned liner deforms as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

404.    The tuning or matching of the NPFT2G-4978-BA liners to a relevant frequency or frequencies is illustrated by the shell mode FRF plots for the 488 Accused Product collected by B&K under my direction as described above. (Ex. C.)  I directed B&K to test a 488 Accused

145

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

Product as produced by Neapco, with the liners in place.  I also directed B&K to test a 488 Accused Product with the liners removed.  In both cases, I directed B&K to place accelerometers on the top and bottom of the driveshaft at roughly the quarter-length and mid-length of the driveshaft.  I directed B&K to clamp on the outbound sides of the universal joints to provide pinned boundary conditions as installed in the driveline system.  I directed B&K to excite the driveshafts with an impact hammer.  Finally, I directed B&K to calculate the FRFs, relevant shell mode natural frequencies, and shell mode damping.  To ensure that the FRFs measure shell mode vibration, I directed B&K to subtract the accelerometer signals from the top and bottom of the driveshaft and liner during testing.   To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft and calculate the subtracted FRFs at both locations.  Further details on the B&K testing are provided in Ex. C.

405.    I have reproduced the shell mode FRF plot for the 488 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals subtracted to best measure ███████████████████  (Ex. C.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



406.    The red line in the above shell mode FRF plot illustrates the amplitude of shell mode vibration of the 488 Accused Product without its NPFT2G-4978-BA liners. The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small.  The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with the ███████████████████ ██████████████████████████████████ (Ex. C).  The blue line in the above FRF plot illustrates the amplitude of shell mode vibration of the 488 Accused Product with NPFT2G-4978-BA liners installed, wherein the propshaft has a ████████████████████ ████████████████████████████████████

407.    The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 488 Accused Product.  The ████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

408.     I instructed B&K to calculate the damping ratios of the second shell modes using the approach described above.  The propshaft of the 488 Accused Product with its NPFT2G-4978-BA liners  has a high ███████████████████████████

███████████████████████████████████████████ (Exs. C & D.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

409.    Shell mode vibrations are vibrations that cause the cross-section of a shaft to deflect or bend along one or more axes.  As I described above, to dampen shell mode vibrations a liner must be configured to deform as the cross-section of the propshaft deflects or bends (and thereby transmits vibration energy through the liner) to absorb the vibration from the deflecting and bending propshaft.  The above quarter-length shell mode FRF plots for the 488 Accused Product indicate that the NPFT2G-4978-BA liners effectively dampen shell mode vibrations at least at the ██████████████ shell modes.  The NPFT2G-4978-BA liners therefore deform as vibration energy is transmitted through the liners to absorb the vibration energy as the cross-section of the propshaft deflects or bends at least at the ██████████████ shell modes.

410.    Moreover, the material and dimensional characteristics of the NPFT2G-4978-BA liners allow them to act as a tuned resistive absorber, thereby deforming as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  In particular, the NPFT2G-4978-BA liners comprise a ███████████████████████ ██████████████ that may deform to absorb vibration energy.  (NEAPCO000078.)  The NPFT2G-4978-BA liners also comprise a ████████████████ tube, which may also deform to absorb vibration energy.  (NEAPCO000078.)  The material and dimensional characteristics of the NPFT2G-4978-BA liners therefore allow them to attenuate shell mode vibrations through resistive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-BA liners so that those liners deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration at least at the relevant first, second, and third shell mode natural frequencies.

411.    The liners of the 488 Accused Products have a natural frequency near a relevant shell mode natural frequency.  I directed B&K to test the NPFT2G-4978-BA liners of the 4888

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

Accused Products as described above.  For example, the ███████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ (*See* Ex. D.)

412.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because the NPFT2G-4978-BA liners have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations. The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

413.    Neapco therefore satisfies the 22[e] limitation for the 488, 716, and 642 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations." ('911 patent, claim 22[e].)

> ### (6)  22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."

414.   Neapco inserts the at least one liner, two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 22[f].)

415.   I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |

416.   As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the two NPFT2G-4978-BA liners positioned within the 488, 716, and 642 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

417.   As I discussed above in reference to the 076 and 647 Accused Products and above in reference to limitation 22[e], documents produced by Neapco, including documents relating to tuned liners for use in 4.5 inch propshafts like the 488, 716, and 642 Accused Products, are consistent with my opinion that Neapco configures the NPFT2G-4978-BA liners positioned within the 488, 716, and 642 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

418.    The liners associated with the 488, 716, and 642 Accused Products have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K show that the liners of the 488, 716, and 642 Accused Products have characteristics ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

419.    As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and, if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

420.    Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

421.     As described above, I directed B&K to test the NPFT2G-4978-BA liners associated with the 488, 716, and 642 Accused Products to determine whether the liners were matched to any bending modes of the propshaft.  The testing results from B&K confirm that the two NPFT2G-4978-BA liners associated with the 488, 716, and 642 Accused Products have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  For example, the ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████████ ██████████████████████████████████

422.     The matching of the NPFT2G-4978-BA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF data for the 488 Accused Product.  (Ex. C.)   As described above, I directed B&K test the propshaft with and without the liners installed and calculate the FRFs, relevant bending mode natural frequencies, and bending mode damping. To ensure that the FRFs measure bending mode vibration, I directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing.  To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

423.     I have reproduced below the bending mode FRF data for the 488 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals added to best measure ████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



424.    The red line in the above bending mode FRF plot illustrates the bending mode FRF of the propshaft of the 488 Accused Product without its NPFT2G-4978-BA liners, wherein the propshaft has a █████████████████████████████████████████████████████ ████████████████████     The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small.  The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values. The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with the ███████████████████████████████████████████████████████ ████████████ (Ex. C). The blue line in the above FRF plot illustrates the amplitude of the bending mode vibration of the propshaft of the 488 Accused Product with its NPFT2G-4978-BA liners installed.

425.    The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 488 Accused Product.   The ████████████ ████████████████████████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



426.    I instructed B&K to calculate the damping ratios of the ███████████ using a standard algorithm based on the width of the peaks. The propshaft of the 488 Accused Product with its NPFT2G-4978-BA liners also has a ███████████████████████████████

███████████████████████████████████████ (Exs. C & D.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

427.     Bending mode vibrations are vibrations that cause the propshaft bend along its length.  As I described above, to dampen bending mode vibrations a liner must be configured to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy in the bending propshaft.  The above quarter-length bending mode FRF plots for the 488 Accused Product indicate that the NPFT2G-4978-BA liners effectively dampen bending mode vibrations at the ███████████████████████ NPFT2G-4978-BA liners therefore oscillate in opposition to vibration energy to cancel out a portion of the vibration energy as the propshaft bends at the ████████████████

428.     Moreover, the material and dimensional characteristics of the NPFT2G-4978-BA liners allow them to act as a tuned reactive absorber, thereby oscillating in opposition to vibration energy of the propshaft to cancel out a portion of the vibration energy to dampen bending mode vibrations.  Similar to classic example of reactive attenuation, the liners have characteristics similar to a mass/spring that is added to the host propshaft.  In particular, the NPFT2G-4978-BA liners comprise a ███████████████████████████████████ ████████ that may stretch and compress like a spring.  (NEAPCO000078.)  The NPFT2G-4978-BA liners also comprise a █████████████████████████ tube, coupled to the ████████ ████████ similar to a mass coupled to the end of a spring.  (NEAPCO000078.)  The material and dimensional characteristics of the NPFT2G-4978-BA liners therefore allow them to attenuate bending mode vibrations through reactive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-BA liners so that those liners oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the relevant second bending mode natural frequency.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

429.    Neapco therefore satisfies the 22[f] limitation for the 488, 716, and 642 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." ('911 patent, claim 22[f].)

430.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because the NPFT2G-4978-BA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

431.    Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

**b.    Claim 23**

**(1)    "The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."**

432.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

433.    Neapco inserts at least one liner of the 488, 716, and 642 Accused Products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." (*See* '911 patent at claim 23.)

434.    As I described above in reference to limitation 22[e], the NPFT2G-4978-BA liners have characteristics configured to match at least the ▮▮▮▮▮▮▮▮▮▮ frequencies of the propshaft of the 488, 716, and 642 Accused Products, and those liners effectively dampen shell mode vibrations of the propshaft of the 488, 716, and 642 Accused Products ▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

435.    Neapco therefore satisfies the additional limitation of claim 23, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." ('911 patent at claim 23.)

436.    Neapco satisfies each and every limitation of, and therefore infringes, claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

**c.    Claim 24**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

        **(1)**    **"The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."**

437.    As I described above in reference to claim 23, Neapco satisfies each and every limitation of claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

438.    Neapco inserts at least one liner of the 488, 716, and 642 Accused products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." (*See* '911 patent at claim 24.)

439.    As I described above in reference to limitation 22[f], the NPFT2G-4978-BA liners have characteristics configured to match at least the ███████████████████ frequency of the propshaft of the 488, 716, and 642 Accused Products, and those liners effectively dampen bending mode vibrations of the propshaft of the 488, 716, and 642 Accused Products ████████ ██████████████████████████████

440.    Neapco therefore satisfies the additional limitation of claim 24, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." ('911 patent at claim 24.)

441.    Neapco satisfies each and every limitation of, and therefore infringes, claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

      **d.**    **Claim 26**

        **(1)**    **"The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

**that a wall of the shaft member contacts the at least one resilient member.**

442.    As I described above in reference to claim 24, Neapco satisfies each and every limitation of claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

443.    Neapco inserts at least one liner of the 488, 716, and 642 Accused Products into the propshafts of those accused products, "wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

444.    I understand that Neapco



445.    In particular, the engineering drawing for the NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products shows how the liners include a structural portion, a tube made out of ▮▮▮▮▮▮▮▮▮▮▮▮ having an outer diameter "A" (▮▮▮ inch), inner diameter "B" (3.920 inch), and length "C" (▮▮▮ inch). (NEAPCO000078.) That engineering drawing also shows how the liners include a resilient portion, a ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ that is coupled to, and winds around, the structural portion of the liners. (NEAPCO000078.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

446.   The engineering drawing further provides a "propshaft description" for the NPFT2G-4978-BA liners: "Aluminum ███ OD x ███ WALL (███ ID)." (NEAPCO000078.)  This propshaft description is consistent with the properties of the 488, 716, and 642 Accused Products set forth in Neapco's engineering drawings.  (*See, e.g.*, NEAPCO000913 (488 Accused Product), NEAPCO000920 (same), NEAPCO000922 (same); NEAPCO001596 (716 Accused Product), NEAPCO001679 (same), and NEAPCO000107 (same); NEAPCO001597 (642 Accused Product), NEAPCO001687 (same), and NEAPCO001598 (same; NEAPCO195905.)   The NPFT2G-4978-BA liners have a slightly larger outer diameter (███ inch) than the inner diameter of the propshaft of the 488, 716, and 642 Accused Products (███ inch).  (NEAPCO000078.)  Thus, the NPFT2G-4978-BA liners will friction-fit against the inner wall of the smaller-diameter propshafts as they are inserted.

447.   The at least one liner, the NPFT2G-4978-BA liners, therefore "includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member."  (*See* '911 patent at claim 26.)

448.   Neapco satisfies each and every limitation of, and therefore infringes, claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

        **e.**      **Claim 27**

        **(1)**      **"The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion."**

449.   As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

450. Neapco inserts at least one liner of the 488, 716, and 642 Accused Products having at least one resilient member, "wherein the at least one resilient member extends helically about and along the structural portion." (*See* '911 patent at 27.)

451. I understand that Neapco ████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████

452. In particular, the engineering drawing for the NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products shows how the liners include a resilient portion, a ████████████████████████ that is coupled to, and extends helically about and along the structural portion:



(NEAPCO000078.)

453. The at least one liner, the NPFT2G-4978-BA liners, therefore include at least "one resilient member extends helically about and along the structural portion." (*See* '911 patent at claim 27.)

454. Neapco satisfies each and every limitation of, and therefore infringes, claim 27 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

#### f.     Claim 31

(1)     **"The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."**

455.    As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

456.    Neapco inserts at least one liner of the 488, 716, and 642 Accused Products having a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

457.    I understand that Neapco ███████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

458.    In particular, the engineering drawing for the NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products shows how the liners include a structural portion, a tube made out of ███████████████████████ (NEAPCO000078.)

459.    The at least one liner, the NPFT2G-4978-BA liners, therefore include a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

460.    Neapco satisfies each and every limitation of, and therefore infringes, claim 31 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

g.      **Claim 34**

(1)      **"The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node."**

461.     As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

462.     I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

463.     Neapco inserts at least one liner of the 488, 716, and 642 Accused Products, "wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at 34.)

464.     I understand that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

465.     In particular, Neapco engineering drawings for the 488, 716, and 642 Accused Products illustrate each of the two NPFT2G-4978-BA liners positioned near the ████████████ ████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



(*See* NEAPCO000922 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPHT2G-4A181-NB); *see also* NEAPCO000107.)  The ███████████████ ███████████ is near a position of maximum displacement for the shaft member in at least a second bending mode of vibration.

466.   The at least one liner, the NPFT2G-4978-BA liners, are therefore "positioned along the shaft member symmetrically about a bending anti-node."  (See '911 patent at claim 34.)

467.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because a first one of the NPFT2G-4978-BA liners is positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because a first one of the NPFT2G-4978-BA liners is positioned approximately at a location of an anti-node such that any difference is insubstantial.  For example, the first one of the NPFT2G-4978-BA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-BA liners function in substantially the

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-BA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

468.   Neapco satisfies each and every limitation of, and therefore infringes, claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

### h.   Claim 35

> **(1)   "The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."**

469.   As I described above in reference to claim 34, Neapco satisfies each and every limitation of claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

470.   I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

471.   Neapco inserts at least one liner of the 488, 716, and 642 Accused Products, "wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node." (*See* '911 patent at 35.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

472.    I understand that ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

473.    In particular, Neapco engineering drawings for the 488, 716, and 642 Accused Products illustrate each of the two NPFT2G-4978-BA liners ████████████████████

████████████████████████████████        (*See* NEAPCO000922 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPHT2G-4A181-NB); *see also* NEAPCO000107.)  As described above, the ████████████████████████████████

███████████████████████████████████████████████████

474.    The at least one liner, the two NPFT2G-4978-BA liners, are therefore "positioned along the shaft member symmetrically about a bending anti-node."  (*See* '911 patent at claim 35.)

475.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because the two NPFT2G-4978-BA liners are positioned along the shaft member symmetrically about bending anti-nodes.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the two NPFT2G-4978-BA liners are positioned approximately at a location of an anti-node such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorbers when located at an anti-node, as a liner literally recited by the claim limitations.  The

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-BA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

476.   Neapco satisfies each and every limitation of, and therefore infringes, claim 35 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

### i.   Claim 36

477.   I understand I should apply the following claim constructions for my analysis of this claim:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |
| "tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |
| "torsion mode vibration" | Vibration that causes a shaft to twist |

### (1)   Corresponding claim limitations of Claim 22

478.   Claim 36 and claim 22 of the '911 patent have many of the same claim limitations.  The following table correlates the limitations of claims 22 and 36.

| Limitation of '911 patent, Claim 22 | Limitation of '911 patent, Claim 36 |
|---|---|
| 22[a] | 36[a] |
| 22[b] | 36[b] |
| 22[c] | 36[c] |
| 22[d] | 36[d] |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

| 22[e] | 36[f] |
| 22[f] | 36[g] |

479.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

> **(2)    36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"**

480.    Neapco inserts at least one liner into the propshafts of the 488, 716, and 642 Accused Products, namely two NPFT2G-4978-BA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36.)

481.    As illustrated by the engineering drawings for the 488, 716, and 642 Accused Products, the mass of the shaft member associated with those accused products is ██ gram.  (*See* NEAPCO000922 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPHT2G-4A181-NB); NEAPCO000107 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-NA).)   The mass of a single NPFT2G-4978-BA liner is ██ grams, for a total mass of the two NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products of ██ grams.  The ratio of the mass of the two NPFT2G-4978-BA liners to the mass of the shaft member is therefore ██.

482.    Thus, for the two NPFT2G-4978-BA liners and the shaft member of the 488, 716, and 642 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36[e].)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

483. Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

484.

### 3. GM part nos. 84059645 and 23464082 (4.5" x 0.085" x 1799 mm)

485. As described herein, I rely, in part, on the modal analysis testing results from B&K. I asked B&K to perform testing on the 645 Accused Product. The 082 Accused Product has similar dimensions and characteristics, and includes the same number and type of liners, as the 645 Accused Product. I understand the similarities between the 082 Accused Product and the 645 Accused Product are a result of the 645 Accused Product ████████████████████ ████████████████████████ (NEAPCO195905.) The resulting ███████████████████████████ is an insubstantial change that would not affect whether the 082 Accused Product satisfies the claim limitations of the '911 patent. (*See, e.g.*, GM_AAM000000248-58.) In other words, modal analysis testing of the 082 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 645 Accused Product. (*See, e.g.*, GM_AAM000000248-58.) Therefore, where applicable, rely on the results of B&K's modal analysis testing of the 645 Accused Product for both the 645 Accused Product and 082 Accused Product.

### a. Claim 22

(1) **22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

486.    To the extent the preamble, 22[a], is considered a claim limitation, Neapco performs "[a] method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

487.    I understand that Neapco ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

488.    Neapco engineering drawings corresponding to the 645 and 082 Accused Products illustrate the shaft assemblies manufactured by Neapco.  (NEAPCO000880 (645 Accused Product); NEAPCO000106 (082 Accused Product).)  For example, propshaft assembly of the 645 Accused Product is reproduced below:



(NEAPCO000880; *see also* NEAPCO000106 (082 Accused Product).)    Consistent with Neapco's admission (*see* Neapco Response to RFA No. 19), the shaft assemblies of the 645 and 082 Accused Products are used in driveline systems of certain GM Colorado/Canyon pick-up trucks to transmit torque within those driveline systems, namely to transmit torque from the engines to the axles and wheels of those trucks.  (*See* NEAPCO000880; NEAPCO000106; NEAPCO195905.)  In particular, Exhibit 47 shows the 645 and 082 driveshafts connect the N8D 6MT Transmission to the Dana M220 Axle.  These first and second driveline components couple to the 645 and 082 driveshafts.  The driveshaft transmits torque between these two driveline

171

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

components using the splined shaft on the left end and u-joint on the right end of the figure above.  These are what are considered to be driveline components in the '911 patent as shown in Fig. 4 and described in the specification: "In the context of an automotive vehicle, the driveline components could be a transmission, a transfer case, a viscous coupling, an axle assembly, or a differential, for example." ('911 patent at 4:45-51.)

489.    Neapco therefore satisfies the preamble, 22[a], for the 645 and 082 Accused Products by "manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component."  ('911 patent, claim 22[a].)

### (2)    22[b]: "providing a hollow shaft member"

490.    Neapco "provid[es] a hollow shaft member" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 22[b].)

491.    I understand that Neapco ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

492.    For example, engineering drawings for the 645 and 082 Accused Products illustrate how they comprise an aluminum, hollow shaft member having a diameter of ███ inch and a shaft thickness of ████ inch.  (*See, e.g.*, NEAPCO000880 (645 Accused Product), NEAPCO000905-12 (same), NEAPCO000922 (same); NEAPCO000106 (082 Accused Product), NEAPCO000107 (same), and NEAPCO000889-96 (same); NEAPCO195905.)   The 645 and 082 Accused Products each have two liners—identified by liner part no. NPFT2G-4978-

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

BA—positioned within their hollow shaft member.  (NEAPCO000922 (645 Accused Product); NEAPCO000107 (082 Accused Product); NEAPCO195905.)

493.   Neapco therefore satisfies the 22[b] limitation for the 645 and 082 Accused Products by "providing a hollow shaft member."  ('911 patent, claim 22[b].)

### (3)   22[c]: "tuning a mass and a stiffness of at least one liner"

494.   Neapco "tun[es] a mass and a stiffness of at least one liner" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 22[c].)

495.   I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning a mass and stiffness of at least one liner" | controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies |

496.   As described herein, Neapco engineering drawings confirm that the 645 and 082 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-BA.  (NEAPCO000922 (645 Accused Product); NEAPCO000107 (082 Accused Product).)   The Caraustar engineering drawing for the NPFT2G-4978-BA liner—which was "prepared for Neapco"—illustrates how Neapco controls the mass and stiffness of the NPFT2G-4978-BA liner to configure its properties.  (*See* NEAPCO000078.)

497.   Neapco controls the mass of the NPFT2G-4978-BA liners by controlling its material properties and dimensions.  (NEAPCO000078.)  In particular, a single NPFT2G-4978-BA liner is controlled to comprise ███████████████████████ and a ██████████ ███████████████ (NEAPCO000078.)   A single NPFT2G-4978-BA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, and

173

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

length "C" of ██████ inch.  (NEAPCO000078.)   These controlled material and dimensional properties for a single NPFT2G-4978-BA liner in turn control the mass of the liner.  (NEAPCO000078.)

498.     Similarly, Neapco controls the stiffness of the NPFT2G-4978-BA liners by controlling its material properties and dimensions.  (NEAPCO000078.)   As described above, stiffness is a measure of the resistance of an object in response to an applied force, and is affected by, among other things, material and dimensions of the object.  For each NPFT2G-4978-BA liner, Neapco controls the material of the liner, e.g., ██████████████████ ████████████████████████████████████ and Neapco controls the shape of the liner by controlling at least the outer diameter, inner diameter, and length of the liner.  (NEAPCO000078.)  These controlled material and dimensional properties for a single NPFT2G-4978-BA liner in turn control the stiffness of the liner.  (NEAPCO000078.)

499.     As I describe below in reference to limitations 22[e] and 22[f], Neapco's control of the mass and stiffness the two NPFT2G-4978-BA liners of the 645 and 082 Accused Products configure those liners to match a relevant frequency or frequencies.    A liner can match a relevant frequency of the driveshaft for either bending mode vibrations or shell mode vibrations. Configuring the liner to have a natural frequency near a relevant driveshaft bending mode natural frequency is one way of matching.  Relevant bending mode frequencies include, for example, the first, second, and third bending mode frequencies.  Configuring the liner to provide attenuation of shell mode vibration where the maximum attenuation occurs near the relevant frequency is another way of matching.  Relevant shell mode natural frequencies include, for example, the first, second, and third shell mode frequencies.  As I describe below in reference to limitations

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

22[e] and 22[f], the Neapco NPFT2G-4978-BA liners are configured to match at least one bending mode natural frequency and at least one shell mode natural frequency.

500.    *Doctrine of Equivalents*:   My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because Neapco controls a mass and stiffness of the NPFT2G-4978-BA liners to configure the liners to match a relevant frequency or frequencies.  As I describe below in reference to limitations 22[e] and 22[f], to the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

501.    Neapco therefore satisfies the 22[c] limitation for the 645 and 082 Accused Products by "tuning a mass and stiffness of at least one liner."  ('911 patent, claim 22[c].)

### (4)    22[d]: "inserting the at least one liner into the shaft member"

502.    Neapco "insert[s] the at least one liner into the shaft member" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 22[d].)

503.    I understand that Neapco ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

504.    For example, Neapco engineering drawings for the 645 and 082 Accused Products illustrate how each of the 645 and 082 Accused Products have two NPFT2G-4978-BA liners— positioned within the shaft at "Liner Insertion D."  (NEAPCO000922 (645 Accused Product);

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NEAPCO000107 (082 Accused Product).)   Further, the Caraustar engineering drawing corresponding to the NPFT2G-4978-BA liner—which was "prepared for Neapco"—provides a "propshaft description" for the corresponding propshaft receiving the NPFT2G-4978-BA liners. (NEAPCO000078.)

505.   Neapco therefore satisfies the 22[d] limitation for the 645 and 082 Accused Products by "inserting the at least one liner into the shaft member." ('911 patent, claim 22[d].)

### (5)    22[e]: "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations"

506.   Neapco "insert[s] the at least one liner into the shaft member . . . wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 22[e].)

507.   I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |

508.   As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the two NPFT2G-4978-BA liners positioned within the 645 and 082 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

509.   As I discussed above in reference to the 076 and 647 Accused Products, documents produced by Neapco, including documents relating to tuned liners for use in 4.5 inch propshafts like the 645 and 082 Accused Products, are consistent with my opinion that Neapco

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

configures the NPFT2G-4978-BA liners positioned within the 645 and 082 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

510.    The testing results from B&K confirm that the two NPFT2G-4978-BA liners associated with the 645 and 082 Accused Products have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  The liners associated with the 645 and 082 Accused Products have characteristics configured to match a relevant shell mode frequency.  A relevant shell mode frequency is matched if the liner provides attenuation of shell mode vibration and maximum attenuation occurs near the relevant frequency.   As described below, the experimental testing by B&K show that the liners of the 645 and 082 Accused Products have characteristics configured to match at least the ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████

511.    As described above, the shell mode mechanics dictate that the liner provides damping through resistive means.  Shell modes involve ovalizing of the cross-section of the propshaft as it deflects or bends along one or more axes.  An ovalizing propshaft squeezes the liner inside the propshaft and, if it is properly tuned, the liner resists, thereby dissipating energy.  Thus, in shell mode damping the tuned liner deforms as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

512.    The tuning or matching of the NPFT2G-4978-BA liners to a relevant frequency or frequencies is illustrated by the shell mode FRF plots for the 645 Accused Product collected by B&K under my direction as described above. (Ex. C.)  I directed B&K to test a 645 Accused Product as produced by Neapco, with the liners in place.  I also directed B&K to test a 645 Accused Product with the liners removed.  In both cases, I directed B&K to place accelerometers on the top and bottom of the driveshaft at roughly the quarter-length and mid-length of the driveshaft.  I directed B&K to clamp on the outbound sides of the universal joints to provide pinned boundary conditions as installed in the driveline system.  I directed B&K to excite the driveshafts with an impact hammer.  Finally, I directed B&K to calculate the FRFs, relevant shell mode natural frequencies, and shell mode damping.  To ensure that the FRFs measure shell mode vibration, I directed B&K to subtract the accelerometer signals from the top and bottom of the driveshaft and liner during testing.   To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft and calculate the subtracted FRFs at both locations.  Further details on the B&K testing are provided in Ex. C.

513.    I have reproduced the shell mode FRF plot for the 645 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals subtracted to best measure ██████████████████ (Ex. C.)

178

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



514.    The red line in the above FRF plot illustrates the amplitude of shell mode vibration of the 645 Accused Product without its NPFT2G-4978-BA liners. The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small.  The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with the ███████████████ ████████████████████████████████████████ (Ex. C).  The blue line in the above FRF plot illustrates the amplitude of shell mode vibration of the 488 Accused Product with NPFT2G-4978-BA liners installed, wherein the propshaft has a ████████████████ ██████████████████████████████

515.    The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 645 Accused Product.  ███████████ ███████████████████████████████████████████████████████████████

179

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

516.    I instructed B&K to calculate the damping ratios of the ████████████ using the approach described above.  The propshaft of the 645 Accused Product with its NPFT2G-4978-BA liners has a ████████████████████████████████████ ████████████████████████████████████ (Ex. C & D.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

517.     Shell mode vibrations are vibrations that cause the cross-section of a shaft to deflect or bend along one or more axes.  As I described above, to dampen shell mode vibrations a liner must be configured to deform as the cross-section of the propshaft deflects or bends (and thereby transmits vibration energy through the liner) to absorb the vibration from the deflecting and bending propshaft.  The above quarter-length shell mode FRF plots for the 645 Accused Product indicate that the NPFT2G-4978-BA liners effectively dampen shell mode vibrations at the ████████████████████████   The NPFT2G-4978-BA liners therefore deform as vibration energy is transmitted through the liners to absorb the vibration energy as the cross-section of the propshaft deflects or bends at the ████████████████████

518.     Moreover, the material and dimensional characteristics of the NPFT2G-4978-BA liners allow them to act as a tuned resistive absorber, thereby deforming as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  In particular, the NPFT2G-4978-BA liners comprise a ███████████████████████ ██████████████ that may deform to absorb vibration energy.  (NEAPCO000078.)  The NPFT2G-4978-BA liners also comprise a ████████████████████ tube, which may also deform to absorb vibration energy.  (NEAPCO000078.)  The material and dimensional characteristics of the NPFT2G-4978-BA liners therefore allow them to attenuate shell mode vibrations through resistive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-BA liners so that those liners deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration at least at the relevant ████████████████████

519.     The liners of the 645 Accused Products have a natural frequency near a relevant shell mode natural frequency.  I directed B&K to test the NPFT2G-4978-BA liners of the 645

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

Accused Products as described above.  For example, the ███████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

520.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because the NPFT2G-4978-BA liners have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration.  To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

521.   Neapco therefore satisfies the 22[e] limitation for the 645 and 082 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations." ('911 patent, claim 22[e].)

> **(6)     22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."**

522.    Neapco inserts the at least one liner, two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 22[f].)

523.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |

524.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the two NPFT2G-4978-BA liners positioned within the 645 and 082 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

525.    As I discussed above in reference to the 076 and 647 Accused Products and above in reference to limitation 22[e], documents produced by Neapco, including documents relating to tuned liners for use in 4.5 inch propshafts like the 645 and 082 Accused Products, are consistent with my opinion that Neapco configures the NPFT2G-4978-BA liners positioned within the 645 and 082 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

183

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

526.     The liners associated with the 645 and 082 Accused Products have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K show that the liners of the 645 and 082 Accused Products have characteristics ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

527.     As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and, if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

528.     Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

529.    As described above, I directed B&K to test the NPFT2G-4978-BA liners associated with the 645 and 082 Accused Products to determine whether the liners were matched to any bending modes of the propshaft.  The testing results from B&K confirm that the two NPFT2G-4978-BA liners associated with the 645 and 082 Accused Products have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  For example, the ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ██████████████████████████████████████████████████

███████████████████████████

530.    The matching of the NPFT2G-4978-BA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF plots for the 645 Accused Product.  (Ex. C.)   As described above, I directed B&K test the propshaft with and without the liners installed and calculate the FRFs, relevant bending mode natural frequencies, and bending mode damping. To ensure that the FRFs measure bending mode vibration, I directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing.  To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

531.    I have reproduced below the bending mode FRF plot for the 645 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals added to best measure ██████████████████████████ (Ex. C.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



532.    The red line in the above FRF plot illustrates the bending mode FRF of the propshaft of the 645 Accused Product without its NPFT2G-4978-BA liners, wherein the propshaft has a ████████████████████████████████████████ ████████████████████ The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small. The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with the ████████████████████████████████████████ ████████ (Ex. C). The blue line in the above FRF plot illustrates the amplitude of the bending mode vibration of the propshaft of the 645 Accused Product with its NPFT2G-4978-BA liners.

533.    The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 645 Accused Product.   The ████████████ ████████████████████████████████████████

186

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████

534.    I instructed B&K to calculate the ███████████████████

████████████████████████████████ The propshaft of the 645 Accused Product

with its NPFT2G-4978-BA liners also has a ███████████████████

████████████████████████████████████████████████████

████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

535.    Bending mode vibrations are vibrations that cause the propshaft bend along its length.  As I described above, to dampen bending mode vibrations a liner must be configured to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy in the bending propshaft.  The above quarter-length bending mode FRF plots for the 645 Accused Product indicate that the NPFT2G-4978-BA liners effectively dampen bending mode vibrations at the ████████████████████ NPFT2G-4978-BA liners therefore oscillate in opposition to vibration energy to cancel out a portion of the vibration energy as the propshaft bends at the ████████████

536.    Moreover, the material and dimensional characteristics of the NPFT2G-4978-BA liners allow them to act as a tuned reactive absorber, thereby oscillating in opposition to vibration energy of the propshaft to cancel out a portion of the vibration energy to dampen bending mode vibrations.  Similar to classic example of reactive attenuation, the liners have characteristics similar to a mass/spring that is added to the host propshaft.  In particular, the NPFT2G-4978-BA liners comprise a ████████████████████████ ████████ that may stretch and compress like a spring.  (NEAPCO000078.)  The NPFT2G-4978-BA liners also comprise a ██████████████████ tube, coupled to the ████ ████████ similar to a mass coupled to the end of a spring.  (NEAPCO000078.)  The material and dimensional characteristics of the NPFT2G-4978-BA liners therefore allow them to attenuate bending mode vibrations through reactive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-BA liners so that those liners oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the relevant ████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

537.    Neapco therefore satisfies the 22[f] limitation for the 645 and 082 Accused Products by inserting at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." ('911 patent, claim 22[f].)

538.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because the NPFT2G-4978-BA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.   To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.   For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.   The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.   The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

539.   Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

### b.   Claim 23

**(1)   "The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."**

540.   As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

541.   Neapco inserts at least one liner of the 645 and 082 Accused products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." (*See* '911 patent at claim 23.)

542.   As I described above in reference to limitation 22[e], the NPFT2G-4978-BA liners have characteristics configured to match at least the ███████████████████ ███████████ of the 645 and 082 Accused Products, and those liners effectively dampen shell mode vibrations of the propshaft of the 645 and 082 Accused Products ██████████ ██████

543.   Neapco therefore satisfies the additional limitation of claim 23, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." ('911 patent at claim 23.)

544.   Neapco satisfies each and every limitation of, and therefore infringes, claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

### c.   Claim 24

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

> **(1)** **"The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."**

545.    As I described above in reference to claim 23, Neapco satisfies each and every limitation of claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

546.    Neapco inserts at least one liner of the 645 and 082 Accused products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." (*See* '911 patent at claim 24.)

547.    As I described above in reference to limitation 22[f], the NPFT2G-4978-BA liners have characteristics ███████████████████████████████████████ ███████ of the 645 and 082 Accused Products, and those liners effectively dampen bending mode vibrations of the propshaft of the 645 and 082 Accused Products ██████████████ ████████████████████████

548.    Neapco therefore satisfies the additional limitation of claim 24, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." ('911 patent at claim 24.)

549.    Neapco satisfies each and every limitation of, and therefore infringes, claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

> **d.**    **Claim 26**
>
> **(1)** **"The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

**that a wall of the shaft member contacts the at least one resilient member.**

550.     As I described above in reference to claim 24, Neapco satisfies each and every limitation of claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

551.     Neapco inserts at least one liner of the 645 and 082 Accused Products into the propshafts of those accused products, "wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

552.     I understand that Neapco ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████

553.     In particular, the engineering drawing for the NPFT2G-4978-BA liners of the 645 and 082 Accused Products shows how the liners include a structural portion, a tube made out of ████████████████████████████ having an outer diameter "A" (████ inch), inner diameter "B" (████ inch), length "C" (████ inch).  (NEAPCO000078.)  That engineering drawing also shows how the liners include ████████████████████████████████████████████████ ████████████████████████████████████ (NEAPCO000078.)

554.     The engineering drawing further provides a "propshaft description" for the NPFT2G-4978-BA liners: "Aluminum ████ OD x ████ WALL (████ ID)."

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

(NEAPCO000078.)  This propshaft description is consistent with the properties of the 645 and 082 Accused Products set forth in Neapco's engineering drawings.  (*See, e.g.*, NEAPCO000880 (645 Accused Product), NEAPCO000905-12 (same), NEAPCO000922 (same); NEAPCO000106 (082 Accused Product), NEAPCO000107 (same), and NEAPCO000889-96 (same); NEAPCO195905.)  The NPFT2G-4978-BA liners have a slightly larger outer diameter (███ inch) than the inner diameter of the propshaft of the 645 and 082 Accused Products (███ inch).  (NEAPCO000078.)  Thus, the NPFT2G-4978-BA liners will friction-fit against the inner wall of the smaller-diameter propshafts as they are inserted.

555.    The at least one liner, the NPFT2G-4978-BA liners, therefore "includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member."  (*See* '911 patent at claim 26.)

556.    Neapco satisfies each and every limitation of, and therefore infringes, claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

e.    **Claim 27**

(1)    **"The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion."**

557.    As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

558.    Neapco inserts at least one liner of the 645 and 082 Accused Products having at least one resilient member, "wherein the at least one resilient member extends helically about and along the structural portion."  (*See* '911 patent at 27.)

193

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

559.    I understand that Neapco █████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████

560.    In particular, the engineering drawing for the NPFT2G-4978-BA liners of the 645

and 082 Accused Products shows how the liners include ██████████████████████████

████████████████████████████████████████████████████████████████████

███████



(NEAPCO000078.)

561.    The at least one liner, the NPFT2G-4978-BA liners, therefore include at least

"one resilient member extends helically about and along the structural portion."  (*See* '911 patent

at claim 27.)

562.    Neapco satisfies each and every limitation of, and therefore infringes, claim 27 of

the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused

Products.

    **f.  Claim 31**

        **(1)  "The method of claim 26, wherein the structural portion is formed of a material selected from a group**

194

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

**consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."**

563.     As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

564.     Neapco inserts at least one liner of the 645 and 082 Accused Products having a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

565.     I understand that Neapco ███████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

566.     In particular, the engineering drawing for the NPFT2G-4978-BA liners of the 645 and 082 Accused Products shows how the liners include a structural portion, a tube made out of "100% recycled content paperboard."  (NEAPCO000078.)

567.     The at least one liner, the NPFT2G-4978-BA liners, therefore include a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."  (*See* '911 patent at claim 31.)

568.     Neapco satisfies each and every limitation of, and therefore infringes, claim 31 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**g.     Claim 34**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

(1)   **"The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node."**

569.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

570.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

571.    Neapco inserts at least one liner of the 645 and 082 Accused Products, "wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at 34.)

572.    I understand that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

573.    In particular, Neapco engineering drawings for the 645 and 082 Accused Products illustrate each of the two NPFT2G-4978-BA liners positioned near the ████████████ ████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



(*See* NEAPCO000922 (engineering drawing corresponding to Neapco "Tube & DMPR ASY"

part no. NPHT2G-4A181-FA).)   The ████████████████████████████████████████

████████████████████████████████████████████

574.   The at least one liner, the NPFT2G-4978-BA liners, are therefore "positioned

along the shaft member symmetrically about a bending anti-node."  (*See* '911 patent at claim

34.)

575.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this

limitation for the 645 and 082 Accused Products because a first one of the NPFT2G-4978-BA

liners is positioned along the shaft member symmetrically about a bending anti-node.  To the

extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products,

Neapco satisfies this limitation under the doctrine of equivalents because a first one of the

NPFT2G-4978-BA liners is positioned approximately at a location of an anti-node such that any

difference is insubstantial.  For example, the first one of the NPFT2G-4978-BA liners perform

substantially the same function, e.g., attenuate vibration at a position of maximum displacement

for the shaft member in a bending mode of vibration, as a liner literally recited by the claim

limitations.  The first one of the NPFT2G-4978-BA liners function in substantially the same way,

e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

recited by the claim limitations.   The first one of the NPFT2G-4978-BA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

576.    Neapco satisfies each and every limitation of, and therefore infringes, claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**h.    Claim 35**

**(1)    "The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."**

577.    As I described above in reference to claim 34, Neapco satisfies each and every limitation of claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

578.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

579.    Neapco inserts at least one liner of the 645 and 082 Accused Products, "wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node." (*See* '911 patent at 35.)

580.    I understand that ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

581.    In particular, Neapco engineering drawings for the 645 and 082 Accused Products illustrate ████████████████████████████████████████████████████ ██████████████████████████ (*See* NEAPCO000922 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-FA).)   As described above, the ████████████████████████████████████████████████████████████ ████████████████████████████████████

582.    The at least one liner, the two NPFT2G-4978-BA liners, are therefore "positioned along the shaft member symmetrically about a bending anti-node."   (*See* '911 patent at claim 35.)

583.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because the two NPFT2G-4978-BA liners are positioned along the shaft member symmetrically about bending anti-nodes.  To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the two NPFT2G-4978-BA liners are positioned approximately at a location of an anti-node such that any difference is insubstantial.   For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorbers when located at an anti-node, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

584.    Neapco satisfies each and every limitation of, and therefore infringes, claim 35 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

i.    **Claim 36**

585.    I understand I should apply the following claim constructions for my analysis of this claim:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |
| "tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |
| "torsion mode vibration" | Vibration that causes a shaft to twist |

(1)    **Corresponding claim limitations of Claim 22**

586.    Claim 36 and claim 22 of the '911 patent have many of the same claim limitations.  The following table correlates the limitations of claims 22 and 36.

| Limitation of '911 patent, Claim 22 | Limitation of '911 patent, Claim 36 |
|---|---|
| 22[a] | 36[a] |
| 22[b] | 36[b] |
| 22[c] | 36[c] |
| 22[d] | 36[d] |
| 22[e] | 36[f] |
| 22[f] | 36[g] |

587.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

manufacture, offer for sale, and sale of the 645 and 082 Accused Products.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

> **(2)**   **36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"**

588.    Neapco inserts at least one liner into the propshafts of the 645 and 082 Accused Products, namely two NPFT2G-4978-BA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36.)

589.    As illustrated by the engineering drawings for the 645 and 082 Accused Products, the mass of the shaft member associated with those accused products is ███ gram.  (*See* NEAPCO000922 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-FA for the 645 Accused Product); NEAPCO000107 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-FB for the 082 Accused Product).)  The mass of a single NPFT2G-4978-BA liner is ███ gram, for a total mass of the two NPFT2G-4978-BA liners of the 645 and 082 Accused Products of ███ gram.  The ratio of the mass of the two NPFT2G-4978-BA liners to the mass of the shaft member is therefore ███.

590.    Thus, for the two NPFT2G-4978-BA liners and the shaft member of the 645 and 082 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36[e].)

591.    Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**C.**    **The Neapco 5.0 inch Accused Products Infringe the '911 patent**

201

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

592.    I understand that AAM accuses Neapco of infringing the '911 patent for Neapco's manufacture, sale, and offer for sale of the following 5.0 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---|---|---|---|---|
| 94769073 | 5.0 | 0.080 | 1956 | (2) NPFT2G-4978-CA |
| 84059646 | 5.0 | 0.080 | 1956 | (2) NPFT2G-4978-CA |

593.    As I describe more fully below, my opinion is that the Neapco 5.0 Accused Products listed above each infringe claims 22-24, 26, 27, 31, 34-36 of the '911 patent.

### 1.    GM part nos. 84059646 and 94769073 (5.0" x 0.080" x 1956 mm)

594.    As described herein, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 646 Accused Product.  The 073 Accused Product has similar dimensions and characteristics, and includes the same number and type of liners, as the 646 Accused Product described above.   Indeed, the 073 Accused Product has the same Neapco part no., Neapco "TUBE DRV/SHT" part no., and  Neapco "TUBE & DMPR ASY" part no. as the 646 Accused Product.   (*Compare* NEAPCO000108 *and* NEAPCO000923.)   I understand the similarities between the 073 Accused Product and the 646 Accused Product are a result of the 646 Accused Product "replac[ing] [the 073 Accused Product] ███████████ ███████████████████████  (NEAPCO195905.)  As I describe herein, the resulting ███████ ████████████████████████████████████████████████████████ is an insubstantial change that would not affect whether the 073 Accused Product satisfies the claim limitations of the '911 patent.  (*See, e.g.*, GM_AAM000000248-58.)  In other words, modal analysis testing of the 073 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 646 Accused Product.  (*See, e.g.*, GM_AAM000000248-58.)  Therefore, where applicable, rely on the results of B&K's modal

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

analysis testing of the 646 Accused Product for both the 646 Accused Product and 073 Accused Product.

             **a.**      **Claim 22**

                **(1)**      **22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

595.    To the extent the preamble, 22[a], is considered a claim limitation, Neapco performs "[a] method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

596.    I understand that Neapco ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

597.    Neapco engineering drawings for the 646 and 073 Accused Products illustrate the shaft assemblies manufactured by Neapco.  (NEAPCO000923 (646 Accused Product); NEAPCO000108 (073 Accused Product).)  For example, a propshaft assembly of the 646 Accused Product is reproduced below:



(NEAPCO000923; *see also* NEAPCO000108 (073 Accused Product).)  Consistent with Neapco's admission (*see* Neapco's Response to RFA No. 19), the shaft assemblies of the 646

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

and 073 Accused Products are used in driveline systems of certain GM Colorado/Canyon pick-up trucks to transmit torque within those driveline systems, namely to transmit torque from the engines to the axles and wheels of those trucks.   (*See* NEAPCO000923; NEAPCO000108; NEAPCO195905.)   In particular, Exhibit 47 shows the 646 and 073 driveshafts connect the MYB 6AT Transmission to the Dana M220 Axle.   These first and second driveline components couple to the 646 and 073 driveshafts.   The driveshaft transmits torque between these two driveline components using the splined shaft on the left end and u-joint on the right end of the figure above.   These are what are considered to be driveline components in the '911 Patent as shown in Fig. 4 and described "In the context of an automotive vehicle, the driveline components could be a transmission, a transfer case, a viscous coupling, an axle assembly, or a differential, for example." (4:49-51.)

598.    Neapco therefore satisfies the preamble, 22[a], for the 646 and 073 Accused Products by "manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component."   ('911 patent, claim 22[a].)

### (2)    22[b]: "providing a hollow shaft member"

599.    Neapco "provid[es] a hollow shaft member" for each of the 646 and 073 Accused Products.   (*See* '911 patent at claim 22[b].)

600.    I understand that Neapco ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

601.    For example, engineering drawings for the 646 and 073 Accused Products illustrate how they comprise an aluminum, hollow shaft member having a diameter of ▮ inch and a shaft thickness of ▮▮▮ inch.   (*See, e.g.*, NEAPCO000923 (646 Accused Product); NEAPCO000932-39 (same); NEAPCO000940 (same); NEAPCO000108 (073 Accused Product); NEAPCO000109 (same); NEAPCO000924-31 (same); NEAPCO195905.)   The 646 and 073 Accused Products each have two liners—identified by liner part no. NPFT2G-4978-CA—positioned within their hollow shaft member.   (NEAPCO000940 (646 Accused Product); NEAPCO000109 (073 Accused Product); NEAPCO195905.)

602.    Neapco therefore satisfies the 22[b] limitation for the 646 and 073 Accused Products by "providing a hollow shaft member."   ('911 patent, claim 22[b].)

### (3)    22[c]: "tuning a mass and a stiffness of at least one liner"

603.    Neapco "tun[es] a mass and a stiffness of at least one liner" for each of the 646 and 073 Accused Products.   (*See* '911 patent at claim 22[c].)

604.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning a mass and stiffness of at least one liner" | controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies |

605.    As described herein, Neapco engineering drawings confirm that the 646 and 073 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-CA. (NEAPCO000940 (646 Accused Product); NEAPCO000109 (073 Accused Product).)   The Caraustar engineering drawing for the NPFT2G-4978-CA liner—which was "prepared for

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

Neapco"—illustrates how Neapco controls the mass and stiffness of the NPFT2G-4978-CA liner to configure its properties.  (NEAPCO000078.)

606.   Neapco controls the mass of the NPFT2G-4978-CA liners by controlling its material properties and dimensions.  (NEAPCO000078.)  In particular, a single NPFT2G-4978-CA liner is controlled to comprise ███████████████████ and a ████████████ ███████████████  (NEAPCO000078.)   A single NPFT2G-4978-CA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, and length "C" of ████ inch.  (NEAPCO000078.)  These controlled material and dimensional properties for a single NPFT2G-4978-CA liner in turn control the mass of the liner. (NEAPCO000078.)

607.   Similarly, Neapco controls the stiffness of the NPFT2G-4978-CA liners by controlling its material properties and dimensions.  (NEAPCO000078.)  As described above, stiffness is a measure of the resistance of an object in response to an applied force, and is affected by, among other things, material and dimensions of an object.  For each NPFT2G-4978-CA liner, Neapco controls the material of the liner, e.g., ██████████████████ ███████████████████████████ and Neapco controls the shape of the liner by controlling at least the outer diameter, inner diameter, and length of the liner. (NEAPCO000078.)  These controlled material and dimensional properties for a single NPFT2G-4978-CA liner in turn control the stiffness of the liner.  (NEAPCO000078.)

608.   As I describe below in reference to limitations 22[e] and 22[f], Neapco controls the mass and stiffness of the two NPFT2G-4978-CA liners of the 646 and 073 Accused Products to configure those liners to match a relevant frequency or frequencies.  A liner can match a relevant frequency of the driveshaft for either bending mode vibrations or shell mode vibrations.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

Configuring the liner to have a natural frequency near a relevant driveshaft bending mode natural frequency is one way of matching.  Relevant bending mode frequencies include, for example, the first, second, and third bending mode frequencies.  Configuring the liner to provide attenuation of shell mode vibration where the maximum attenuation occurs near the relevant frequency is another way of matching.  Relevant shell mode natural frequencies include, for example, the first, second, and third shell mode frequencies.  As I describe below in reference to limitations 22[e] and 22[f], the Neapco NPFT2G-4978-CA liners are configured to match at least one bending mode natural frequency and at least one shell mode natural frequency.

609.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because Neapco controls a mass and stiffness of the NPFT2G-4978-CA liners to configure the liners to match a relevant frequency or frequencies.  As I describe below in reference to limitations 22[e] and 22[f], to the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

610.    Neapco therefore satisfies the 22[c] limitation for the 646 and 073 Accused Products by "tuning a mass and stiffness of at least one liner."  ('911 patent, claim 22[c].)

### (4)    22[d]: "inserting the at least one liner into the shaft member"

611.    Neapco "insert[s] the at least one liner into the shaft member" for each of the 646 and 073 Accused Products.  (*See* '911 patent at claim 22[d].)

612.    I understand that Neapco ████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

613. For example, Neapco engineering drawings for the 646 and 073 Accused Products illustrate how each of the 646 and 073 Accused Products have two NPFT2G-4978-CA liners— positioned within the shaft at a "Liner Insertion D." (NEAPCO000940 (646 Accused Product); NEAPCO000109 (073 Accused Product).) Further, the Caraustar engineering drawing corresponding to the NPFT2G-4978-CA liner—which was "prepared for Neapco"—provides a "propshaft description" for the corresponding propshaft receiving the NPFT2G-4978-CA liners. (NEAPCO000078.)

614. Neapco therefore satisfies the 22[d] limitation for the 646 and 073 Accused Products by "inserting the at least one liner into the shaft member." ('911 patent, claim 22[d].)

### (5)   22[e]: "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations"

615. Neapco "insert[s] the at least one liner into the shaft member . . . wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations" for each of the 645 and 082 Accused Products. (*See* '911 patent at claim 22[e].)

616. I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |

208

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

617.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the two NPFT2G-4978-CA liners positioned within the 645 and 082 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

618.    Documents produced by Neapco are consistent with my opinion that Neapco configures the NPFT2G-4978-CA liners positioned within the 646 and 073 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.   For example, a document titled ████████████████████ ████████████████████████████████████ NEAPCO004240-4253, is a General Motors presentation ████████████████   ████████████████   ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ (NEAPCO004240- 4253; *see also* NEAPCO004242.)   The presentation ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (NEAPCO004241.)   With regard to the ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (NEAPCO004242.)

619.    The testing results from B&K confirm that the two NPFT2G-4978-CA liners associated with the 646 and 073 Accused Products have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  The liners associated with the

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

646 and 073 Accused Products have characteristics configured to match a relevant shell mode frequency. A relevant shell mode frequency is matched if the liner provides attenuation of shell mode vibration and maximum attenuation occurs near the relevant frequency. As described below, the experimental testing by B&K show that the liners of the 646 and 073 Accused Products have characteristics configured to match at least the ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

620.     As described above, the shell mode mechanics dictate that the liner provides damping through resistive means. Shell modes involve ovalizing of the cross-section of the propshaft as it deflects or bends along one or more axes. An ovalizing propshaft squeezes the liner inside the propshaft and, if it is properly tuned, the liner resists, thereby dissipating energy. Thus, in shell mode damping the tuned liner deforms as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

621.     The tuning or matching of the NPFT2G-4978-CA liners to a relevant frequency or frequencies is illustrated by the shell mode FRF plots for the 646 Accused Product collected by B&K under my direction as described above. (Ex. C.) I directed B&K to test a 646 Accused Product as produced by Neapco, with the liners in place. I also directed B&K to test a 646 Accused Product with the liners removed. In both cases, I directed B&K to place accelerometers on the top and bottom of the driveshaft at roughly the quarter-length and mid-length of the driveshaft. I directed B&K to clamp on the outbound sides of the universal joints to provide pinned boundary conditions as installed in the driveline system. I directed B&K to excite the driveshafts with an impact hammer. Finally, I directed B&K to calculate the FRFs, relevant shell

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

mode natural frequencies, and shell mode damping.  To ensure that the FRFs measure shell mode vibration, I directed B&K to subtract the accelerometer signals from the top and bottom of the driveshaft and liner during testing.   To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft and calculate the subtracted FRFs at both locations.  Further details on the B&K testing are provided in Ex. C.

622.    I have reproduced the shell mode FRF plot for the 646 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals subtracted to best measure ████████████████████  (Ex. C.)



623.    The red line in the above FRF plot illustrates the amplitude of shell mode vibration of the 646 Accused Product without its NPFT2G-4978-CA liners. The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small.  The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with the ███████████████████ ██████████████ are identified on a half-length FRF (Ex. C).  The blue line in the above FRF plot illustrates the amplitude of shell mode vibration of the 646 Accused Product with NPFT2G-4978-CA liners installed, wherein the propshaft has a ████████████████ ████████████████████

624.    The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 646 Accused Product.   The ███████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



625.    I instructed B&K to calculate the damping ratios of the ███████████ using

the approach described above.  The propshaft of the 646 Accused Product with its NPFT2G-

4978-CA liners has a ██████████████████████████████████████████████

████████████████████████████████████████ (Exs. C & D.)

626.    Shell mode vibrations are vibrations that cause the cross-section of a shaft to

deflect or bend along one or more axes.  As I described above, to dampen shell mode vibrations a

liner must be configured to deform as the cross-section of the propshaft deflects or bends (and

thereby transmits vibration energy through the liner) to absorb the vibration from the deflecting

and bending propshaft.  The above quarter-length shell mode FRF plots for the 646 Accused

Product ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

627.     Moreover, the material and dimensional characteristics of the NPFT2G-4978-CA liners allow them to act as a tuned resistive absorber, thereby deforming as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  In particular, the NPFT2G-4978-CA liners comprise a ████████████████████████ ██████████████████ that may deform to absorb vibration energy.  (NEAPCO000078.)  The NPFT2G-4978-CA liners also comprise a ██████████████████████ tube, which may also deform to absorb vibration energy.  (NEAPCO000078.)  The material and dimensional characteristics of the NPFT2G-4978-CA liners therefore allow them to attenuate shell mode vibrations through resistive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-CA liners so that those liners deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration at least at the relevant first, second, and third shell mode natural frequencies.

628.     The liners of the 646 Accused Products have a natural frequency near a relevant shell mode natural frequency.  I directed B&K to test the NPFT2G-4978-CA liners of the 646 Accused Products as described above.  For example, the ████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████

629.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because the NPFT2G-4978-CA liners have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. For example, the NPFT2G-4978-CA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-CA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations. The NPFT2G-4978-CA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

630.    Neapco therefore satisfies the 22[e] limitation for the 646 and 073 Accused Products by inserting at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations." ('911 patent, claim 22[e].)

> **(6)     22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."**

631.    Neapco inserts the at least one liner, two NPFT2G-4978-CA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 646 and 073 Accused Products. (*See* '911 patent at claim 22[f].)

632.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

| | oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
|---|---|
| "bending mode vibration" | Vibration that causes a shaft to bend |

633.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the two NPFT2G-4978-CA liners positioned within the 646 and 073 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

634.    Documents produced by Neapco, including documents relating to tuned liners for use in 4.5 inch propshafts like the 646 and 073 Accused Products, are consistent with my opinion that Neapco configures the NPFT2G-4978-CA liners positioned within the 646 and 073 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

635.    The liners associated with the 646 and 073 Accused Products have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K show that the liners of the 646 and 073 Accused Products have characteristics ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

636.    As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and,

if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

637.   Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

638.   As described above, I directed B&K to test the NPFT2G-4978-CA liners associated with the 646 and 073 Accused Products to determine whether the liners were matched to any bending modes of the propshaft.  The testing results from B&K confirm that the two NPFT2G-4978-CA liners associated with the 646 and 073 Accused Products have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  For example ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████   (*See* Ex. D.)  The FRF of the sum of all four accelerometers (Ex. C) shows that the ████████████████████████████████████████

██████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

639.   The matching of the NPFT2G-4978-CA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF plots for the 646 Accused Product.  (Ex. C.)   As described above, I directed B&K test the propshaft with and without the liners installed and calculate the FRFs, relevant bending mode natural frequencies, and bending mode damping. To ensure that the FRFs measure bending mode vibration, I directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing.  To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

640.   I have reproduced below the bending mode FRF plot for the 646 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals added to best measure ███████████████████████ (Ex. C.)



641.   The red line in the above FRF plot illustrates the bending mode FRF of the propshaft of the 646 Accused Product without its NPFT2G-4978-CA liners, wherein the propshaft has a ██████████████████████████████████████ ████████████  The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small.  The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with the ███████████████████████████████████████ ███████████████████ The blue line in the above FRF plot ███████████████████████ ████████████████████████████████████████████████████████

642.    The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 646 Accused Product.   The ████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



643.    I instructed B&K to calculate the damping ratios of the ▮▮▮▮▮▮ using a standard algorithm based on the width of the peaks. The propshaft of the 646 Accused Product with its NPFT2G-4978-CA liners also has a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (Exs. C & D.)

644.    Bending mode vibrations are vibrations that cause the propshaft bend along its length.  As I described above, to dampen bending mode vibrations a liner must be configured to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy in the bending propshaft.  The above quarter-length bending mode FRF plots for the 645 Accused Product indicate that the NPFT2G-4978-CA liners effectively dampen bending mode vibrations at the second bending mode frequency.   NPFT2G-4978-CA liners therefore oscillate in opposition to vibration energy to cancel out a portion of the vibration energy as the propshaft bends at the ▮▮▮▮▮▮▮▮▮

645.    Moreover, the material and dimensional characteristics of the NPFT2G-4978-CA liners allow them to act as a tuned reactive absorber, thereby oscillating in opposition to

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

vibration energy of the propshaft to cancel out a portion of the vibration energy to dampen bending mode vibrations.  Similar to classic example of reactive attenuation, the liners have characteristics similar to a mass/spring that is added to the host propshaft.  In particular, the NPFT2G-4978-CA liners comprise a ███████████████████████████████ ████████ that may stretch and compress like a spring.  (NEAPCO000078.)  The NPFT2G-4978-CA liners also comprise a ██████████████████████████ tube, coupled to the ███████ ███████ similar to a mass coupled to the end of a spring.  (NEAPCO000078.)  The material and dimensional characteristics of the NPFT2G-4978-CA liners therefore allow them to attenuate bending mode vibrations through reactive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-CA liners so that those liners oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the ████████████████████████████████

646.  Neapco therefore satisfies the 22[f] limitation for the 646 and 073 Accused Products by inserting at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."  ('911 patent, claim 22[f].)

647.  *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because the NPFT2G-4978-CA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-CA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-CA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.  The NPFT2G-4978-CA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

648.    Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

        **b.**      **Claim 23**

            **(1)**    **"The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."**

649.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

650.    Neapco inserts at least one liner of the 646 and 073 Accused Products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."  (*See* '911 patent at claim 23.)

651.    As I described above in reference to limitation 22[e], the NPFT2G-4978-CA liners have characteristics configured to match at least the second shell mode natural frequencies

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

of the propshaft of the 646 and 073 Accused Products, and those liners effectively dampen shell mode vibrations of the propshaft of the 646 and 073 Accused Products ████████████████ ██████.

652.    Neapco therefore satisfies the additional limitation of claim 23, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." ('911 patent at claim 23.)

653.    Neapco satisfies each and every limitation of, and therefore infringes, claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### c.    Claim 24

**(1)    "The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."**

654.    As I described above in reference to claim 23, Neapco satisfies each and every limitation of claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

655.    Neapco inserts at least one liner of the 646 and 073 Accused products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." (*See* '911 patent at claim 24.)

656.    As I described above in reference to limitation 22[f], the NPFT2G-4978-CA liners have characteristics ████████████████████████████████ of the propshaft of the 646 and 073 Accused Products, and those liners effectively dampen bending mode vibrations of the propshaft of the 646 and 073 Accused Products ████████████████ ██████████████████.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

657.    Neapco therefore satisfies the additional limitation of claim 24, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." ('911 patent at claim 24.)

658.    Neapco satisfies each and every limitation of, and therefore infringes, claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

> ### d.    Claim 26
>
> #### (1)    "The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member.

659.    As I described above in reference to claim 24, Neapco satisfies each and every limitation of claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

660.    Neapco inserts at least one liner of the 646 and 073 Accused Products into the propshafts of those accused products, "wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

661.    I understand that Neapco ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████

██████████████████████████████████████

662.     In particular, the engineering drawing for the NPFT2G-4978-CA liners of the 646 and 073 Accused Products shows ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

663.     The engineering drawing further provides a "propshaft description" for the NPFT2G-4978-CA   liners: ████████████████████████████

██████████████████     This propshaft description is consistent with the properties of the 646 Accused Product set forth in Neapco's engineering drawings.  (*See, e.g.*, NEAPCO000923 (646 Accused  Product);  NEAPCO000932-39  (same);  NEAPCO000940  (same);  NEAPCO000108 (073   Accused   Product);   NEAPCO000109   (same);   NEAPCO000924-31   (same); NEAPCO195905.)  The NPFT2G-4978-CA liners have a ████████████████████████

████████████████████████████████████████████

(NEAPCO000078.)  Thus, the NPFT2G-4978-CA liners will friction-fit against the inner wall of the smaller-diameter propshafts as they are inserted.

664.     The at least one liner, the NPFT2G-4978-CA liners, therefore "includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member."  (*See* '911 patent at claim 26.)

225

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

665.     Neapco satisfies each and every limitation of, and therefore infringes, claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

   **e. Claim 27**

     **(1) "The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion."**

666.     As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

667.     Neapco inserts at least one liner of the 646 and 073 Accused Products having at least one resilient member, "wherein the at least one resilient member extends helically about and along the structural portion." (*See* '911 patent at 27.)

668.     I understand that Neapco ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████

669.     In particular, the engineering drawing for the NPFT2G-4978-CA liners of the 646 and 073 Accused Products shows ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



(NEAPCO000078.)

670.    The at least one liner, the NPFT2G-4978-CA liners, therefore include at least "one resilient member extends helically about and along the structural portion." (*See* '911 patent at claim 27.)

671.    Neapco satisfies each and every limitation of, and therefore infringes, claim 27 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

   **f. Claim 31**

    **(1) "The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."**

672.    As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

673.    Neapco inserts at least one liner of the 646 and 073 Accused Products having a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

674.    I understand that Neapco ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

675.    In particular, the engineering drawing for the NPFT2G-4978-CA liners of the 646 and 073 Accused Products shows ████████████████████████████████████

████████████████████████████ (NEAPCO000078.)

676.    The at least one liner, the NPFT2G-4978-CA liners, therefore include a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

677.    Neapco satisfies each and every limitation of, and therefore infringes, claim 31 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

g.    **Claim 34**

(1)    **"The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node."**

678.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

679.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

680.    Neapco inserts at least one liner of the 646 and 073 Accused Products, "wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at 34.)

681.    I understand that ██████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████

682.    In particular, Neapco engineering drawings for the 646 and 073 Accused Products ████████████████████████████████████████████████████ █████████████████████████



(*See* NEAPCO000940 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPHT2G-4A181-GA); *see also* NEAPCO000109 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPFT2G-4A181-GA).) ██████████████████ ████████████████████████████████████████████████████ ████████████████████████

683.    The at least one liner, the NPFT2G-4978-CA liners, are therefore "positioned along the shaft member symmetrically about a bending anti-node." (See '911 patent at claim 34.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

684.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because a first one of the NPFT2G-4978-CA liners is positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because ███████████ ████████████████████████████████████████████████████ such that any difference is insubstantial.  For example, the first one of the NPFT2G-4978-CA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-CA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.   The first one of the NPFT2G-4978-CA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

685.    Neapco satisfies each and every limitation of, and therefore infringes, claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### h.    Claim 35

> (1)    **"The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."**

686.    As I described above in reference to claim 34, Neapco satisfies each and every limitation of claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

687.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

688.    Neapco inserts at least one liner of the 646 and 073 Accused Products, "wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."  (See '911 patent at 35.)

689.    I understand that 

690.    In particular, Neapco engineering drawings for the 646 and 073 Accused Products

(*See* NEAPCO000940; NEAPCO000109.)

691.    The two NPFT2G-4978-CA liners are therefore "positioned along the shaft member symmetrically about another bending anti-node."  ('911 patent at claim 35.)

692.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are positioned approximately at a location of an anti-node such that any difference is

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

insubstantial.  For example, the NPFT2G-4978-CA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The NPFT2G-4978-CA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.  The NPFT2G-4978-CA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

693.    Neapco satisfies each and every limitation of, and therefore infringes, claim 35 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### i.    Claim 36

694.    I understand I should apply the following claim constructions for my analysis of this claim:

| Claim Element | Construction |
| --- | --- |
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |
| "tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |
| "torsion mode vibration" | Vibration that causes a shaft to twist |

### (1)    Corresponding claim limitations of Claim 22

232

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

695.    Claim 36 and claim 22 of the '911 patent have many of the same claim limitations.  The following table correlates the limitations of claims 22 and 36.

| Limitation of '911 patent, Claim 22 | Limitation of '911 patent, Claim 36 |
|---|---|
| 22[a] | 36[a] |
| 22[b] | 36[b] |
| 22[c] | 36[c] |
| 22[d] | 36[d] |
| 22[e] | 36[f] |
| 22[f] | 36[g] |

696.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

> **(2)    36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"**

697.    Neapco inserts at least one liner into the propshafts of the 646 and 073 Accused Products, namely two NPFT2G-4978-CA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36.)

698.    As illustrated by the engineering drawings for the 646 and 073 Accused Products, the mass of the shaft member associated with those accused products is ▮ gram.  (*See* NEAPCO000940 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-FA for the 646 Accused Product); NEAPCO000109 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-FA for the 073 Accused Product).)  The mass of a single NPFT2G-4978-CA liner is ▮ gram, for a total mass of the two NPFT2G-4978-CA liners of the 646 and 073 Accused Products of ▮ gram.  The

233

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

ratio of the mass of the two NPFT2G-4978-CA liners to the mass of the shaft member is therefore ▮▮▮▮▮

699.    Thus, for the two NPFT2G-4978-CA liners and the shaft member of the 646 and 073 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36[e].)

700.    Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

**D.    The Neapco 5.775 inch Accused Products Infringe the '911 patent**

701.    I understand that AAM accuses Neapco of infringing the '911 patent for Neapco's manufacture, sale, and offer for sale of the following 5.775 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---|---|---|---|---|
| 23225169 | 5.775 | 0.079 | 2222 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059643 | 5.775 | 0.079 | 2222 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23253781 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059644 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84148489 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23377650 | 5.775 | 0.079 | 2172 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |

702.    As I describe more fully below, my opinion is that the Neapco 5.775 Accused Products listed above each infringe claims 22-24, 26, 27, 31, 34-36 of the '911 patent.

**1.    GM part nos. 84059643 and 23225169 (5.775" x 0.079" x 2222 mm)**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

703.    As described herein, I rely in part on the modal analysis testing results from B&K. I asked B&K to perform testing on the 643 Accused Product.  The 169 Accused Product has similar dimensions and characteristics, and includes the same number and type of liners, as the 643 Accused Product described above.  Indeed, the 169 Accused Product has the same Neapco part no., Neapco "TUBE DRV/SHT" part no., and  Neapco "TUBE & DMPR ASY" part no. as the 643 Accused Product.  (*Compare* NEAPCO000110 *and*  NEAPCO000941.)  I understand the similarities between the 169 Accused Product and the 643 Accused Product are a result of the 643 Accused Product █████████████████████████████████████████████

████████████████  (NEAPCO195905.)  █████████████████████████████

██████████████████████████████  is an insubstantial change that would not affect whether the 169 Accused Product satisfies the claim limitations of the '911 patent.  (*See, e.g.*, GM_AAM000000248-58.)  In other words, modal analysis testing of the 169 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 643 Accused Product.  (*See, e.g.*, GM_AAM000000248-58.)  Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 643 Accused Product for both the 643 Accused Product and the 169 Accused Product.

### a.    Claim 22

**(1)    22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

704.    To the extent the preamble, 22[a], is considered a claim limitation, Neapco performs "[a] method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

705.   I understand that Neapco ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

706.   Neapco engineering drawings for the 643 and 169 Accused Products illustrate the shaft assemblies manufactured by Neapco.   (NEAPCO000941 (643 Accused Product); NEAPCO000110 (169 Accused Product).)   For example, a propshaft assembly of the 643 Accused Product is reproduced below:

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

(NEAPCO000941; *see also* NEAPCO000110 (169 Accused Product).)   Consistent with

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████   (*See* NEAPCO000941; NEAPCO000110; NEAPCO195905.)   In particular, ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████   These are what are considered to be driveline components in the '911 patent as shown in Fig. 4 and described in the specification: "In the context of an

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

automotive vehicle, the driveline components could be a transmission, a transfer case, a viscous coupling, an axle assembly, or a differential, for example." ('911 patent at 4:45-51.)

707.    Neapco therefore satisfies the preamble, 22[a], for the 643 and 169 Accused Products by "manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

### (2)    22[b]: "providing a hollow shaft member"

708.    Neapco "provid[es] a hollow shaft member" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 22[b].)

709.    I understand that Neapco ████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

710.    For example, engineering drawings for the 643 and 169 Accused Products illustrate how they ███████████████████████████████████████████████████████████ ████████████████████████████████ (*See, e.g.*, NEAPCO000941 (643 Accused Product), NEAPCO000958-65 (same), and NEAPCO000991 (same); NEAPCO000110 (169 Accused Product), NEAPCO000111 (same), and NEAPCO000950-57 (same); NEAPCO195905.)   The 643 and 169 Accused Products each have ███████████████████████████████████████ ██████████████████████████████ (*See* NEAPCO000991; NEAPCO000111; NEAPCO195905.)  In particular, the 643 and 169 Accused Products each have ██████████████████████████ ███████████████████████████████████████████████████████████████████████ (NEAPCO000991; NEAPCO000111.)  The 643 and 169 Accused Products also each have ████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ (NEAPCO000991; NEAPCO000111.)

711.    Neapco therefore satisfies the 22[b] limitation for the 643 and 169 Accused Products by "providing a hollow shaft member."  ('911 patent, claim 22[b].)

<div align="center">

**(3)    22[c]: "tuning a mass and a stiffness of at least one liner"**

</div>

712.    Neapco "tun[es] a mass and a stiffness of at least one liner" for the 643 and 169 Accused Products.  (*See* '911 patent at claim 22[c].)

713.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning a mass and stiffness of at least one liner" | controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies |

714.    As described herein, Neapco engineering drawings confirm that the 643 and 169 Accused Products comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA.   (NEAPCO000991; NEAPCO000111.)  The Caraustar engineering drawings for the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners—which were both "prepared for Neapco"—illustrate how Neapco controls the mass and stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the properties of those liners.  (*See* NEAPCO000081 (Caraustar engineering drawing for liner having part no. NPFT2G-4978-DBA); NEAPCO000082 (Caraustar engineering drawing for the liner having part no. NPFT2G-4978-DCA).)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

715.    Neapco controls the mass of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  (NEAPCO000081; NEAPCO000082.)  In particular, a single NPFT2G-4978-DBA liner is controlled to comprise ██████████████████ and a ██████████████████ winding, specifically a ██████████████████ (NEAPCO000081.)  A single NPFT2G-4978-DCA liner is controlled to comprise ██████████████████ and a ██████████████████ ████████ winding, specifically a ██████████████████ (NEAPCO000082.)  A single NPFT2G-4978-DBA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, length "C" of ████ inch, and winding pitch "D" of ████ inch.  (NEAPCO000081.)  A single NPFT2G-4978-DCA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, length "C" of ████ inch, and winding pitch "D" of ██ inch.  (NEAPCO000082.)  The one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners have a combined mass of ████ gram.  (NEAPCO000991; NEAPCO000111.)  These controlled material and dimensional properties the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners in turn control the mass of those liners.  (NEAPCO000081; NEAPCO000082.)

716.    Similarly, Neapco controls the stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  (NEAPCO000081; NEAPCO000082.)  As described above, stiffness is a measure of the resistance of an object in response to an applied force, and is affected by, among other things, material and dimensions of an object.  For each NPFT2G-4978-DBA and NPFT2G-4978-DCA liner, Neapco controls the material of the liner, e.g., ██████████████████ and either a ██████████ ██████████ winding (NEAPCO000081 (NPFT2G-4978-DBA liner)) or ██████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████ winding (NEAPCO000082 (NPFT2G-4978-DCA)), each comprising a ██

████████████████████ (*See* NEAPCO000081; NEAPCO000082.) Note that durometer is a measure of the hardness of a material and is related to the stiffness of the material[4]. Thus, by specifying ██████████████████ material, Neapco is directly controlling the stiffness of the liner. Neapco also controls the shape of the liner by controlling at least the outer diameter, inner diameter, and length of the liner. (NEAPCO000081; NEAPCO000082.) These controlled material properties and dimensions for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners in turn control the stiffness of the liner. (NEAPCO000081; NEAPCO000082.)

717.    As I describe below in reference to limitations 22[e] and 22[f], Neapco controls the mass and stiffness of the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners of the 643 and 169 Accused Products to configure those liners to match a relevant frequency or frequencies. A liner can match a relevant frequency of the driveshaft for either bending mode vibrations or shell mode vibrations. Configuring the liner to have a natural frequency near a relevant driveshaft bending mode natural frequency is one way of matching. Relevant bending mode frequencies include, for example, the first, second, and third bending mode frequencies. Configuring the liner to have a natural frequency near a relevant driveshaft shell mode natural frequency is another way of matching. Relevant shell mode natural frequencies include, for example, the first, second, and third shell mode frequencies. As I describe below in reference to limitations 22[e] and 22[f], the Neapco NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to match at least one bending mode natural frequency and at least one shell mode natural frequency.

---

[4] https://en.wikipedia.org/wiki/Shore_durometer, accessed 5/26/17.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

718.    Indeed, I understand that Neapco ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

719.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because Neapco controls a mass and stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant frequency or frequencies.  As I describe below in reference to limitations 22[e] and 22[f], to the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

720.    Neapco therefore satisfies the 22[c] limitation for the 643 and 169 Accused Products by "tuning a mass and stiffness of at least one liner."  ('911 patent, claim 22[c].)

> (4)    **22[d]: "inserting the at least one liner into the shaft member"**

721.    Neapco "insert[s] the at least one liner into the shaft member" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 22[d].)

722.    I understand that Neapco ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

241

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

723. For example, Neapco engineering drawings for the 643 and 169 Accused Products illustrate how each of the 643 and 169 Accused Products have one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners positioned within the shaft at depth locations "B," "C," and "D." (NEAPCO000111; *see also* NEAPCO000991.)   Further, the Caraustar engineering drawings corresponding to the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners—which were each "prepared for Neapco"—provide a "propshaft description" for the corresponding propshaft receiving the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners.  (NEAPCO000081; NEAPCO000082.)

724. Neapco therefore satisfies the 22[d] limitation for the 643 and 169 Accused Products by "inserting the at least one liner into the shaft member."  ('911 patent, claim 22[d].)

> **(5)    22[e]: "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations"**

725. Neapco inserts at least one liner, namely the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners, into a shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations" for the 643 and 169 Accused Products. (*See* '911 patent at claim 22[e].)

726. I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |

727. As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

positioned within the 643 and 169 Accused Products by, for example, controlling the material properties and dimensions of those liners control their mass and stiffness.  (NEAPCO000081; NEAPCO000082.)

728.   Documents produced by Neapco are consistent with my opinion that Neapco configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 643 and 169 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  For example, a document titled ███████ ████████████████████████████████████████████ NEAPCO004240-4253, is a General Motors presentation ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ (NEAPCO004240-4253; *see also* NEAPCO004242, NEAPCO004248.)    The presentation describes ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ ██ ████████████████ ████████████████████████████████

729.   Other documents produced by Neapco are consistent with my opinion that Neapco configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 643 and 169 Accused Products to match a relevant frequency or frequencies of the propshafts

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

of those accused products to dampen shell mode vibrations. (*See, e.g.*, NEAPCO002584-93

███████████████████████████████████ NEAPCO004344 ████████████

████████████████████████████████████████████████████████

███████████████████████████████ NEAPCO001436-42 (presentation describing

████████████████████████████████████████████████████████

██████████████████████████████████████ NEAPCO001443-

1460 (presentation describing ████████████████████████████

██████████████████████████████████ NEAPCO001461-85

(same); NEAPCO001486-1512 (same); NEAPCO001513 (same); NEAPCO004347 ███████

███████████████████████████████ NEAPCO001435 (handwritten

notes ████████████████████████████████████

NEAPCO001524-44   (presentation   on   █████████████████████

████████████████████████████████████████████████████████

████████████████ NEAPCO004348 ███████████████████████████

████████████████████████████████ NEAPCO004345 (same);

NEAPCO001282 (presentation describing ██████████████████████

█████████████ NEAPCO160006 (presentation describing ████████████

████████████████████████████████████████████████████████

██████████████████ NEAPCO007762 ██████████████████████████

████████████████████████████████████████████████████████

NEAPCO000090   (presentation   describing   ████████████████████

█████████████████████████████████████ NEAPCO160021

(presentation describing █████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

███████████   NEAPCO004343   (describing ███████████
███████████████████████████████).)

730.    The testing results from B&K confirm that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners associated with the 643 and 169 Accused Products have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  The liners associated with the 643 and 169 Accused Products have characteristics configured to match a relevant shell mode frequency.  A relevant shell mode frequency is matched if the liner provides attenuation of shell mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K shows

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████

731.    As described above, the shell mode mechanics dictate that the liner provides damping through resistive means.  Shell modes involve ovalizing of the cross-section of the propshaft as it deflects or bends along one or more axes.  An ovalizing propshaft squeezes the liner inside the propshaft and, if it is properly tuned, the liner resists, thereby dissipating energy.  Thus, in shell mode damping the tuned liner deforms as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

732.    The tuning or matching of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to a relevant frequency or frequencies is illustrated by the shell mode FRF data for the 643 Accused Product collected by B&K under my direction as described above.  (Ex. C.)  I directed

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

B&K to test a 643 Accused Product as produced by Neapco, with the liners in place.  I also directed B&K to test a 643 Accused Product with the liners removed.  In both cases, I directed B&K to place accelerometers on the top and bottom of the driveshaft at roughly the quarter-length and mid-length of the driveshaft.  I directed B&K to clamp on the outbound sides of the universal joints to provide pinned boundary conditions as installed in the driveline system.  I directed B&K to excite the driveshafts with an impact hammer near the top accelerometers.  Finally, I directed B&K to calculate the FRFs, relevant shell mode natural frequencies, and shell mode damping.  To ensure that the FRFs measure shell mode vibration, I directed B&K to subtract the accelerometer signals from the top and bottom of the driveshaft and liner during testing.   To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft and calculate the subtracted FRFs at both locations.  Further details on the B&K testing are provided in Ex. C.

733.    I have reproduced below the shell mode FRF data for the 643 Accused Product having accelerometers positioned generally at the mid-length of the propshaft and having signals subtracted to best measure ███████████████████ (Ex. C.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



734.    The red line in the above FRF plot illustrates the amplitude of shell mode vibration of the 643 Accused Product without its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners.  The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration. The vertical axis is a log scale so large changes in amplitude look relatively small.   The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with

735.    The figure below zooms into the mid-length FRF plot shown above to highlight the attenuation caused by the liners of the 643 Accused Products.  The ████████████████

247

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

736.     I instructed B&K to calculate the damping ratios ████████████ using the approach described above.  The propshaft of the 643 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ████████████████████ ████████████████████ (Ex. C; Ex. D.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

737.     Shell mode vibrations are vibrations that cause the cross-section of a shaft to deflect or bend along one or more axes.  As I described above, to dampen shell mode vibrations a liner must be configured to deform as the cross-section of the propshaft deflects or bends (and thereby transmits vibration energy through the liner) to absorb the vibration from the deflecting and bending propshaft. █████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

738.     Moreover, the material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners allow them to act as a tuned resistive absorber, thereby deforming as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  In particular, the NPFT2G-4978-DBA liners comprise ████████████ ████████ and a █████████████████ winding, specifically a ██████████ ████████ (NEAPCO000081.)   The NPFT2G-4978-DCA liners comprise ████████ ██████████████ and a "████████████████████████ winding, specifically a ██ ████████████ (NEAPCO000082.)  The silicone winding of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners ████████████████████████████████ ████████ (NEAPCO000081; NEAPCO000082.)  The █████████████████████ tube of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners may also deform to absorb vibration energy.  (NEAPCO000081; NEAPCO000082.)  The material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore allow them to attenuate shell mode vibrations through resistive attenuation.    Neapco controls specific properties and

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners so that those liners deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration at least at the relevant third shell mode natural frequency.

739.    The liners of the 643 Accused Products have a natural frequency near a relevant shell mode frequency.  I directed B&K to test the NPFT2G-4978-DCA and NPFT2G-4978-DCA liners of the 643 Accused Products as described above.

740.



741.

742.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration.  To the extent that Neapco does not literally satisfy this limitation for the 643 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

743.    Neapco therefore satisfies the 22[e] limitation for the 643 and 169 Accused Products by inserting at least one liner, namely one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations." ('911 patent, claim 22[e].)

> **(6)    22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."**

744.    Neapco inserts the at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 22[f].)

745.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

746.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within 643 and 169 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

747.    ███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████

748.    As described above with regard to limitation 22[e], documents produced by Neapco are consistent with my opinion that Neapco configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 643 and 169 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  (*See* NEAPCO004240-4253 ████████████████████████

███████████████████████████████ NEAPCO002584-93

███████████████████████████ NEAPCO004344 █████████

█████████████████████████████████████████████████

████████████████████████████ NEAPCO001436-42 (presentation describing

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████ NEAPCO001443-1460 (presentation describing ███████████████

█████████████████████████████████████████████████

████████ NEAPCO001461-85 (same); NEAPCO001486-1512 (same); NEAPCO001513 (same);

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NEAPCO004347 ████████████████████████████████████

NEAPCO001435 (handwritten notes ████████████████████████████

███████████████████████ NEAPCO001524-44 (presentation on ██████████

█████████████████████████████████████████████████████████████

███████████████████████████████ ██ ████████████████ ██ ████████

██████████████ NEAPCO004348 ███████████████████████████████████

███████████████████████████████████ NEAPCO004345 (same);

NEAPCO001282 (presentation describing ████████████████████████

████████████████ NEAPCO160006 (presentation describing ███████████

█████████████████████████████████████████████████████████████

████████████████████████ NEAPCO007762 ██████████████████████████

█████████████████████████████████████████████████████████████

NEAPCO000090 (presentation describing ██████████████████████████

████████████████████████████████████████████ NEAPCO160021

(presentation describing ██████████████████████████████████████

██████████████ NEAPCO004343 (describing ██████████████████████████

████████████████████████████████████████

749.    The liners associated with the 643 and 169 Accused Products have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K shows that the liners of the 643 Accused Products have characteristics ██████████████████████

█████████████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

███████████████████████████████████████████████████████

███████████████████████████

750.    As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and, if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

751.    Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

752.    As described above, I directed B&K to test the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners associated with the 643 Accused Product to determine whether the liners were matched to any bending modes of the propshaft.

753.    The testing results from B&K confirm that these liners have characteristics configured to match a relevant frequency or frequencies and to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  For example, ████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

754.    The matching of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF data for the 643 Accused Product.  (Ex. C.)  As described above, I directed B&K to test the propshaft with and without the liners installed and calculated the FRFs, relevant bending mode natural frequencies, and bending mode damping.  To ensure that the FRFs measure bending mode vibration, I directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing.

755.    To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

756.    I have reproduced the bending mode FRF of the 643 Accused Product having accelerometers positioned generally at the mid-length of the propshaft and having signals added to best measure ███████████████████████Ex. C.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



757.     The red line in the above FRF plot illustrates the amplitude of bending mode vibration of the 643 Accused Product without its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners.  The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.  The vertical axis is a log scale so large changes in amplitude look relatively small.   The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with

758.     The figure below zooms into the mid-length FRF plot shown above to highlight the attenuation caused by the liners of the 643 Accused Product.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



759.    I instructed B&K to calculate the damping ratios ███████████ using a standard algorithm based on the width of the peaks.  The propshaft of the 643 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ██████████████ ████████████████████████████████ (Ex. C; Ex. D.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

760.    Bending mode vibrations are vibrations that cause the propshaft bend along its length.  As I described above, to dampen bending mode vibrations a liner must be configured to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy in the bending propshaft.  The above mid-length bending mode FRF plots for the 643 Accused Product indicate that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners ███████████████



761.    Moreover, the material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners allow them to act as a tuned reactive absorber, thereby oscillating in opposition to vibration energy of the propshaft to cancel out a portion of the vibration energy to dampen bending mode vibrations.  Similar to classic example of reactive attenuation, the liners have characteristics similar to a mass/spring that is added to the host propshaft.  In particular, the NPFT2G-4978-DBA liners comprise ████████████████ winding, specifically a ████ ████████████████████ that may stretch and compress like a spring. (NEAPCO000081.)    The NPFT2G-4978-DCA liners comprise a ████████████████ ██████████ winding, specifically a ████████████████████ ████████████████ (NEAPCO000082.)  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners also comprise a ████████████████████ tube, coupled to the ██████████ similar to a mass coupled to the end of a spring.  (NEAPCO000081; NEAPCO000082.)   The material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore allow them to attenuate bending mode vibrations through reactive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

DBA and NPFT2G-4978-DCA liners so that those liners oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the relevant third bending mode natural frequency.

762.   Neapco therefore satisfies the 22[f] limitation for the 643 and 169 Accused Products by inserting at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations." ('911 patent, claim 22[f].)

763.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.   To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.   For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

764.    Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### b.    Claim 23

#### (1)    "The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."

765.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

766.    Neapco inserts at least one liner of the 643 and 169 Accused Products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." (*See* '911 patent at claim 23.)

767.    As I described above in reference to limitation 22[e], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to ███████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████

768.    Neapco therefore satisfies the additional limitation of claim 23, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." ('911 patent at claim 23.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

769.    Neapco satisfies each and every limitation of, and therefore infringes, claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### c.    Claim 24

(1)    **"The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."**

770.    As I described above in reference to claim 23, Neapco satisfies each and every limitation of claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

771.    Neapco inserts at least one liner of the 643 and 169 Accused Products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."  (*See* '911 patent at claim 24.)

772.    As I described above in reference to limitation 22[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have ███████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████

773.    Neapco therefore satisfies the additional limitation of claim 24, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."  ('911 patent at claim 24.)

774.    Neapco satisfies each and every limitation of, and therefore infringes, claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

        **d.**    **Claim 26**

        **(1)**    **"The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member.**

775.    As I described above in reference to claim 24, Neapco satisfies each and every limitation of claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

776.    Neapco inserts at least one liner of the 643 and 169 Accused Products into the propshafts of those accused products, "wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

777.    I understand that Neapco ███████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████

778.    In particular, the engineering drawings for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 643 and 169 Accused Products show how each of those liners include a structural portion, a tube made out of ██████████████████████████████ (NEAPCO000081 (engineering drawing corresponding to the NPFT2G-4978-DBA liner); NEAPCO000082 (engineering drawing corresponding to the NPFT2G-4978-DCA liner).)  The

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-DBA has an outer diameter "A" (███ inch), inner diameter "B" (███ inch), length "C" (███ inch) (NEAPCO000081), and the   NPFT2G-4978-DCA liner has an outer diameter "A" (███ inch), inner diameter "B" (███ inch), length "C" (███ inch) (NEAPCO000082).  Those engineering drawings also show how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners comprise a ████████████████████████████ ████████ (NEAPCO000081),   or   a ████████████████████████████ (NEAPCO000082),   each   a ██████████████████████ (NEAPCO000081; NEAPCO000082.) ████████████ ██████████████████████████████████████ (NEAPCO000081; NEAPCO000082.)

779.    The engineering drawings further provide a "propshaft description" for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners: ████████████████████ ████████████ (NEAPCO000081; NEAPCO000082.)  This propshaft description is consistent with the properties of the 643 and 169 Accused Products set forth in Neapco's engineering drawings.  (*See, e.g.*, NEAPCO000941 (643 Accused Product), NEAPCO000958-65 (same), and NEAPCO000991 (same); NEAPCO000110 (169 Accused Product), NEAPCO000111 (same), and NEAPCO000950-57 (same); NEAPCO195905.)  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners each have a ██████████████████████████████ ██████████████████████████████████████ (NEAPCO000081; NEAPCO000082.)  Thus, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners will friction-fit against the inner wall of the smaller-diameter propshafts as they are inserted.

780.    The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore "includes a structural portion and at least one resilient member that is coupled to the

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

781.    Neapco satisfies each and every limitation of, and therefore infringes, claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### e.    Claim 27

(1)    **"The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion."**

782.    As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

783.    Neapco inserts at least one liner of the 643 and 169 Accused Products having at least one resilient member, "wherein the at least one resilient member extends helically about and along the structural portion." (*See* '911 patent at 27.)

784.    I understand that Neapco ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

785.    In particular, the engineering drawing for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 643 and 169 Accused Products shows how the liners include a ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



(NEAPCO000081.)



(NEAPCO000082.)

786.    The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore include at least "one resilient member extends helically about and along the structural portion." (*See* '911 patent at claim 27.)

787.    Neapco satisfies each and every limitation of, and therefore infringes, claim 27 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

### f.      Claim 31

(1)      **"The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."**

788.    As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

789.    Neapco inserts at least one liner of the 643 and 169 Accused Products having a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

790.    I understand that Neapco █████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████

791.    In particular, the engineering drawing for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 643 and 169 Accused Products shows how the liners include a structural portion, a tube made out of ███████████████████████ (NEAPCO000081; NEAPCO000082.)

792.    The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore include a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."  (*See* '911 patent at claim 31.)

266

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

793.    Neapco satisfies each and every limitation of, and therefore infringes, claim 31 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

        g.     **Claim 34**

        (1)     **"The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node."**

794.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

795.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

796.    Neapco inserts at least one liner of the 643 and 169 Accused Products, "wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at 34.)

797.    I understand that ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

798.    In particular, Neapco engineering drawings for the 643 and 169 Accused Products illustrate the one NPFT2G-4978-DBA liner ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



(NEAPCO000111 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPHT2G-4A181-KA); *see also* NEAPCO000991 (same).)  The ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

799.     The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, are therefore "positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at claim 34.)

800.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because a first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because a first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is positioned approximately at a location of an anti-node such that any difference is insubstantial.  For example, the first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim

268

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

limitations.  The first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

801.    Neapco satisfies each and every limitation of, and therefore infringes, claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

h.    **Claim 35**

(1)    **"The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."**

802.    As I described above in reference to claim 34, Neapco satisfies each and every limitation of claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

803.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

804.    Neapco inserts at least one liner of the 643 and 169 Accused Products, "wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."  (*See* '911 patent at 35.)

269

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

805. I understand that ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

806. In particular, Neapco engineering drawings for the 643 and 169 Accused Products illustrate the one NPFT2G-4978-DBA liner positioned near a ███████████████

███████████████████████████████████████████████

███████████████████████████████████████   ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

807. A second one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is therefore "positioned along the shaft member symmetrically about another bending anti-node." ('911 patent at claim 35.)

808. *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are positioned along the shaft member symmetrically about a bending anti-node. To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are positioned approximately at a location of an anti-node such that any difference is insubstantial. For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as

270

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

809.    Neapco satisfies each and every limitation of, and therefore infringes, claim 35 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### i.    Claim 36

810.    I understand I should apply the following claim constructions for my analysis of this claim:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |
| "tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |
| "torsion mode vibration" | Vibration that causes a shaft to twist |

### (1)    Corresponding claim limitations of Claim 22

811.    Claim 36 and claim 22 of the '911 patent have many of the same claim limitations.  The following table correlates the limitations of claims 22 and 36.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

| Limitation of '911 patent, Claim 22 | Limitation of '911 patent, Claim 36 |
|:---:|:---:|
| 22[a] | 36[a] |
| 22[b] | 36[b] |
| 22[c] | 36[c] |
| 22[d] | 36[d] |
| 22[e] | 36[f] |
| 22[f] | 36[g] |

812.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

> **(2)    36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"**

813.    Neapco inserts at least one liner into the propshafts of the 643 and 169 Accused Products, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36.)

814.    As illustrated by the engineering drawings for the 643 and 169 Accused Products, the mass of the shaft member is ▮▮▮ gram.  (*See* NEAPCO000111 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPHT2G-4A181-KA for the 643 and 169 Accused Products); NEAPCO000991 (same).)  The same engineering drawings show that the total liner weight for the 643 and 169 Accused Products is ▮▮▮▮▮ram.  (NEAPCO000111; NEAPCO000991.)   The ratio of the mass of the one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners to the mass of the shaft member is therefore ▮▮▮▮▮

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

815.     Thus, for the one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners and the shaft member of the 643 and 169 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36[e].)

816.     Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### 2.      GM part nos. 84148489, 84059644, and 23253781 (5.775" x 0.079" x 2200 mm)

817.     As described herein, I rely, in part, on the modal analysis testing from B&K.  I asked B&K to perform testing on the 489 Accused Product.  The 644 and 781 Accused Products have similar dimensions and characteristics, and include the same number and type of liners, as the 489 Accused Product described above.  I understand the similarities among the 489, 644, and 781 Accused Products are a result of the 489 Accused Product ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ (NEAPCO195905.)  As I describe herein, the ████████████████████████████████ are insubstantial changes that would not affect whether the 644 and 781 Accused Products satisfies the claim limitations of the '911 patent.  (*See, e.g.*, GM_AAM000000248-58.)  In other words, modal analysis testing of the 489 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 644 and 781 Accused Products.  (*See, e.g.*, GM_AAM000000248-58.) Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 489 Accused Product for each of the 489, 644, and 781 Accused Products.

#### a.      Claim 22

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

      **(1)**     **22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

818.    To the extent the preamble, 22[a], is considered a claim limitation, Neapco performs "[a] method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

819.    I understand that Neapco ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

820.    Neapco engineering drawings corresponding to the 489, 644, and 781 Accused Products illustrate the shaft assemblies manufactured by Neapco.  (NEAPCO000982 (489 Accused Product), NEAPCO000983-90 (same), and NEAPCO000991 (489 and 644 Accused Products);  NEAPCO001600 (644 Accused Product), NEAPCO001697-1704 (same);  NEAPCO001599 (781 Accused Product), NEAPCO001689-96 (same), and NEAPCO016073 (same).)  For example, the propshaft assembly of the 489 Accused Product is reproduced below:



(NEAPCO000982; *see also* NEAPCO001600 (644 Accused Product); NEAPCO001599 (781 Accused Product).)  Consistent with ████████████████████████████

████████████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

(*See*      NEAPCO000982;      NEAPCO000983-90;      NEAPCO000991;      NEAPCO001600;

NEAPCO001697-1704;      NEAPCO001599;      NEAPCO001689-96;      NEAPCO016073;

NEAPCO195905.) ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ These are

what are considered to be driveline components in the '911 patent as shown in Fig. 4 and

described in the specification: "In the context of an automotive vehicle, the driveline components

could be a transmission, a transfer case, a viscous coupling, an axle assembly, or a differential,

for example." ('911 patent at 4:45-51.)

821.    Neapco therefore satisfies the preamble, 22[a], for the 489, 644, and 781 Accused

Products by "manufacturing a shaft assembly of a driveline system, the driveline system further

including a first driveline component and a second driveline component, the shaft assembly

being adapted to transmit torque between the first driveline component and the second driveline

component." ('911 patent, claim 22[a].)

### (2)      22[b]: "providing a hollow shaft member"

822.    Neapco "provid[es] a hollow shaft member" for each of the 489, 644, and 781

Accused Products.  (*See* '911 patent at claim 22[b].)

823.    I understand that Neapco ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

824.    For example, engineering drawings for the 489, 644, and 781 Accused Products illustrate how they comprise an aluminum hollow shaft member having a diameter of ███ inch and a shaft thickness of ███ inch.   (NEAPCO000982 (489 Accused Product), NEAPCO000983-90 (same), and NEAPCO000991 (489 and 644 Accused Products); NEAPCO001600 (644 Accused Product), NEAPCO001697-1704 (same); NEAPCO001599 (781 Accused Product), NEAPCO001689-96 (same), and NEAPCO016073 (same); NEAPCO195905.)   The 489, 644, and 781 Accused Products each have three liners. (NEAPCO000991; NEAPCO016073; NEAPCO195905.)   The 489, 644, and 781 Accused Products each have one liner identified by liner part no. NPFT2G-4978-DBA located within the shaft at depth "D," ███ mm (███ inch).   (NEAPCO000991; NEAPCO016073.)   The 489, 644, and 781 Accused Products each have two liners identified by liner part no. NPFT2G-4978-DCA located within the shaft at depths "C" and "B," ███ mm (███ inch) and ███ mm (███ inch) (489 and 644 Accused Products) or ███ mm (███ inch) (781 Accused Product). (NEAPCO000991; NEAPCO016073.)

825.    Neapco therefore satisfies the 22[b] limitation for the 489, 644, and 781 Accused Products by "providing a hollow shaft member."  ('911 patent, claim 22[b].)

(3)    **22[c]: "tuning a mass and a stiffness of at least one liner"**

826.    Neapco "tun[es] a mass and a stiffness of at least one liner" for the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 22[c].)

827.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning a mass and stiffness of at least one liner" | controlling a mass and stiffness of at least one liner to configure the liner to match a relevant |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

| | frequency or frequencies |
|---|---|
| | |

828.   As described herein, Neapco engineering drawings confirm that the 489, 644, and 781 Accused Products comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA.  (NEAPCO000991; NEAPCO016073.)  The Caraustar engineering drawings for the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners—which were both "prepared for Neapco"—illustrate how Neapco controls the mass and stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the properties of those liners.  (*See* NEAPCO000081 (Caraustar engineering drawing for liner having part no. NPFT2G-4978-DBA); NEAPCO000082 (Caraustar engineering drawing for the liner having part no. NPFT2G-4978-DCA).)

829.   Neapco controls the mass of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  (NEAPCO000081; NEAPCO000082.)  In particular, a single NPFT2G-4978-DBA liner is controlled to comprise ███████████████████████ and a ███████████████ winding, specifically a ███████████████████ (NEAPCO000081.)  A single NPFT2G-4978-DCA liner is controlled to comprise ███████████████████ and a ███████████████ ███████████ specifically a ███████████████████ (NEAPCO000082.)  A single NPFT2G-4978-DBA liner is further controlled to have an outer diameter "A" of ███ inch, inner diameter "B" of ████ inch, length "C" of ████ inch, and winding pitch "D" of ██ inch.  (NEAPCO000081.)  A single NPFT2G-4978-DCA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, length "C" of ████ inch, and winding pitch "D" of ██ inch.  (NEAPCO000082.)  The one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners have a combined mass of ████ gram.  (NEAPCO000991;

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NEAPCO000111.)  These controlled material and dimensional properties the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners in turn control the mass of those liners.  (NEAPCO000081; NEAPCO000082.)

830.    Similarly, Neapco controls the stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  (NEAPCO000081; NEAPCO000082.)  As described above, stiffness is a measure of the resistance of an object in response to an applied force, and is affected by, among other things, material and dimensions of an object.  For each NPFT2G-4978-DBA and NPFT2G-4978-DCA liner, Neapco controls the material of the liner, e.g., ███████████████████████ and either a ████████████ ███████████████████ (NEAPCO000081 (NPFT2G-4978-DBA liner) or ███████████████████ ████████████████ (NEAPCO000082  (NPFT2G-4978-DCA)), each comprising a ████████ ███████████████████ (*See* NEAPCO000081; NEAPCO000082.)  Note that durometer is a measure of the hardness of a material and is related to the stiffness of the material[5].  Thus, by specifying ███████████████████ material, Neapco is directly controlling the stiffness of the liner.  Neapco also controls the shape of the liner by controlling at least the outer diameter, inner diameter, and length of the liner.  (NEAPCO000081; NEAPCO000082.)  These controlled material properties and dimensions for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners in turn control the stiffness of the liner.  (NEAPCO000081; NEAPCO000082.)

831.    As I describe below in reference to limitations 22[e] and 22[f], Neapco controls the mass and stiffness of the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners of the 489, 644, and 781 Accused Products to configure those liners to match a relevant frequency or frequencies.  A liner can match a relevant frequency of the driveshaft for either bending mode

---

[5] https://en.wikipedia.org/wiki/Shore_durometer, accessed 5/26/17.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

vibrations or shell mode vibrations.  Configuring the liner to have a natural frequency near a relevant driveshaft bending mode natural frequency is one way of matching.  Relevant bending mode frequencies include, for example, the first, second, and third bending mode frequencies. Configuring the liner to provide attenuation of shell mode vibration where the maximum attenuation occurs near the relevant frequency is another way of matching.  Relevant shell mode natural frequencies include, for example, the first, second, and third shell mode frequencies.  As I describe below in reference to limitations 22[e] and 22[f], the Neapco NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to match at least one bending mode natural frequency and at least one shell mode natural frequency.

832.    Indeed, I understand that ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████

833.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because Neapco controls a mass and stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant frequency or frequencies.  As I describe below in reference to limitations 22[e] and 22[f], to the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

834.    Neapco therefore satisfies the 22[c] limitation for the 489, 644, and 781 Accused Products by "tuning a mass and stiffness of at least one liner." ('911 patent, claim 22[c].)

### (4)    22[d]: "inserting the at least one liner into the shaft member"

835.    Neapco "insert[s] the at least one liner into the shaft member" for each of the 489, 644, and 781 Accused Products. (*See* '911 patent at claim 22[d].)

836.    I understand that Neapco ████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

837.    For example, Neapco engineering drawings for the 489, 644, and 781 Accused Products illustrate how each of the 489, 644, and 781 Accused Products have one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners positioned within the shaft. (*See* NEAPCO000991; NEAPCO016073.)   Further, the Caraustar engineering drawings corresponding to the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners—which were each "prepared for Neapco"—provide a "propshaft description" for the corresponding propshaft receiving the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners. (NEAPCO000081; NEAPCO000082.)

838.    Neapco therefore satisfies the 22[d] limitation for the 489, 644, and 781 Accused Products by "inserting the at least one liner into the shaft member." ('911 patent, claim 22[d].)

### (5)    22[e]: "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations"

839.    Neapco inserts at least one liner, namely the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners, into a shaft member, "wherein the at least one liner is a tuned

280

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

resistive absorber for attenuating shell mode vibrations" for the 489, 644, and 781 Accused Products. (*See* '911 patent at claim 22[e].)

840. I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |

841. As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners positioned within the 489, 644, and 781 Accused Products by, for example, controlling the material properties and dimensions of those liners control their mass and stiffness. (NEAPCO000081; NEAPCO000082.)

842. As I discussed above in reference to the 643 and 169 Accused Products, documents produced by Neapco, including documents relating to tuned liners for use in 5.775 inch propshafts like the 489, 644, and 781 Accused Products, are consistent with my opinion that Neapco configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 489, 644, and 781 Accused Products to match a relevant frequency or frequencies of the propshafts of those accused products to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

843. The testing results from B&K confirm that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners associated with the 489 Accused Product have characteristics

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

844.    The liners associated with the 489 Accused Products have characteristics configured to match a relevant shell mode frequency. A relevant shell mode frequency is matched if the liner provides attenuation of shell mode vibration and maximum attenuation occurs near the relevant frequency. As described below, the experimental testing by B&K show that the liners of the 489 Accused Products have characteristics █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

845.    As described above, the shell mode mechanics dictate that the liner provides damping through resistive means. Shell modes involve ovalizing of the cross-section of the propshaft as it deflects or bends along one or more axes. An ovalizing propshaft squeezes the liner inside the propshaft and, if it is properly tuned, the liner resists, thereby dissipating energy. Thus, in shell mode damping the tuned liner deforms as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

846.    The tuning or matching of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to a relevant frequency or frequencies is illustrated by the shell mode FRF data for the 489 Accused Product collected by B&K under my direction as described above. (Ex. C.)  I directed B&K to test a 489 Accused Product as produced by Neapco, with the liners in place. I also directed B&K to test a 489 Accused Product with the liners removed. In both cases, I directed B&K to place accelerometers on the top and bottom of the driveshaft at roughly the quarter-length and mid-length of the driveshaft. I directed B&K to clamp on the outbound sides of the

universal joints to provide pinned boundary conditions as installed in the driveline system. I directed B&K to excite the driveshafts with an impact hammer. Finally, I directed B&K to calculate the FRFs, relevant shell mode natural frequencies, and shell mode damping.

847.    To ensure that the FRFs measure shell mode vibration, I directed B&K to subtract the accelerometer signals from the top and bottom of the driveshaft and liner during testing. To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft and calculate the subtracted FRFs at both locations. Further details on the B&K testing are provided in Ex. C.

848.    I have reproduced below the shell mode FRF data for the 489 Accused Product having accelerometers positioned generally at the mid-length of the propshaft and having signals subtracted to best measure the ████████████████████ (Ex. C.)



849.    The red line in the above FRF plot illustrates the amplitude of shell mode vibration of the 489 Accused Product without its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners. The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

The vertical axis is a log scale so large changes in amplitude look relatively small.   The maximum vibration occurs at the resonant peaks.   Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.   The frequency axis is also a log scale so modes are farther apart than they appear.   The FRF is annotated with the ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

850.    The figure below zooms into the mid-length FRF plot shown above to highlight the attenuation caused by the liners of the 489 Accused Product.    The ███████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



851.    I instructed B&K to calculate the damping ratios ▮▮▮▮▮▮▮ using the approach described above. The propshaft of the 489 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

852.    Shell mode vibrations are vibrations that cause the cross-section of a shaft to deflect or bend along one or more axes.  As I described above, to dampen shell mode vibrations a liner must be configured to deform as the cross-section of the propshaft deflects or bends (and thereby transmits vibration energy through the liner) to absorb the vibration from the deflecting and bending propshaft.  The above mid-length shell mode FRF plots for the 489 Accused Product indicate that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners effectively dampen shell mode vibrations at the ▮▮▮▮▮▮▮▮▮.  NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore deform as vibration energy is transmitted through the liners to absorb the vibration energy as the cross-section of the propshaft deflects or bends at the ▮▮▮ ▮▮▮▮

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

853.    Moreover, the material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners allow them to act as a tuned resistive absorber, thereby deforming as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  In particular, the NPFT2G-4978-DBA liners comprise ███████████ ████████ and ████████████████████ specifically ██████ ██████  (NEAPCO000081.)   The  NPFT2G-4978-DCA  liners  comprise  ████████ █████████████ and a ██████████████████████ specifically a ██ ███████████████████  (NEAPCO000082.)  The  ███████████  of the NPFT2G-4978-DBA  and  NPFT2G-4978-DCA  liners  ███████████  that  may  deform  to  absorb  vibration energy.  (NEAPCO000081; NEAPCO000082.)  The  ██████████████████  tube of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners may also deform to absorb vibration energy.  (NEAPCO000081; NEAPCO000082.)  The material properties and dimensions of the NPFT2G-4978-DBA  and  NPFT2G-4978-DCA  liners  therefore  allow  them  to  attenuate  shell mode  vibrations  through  resistive  attenuation.    Neapco  controls  specific  properties  and dimensions  of  the  NPFT2G-4978-DBA  and  NPFT2G-4978-DCA  liners  so  that  those  liners deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration at least ████████████████████████

854.    The liners of the 489 Accused Products have a natural frequency near a relevant shell mode natural frequency.  I directed B&K to test the NPFT2G-4978-DCA and NPFT2G-4978-DCA liners of the 489 Accused Products as described above.

855.    With regard to the NPFT2G-4978-DCA liners, for example, ███████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████



*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

856.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration.  To the extent that Neapco does not literally satisfy this limitation for the 489 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

857.    Neapco therefore satisfies the 22[e] limitation for the 489, 644, and 781 Accused Products by inserting at least one liner, namely one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations."  ('911 patent, claim 22[e].)

**(6)     22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."**

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

858.    Neapco inserts the at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 22[f].)

859.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |

860.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within 489, 644, and 781 Accused Products by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

861.    I understand that Neapco ██████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████

862.    As described above in reference to the 643 and 169 Accused Products and with regard to limitation 22[e], documents produced by Neapco, including documents relating to tuned liners for use in 5.775 inch propshafts like the 489, 644, and 781 Accused Products, are consistent with my opinion that Neapco configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 489, 644, and 781 Accused Products to match a relevant

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

frequency or frequencies of the propshafts of those accused products to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

863.    The liners associated with the 489 Accused Products have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K show that the liners of the 489 Accused Products have characteristics ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

864.    As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and, if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

865.    Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in

289

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

866.   As described above, I directed B&K to test the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners associated with the 489 Accused Product to determine whether the liners were matched to any bending modes of the propshaft.   The testing results from B&K confirm that these liners have characteristics configured to match a relevant frequency or frequencies and to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.   For example, ███████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

867.   The matching of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF data for the 489 Accused Product.   (Ex. C.)   As described above, I directed B&K test the propshaft with and without the liners installed and calculate the FRFs, relevant bending mode natural frequencies, and bending mode damping.   To ensure that the FRFs measure bending mode vibration, I

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing. To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

868.    I have reproduced the bending mode FRF of the 489 Accused Product having accelerometers positioned generally at the mid-length of the propshaft and having signals added to best measure ██████████████████ (Ex. C.)



869.    The red line in the above FRF plot illustrates the amplitude of bending mode vibration of the 489 Accused Product without its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners. The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration. The vertical axis is a log scale so large changes in amplitude look relatively small. The maximum vibration occurs at the resonant peaks. Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values. The frequency axis is also a log scale so modes are farther apart than they appear. The FRF is annotated with the first and third bending modes. ███████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

870.    The figure below zooms into the mid-length FRF plot shown above to highlight the attenuation caused by the liners of the 489 Accused Product.   The t███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

871.    I instructed B&K to calculate the damping ratios ███████████████ using a standard algorithm based on the width of the peaks. The propshaft of the 489 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ████████████████████ ███████████████████████████████████████████████ (Exs. C & D.)

872.    Bending mode vibrations are vibrations that cause the propshaft bend along its length.  As I described above, to dampen bending mode vibrations a liner must be configured to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy in the bending propshaft.  The above mid-length bending mode FRF plots for the 489 Accused Product indicate that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners effectively dampen bending mode vibrations at the ███████████████████ NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore oscillate in opposition to vibration energy to cancel out a portion of the vibration energy as the propshaft bends ████████████████████.

873.    Moreover, the material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners allow them to act as a tuned reactive absorber, thereby oscillating in opposition to vibration energy of the propshaft to cancel out a portion of the vibration energy to dampen bending mode vibrations.  Similar to classic example of reactive attenuation, the liners have characteristics similar to a mass/spring that is added to the host propshaft.  In particular, the NPFT2G-4978-DBA liners comprise ████████████████████████ specifically a ███ ███████████████████████████ that may stretch and compress like a spring. (NEAPCO000081.)   The  NPFT2G-4978-DCA  liners  comprise  a  ██████████████████ ████████ winding, specifically a ████████████████████████████████ that may stretch and compress like a spring.  (NEAPCO000082.)  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners also comprise a ████████████████████████ tube, coupled

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

to the █████████ similar to a mass coupled to the end of a spring.  (NEAPCO000081; NEAPCO000082.)   The material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore allow them to attenuate bending mode vibrations through reactive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners so that those liners oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the relevant third bending mode natural frequency.

874.    Neapco therefore satisfies the 22[f] limitation for the 489, 644, and 781 Accused Products by inserting at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."  ('911 patent, claim 22[f].)

875.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.    The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

876.    Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

### b.    Claim 23

(1)    **"The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."**

877.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

878.    Neapco inserts at least one liner of the 489, 644, and 781 Accused Products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." (*See* '911 patent at claim 23.)

879.    As I described above in reference to limitation 22[e], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match ████████████ natural frequency of the propshaft of the 489, 644, and 781 Accused Products, and those liners effectively dampen shell mode vibrations of the propshaft of the 489, 644, and 781 Accused Products ████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

880.    Neapco therefore satisfies the additional limitation of claim 23, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." ('911 patent at claim 23.)

881.    Neapco satisfies each and every limitation of, and therefore infringes, claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

<div align="center">

**c.**    **Claim 24**

**(1)**    **"The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."**

</div>

882.    As I described above in reference to claim 23, Neapco satisfies each and every limitation of claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

883.    Neapco inserts at least one liner of the 489, 644, and 781 Products into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." (*See* '911 patent at claim 24.)

884.    As I described above in reference to limitation 22[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match at least the third bending mode natural frequency of the propshaft of the 489, 644, and 781 Accused Products, and those liners effectively dampen bending mode vibrations of the propshaft of the 489, 644, and 781 Accused Products ███████████████████████████████

885.    Neapco therefore satisfies the additional limitation of claim 24, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." ('911 patent at claim 24.)

<div align="center">296</div>

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

886.    Neapco satisfies each and every limitation of, and therefore infringes, claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

> **d.    Claim 26**
>
> > **(1)    "The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member.**

887.    As I described above in reference to claim 24, Neapco satisfies each and every limitation of claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

888.    Neapco inserts at least one liner of the 489, 644, and 781 Accused Products into the propshafts of those accused products, "wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

889.    I understand that Neapco ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████

890.    In particular, the engineering drawings for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 489, 644, and 781 Accused Products show how each of those

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

liners include a structural portion, a tube made out of ██████████████████ (NEAPCO000081 (engineering drawing corresponding to the NPFT2G-4978-DBA liner); NEAPCO000082 (engineering drawing corresponding to the NPFT2G-4978-DCA liner).)  The NPFT2G-4978-DBA has an outer diameter "A" (██ inch), inner diameter "B" (██ inch), length "C" (██ inch) (NEAPCO000081), and the  NPFT2G-4978-DCA liner has an outer diameter  "A" (██ inch),  inner  diameter  "B"  (███ inch),  length  "C"  (██ inch) (NEAPCO000082).  Those engineering drawings also show how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners comprise a resilient portion, either a ██████████████ ██████ (NEAPCO000081),  or  a  ██████████████████ (NEAPCO000082),  each  a  ██████████████████  (NEAPCO000081; NEAPCO000082.)  The ████████ of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are coupled to, and wind around, the structural portion of the liners.  (NEAPCO000081; NEAPCO000082.)

891.   The engineering drawings further provide a "propshaft description" for the NPFT2G-4978-DBA and  NPFT2G-4978-DCA  liners:  ██████████████████ ██████████  (NEAPCO000081; NEAPCO000082.)  This propshaft description is consistent with the properties of the 489, 644, and 781 Accused Products set forth in Neapco's engineering drawings.  (*See* NEAPCO000982 (489 Accused Product), NEAPCO000983-90 (same), and NEAPCO000991 (489 and 644 Accused Products); NEAPCO001600 (644 Accused Product), NEAPCO001697-1704 (same); NEAPCO001599 (781 Accused Product), NEAPCO001689-96 (same),  and  NEAPCO016073  (same);  NEAPCO195905.)   The  NPFT2G-4978-DBA  and NPFT2G-4978-DCA liners each have a slightly larger outer diameter (██ inch) than the inner diameter  of  the  propshaft  of  the  489,  644,  and  781  Accused  Products  (██ inch).

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

(NEAPCO000081; NEAPCO000082.)  Thus, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners will friction-fit against the inner wall of the smaller-diameter propshafts as they are inserted.

892.    The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore "includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

893.    Neapco satisfies each and every limitation of, and therefore infringes, claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

> **e.    Claim 27**
>
> **(1)    "The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion."**

894.    As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

895.    Neapco inserts at least one liner of the 489, 644, and 781 Accused Products having at least one resilient member, "wherein the at least one resilient member extends helically about and along the structural portion." (*See* '911 patent at 27.)

896.    I understand that Neapco ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

897.    In particular, the engineering drawing for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 489, 644, and 781 Accused Products shows how the liners include a resilient portion, either a ███████████████████████ (NEAPCO000081) or a ███████████████████████ (NEAPCO000082), that is coupled to, and extends helically about and along the structural portion:



(NEAPCO000081.)



(NEAPCO000082.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

898.     The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore include at least "one resilient member extends helically about and along the structural portion." (*See* '911 patent at claim 27.)

899.     Neapco satisfies each and every limitation of, and therefore infringes, claim 27 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

> **f.     Claim 31**
>
> **(1)     "The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."**

900.     As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

901.     Neapco inserts at least one liner of the 489, 644, and 781 Accused Products having a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

902.     I understand that Neapco █████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

903.     In particular, the engineering drawing for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 489, 644, and 781 Accused Products shows how the liners include a structural portion, a tube made out of █████████████████████ (NEAPCO000081; NEAPCO000082.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

904.    The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore include a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof." (*See* '911 patent at claim 31.)

905.    Neapco satisfies each and every limitation of, and therefore infringes, claim 31 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

g.    **Claim 34**

(1)    **"The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node."**

906.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

907.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

908.    Neapco inserts at least one liner of the 489, 644, and 781 Accused Products, "wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at 34.)

909.    I understand that ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

302

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

910.    In particular, Neapco engineering drawings for the 489, 644, and 781 Accused

Products illustrate the one NPFT2G-4978-DBA liner ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

(NEAPCO000991; NEAPCO016073.) ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████

911.    The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners,

are therefore "positioned along the shaft member symmetrically about a bending anti-node."

(*See* '911 patent at claim 34.)

912.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this

limitation for the 489, 644, and 781 Accused Products because a first one of the NPFT2G-4978-

DBA and NPFT2G-4978-DCA liners is positioned along the shaft member symmetrically about

a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the

489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of

equivalents because a first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is

positioned approximately at a location of an anti-node such that any difference is insubstantial.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

For example, the first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

913.    Neapco satisfies each and every limitation of, and therefore infringes, claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

<div align="center">

**h.    Claim 35**

</div>

<div align="center">

**(1)    "The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."**

</div>

914.    As I described above in reference to claim 34, Neapco satisfies each and every limitation of claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

915.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

916.    Neapco inserts at least one liner of the 489, 644, and 781 Accused Products, "wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node." (*See* '911 patent at 35.)

917.    I understand that ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████

918.    In particular, Neapco engineering drawings for the 489, 644, and 781 Accused Products illustrate the one NPFT2G-4978-DBA liner positioned ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

919.    A second one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is therefore "positioned along the shaft member symmetrically about another bending anti-node." ('911 patent at claim 35.)

920.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are positioned approximately

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

at a location of an anti-node such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.    The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

921.    Neapco satisfies each and every limitation of, and therefore infringes, claim 35 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

### i.    Claim 36

922.    I understand I should apply the following claim constructions for my analysis of this claim:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |
| "tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations |

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

| "bending mode vibration" | Vibration that causes a shaft to bend |
|---|---|
| "torsion mode vibration" | Vibration that causes a shaft to twist |

### (1)     Corresponding claim limitations of Claim 22

923.    Claim 36 and claim 22 of the '911 patent have many of the same claim limitations.  The following table correlates the limitations of claims 22 and 36.

| Limitation of '911 patent, Claim 22 | Limitation of '911 patent, Claim 36 |
|---|---|
| 22[a] | 36[a] |
| 22[b] | 36[b] |
| 22[c] | 36[c] |
| 22[d] | 36[d] |
| 22[e] | 36[f] |
| 22[f] | 36[g] |

924.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

### (2)     36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"

925.    Neapco inserts at least one liner into the propshafts of the 489, 644, and 781 Accused Products, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36.)

926.    As illustrated by the engineering drawings for the 489, 644, and 781 Accused Products, the mass of the shaft member is ██ gram. (NEAPCO000991 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. MPHT2G-4A181-MB); NEAPCO016073 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

no. NPHT2G-4A181-MA).)  The same engineering drawings show that the total liner weight for the 643 and 169 Accused Products is ▇▇▇ gram.  (NEAPCO000991; NEAPCO016073.)  The ratio of the mass of the one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners to the mass of the shaft member is therefore ▇▇▇

927.    Thus, for the one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners and the shaft member of the 489, 644, and 781 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36[e].)

928.    Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

### 3.    GM part no. 23377650 (5.775" x 0.079" x 2172 mm)

929.    As described herein, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 650 Accused Product.

### a.    Claim 22

**(1)    22[a]: "A method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component"**

930.    To the extent the preamble, 22[a], is considered a claim limitation, Neapco performs "[a] method for manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component."  ('911 patent, claim 22[a].)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

931.    I understand that Neapco ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

932.    Neapco engineering drawings for the 650 Accused Product illustrate the shaft assemblies manufactured by Neapco.   (NEAPCO000110 (650 Accused Product); NEAPCO000941 (same).)   For example, a propshaft assembly of the 650 Accused Product is reproduced below:

████████████████████████████████████████████████████████████████

(NEAPCO000110; *see also* NEAPCO000923.) ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████   (*See* NEAPCO000110; NEAPCO000923; NEAPCO195905.)   In particular,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

933. Neapco therefore satisfies the preamble, 22[a], for the 650 Accused Product by "manufacturing a shaft assembly of a driveline system, the driveline system further including a first driveline component and a second driveline component, the shaft assembly being adapted to transmit torque between the first driveline component and the second driveline component." ('911 patent, claim 22[a].)

### (2) 22[b]: "providing a hollow shaft member"

934. Neapco "provid[es] a hollow shaft member" for each of the 650 Accused Product. (*See* '911 patent at claim 22[b].)

935. I understand that Neapco ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████

936. For example, engineering drawings for the 650 Accused Product illustrate how they comprise an aluminum, hollow shaft member having a diameter of ████ inch and a shaft thickness of ████ inch. (*See* NEAPCO000110, NEAPCO000111, NEAPCO000941, NEAPCO000974-81, and NEAPCO00991; NEAPCO195905.) The 650 Accused Product has three liners—positioned within the shaft at depth locations "B," "C," and "D." (*See* NEAPCO000111; *see also* NEAPCO000991; NEAPCO195905.) In particular, the 650 Accused Product has one liner identified by liner part no. NPFT2G-4978-DBA located within the shaft at depth "D," ████ mm (████ inch). (NEAPCO000111; *see also* NEAPCO000991.) The 650 Accused Product also has two liners identified by liner part no. NPFT2G-4978-DCA located within the shaft at depths "C" and "B," ████ mm (████ inch) and ████ mm (████ inch), respectively. (NEAPCO000111; *see also* NEAPCO000991.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

937.    Neapco therefore satisfies the 22[b] limitation for the 650 Accused Product by "providing a hollow shaft member."  ('911 patent, claim 22[b].)

### (3)    22[c]: "tuning a mass and a stiffness of at least one liner"

938.    Neapco "tun[es] a mass and a stiffness of at least one liner" for the 650 Accused Product.  (*See* '911 patent at claim 22[c].)

939.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning a mass and stiffness of at least one liner" | controlling a mass and stiffness of at least one liner to configure the liner to match a relevant frequency or frequencies |

940.    As described herein, Neapco engineering drawings confirm that the 650 Accused Product comprises three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA.  (NEAPCO000111; *see also* NEAPCO000991.)  The Caraustar engineering drawings for the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners—which were both "prepared for Neapco"—illustrate how Neapco controls the mass and stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the properties of those liners.  (*See* NEAPCO000081 (Caraustar engineering drawing for liner having part no. NPFT2G-4978-DBA); NEAPCO000082 (Caraustar engineering drawing for the liner having part no. NPFT2G-4978-DCA).)

941.    Neapco controls the mass of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  (NEAPCO000081; NEAPCO000082.)  In particular, a single NPFT2G-4978-DBA liner is controlled to comprise ███████████████████████ and a ███████████████████ specifically a

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

█████████████████████ (NEAPCO000081.)  A single NPFT2G-4978-DCA liner is controlled to comprise ████████████████████ and a ████████████████ ███████ winding, specifically a ██████████████████████ (NEAPCO000082.)  A single NPFT2G-4978-DBA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, length "C" of ████ inch, and winding pitch "D" of ████ inch.  (NEAPCO000081.)  A single NPFT2G-4978-DCA liner is further controlled to have an outer diameter "A" of ████ inch, inner diameter "B" of ████ inch, length "C" of ████ inch, and winding pitch "D" of ██ inch.  (NEAPCO000082.)  The one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liner have a combined mass of ████ gram.  (NEAPCO000111; *see also* NEAPCO000991.)  These controlled material and dimensional properties the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners in turn control the mass of those liners.  (NEAPCO000081; NEAPCO000082.)

942.   Similarly, Neapco controls the stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  (NEAPCO000081; NEAPCO000082.)  As described above, stiffness is a measure of the resistance of an object in response to an applied force, and is affected by, among other things, material and dimensions of an object.  For each NPFT2G-4978-DBA and NPFT2G-4978-DCA liner, Neapco controls the material of the liner, e.g., ██████████████████████ and either a ████████████ ████████████████ (NEAPCO000081 (NPFT2G-4978-DBA liner) or ████████████████ ██████████████████ (NEAPCO000082  (NPFT2G-4978-DCA), each comprising a ████ ██████████████████████ (*See* NEAPCO000081; NEAPCO000082.)  Note that durometer is

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

a measure of the hardness of a material and is related to the stiffness of the material[6].  Thus, by specifying ██████████████████ material, Neapco is directly controlling the stiffness of the liner.  Neapco also controls the shape of the liner by controlling at least the outer diameter, inner diameter, and length of the liner.  (NEAPCO000081; NEAPCO000082.)  These controlled material properties and dimensions for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners in turn control the stiffness of the liner.  (NEAPCO000081; NEAPCO000082.)

943.    As I describe below in reference to limitations 22[e] and 22[f], Neapco controls the mass and stiffness of the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners of the 650 Accused Product to configure those liners to match a relevant frequency or frequencies.  A liner can match a relevant frequency of the driveshaft for either bending mode vibrations or shell mode vibrations.  Configuring the liner to have a natural frequency near a relevant driveshaft bending mode natural frequency is one way of matching.  Relevant bending mode frequencies include, for example, the first, second, and third bending mode frequencies.  Configuring the liner to provide attenuation of shell mode vibration where the maximum attenuation occurs near the relevant frequency is another way of matching.  Relevant shell mode natural frequencies include, for example, the first, second, and third shell mode frequencies.  As I describe below in reference to limitations 22[e] and 22[f], the Neapco NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to match at least one bending mode natural frequency and at least one shell mode natural frequency.

944.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because Neapco controls a mass and stiffness of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant

---

[6] https://en.wikipedia.org/wiki/Shore_durometer, accessed 5/26/17.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

frequency or frequencies.  As I describe below in reference to limitations 22[e] and 22[f], to the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.

945.    Neapco therefore satisfies the 22[c] limitation for the 650 Accused Products by "tuning a mass and stiffness of at least one liner."  ('911 patent, claim 22[c].)

> **(4)    22[d]: "inserting the at least one liner into the shaft member"**

946.    Neapco "insert[s] the at least one liner into the shaft member" for each of the 650 Accused Product.  (*See* '911 patent at claim 22[d].)

947.    I understand that Neapco ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

948.    For example, Neapco engineering drawings for the 650 Accused Product illustrate how each of the 650 Accused Product have one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners positioned within the shaft at depth locations "B," "C," and "D."  (NEAPCO000111; *see also* NEAPCO000991.)  Further, the Caraustar engineering drawings corresponding to the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners—which were each "prepared for Neapco"—provide a "propshaft description" for the corresponding propshaft receiving the one

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-DBA    and    two    NPFT2G-4978-DCA    liners.    (NEAPCO000081; NEAPCO000082.)

949.    Neapco therefore satisfies the 22[d] limitation for the 650 Accused Product by "inserting the at least one liner into the shaft member." ('911 patent, claim 22[d].)

### (5)    22[e]: "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations"

950.    Neapco inserts at least one liner, namely the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners, into a shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations" for the 650 Accused Product.  (*See* '911 patent at claim 22[e].)

951.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
| --- | --- |
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |

952.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners positioned within the 650 Accused Product by, for example, controlling the material properties and dimensions of those liners control their mass and stiffness.    (NEAPCO000081; NEAPCO000082.)

953.    As I discussed above in reference to the 643 and 169 Accused Products, documents produced by Neapco, including documents relating to tuned liners for use in 5.775 inch propshafts like the 650 Accused Product, are consistent with my opinion that Neapco

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 650 Accused Product to match a relevant frequency or frequencies of the propshafts of those accused products to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

954.   The testing results from B&K confirm that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners associated with the 650 Accused Product have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

955.   The liners associated with the 650 Accused Product have characteristics configured to match a relevant shell mode frequency.   A relevant shell mode frequency is matched if the liner provides attenuation of shell mode vibration and maximum attenuation occurs near the relevant frequency.   As described below, the experimental testing by B&K show that the liners of the 650 Accused Product have characteristics ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

956.   As described above, the shell mode mechanics dictate that the liner provides damping through resistive means.   Shell modes involve ovalizing of the cross-section of the propshaft as it deflects or bends along one or more axes.   An ovalizing propshaft squeezes the liner inside the propshaft and, if it is properly tuned, the liner resists, thereby dissipating energy. Thus, in shell mode damping the tuned liner deforms as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

957.    The tuning or matching of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to a relevant frequency or frequencies is illustrated by the shell mode FRF data for the 650 Accused Product collected by B&K under my direction as described above.  (Ex. C.)  I directed B&K to test a 650 Accused Product as produced by Neapco, with the liners in place.  I also directed B&K to test a 650 Accused Product with the liners removed.  In both cases, I directed B&K to place accelerometers on the top and bottom of the driveshaft at roughly the quarter-length and mid-length of the driveshaft.  I directed B&K to clamp on the outbound sides of the universal joints to provide pinned boundary conditions as installed in the driveline system.  I directed B&K to excite the driveshafts with an impact hammer near the top accelerometers. Finally, I directed B&K to calculate the FRFs, relevant shell mode natural frequencies, and shell mode damping.

958.    To ensure that the FRFs measure shell mode vibration, I directed B&K to subtract the accelerometer signals from the top and bottom of the driveshaft and liner during testing.  To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft and calculate the subtracted FRFs at both locations.  Further details on the B&K testing are provided in Ex. C.

959.    I have reproduced the shell mode FRF data for the 650 Accused Product having accelerometers positioned generally at the mid-length of the propshaft and having signals subtracted to best measure the ███████████████████ (Ex. C.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



960.    The red line in the above FRF plot illustrates the amplitude of shell mode vibration of the 650 Accused Product without its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners.  The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration. The vertical axis is a log scale so large changes in amplitude look relatively small.   The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with

The blue line in the above FRF plot illustrates the amplitude of shell mode vibration of the 650 Accused Product with NPFT2G-4978-DBA and NPFT2G-4978-DCA liners installed.

961.    The figure below zooms into the mid-length FRF plot shown above to highlight the attenuation caused by the liners of the 650 Accused Product.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

[REDACTED]

962.    I instructed B&K to calculate the damping ratios [REDACTED] using the approach described above.  The propshaft of the 650 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a [REDACTED]

963.    Shell mode vibrations are vibrations that cause the cross-section of a shaft to deflect or bend along one or more axes.  As I described above, to dampen shell mode vibrations a

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

liner must be configured to deform as the cross-section of the propshaft deflects or bends (and thereby transmits vibration energy through the liner) to absorb the vibration from the deflecting and bending propshaft.   The above mid-length shell mode FRF plots for the 650 Accused Product indicate that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners effectively dampen shell mode vibrations at the third shell mode frequency.   NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore deform as vibration energy is transmitted through the liners to absorb the vibration energy as the cross-section of the propshaft deflects or bends at the third shell mode.

964.    Moreover, the material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners allow them to act as a tuned resistive absorber, thereby deforming as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration.  In particular, the NPFT2G-4978-DBA liners comprise ███████ ███████ and a ████████████████████, specifically a ██████████████ ███████ (NEAPCO000081.)   The NPFT2G-4978-DCA liners comprise ██████████ ██████████ and a ██████████████████████████ specifically a ██ ██████████████████████ (NEAPCO000082.)  The ██████████████ of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners ██████████ that may deform to absorb vibration energy.  (NEAPCO000081; NEAPCO000082.)  The ████████████████████████ tube of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners may also deform to absorb vibration energy.  (NEAPCO000081; NEAPCO000082.)  The material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore allow them to attenuate shell mode vibrations through resistive attenuation.   Neapco controls specific properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners so that those liners

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration at least at the relevant third shell mode natural frequency.

965.    The liners of the 650 Accused Products have a natural frequency near a relevant shell mode natural frequency.  I directed B&K to test the NPFT2G-4978-DCA and NPFT2G-4978-DCA liners of the 650 Accused Products as described above.

966.    With regard to the NPFT2G-4978-DCA liner, for example, the ███████████

███████████████████████████████████████████

██████████████████████████████████████

967.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liners to absorb the vibration energy to dampen shell mode vibration.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to deform and absorb vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.    The

321

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating shell mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

968.    Neapco therefore satisfies the 22[e] limitation for the 650 Accused Product by inserting at least one liner, namely one NPFT2G-4978-DBA and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned resistive absorber for attenuating shell mode vibrations."  ('911 patent, claim 22[e].)

<div align="center">

**(6)     22[f]: "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."**

</div>

969.    Neapco inserts the at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations" for each of the 650 Accused Product. (*See* '911 patent at claim 22[f].)

970.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuned reactive absorber for attenuating bending mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |

971.    As I described above in reference to limitation 22[c], Neapco configures the characteristics of each of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within 650 Accused Product by, for example, controlling the material properties and dimensions of those liners to control their mass and stiffness.  (NEAPCO000078.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

972.     As described above in reference to the 643 and 169 Accused Products and with regard to limitation 22[e], documents produced by Neapco, including documents relating to tuned liners for use in 5.775 inch propshafts like the 650 Accused Product, are consistent with my opinion that Neapco configures the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners positioned within the 650 Accused Product to match a relevant frequency or frequencies of the propshafts of those accused products to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

973.     The liners associated with the 650 Accused Product have characteristics configured to match a relevant bending mode frequency.  A relevant bending mode frequency is matched if the liner provides attenuation of bending mode vibration and maximum attenuation occurs near the relevant frequency.  As described below, the experimental testing by B&K shows that the liners of the 650 Accused Products have characteristics ████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████

974.     As described above, the bending mode mechanics dictate that the liner provides damping through reactive means.  Bending modes involve translation of the cross-section of the propshaft as it bends along its length.  This translation shakes the liner inside the propshaft and, if it is properly tuned, the liner reacts, thereby dissipating energy.  Thus, in bending mode damping the tuned liner deforms as it oscillates in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

975.     Tuning of the liner for reactive vibration attenuation requires that the liner have characteristics configured to match a relevant frequency.  A liner is matched to a relevant

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

bending frequency of the propshaft if the liner has a vibration mode frequency near the relevant bending frequency of the propshaft.  Further, this liner natural frequency must involve translation of the liner as opposed to ovalization of the liner to effectively couple with the propshaft bending mode.  If the liner is matched to a bending mode of the propshaft in this way, it will oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.

976.    As described above, I directed B&K to test the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners associated with the 650 Accused Product to determine whether the liners were matched to any bending modes of the propshaft.

977.    The testing results from B&K confirm that these liners have characteristics configured to match a relevant frequency or frequencies and to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  For example, █████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████

978.    The matching of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to a relevant frequency or frequencies is also illustrated by the bending mode FRF data for the 650 Accused Product.  (Ex. C.)  As described above, I directed B&K test the propshaft with and without the liners installed and calculate the FRFs, relevant bending mode natural frequencies, and bending mode damping.  To ensure that the FRFs measure bending mode vibration, I

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

directed B&K to add the accelerometer signals from the top and bottom of the driveshaft during testing.

979.    To capture the variation in vibration along the length of the shaft, I directed B&K to mount accelerometers near the mid-length and quarter-length of the driveshaft.

980.    I have reproduced the bending mode FRF of the 650 Accused Product having accelerometers positioned generally at the quarter-length of the propshaft and having signals added to best measure ███████████████████████████ (Ex. C.)



981.    The red line in the above FRF plot illustrates the amplitude of bending mode vibration of the 650 Accused Product without its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners.  The higher the value of the FRF, measured in units of $(m/s^2)/N$, the higher the vibration. The vertical axis is a log scale so large changes in amplitude look relatively small.  The maximum vibration occurs at the resonant peaks.  Each peak is associated with a specific mode, numbered from left to right as frequency increases from small to large values.  The frequency axis is also a log scale so modes are farther apart than they appear.  The FRF is annotated with

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████████████████

The blue line in the above FRF plot illustrates the amplitude of bending mode vibration of the 650 Accused Product with NPFT2G-4978-DBA and NPFT2G-4978-DCA liners installed.

982.   The figure below zooms into the quarter-length FRF plot shown above to highlight the attenuation caused by the liners of the 650 Accused Product. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



983.    I instructed B&K to calculate the damping ratios of the ████████████ using a standard algorithm based on the width of the peaks. The propshaft of the 650 Accused Product with its NPFT2G-4978-DBA and NPFT2G-4978-DCA liners has a ██████████ ████████████████████████████████████████████████████ (Ex. C; Ex. D.)

984.    Bending mode vibrations are vibrations that cause the propshaft bend along its length.  As I described above, to dampen bending mode vibrations a liner must be configured to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy in the bending propshaft.  The above quarter-length bending mode FRF plots for the 650 Accused Product indicate that the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners effectively dampen bending mode vibrations at the second bending mode frequency.  NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore oscillate in opposition to vibration energy to cancel out a portion of the vibration energy as the propshaft ████████████████████

985.    Moreover, the material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners allow them to act as a tuned reactive absorber, thereby oscillating in

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

opposition to vibration energy of the propshaft to cancel out a portion of the vibration energy to dampen bending mode vibrations.  Similar to a classic example of reactive attenuation, the liners have characteristics similar to a mass/spring that is added to the host propshaft.  In particular, the NPFT2G-4978-DBA liners comprise ████████████████████████ specifically a ████ ████████████████████████████████ that may stretch and compress like a spring. (NEAPCO000081.)   The NPFT2G-4978-DCA liners comprise a ██████████████████ ████████████████ specifically a ████████████████████████████ that may stretch and compress like a spring.  (NEAPCO000082.)  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners also comprise a █████████████████████ tube, coupled to the ████████████ similar to a mass coupled to the end of a spring.  (NEAPCO000081; NEAPCO000082.)   The material properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners therefore allow them to attenuate bending mode vibrations through reactive attenuation.  Neapco controls specific properties and dimensions of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners so that those liners oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations at least at the █████████████████████

986.   Neapco therefore satisfies the 22[f] limitation for the 650 Accused Product by inserting at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member, "wherein the at least one liner is a tuned reactive absorber for attenuating bending mode vibrations."  ('911 patent, claim 22[f].)

987.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match a relevant frequency or frequencies to

328

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen bending mode vibrations.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to oscillate in opposition to vibration energy at a relevant frequency or frequencies as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

988.    Neapco satisfies each and every limitation of, and therefore infringes, claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### b.    Claim 23

#### (1)    "The method of claim 22, wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode."

989.    As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

990.    Neapco inserts at least one liner of the 650 Accused Product into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." (*See* '911 patent at claim 23.)

991.    As I described above in reference to limitation 22[e], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics configured to match ███████████  ███████████ of the propshaft of the 650 Accused Product, and those liners effectively dampen shell mode vibrations of the propshaft of the 650 Accused Product ███████████ ███████████

992.    Neapco therefore satisfies the additional limitation of claim 23, "wherein the at least one liner is tuned to at least one of a first shell mode, a second shell mode and a third shell mode." ('911 patent at claim 23.)

993.    Neapco satisfies each and every limitation of, and therefore infringes, claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### c.    Claim 24

**(1)    "The method of claim 23, wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode."**

994.    As I described above in reference to claim 23, Neapco satisfies each and every limitation of claim 23 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

995.    Neapco inserts at least one liner of the 650 Accused Product into the propshafts of those accused products, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." (*See* '911 patent at claim 24.)

996.    As I described above in reference to limitation 22[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners have characteristics ███████████

330

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

███████████ of the propshaft of the 650 Accused Product, and those liners effectively dampen bending mode vibrations of the propshaft of the 650 Accused Product ████████████ ████████████████████

997.   Neapco therefore satisfies the additional limitation of claim 24, "wherein the at least one liner is tuned to at least one of a first bending mode, a second bending mode and a third bending mode." ('911 patent at claim 24.)

998.   Neapco satisfies each and every limitation of, and therefore infringes, claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### d.   Claim 26

**(1)   "The method of claim 24, wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member.**

999.   As I described above in reference to claim 24, Neapco satisfies each and every limitation of claim 24 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

1000.   Neapco inserts at least one liner of the 650 Accused Product into the propshafts of those accused products, "wherein the at least one liner includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member."  (*See* '911 patent at claim 26.)

1001.   I understand that Neapco ████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



1002. In particular, the engineering drawings for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 650 Accused Product shows how each of those liners include a structural portion, a tube made out of ███████████████ (NEAPCO000081 (engineering drawing corresponding to the NPFT2G-4978-DBA liner); NEAPCO000082 (engineering drawing corresponding to the NPFT2G-4978-DCA liner).)  The NPFT2G-4978-DBA has an outer diameter "A" (█████ inch), inner diameter "B" (█████ inch), length "C" (████ inch) (NEAPCO000081), and the   NPFT2G-4978-DCA liner has an outer diameter "A" (5.767 inch), inner diameter "B" (████ inch), length "C" (████ inch) (NEAPCO000082).   Those engineering drawings also show how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners comprise a resilient portion, either a █████████████ (NEAPCO000081), or a ████████████████ (NEAPCO000082), each a ██████████ ██████ (NEAPCO000081; NEAPCO000082.)  The ████████████ of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are coupled to, and wind around, the structural portion of the liners.  (NEAPCO000081; NEAPCO000082.)

1003.  The engineering drawings further provide a "propshaft description" for the NPFT2G-4978-DBA and  NPFT2G-4978-DCA  liners: █████████████████ ████████ (NEAPCO000081; NEAPCO000082.)  This propshaft description is consistent with the properties of the 650 Accused Product set forth in Neapco's engineering drawings.  (*See* NEAPCO000110, NEAPCO000111, NEAPCO000941, NEAPCO000974-81, and NEAPCO00991; NEAPCO195905.)  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

each have a slightly larger outer diameter (███ inch) than the inner diameter of the propshaft of the 650 Accused Product (███ inch).   (NEAPCO000081; NEAPCO000082.)   Thus, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners will friction-fit against the inner wall of the smaller-diameter propshafts as they are inserted.

1004.   The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore "includes a structural portion and at least one resilient member that is coupled to the structural portion, the at least one liner being inserted to the shaft member such that a wall of the shaft member contacts the at least one resilient member." (*See* '911 patent at claim 26.)

1005.   Neapco satisfies each and every limitation of, and therefore infringes, claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### e.   Claim 27

**(1)   "The method of claim 26, wherein the at least one resilient member extends helically about and along the structural portion."**

1006.   As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

1007.   Neapco inserts at least one liner of the 650 Accused Product having at least one resilient member, "wherein the at least one resilient member extends helically about and along the structural portion." (*See* '911 patent at 27.)

1008.   I understand that Neapco ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

1009.   In particular, the engineering drawing for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 650 Accused Product shows how the liners include a resilient portion, either a ███████████████████████████████ (NEAPCO000081) or a ███████████████████████████████ (NEAPCO000082), that is coupled to, and extends helically about and along the structural portion:



(NEAPCO000081.)



(NEAPCO000082.)

1010.   The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore include at least "one resilient member extends helically about and along the structural portion."  (See '911 patent at claim 27.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

1011.   Neapco satisfies each and every limitation of, and therefore infringes, claim 27 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### f.   Claim 31

**(1)   "The method of claim 26, wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."**

1012.   As I described above in reference to claim 26, Neapco satisfies each and every limitation of claim 26 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

1013.   Neapco inserts at least one liner of the 650 Accused Product having a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."  (*See* '911 patent at claim 31.)

1014.   I understand that Neapco 

1015.   In particular, the engineering drawing for the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 650 Accused Product shows how the liners include a structural portion, a tube made out of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (NEAPCO000081; NEAPCO000082.)

1016.   The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, therefore include a structural portion, "wherein the structural portion is formed of a material selected from a group consisting of cardboard, plastic resin, carbon fiber, fiberglass, metal and combinations thereof."  (*See* '911 patent at claim 31.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

1017.  Neapco satisfies each and every limitation of, and therefore infringes, claim 31 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### g.  Claim 34

### (1)  "The method of claim 22, wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node."

1018.  As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

1019.  I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

1020.  Neapco inserts at least one liner of the 650 Accused Product, "wherein a first one of the liners is positioned along the shaft member symmetrically about a bending anti-node." (*See* '911 patent at 34.)

1021.  I understand that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

1022.  In particular, Neapco engineering drawings for the 650 Accused Product illustrate the one NPFT2G-4978-DBA liner ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.



(NEAPCO000111 (engineering drawing corresponding to Neapco "TUBE & DMPR ASY" part no. NPFT2G-4A181-PA); *see also* NEAPCO000991 (same).)

1023.   The at least one liner, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners, are therefore "positioned along the shaft member symmetrically about a bending anti-node." (See '911 patent at claim 34.)

1024.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because a first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because a first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is positioned approximately at a location of an anti-node such that any difference is insubstantial.  For example, the first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner literally recited by the claim limitations.  The first one of

337

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations.  The first one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

1025.   Neapco satisfies each and every limitation of, and therefore infringes, claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### h.    Claim 35

(1)    **"The method of claim 34, wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node."**

1026.   As I described above in reference to claim 34, Neapco satisfies each and every limitation of claim 34 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

1027.   I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "bending anti-node" | Plain and ordinary meaning: a position of maximum displacement for the shaft member in a bending mode of vibration |

1028.   Neapco inserts at least one liner of the 650 Accused Products, "wherein a second one of the liners is positioned along the shaft member symmetrically about another bending anti-node." (*See* '911 patent at 35.)

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

1029.  I understand that ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

1030.  In particular, Neapco engineering drawings for the 650 Accused Product illustrate the one NPFT2G-4978-DBA liner positioned near a ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

1031.  A second one of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners is therefore "positioned along the shaft member symmetrically about another bending anti-node." ('911 patent at claim 35.)

1032.  *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are positioned along the shaft member symmetrically about a bending anti-node.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are positioned approximately at a location of an anti-node such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., attenuate vibration at a position of maximum displacement for the shaft member in a bending mode of vibration, as a liner

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

literally recited by the claim limitations. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., act as a tuned resistive and reactive absorber when located at an anti-node, as a liner literally recited by the claim limitations. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., vibration at a position of maximum displacement for the shaft member in a bending mode of vibration is attenuated, as a liner literally recited by the claim limitations.

1033.   Neapco satisfies each and every limitation of, and therefore infringes, claim 35 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### i.      Claim 36

1034.   I understand I should apply the following claim constructions for my analysis of this claim:

| Claim Element | Construction |
|---|---|
| "tuned resistive absorber for attenuating shell mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to deform as vibration energy is transmitted through the liner to absorb the vibration energy to dampen shell mode vibration |
| "shell mode vibration" | Vibration that causes the cross-section of a shaft to deflect or bend along one or more axes |
| "tuned reactive absorber for attenuating at least one of bending mode vibrations and torsion mode vibrations" | a liner having characteristics configured to match a relevant frequency or frequencies to oscillate in opposition to vibration energy to cancel out a portion of the vibration energy to dampen at least one of bending mode vibrations or torsion mode vibrations |
| "bending mode vibration" | Vibration that causes a shaft to bend |
| "torsion mode vibration" | Vibration that causes a shaft to twist |

### (1)      Corresponding claim limitations of Claim 22

1035.   Claim 36 and claim 22 of the '911 patent have many of the same claim limitations. The following table correlates the limitations of claims 22 and 36.

| Limitation of '911 patent, Claim 22 | Limitation of '911 patent, Claim 36 |
|---|---|

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

| 22[a] | 36[a] |
|-------|-------|
| 22[b] | 36[b] |
| 22[c] | 36[c] |
| 22[d] | 36[d] |
| 22[e] | 36[f] |
| 22[f] | 36[g] |

1036.   As I described above in reference to claim 22, Neapco satisfies each and every limitation of claim 22 of the '911 patent, including limitations 22[a]-[f], by at least its manufacture, offer for sale, and sale of the 650 Accused Product.  With respect to limitations 36[a]-[d] and [f]-[g], I incorporate my above analysis concerning corresponding limitations 22[a]-[f].  I address the remaining limitation of claim 36, limitation 36[e] below.

>    **(2)    36[e]: "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%"**

1037.   Neapco inserts at least one liner into the propshafts of the 650 Accused Product, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, "wherein a ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%."  (*See* '911 patent at claim 36.)

1038.   As illustrated by the engineering drawings for the 650 Accused Product, the mass of the shaft member is ███ gram.  (*See* NEAPCO000111 (engineering drawing corresponding to Neapco "Tube & DMPR ASY" part no. NPFT2G-4A181-PA for the 650 Accused Product); NEAPCO000991 (same).)  The same engineering drawings show that the total liner weight for the 650 Accused Product is ███ gram.  (NEAPCO000111; NEAPCO000991.)  The ratio of the mass of the one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners to the mass of the shaft member is therefore ███

341

*Highly Confidential* – Opening Expert Report of Christopher D. Rahn, Ph.D.

1039.   Thus, for the one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners and the shaft member of the 650 Accused Products, the "ratio of a mass of the at least one liner to a mass of the shaft member is about 5% to about 30%." (*See* '911 patent at claim 36[e].)

1040.   Neapco satisfies each and every limitation of, and therefore infringes, claim 36 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

## X.   CONCLUSION

1041.   I reserve the right to supplement, modify, or revise my opinions based on additional information that is provided to me in this litigation.

# **EXHIBIT E**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AMERICAN AXLE & MANUFACTURING, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15-1168-LPS-CJB |
| NEAPCO HOLDINGS LLC and NEAPCO DRIVELINES LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## FIRST SUPPLEMENTAL EXPERT REPORT OF CHRISTOPHER D. RAHN, PH.D.

By: _____

October 17, 2017

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

## VIII.   BACKGROUND AND SUMMARY OF THE ACCUSED PRODUCTS

31.     I have already provided a background and summary of the Accused Products, including a summary of GM's 31XXN program.  (*See, e.g.*, May 31 Report, Section VIII; July 21 Report, Section VIII.)  I incorporate by reference, and summarize below when pertinent, my prior description of the background and summary of the Accused Products.

## IX.   THE ACCUSED PRODUCTS INFRINGE THE '911 PATENT

32.     My opinion is that the Accused Products infringe certain of the New Asserted Claims of the '911 patent.  My infringement analysis is organized by groups of Accused Products and claim limitations.

### A.   The Neapco 4.5 inch Accused Products Infringe the '911 patent

33.     I understand that AAM accuses Neapco of infringing the '911 patent for at least Neapco's manufacture, sale, and offer for sale of the following 4.5 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---|---|---|---|---|
| 23214716 | 4.5 | 0.085 | 1891 | (2) NPFT2G-4978-BA |
| 84059642 | 4.5 | 0.085 | 1891 | (2) NPFT2G-4978-BA |
| 84148488 | 4.5 | 0.085 | 1891 | (2) NPFT2G-4978-BA |
| 23464082 | 4.5 | 0.085 | 1799 | (2) NPFT2G-4978-BA |
| 84059645 | 4.5 | 0.085 | 1799 | (2) NPFT2G-4978-BA |

34.     As I describe more fully below, my opinion is that the foregoing Neapco 4.5 Accused Products listed above each infringe claims 1-6, 12, 13, 19-21 of the '911 patent.

### 1.   GM part nos. 84148488, 23214716, and 84059642 (4.5" x 0.085" x 1891 mm)

35.     As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 488 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 488 Accused Product would produce the same, or substantially the same, results as modal analysis

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

testing of the 716 and 642 Accused Products.  Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 488 Accused Product for each of the 488 Accused Product, 716 Accused Product, and 642 Accused Product.

36.　　As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of the 488 Accused Product, 716 Accused Product, and 642 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 378-81, 478-79 | ¶ 124 |
| 1[b] | 22[b], 36[b] | ¶¶ 382-85, 478-79 | ¶ 124 |
| 1[d] | 22[d], 36[d] | ¶¶ 394-97, 478-79 | ¶ 124 |
| 5 | 23 | ¶¶ 432-36 | ¶¶ 144-48 |
| 6 | 24 | ¶¶ 437-41 | ¶¶ 144-48 |
| 12 | 26 | ¶¶ 442-48 | ¶¶ 149-50 |
| 13 | 27 | ¶¶ 449-54 | ¶¶ 149-50 |
| 19 | 31 | ¶¶ 455-60 | ¶¶ 149-50 |
| 20 | 34 | ¶¶ 461-68 | ¶¶ 149-50 |
| 21 | 35 | ¶¶ 469-76 | ¶¶ 149-50 |

37.　　As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-4 for each of the 488 Accused Product, 716 Accused Product, and 642 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

    a.  **Claim 1**

      (1)  **1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"**

38. Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 1[c].)

39. I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

40. I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 386-93, 478-79; July 21 Report ¶¶ 125-29.)

41. In those reports, I described how Neapco engineering drawings confirm that the 488, 716, and 642 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-BA and Neapco controls the characteristics of the NPFT2G-4978-BA liners by controlling its material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-BA liners of the 488, 716, and 642 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

42.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-BA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and 642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

43.    Neapco therefore satisfies the 1[c] limitation for the 488, 716, and 642 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

44.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 1[e].)

45.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how

14

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 398-413, 478-79; July 21 Report ¶¶ 130-137.)

46.     In those reports, I described how the NPFT2G-4978-BA liners match a relevant shell mode frequency of the propshafts of the 488, 716, and 642 Accused Products.  In particular,

████████████████████████████████████████████████████████████████

██████████████████████████████████ (Ex. C).  In those reports, I also described how the NPFT2G-4978-BA liners are configured to damp shell mode vibrations of the propshaft ████ ████████████  For example, the FRF data for the 488 Accused Product (reproduced below) illustrates an amplitude reduction due to the significant damping of the ████████████ ███████████████████████  In those reports, I also described how the propshaft of the 488 Accused Product with its NPFT2G-4978-BA liners has a ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████

████████████████████████████████████████████████████████████

47.     I further note that that the ████████████████████████████████ ████████████████████████████████████████████████████████████████

15

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

48.      Neapco therefore satisfies the 1[e] limitation for the 488, 716, and 642 Accused

Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft

member such that "the at least one liner is configured to damp shell mode vibrations in the shaft

member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

> **(3)      1[f]: "the at least one liner is also configured to damp
> bending mode vibrations in the shaft member, the at
> least one liner being tuned to within about ±20% of a
> bending mode natural frequency of the shaft assembly
> as installed in the driveline system."**

49.      Neapco positions at least one liner within the shaft member such that "the at least

one liner is also configured to damp bending mode vibrations in the shaft member, the at least

one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft

assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused

Products. (*See* '911 patent at claim 1[f].)

50.      I incorporate herein by reference my analysis of Original Asserted Claim

limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how

Neapco satisfies those limitations for each of the 488, 716, and 642 Accused Products. (*See,

e.g.*, May 31 Report ¶¶ 414-31, 478-79; July 21 Report ¶¶ 138-43.)

51.      In those reports, I described how the NPFT2G-4978-BA liners match a relevant

bending mode frequency of the propshafts of the 488, 716, and 642 Accused Products. █

████████████████████████████████████████████████

████████████████████████████████████████████████

16

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



52.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 488, 716, and 642 Accused Products because the NPFT2G-4978-BA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 488, 716, and

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

642 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   The NPFT2G-4978-BA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

53.    Neapco therefore satisfies the 1[f] limitation for the 488, 716, and 642 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent, claim 1[f].)

54.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

      **b.**     **Claim 2**

      **(1)**    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

55.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

56.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products. (*See* '911 patent at claim 2.)

57.    As I described above in reference to limitation 1[f], the ████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████

58.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 2.)

59.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

      **c.**     **Claim 3**

      **(1)**    **"The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

19

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

60.     As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

61.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 3.)

62.     As I described above in reference to limitation 1[f] and 2, ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

63.     Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 3.)

64.     Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

> **d.     Claim 4**
>
> **(1)     "The method of claim 3, wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

65.     As I described above in reference to claim 3, Neapco satisfies each and every limitation of claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

66.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 488, 716, and 642 Accused Products.  (*See* '911 patent at claim 4.)

67.     As I described above in reference to limitation 1[f], 2, and 3, ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

68.     Neapco therefore satisfies the additional limitation of claim 4, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 4.)

69.     Neapco satisfies each and every limitation of, and therefore infringes, claim 4 of the '911 patent by at least its manufacture, offer for sale, and sale of the 488, 716, and 642 Accused Products.

**2.      GM part nos. 84059645 and 23464082 (4.5" x 0.085" x 1799 mm)**

70.     As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 645 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 645 Accused Product modal analysis testing of the 082 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 645 Accused Product.  Therefore, where applicable, rely on the results of B&K's modal analysis testing of the 645 Accused Product for both the 645 Accused Product and 082 Accused Product.

71.     As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of the 645 Accused Product and 082 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 486-89, 586-87 | ¶ 153 |
| 1[b] | 22[b], 36[b] | ¶¶ 490-93, 586-87 | ¶ 153 |
| 1[d] | 22[d], 36[d] | ¶¶ 502-05, 586-87 | ¶ 153 |
| 5 | 23 | ¶¶ 540-44 | ¶¶ 173-77 |
| 6 | 24 | ¶¶ 545-49 | ¶¶ 173-77 |
| 12 | 26 | ¶¶ 550-56 | ¶¶ 178-79 |
| 13 | 27 | ¶¶ 557-62 | ¶¶ 178-79 |
| 19 | 31 | ¶¶ 563-68 | ¶¶ 178-79 |
| 20 | 34 | ¶¶ 569-76 | ¶¶ 178-79 |
| 21 | 35 | ¶¶ 577-584 | ¶¶ 178-79 |

72.     As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-4 for each of the 645 Accused Product and 082 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

        **a.**    **Claim 1**

        **(1)**    **1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"**

73.     Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 1[c].)

74.     I understand I should apply the following claim constructions for my analysis of this claim limitation:

22

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

75.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 494-501, 585-87; July 21 Report ¶¶ 154-58.)

76.     In those reports, I described how Neapco engineering drawings confirm that the 645 and 082 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-BA and Neapco controls the characteristics of the NPFT2G-4978-BA liners by controlling its material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-BA liners of the 645 and 082 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

77.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-BA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration

23

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

78.     Neapco therefore satisfies the 1[c] limitation for the 645 and 082 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)     1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

79.     Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 1[e].)

80.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 506-21, 585-87; July 21 Report ¶¶ 159-66.)

81.     In those reports, I described how the NPFT2G-4978-BA liners match a relevant shell mode frequency of the propshafts of the 645 and 082 Accused Products.  ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



82.    I further note that the ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

83.    Neapco therefore satisfies the 1[e] limitation for the 645 and 082 Accused Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%."  ('911 patent, claim 1[e].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

> **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

84.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products. (*See* '911 patent at claim 1[f].)

85.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 645 and 082 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 522-39, 585-87; July 21 Report ¶¶ 167-72.)

86.    In those reports, I described how the NPFT2G-4978-BA liners match a relevant bending mode frequency of the propshafts of the 645 and 082 Accused Products.  In particular,

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



87.     *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 645 and 082 Accused Products because the NPFT2G-4978-BA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 645 and 082 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-BA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-BA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-BA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft

assembly as installed in the driveline system. The NPFT2G-4978-BA liners achieve

substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating

bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the

claim limitations.

88.     Neapco therefore satisfies the 1[f] limitation for the 645 and 082 Accused

Products by positioning at least one liner, namely two NPFT2G-4978-BA liners, into the shaft

member such that "the at least one liner is also configured to damp bending mode vibrations in

the shaft member, the at least one liner being tuned to within about ±20% of a bending mode

natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim

1[f].)

89.     Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of

the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused

Products.

          **b.**     **Claim 2**

                **(1)**    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

90.     As I described above in reference to claim 1, Neapco satisfies each and every

limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the

645 and 082 Accused Products.

91.     Neapco positions at least one liner within the shaft member, "wherein the at least

one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

installed in the driveline system" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 2.)

92.     As I described above in reference to limitation 1[f], the 

93.     Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

94.     Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

### c.     Claim 3

(1)     **"The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

95.     As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

96.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 3.)

97.     As I described above in reference to limitation 1[f] and 2,

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

██████████████████████████████████████████████████████

████████████

98.     Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 3.)

99.     Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

        **d.     Claim 4**

                **(1)     "The method of claim 3, wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

100.    As I described above in reference to claim 3, Neapco satisfies each and every limitation of claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

101.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 645 and 082 Accused Products.  (*See* '911 patent at claim 4.)

102.    As I described above in reference to limitation 1[f], 2, and 3, the ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

103.    Neapco therefore satisfies the additional limitation of claim 4, "wherein the at least one liner is tuned to within ±5% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 4.)

104.    Neapco satisfies each and every limitation of, and therefore infringes, claim 4 of the '911 patent by at least its manufacture, offer for sale, and sale of the 645 and 082 Accused Products.

**B.      The Neapco 5.0 inch Accused Products Infringe the '911 patent**

105.    I understand that AAM accuses Neapco of infringing the '911 patent for Neapco's manufacture, sale, and offer for sale of the following 5.0 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---------------|------------------------|-------------------------|--------------------|-------------------------------|
| 94769073 | 5.0 | 0.080 | 1956 | (2) NPFT2G-4978-CA |
| 84059646 | 5.0 | 0.080 | 1956 | (2) NPFT2G-4978-CA |

106.    As I describe more fully below, my opinion is that the Neapco 5.0 Accused Products listed above each infringe claims 1-2 of the '911 patent.

**1.      GM part nos. 84059646 and 94769073 (5.0" x 0.080" x 1956 mm)**

107.    As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 646 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 073 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 646 Accused Product.  Therefore, where applicable, rely on the results of B&K's modal analysis testing of the 646 Accused Product for both the 646 Accused Product and 073 Accused Product.

108.    As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of the 646 Accused Product and 073 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 595-98, 694-96 | ¶ 184 |
| 1[b] | 22[b], 36[b] | ¶¶ 599-602, 694-96 | ¶ 184 |
| 1[d] | 22[d], 36[d] | ¶¶ 611-614, 694-96 | ¶ 184 |

109.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2 for each of the 646 Accused Product and 073 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1 and 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### a.    Claim 1

#### (1)    1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

110.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 646 and 073 Accused Products.  (*See* '911 patent at claim 1[c].)

111.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

112.   I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 603-10, 694-96; July 21 Report ¶¶ 185-89.)

113.   In those reports, I described how Neapco engineering drawings confirm that the 646 and 073 Accused Products comprise two liners identified by liner part no. NPFT2G-4978-CA and Neapco controls the characteristics of the NPFT2G-4978-CA liners by controlling its material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-CA liners of the 646 and 073 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

114.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-CA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

33

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

115.    Neapco therefore satisfies the 1[c] limitation for the 646 and 073 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

>               (2)     **1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

116.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 646 and 073 Accused Products.  (*See* '911 patent at claim 1[e].)

117.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 615-30, 694-96; July 21 Report ¶¶ 190-98.)

118.    In those reports, I described how the NPFT2G-4978-CA liners match a relevant shell mode frequency of the propshafts of the 646 and 073 Accused Products.  In particular, the

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



119.    Neapco therefore satisfies the 1[e] limitation for the 646 and 073 Accused Products by positioning at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

>               **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

120.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 646 and 073 Accused Products. (*See* '911 patent at claim 1[f].)

121.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

Neapco satisfies those limitations for each of the 646 and 073 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 631-48, 694-96; July 21 Report ¶¶ 199-210.)

122.    In those reports, I described how the NPFT2G-4978-CA liners match a relevant bending mode frequency of the propshafts of the 646 and 073 Accused Products.  In particular,

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



123.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 646 and 073 Accused Products because the NPFT2G-4978-CA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 646 and 073 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-CA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-CA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-CA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   The NPFT2G-4978-CA liners achieve

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

124.    Neapco therefore satisfies the 1[f] limitation for the 646 and 073 Accused Products by positioning at least one liner, namely two NPFT2G-4978-CA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

125.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### b.    Claim 2

#### (1)    "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."

126.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

127.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 646 and 073 Accused Products.  (*See* '911 patent at claim 2.)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

128.    As I described above in reference to limitation 1[f], the ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████

129.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

130.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 646 and 073 Accused Products.

### C.    The Neapco 5.775 inch Accused Products Infringe the '911 patent

131.    I understand that AAM accuses Neapco of infringing the '911 patent for Neapco's manufacture, sale, and offer for sale of the following 5.775 inch propshafts with liners:

| (GM Part No.) | Shaft Diameter (inch) | Shaft Thickness (inch) | Shaft Length (mm) | Liner(s) (Quantity; Part No.) |
|---|---|---|---|---|
| 23225169 | 5.775 | 0.079 | 2222 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059643 | 5.775 | 0.079 | 2222 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23253781 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84059644 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 84148489 | 5.775 | 0.079 | 2200 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |
| 23377650 | 5.775 | 0.079 | 2172 | (1) NPFT2G-4978-DBA; (2) NPFT2G-4978-DCA |

132.    As I describe more fully below, my opinion is that the following Neapco 5.775 Accused Products listed above each infringe claims 1-3, 5, 6, 12, 13, 19-21 of the '911 patent:

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

169, 643, 781, 644, 489 Accused Products.  As I describe more fully below, my opinion is that the 650 Accused Product infringes claims 1-2 of the '911 patent.

> **1.      GM part nos. 84059643 and 23225169 (5.775" x 0.079" x 2222 mm)**

133.    As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 643 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 169 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 643 Accused Product.  Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 643 Accused Product for both the 643 Accused Product and the 169 Accused Product.

134.    As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of the 643 Accused Product and the 169 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 704-707, 811-12 | ¶ 222 |
| 1[b] | 22[b], 36[b] | ¶¶ 708-11, 811-12 | ¶ 222 |
| 1[d] | 22[d], 36[d] | ¶¶ 721-24, 811-12 | ¶ 222 |
| 5 | 23 | ¶¶ 765-69 | ¶¶ 249-53 |
| 6 | 24 | ¶¶ 770-74 | ¶¶ 249-53 |
| 12 | 26 | ¶¶ 775-81 | ¶¶ 254-55 |
| 13 | 27 | ¶¶ 782-87 | ¶¶ 254-55 |
| 19 | 31 | ¶¶ 788-93 | ¶¶ 254-55 |
| 20 | 34 | ¶¶ 794-801 | ¶¶ 254-55 |
| 21 | 35 | ¶¶ 802-809 | ¶¶ 254-55 |

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

135.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-3 for each of the 643 Accused Product and the 169 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-3, 5, 6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

<div align="center">

**a.      Claim 1**

**(1)      1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"**

</div>

136.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 1[c].)

137.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

138.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 712-20, 810-812; July 21 Report ¶¶ 223-27.)

139.    In those reports, I described how Neapco engineering drawings confirm that the 643 and 169 Accused Products comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA, and Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners

<div align="center">41</div>

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

by controlling their material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 643 and 169 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

140.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

141.    Neapco therefore satisfies the 1[c] limitation for the 643 and 169 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

142.     Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 1[e].)

143.     I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 725-43, 810-12; July 21 Report ¶¶ 228-36.)

144.     In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 643 and 169 Accused Products.   In particular, the

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



145.    Neapco therefore satisfies the 1[e] limitation for the 643 and 169 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

> **(3)    1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

146.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 643 and 169 Accused Products. (*See* '911 patent at claim 1[f].)

44

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

147.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 643 and 169 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 744-64, 810-12; July 21 Report ¶¶ 237-48.)

148.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products.  For example, the ████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



149.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 643 and 169 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.   To the extent that Neapco does not literally satisfy this limitation for the 643 and 169 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.   For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.   The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending

46

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

150.     Neapco therefore satisfies the 1[f] limitation for the 643 and 169 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

151.     Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

       **b.**       **Claim 2**

              **(1)**     **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

152.     As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

153.     Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

installed in the driveline system" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 2.)

154.    As I described above in reference to limitation 1[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products.  For example, the ███████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████

155.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

156.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

        **c.**       **Claim 3**

        **(1)**    **"The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

157.    As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

158.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 643 and 169 Accused Products.  (*See* '911 patent at claim 3.)

48

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

159.   As I described above in reference to limitation 1[f] and 2, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 643 and 169 Accused Products.  For example, the ████████████████████

████████████████████████████████████████████████

████████████████████████████████████

160.   Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 3.)

161.   Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 643 and 169 Accused Products.

### 2.     GM part nos. 84148489, 84059644, and 23253781 (5.775" x 0.079" x 2200 mm)

162.   As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 489 Accused Product.  As I described in my May 31 Report, modal analysis testing of the 489 Accused Product would produce the same, or substantially the same, results as modal analysis testing of the 644 and 781 Accused Products.  Therefore, where applicable, I rely on the results of B&K's modal analysis testing of the 489 Accused Product for each of the 489, 644, and 781 Accused Products.

163.   As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for each of 489, 644, and 781 Accused Products.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 818-21, 922-24 | ¶ 258 |
| 1[b] | 22[b], 36[b] | ¶¶ 822-25, 922-24 | ¶ 258 |
| 1[d] | 22[d], 36[d] | ¶¶ 835-38, 922-24 | ¶ 258 |
| 5 | 23 | ¶¶ 877-81 | ¶¶ 275-79 |
| 6 | 24 | ¶¶ 882-86 | ¶¶ 275-79 |
| 12 | 26 | ¶¶ 887-93 | ¶¶ 280-81 |
| 13 | 27 | ¶¶ 894-99 | ¶¶ 280-81 |
| 19 | 31 | ¶¶ 900-905 | ¶¶ 280-81 |
| 20 | 34 | ¶¶ 906-13 | ¶¶ 280-81 |
| 21 | 35 | ¶¶ 914-21 | ¶¶ 280-81 |

164.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2-3 for each of the 489, 644, and 781 Accused Products.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1-3, 5, 6, 12, 13, 19-21 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

### a.    Claim 1

#### (1)    1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

165.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[c].)

166.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two |

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

| | types of vibration transmitted through the shaft member |
|---|---|

167.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 826-34, 922-24; July 21 Report ¶¶ 259-63.)

168.    In those reports, I described how Neapco engineering drawings confirm that the 489, 644, and 781 Accused Products comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA, and Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 489, 644, and 781 Accused Products configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

169.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial. I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report. (*See, e.g.*, July 21 Report ¶¶ 310-13.)

170. Neapco therefore satisfies the 1[c] limitation for the 489, 644, and 781 Accused Products by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member." ('911 patent, claim 1[c].)

> **(2)** **1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

171. Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for each of the 489, 644, and 781 Accused Products. (*See* '911 patent at claim 1[e].)

172. I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products. (*See, e.g.*, May 31 Report ¶¶ 839-57, 922-24; July 21 Report ¶¶ 269-74.)

173. In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 489, 644, and 781 Accused Products. For example, the

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



174.    Neapco therefore satisfies the 1[e] limitation for the 489, 644, and 781 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

                  **(3)**     **1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

175.   Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 1[f].)

176.   I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 489, 644, and 781 Accused Products.  (*See, e.g.*, May 31 Report ¶¶ 858-76, 922-24; July 21 Report ¶¶ 269-74.)

177.   In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 489, 644, and 781 Accused Products.  For example, █████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



178.  *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 489, 644, and 781 Accused Products because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 489, 644, and 781 Accused Products, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

relevant frequency or frequencies, as a liner literally recited by the claim limitations. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

179. Neapco therefore satisfies the 1[f] limitation for the 489, 644, and 781 Accused Products by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

180. Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

        **b.**    **Claim 2**

            **(1)**    **"The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

181. As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

182.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 2.)

183.    As I described above in reference to limitation 1[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 489, 644, and 781 Accused Products.  For example, ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████

184.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

185.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

       **c.    Claim 3**

          (1)    **"The method of claim 2, wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

186.    As I described above in reference to claim 2, Neapco satisfies each and every limitation of claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

187.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system" for each of the 489, 644, and 781 Accused Products.  (*See* '911 patent at claim 3.)

188.    As I described above in reference to limitation 1[f] and 2, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 489, 644, and 781 Accused Products.  For example, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

189.    Neapco therefore satisfies the additional limitation of claim 3, "wherein the at least one liner is tuned to within ±10% of the bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent at claim 3.)

190.    Neapco satisfies each and every limitation of, and therefore infringes, claim 3 of the '911 patent by at least its manufacture, offer for sale, and sale of the 489, 644, and 781 Accused Products.

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

### 3.    GM part no. 23377650 (5.775" x 0.079" x 2172 mm)

191.    As described herein and in my May 31 Report and July 21 Report, I rely, in part, on the modal analysis testing results from B&K.  I asked B&K to perform testing on the 650 Accused Product.

192.    As described above in reference to Table 2, the New Asserted Claims have many of the same claim limitations as the Original Asserted Claims.  I incorporate herein by reference my analysis of Original Asserted Claims limitations 22[a]/36[a], 22[b]/36[b], 22[d]/36[d], 23, 24, 26, 27, 31, 34, and 35 in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations (and the corresponding limitations of the New Asserted Claims) for the 650 Accused Product.

| Limitation of New Asserted Claims | Limitation of Original Asserted Claims | May 31 Report | July 21 Report |
|---|---|---|---|
| 1[a] | 22[a], 36[a] | ¶¶ 930-33 | ¶ 284 |
| 1[b] | 22[b], 36[b] | ¶¶ 934-37 | ¶ 284 |
| 1[d] | 22[d], 36[d] | ¶¶ 946-49 | ¶ 284 |

193.    As set forth below, Neapco also satisfies limitations 1[c], 1[e], 1[f], and 2 for the 650 Accused Product.  Accordingly, Neapco satisfies each and every limitation of, and therefore infringes, claims 1 and 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

### a.    Claim 1

#### (1)    1[c]: "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member"

194.    Neapco satisfies limitation 1[c], "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" for the 650 Accused Product.  (*See* '911 patent at claim 1[c].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

195.    I understand I should apply the following claim constructions for my analysis of this claim limitation:

| Claim Element | Construction |
|---|---|
| "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member" | controlling characteristics of at least one liner to configure the liner to match a relevant frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member |

196.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[c] and 36[c] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 938-45, 1034-36; July 21 Report ¶¶ 285-89.)

197.    In those reports, I described how Neapco engineering drawings confirm that the 650 Accused Product comprise three liners, one liner identified by liner part no. NPFT2G-4978-DBA and two liners identified by liner part no. NPFT2G-4978-DCA, and Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners by controlling their material properties and dimensions.  As I described in my May 31 Report and July 21 Report and as I describe below in reference to limitation 1[e] and 1[f], Neapco's control of the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners of the 650 Accused Product configure those liners to match a relevant frequency or frequencies, i.e., at least one shell mode and bending mode, to reduce at least two types of vibration transmitted through the shaft member, i.e., shell mode vibration and bending mode vibration transmitted through the shaft member.

198.    *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because Neapco controls the characteristics of the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners to configure the liners to match a relevant

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

frequency or frequencies to reduce at least two types of vibration transmitted through the shaft member.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  I further incorporate herein by reference my doctrine of equivalents analysis set forth in my July 21 Report.  (*See, e.g.*, July 21 Report ¶¶ 310-13.)

199.    Neapco therefore satisfies the 1[c] limitation for the 650 Accused Product by "tuning at least one liner to attenuate at least two types of vibration transmitted through the shaft member."  ('911 patent, claim 1[c].)

> **(2)    1[e]: "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%"**

200.    Neapco positions at least one liner within the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%" for the 650 Accused Product.  (*See* '911 patent at claim 1[e].)

201.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[e] and 36[f] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 950-68, 1034-36; July 21 Report ¶¶ 290-94.)

202.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant shell mode frequency of the propshafts of the 650 Accused Product. For example,

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



203.    Neapco therefore satisfies the 1[e] limitation for the 650 Accused Product by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is configured to damp shell mode vibrations in the shaft member by an amount that is greater than or equal to about 2%." ('911 patent, claim 1[e].)

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

> **(3)** **1[f]: "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system."**

204.    Neapco positions at least one liner within the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system" for the 650 Accused Product.  (*See* '911 patent at claim 1[f].)

205.    I incorporate herein by reference my analysis of Original Asserted Claim limitations 22[f] and 36[g] in my May 31 Report and July 21 Report, wherein I set forth how Neapco satisfies those limitations for each of the 650 Accused Product.  (*See, e.g.*, May 31 Report ¶¶ 969-88, 1034-36; July 21 Report ¶¶ 295-300.)

206.    In those reports, I described how the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 650 Accused Product.  For example, the ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.



207.   *Doctrine of Equivalents*: My opinion is that Neapco literally satisfies this limitation for the 650 Accused Product because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to damp bending mode vibrations in the shaft member, and are tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system.  To the extent that Neapco does not literally satisfy this limitation for the 650 Accused Product, Neapco satisfies this limitation under the doctrine of equivalents because the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners are configured to substantially match a relevant frequency or frequencies and attenuate vibration at a relevant frequency or frequencies such that any difference is insubstantial.  For example, the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners perform substantially the same function, e.g., substantially match a relevant frequency or frequencies and attenuate vibration at the relevant frequency or frequencies, as a liner literally recited by the claim limitations.  The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners function in substantially the same way, e.g., having a liner with controlled

64

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

characteristics, including mass and stiffness, to damp bending mode vibrations and be tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system. The NPFT2G-4978-DBA and NPFT2G-4978-DCA liners achieve substantially the same result, e.g., matching a relevant frequency or frequencies and attenuating bending mode vibrations at a relevant frequency or frequencies, as a liner literally recited by the claim limitations.

208.    Neapco therefore satisfies the 1[f] limitation for the 650 Accused Product by positioning at least one liner, namely one NPFT2G-4978-DBA liner and two NPFT2G-4978-DCA liners, into the shaft member such that "the at least one liner is also configured to damp bending mode vibrations in the shaft member, the at least one liner being tuned to within about ±20% of a bending mode natural frequency of the shaft assembly as installed in the driveline system." ('911 patent, claim 1[f].)

209.    Neapco satisfies each and every limitation of, and therefore infringes, claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

> **b.    Claim 2**
>
> > **(1)    "The method of claim 1, wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."**

210.    As I described above in reference to claim 1, Neapco satisfies each and every limitation of claim 1 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

211.    Neapco positions at least one liner within the shaft member, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as

*Highly Confidential* – First Supplemental Expert Report of Christopher D. Rahn, Ph.D.

installed in the driveline system" for each of the 650 Accused Product.  (*See* '911 patent at claim 2.)

212.    As I described above in reference to limitation 1[f], the NPFT2G-4978-DBA and NPFT2G-4978-DCA liners match a relevant bending mode frequency of the propshafts of the 650 Accused Product.  For example, █████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████

213.    Neapco therefore satisfies the additional limitation of claim 2, "wherein the at least one liner is tuned within ±15% of the bending mode natural frequency of the shaft assembly as installed in the driveline system."  ('911 patent at claim 2.)

214.    Neapco satisfies each and every limitation of, and therefore infringes, claim 2 of the '911 patent by at least its manufacture, offer for sale, and sale of the 650 Accused Product.

## X.    CONCLUSION

215.    I reserve the right to supplement, modify, or revise my opinions based on additional information that is provided to me in this litigation.